## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: **Daryle McNelis v. Pennsylvania Power & Light Susquehanna**

USCA NO.: 16-3883

LOWER COURT or AGENCY and DOCKET NUMBER:
Middle District of Pennsylvania, 4:CV13-2612

NAME OF JUDGE: Matthew W. Brann

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

Daryle McNelis sued his former employer Pennsylvania Power & Light Susquwhanna, for its temirnation of his employment on the basis of its erroneous perception that he had a disability in violation of the Americans with Disabilities Act (ADA), the Rehabilitation Act, the Pennsylvania Human Relations Act, and the Family and Medical Leave Act. He has requested an award of back pay, reinstatement and/or front pay, compensatory damages for his emotional distress, punitive damages, and an award of attorneys' fees and costs. Mr. McNelis has filed this appeal of the district court's adoption of the Magistrate's Report and recommendation that the Defendant's Motion for Summary Judgment be granted and its entry of Judgment in favor of the Defendant

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

1) Magistrate's Report and Recommendation that Defendant's Motion for Summary Judgment be Granted;
2) District Court's Memorandum Adopting the Magistrate's Report and Recommendation;
3) District Court's Order Dismissing the case; and
4) District Court's Entry of Judgment in favor of the Defendant.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

In April of 2012 McNelis notified PPL of his need for inpatient treatment for sleep problems. Unbeknownst to him he had already been referred to PPL's Behavioral Observation Program (BOP), in part, due to an unsubstantiated rumor that he had caused a local school lockdown.  He was successfully treated for the sleep issues and released from the hospital to return to work with no restrictions. McNelis then fully cooperated with the BOP process.  There had also been rumors at the time that he was using illegal bath salts. PPL's psychologist found that he was not suffering from any clinical psychological condition and there was no evidence of use of illegal drugs. The only thing preventing McNelis from returning to work was the requirement that he submit to an evaluation for alcohol abuse by the psychologist. Prior to that date (and afterwards too) everyone who had been in the BOP had been allowed to get an evaluation - instead McNelis was summarily fired. The purported reasons for his firing were the finding that he was "unfit for duty" even though there was no finding that he was permanently "unfit for duty" and his purported failure to be "forthcoming" with a manager about the school lockdown (of which he had no knowledge). The way McNelis was treated was rife with procedural irregularities. A reasonable jury of his peers could find that PPL erroneously regarded him as having a disability when he had none, and that it terminated his employment because of those perceptions.

PPL moved for summary judgment on June 18, 2015. The Magistrate recommended that its' motion be granted on March 23, 2016.  The District Court denied plaintiff's objections and adopted the Magistrate's R&R on September 19, 2016 and dismissed the case and entered judgment for PPL that same day.

Identify the issues to be raised on appeal:

1) Whether the Court erred in finding that plaintiff was not a qualified individual with a disability based upon his loss of access to the power plant;
2) Whether the court erred in relying on the 3rd Circuit's holding in Lauren W. v. DeFlaminis, 480 F.3d 259 (3d Cir. 2007), when it failed to consider that a jury could find that defendant's employees were not being truthful, in contravention  of the U.S. Supreme Court's opinion in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000); and
3) Whether the court erred by failing to consider the facts in a light most favorable to the plaintiff, as the non-moving party, as it is required to do at summary judgment;
4) Whether the Court erred in finding that plaintiff's statement at the time of his deposition that he did not have any evidence of Dr. Thompson's lack of truthfulness was a binding admission even though discovery had not been completed, and even though plaintiff is not a trained lawyer, in contravention of the holding of Surowitz v. Hilton Hotels Corp., 383 U.S. 363 (1963).

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this __30th__ day of __October__ ,20__16__ .

*Ralph C. Forman*

Signature of Counsel

Rev. 07/2015

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYLE MCNELIS, | : | CIVIL NO: 4:13-CV-02612 |
| | : | |
| Plaintiff | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| PENNSYLVANIA POWER & | : | |
| LIGHT, SUSQUEHANNA, LLC, | : | |
| | : | |
| Defendant | : | |
| | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

In this employment discrimination case, the plaintiff, Daryle McNelis,

claims that the defendant, Pennsylvania Power & Light, Susquehanna, LLC (PPL),

violated the Americans with Disabilities Act, the Rehabilitation Act, the

Pennsylvania Human Relations Act, and the Family and Medical Leave Act.

Currently pending is PPL's motion for summary judgment. For the reasons

discussed below, we recommend that PPL's motion for summary judgment be

granted. We also recommend that PPL's motion to preclude the testimony of

McNelis's vocational expert be denied without prejudice to PPL refiling such

motion should the district court conclude that PPL is not entitled to summary

judgment.

## II. Background and Procedural History.

McNelis began this action by filing a *pro se* complaint. Counsel later entered an appearance on behalf of McNelis and filed an amended complaint and then a second amended complaint. McNelis, who worked as a Nuclear Security Officer at PPL's Susquehanna Steam Electric Station, claims that PPL denied him access to the Station and terminated his employment after a coworker expressed safety concerns about him, after he was hospitalized, and after a psychologist determined, erroneously according to McNelis, that he was not fit for duty pending an alcohol assessment and possibly treatment for alcohol issues. Although McNelis contends that he then obtained a letter from a rehabilitation counselor stating that he did not meet the criteria for alcohol treatment, his appeal of the revocation of his access to the station was nevertheless denied. McNelis claims that PPL, which erroneously regarded him as disabled due to a false perception about his mental health and/or whether he was an alcoholic, violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*,[5] the Rehabilitation Act (RA), 29 U.S.C. § 794 *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.* He also claims that PPL violated the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, by failing to

---

[5] References to the ADA are references to the ADA as amended by the ADA Amendments Act of 2008 (ADAAA), which became effective on January 1, 2009. *See* Pub.L. No. 110–325, 122 Stat. 3553 (codified at 42 U.S.C. § 12101 *et seq.*).

provide him with necessary FMLA paperwork after he requested such, by refusing

allow him to return to work, and by firing him.

PPL filed an answer to the second amended complaint, and the parties

engaged in discovery, which at times was contentious and required the intervention

of the undersigned.  In June of 2015, the defendant filed a motion for summary

judgment, and in August of 2015, it filed a motion to preclude the testimony of

McNelis's vocational expert.  After those motions were fully briefed, the case was

referred, with the agreement of the parties, to Chief Magistrate Judge Carlson for a

settlement conference.  Although a settlement was not reached at the settlement

conference, after the conference Judge Carlson reached out to the parties in a

further attempt to settle the case.  Having recently been informed by Judge Carlson

that the parties have not settled the case, we turn now to the pending motion for

summary judgment and motion to preclude McNelis's vocational expert.

## III.  Summary Judgment Standards.

PPL moves for summary judgment under Rule 56(a) of the Federal Rules of

Civil Procedure, which provides that "[t]he court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Through summary adjudication the court may dispose of those claims that do not

present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether

5

there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV. Material Facts.

A party who seeks to resist a summary judgment motion must comply with

Local Rule 56.1, which specifically provides that "[s]tatements of material facts in

support of, or in opposition to, a motion shall include references to the parts of the

record that support the statements" and that "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed admitted

unless controverted by the statement required to be served by the opposing party."

Under this Rule, the failure to appropriately challenge the material facts tendered

by the defendant means that those facts must be deemed admitted.  Further, a party

opposing a motion for summary judgment may not "rely merely upon bare

assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v.

DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Rather, "[o]nce the moving party has

supplied sufficient affidavits in support of its motion, the opposing party must

respond by supplementing the record in some manner—whether by its own

affidavits or otherwise—setting forth specific facts demonstrating that there is a

genuinely disputed factual issue for trial." *Id.*  In accordance with the standard of

review for a motion for summary judgment, the following facts are either

undisputed or are the version of the facts asserted by McNelis, the nonmoving party.[6]

## A. NRC Regulations and PPL Policies Regarding Fitness for Duty.

PPL operates the Susquehanna Steam Electric Station, which is a nuclear power plant. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶1 and *Doc. 63* (*Plaintiff's Statement of Additional Material Facts in Support of His Opposition to Defendant's Motion for Summary Judgment and His Response to Defendant's Statement of Undisputed Material Facts—section titled Response to Defendant's Statement of Undisputed Material Facts*) (hereinafter *Plaintiff's Response*) at ¶1. The Nuclear Regulatory Commission (NRC) requires that all nuclear power plants adopt Fitness for Duty (FFD) programs that prescribe, among other things, unescorted access requirements for employees entering upon secured and vital areas of the nuclear facility. *Id.* at ¶2. NRC licensees authorized to operate a nuclear power reactor are required "to provide high assurance that individuals granted unescorted access are trustworthy and reliable and do not constitute an unreasonable risk to public health

---

[6] PPL sets forth 186 statements of fact, and McNelis sets forth an additional 295 statements of fact. Given our determination that PPL is entitled to summary judgment as to certain claims for certain reasons, we do not address all the arguments by PPL for summary judgment, and we set forth only those facts that are material to the issues we address in this Report an Recommendation.

and safety." *Id.* at ¶3.  NRC licensees authorized to operate a nuclear power reactor must also "[p]rovide reasonable measures for the early detection of persons who are not fit to perform the duties that require them to be subject to the FFD program." *Id.* at ¶4.

NRC regulations require that a nuclear power plant's unescorted-access-authorization program include a background investigation, psychological assessment, and behavioral observation of individuals to be granted unescorted access. *Id.* at ¶5.  NRC regulations further require that a nuclear power plant's unescorted-access-authorization program include "[b]ehavioral observation, conducted by supervisors and management personnel, designed to detect individual behavioral changes." *Id.* at ¶6.  Potentially disqualifying behaviors include those "that may indicate possible use, sale, or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security." *Id.* at ¶7.  Where an individual's fitness is questionable, a licensee "shall take immediate action to prevent the individual" from continuing to perform his or her job duties. *Id.* at ¶8.

NRC regulations also require the implementation of a review procedure for denials or revocations of unescorted access authorization, and they set forth minimum standards for such a procedure. *Id.* at ¶9.  "The procedure must provide

9

that the employee is informed of the grounds for denial or revocation and allow the

employee an opportunity to provide additional relevant information, and provide

an opportunity for an objective review of the information on which the denial or

revocation was based. The procedure may be an impartial and independent

internal management review." *Id.*

PPL's Fitness for Duty/Behavior Observation Program (FFD/BOP) and Site

Access Program policy are designed to implement NRC guidelines and regulations.

*Doc. 63 (Plaintiff's Statement of Additional Material Facts in Support of His*

*Opposition to Defendant's Motion for Summary Judgment and His Response to*

*Defendant's Statement of Undisputed Material Facts—section titled Plaintiff's*

*Statement of Additional Material Facts in Opposition to Defendant's Motion for*

*Summary Judgment) (hereinafter Plaintiff's Additional Facts)* at ¶ ¶220 & 221. In

accordance with NRC regulations, PPL's FFD/BOP is intended "to provide high

assurance that personnel who have been granted unescorted access continue to be

reliable, trustworthy, [and] mentally and physically fit to perform their duties

safely and competently." *Doc. 57-2 (Defendant PPL Susquehanna LLC's*

*Statement of Uncontested Material Facts)* at ¶11 and *Doc. 63 (Plaintiff's*

*Response)* at ¶11. Specifically, PPL's FFD/BOP procedures require behavioral

observation:

> Behavioral observation must be performed by individuals who
> are trained to detect behaviors that may indicate possible use,

10

> sale or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security.

*Id.* at ¶12. Fatigue is defined as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest." *Id.* at ¶13.

A refusal to provide, or the falsification of, any personal-history information is sufficient cause for denial or unfavorable termination of unescorted access or unescorted-access-authorization status. *Id.* at ¶14. Personal history information includes "any information that may be necessary for the reviewing official to make a determination of the individual's trustworthiness and reliability." *Id.* at ¶15.

Every PPL employee subject to the FFD/BOP is responsible to self-report potential fitness for duty issues to his or her supervisor, and a failure to do so is grounds for disciplinary action. *Id.* at ¶16. Additionally, "all individuals shall report any FFD concerns about other individuals to their Supervisor or to Site Access Services." *Id.* at ¶18. PPL's FFD/BOP procedures also require that supervisors be vigilant in identifying any changes in employee behavior and initiate a BOP Referral upon detecting a change in behavior. *Id.* at ¶17. In determining whether a BOP Referral is appropriate, PPL's FFD/BOP procedures provide management personnel with "Behavior Observation Questions" as a guideline. *Id.* at ¶19. Included in the list of "Behavior Observation Questions" are the following:

11

> Have you noticed any changes in the employee's thinking
> pattern?
> • See things that aren't there (hallucinations)
> • False beliefs (delusions)
> • Bizarre or unusual ideas

*Id.* at ¶20.

Upon receipt of a BOP Referral, PPL's Site Access Services is required to, among other things, place on Administrative Hold/Suspension the access key card of the individual that is the subject of the BOP Referral, interview the individual, and "use professional personnel (psychologist, MRO [Medical Review Officer], Substance abuse, etc.) to determine [the] course of action." *Id.* at ¶21. A determination of fitness for duty "can only be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise . . . to evaluate the specific fitness issues presented by the individual." *Id.* at ¶22. Where a BOP clinician determines in the scope of a mandatory clinical interview that drug and/or alcohol concerns may be present, the individual is also required to be evaluated by a Substance Abuse Expert (SAE). *Id.* at ¶23. The SAE is not an advocate for PPL or the individual. *Id.* at ¶24. Rather, the SAE's function is to protect public health and safety and the common defense and security by professionally evaluating the individual. *Id.* The SAE must satisfy certain licensing/certification and training prerequisites, including training on the "[t]he role of the SAE in making determinations of fitness and . . . continuing treatment

12

recommendations . . . ." *Id.* at ¶25. While a BOP clinician may function as both a Psychologist and an SAE, separate documentation for each type of evaluation is required to be completed and provided to PPL's Site Access Services personnel. *Id.* at ¶26. Neither the individual nor PPL "may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional . . . ." *Id.* at ¶27.

All individuals working inside PPL's Susquehanna Steam Electric Station are required to maintain unescorted access authorization. *Id.* at ¶28.

### B. McNelis's Employment as a Nuclear Security Officer.

PPL hired McNelis in June of 2009 as a Nuclear Security Officer I. *Id.* at ¶29. McNelis later became a Nuclear Security Officer II, and he remained in that position until his termination. *Id.* at ¶30. A PPL Nuclear Security Officer is an armed officer responsible for, among other things, conducting surveillance, protecting vital areas of the plant, preventing radiological sabotage, using force, including, if necessary, deadly force, to neutralize threats, and responding to medical and/or fire emergencies. *Id.* at ¶31. At all times while on duty at PPL, McNelis was armed with a semiautomatic pistol. *Id.* at ¶32. While on patrol, which occurred multiple times per shift, he was also armed with a .223 caliber AR-15 assault rifle. *Id.*

Prior to McNelis's termination, Mike McCabe, McNelis's supervisor, had recommended him for a promotion to the controller program, and McNelis was just waiting for Jim Gorman, the Manager of Nuclear Security, to decide when the training program for that position would begin. *Doc. 63 (Plaintiff's Additional Facts)* at ¶7.

### C. 2010 Anonymous Report and McNelis's Use of Bath Salts.

In February of 2010, PPL received an anonymous report that McNelis had been overheard bragging openly about his use of drugs. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶33 and *Doc. 63 (Plaintiff's Response)* at ¶33. The anonymous report was sent via e-mail to PPL by Joseph Lesperance, State Emergency Operations Center Watch Officer at the Pennsylvania Emergency Management Agency. *Id.* at ¶34. Lesperance's e-mail reflects that he had received the report by way of an anonymous telephone call to the Columbia County 911 service. *Id.* at ¶35. Because the report was submitted anonymously, it was deemed not credible, and PPL determined that no "for cause" drug testing of McNelis was warranted. *Id.* at ¶36. PPL did not approach McNelis about the report, and the report was not pursued further. *Id.* at ¶37.

McNelis admits to ingesting bath salts approximately three times in February-March 2010, when they were still legal. *Id.* at ¶38 and *Doc. 63*

14

(*Plaintiff's Additional Facts*) at ¶ 69. McNelis also placed an order for bath salts over the internet in April 2010. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶39 and *Doc. 63 (Plaintiff's Response)* ¶39. Specifically, McNelis paid approximately $50.00 for bath salts to be delivered to his home, but when they were delivered, his wife threw them out. *Id.* at ¶40 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶70. McNelis used bath salts maybe once or twice after that in late 2010 or early 2011. *Doc. 63 (Plaintiff's Additional Facts )* at ¶71. He has not used bath salts since that time. *Id.* at ¶ 72.

"Bath salts" is a generic name for synthetic derivatives of cathinone. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶1 and *Doc. 63 (Plaintiff's Response)* at ¶42. The chemical compound, which is ingested by the user, affects the central nervous system in various ways. *Id.* Beginning in August of 2011, bath salts were illegal in Pennsylvania. *Doc. 63 (Plaintiff's Additional Facts )* at ¶73. While the DEA took emergency action in September of 2011 to federally ban the stimulants often found in bath salts, Congress did not pass a comprehensive bill banning synthetic bath salts on the federal level until July of 2012. *Id.*

McNelis never disclosed to his supervisor at PPL the fact that he had ingested bath salts. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶43 and *Doc. 63 (Plaintiff's Response)* at ¶43.

### D. McNelis's Problems in April of 2012.

During the week of April 9–16, 2012, McNelis was having difficulty sleeping as a result of working an excessive number of hours and as a result of being stressed out by tech issues with his computer and phone and by home renovations necessitated by a flood. *Doc. 63 (Plaintiff's Additional Facts)* at ¶8. As a result, he became increasingly paranoid. *Id.*

In the days prior to April 16, 2012, Kris Keefer, McNelis's best friend, who was also a security officer for PPL at the nuclear plant, developed concerns about McNelis's state of mind. *Id.* at ¶10. For instance, McNelis was fixated on whether someone had broken into his telephone and his home computer, and he felt that there were cameras in his coal bin and in his car. *Id.* at ¶11. McNelis was also having problems with his wife. *Id.* at ¶12.

According to Keefer, McNelis was also obsessing about bath salts. *Id.* at ¶13. He was doing a lot of research about the different names that bath salts were sold under and the fact that they were sold as plant food. *Id.* at ¶13. McNelis told Keefer that he had tried bath salts, but he did not tell Keefer when that had been. *Id.* at ¶14.

On April 16, 2012, McNelis had an argument with his wife. *Id.* at ¶9. As a result of the argument, McNelis's wife left their home with their children. *Id.*

16

16.  Keefer went to McNelis's home around 6:00 a.m. on April 16, 2012, in response to a phone call from McNelis's wife, who was a seventh grade English teacher at the Central Columbia Middle School. *Id.* at ¶¶16 & 17.  Although McNelis's wife was scheduled to work, she did not go to work that day. *Id.* at ¶17.  Instead, she took her children to her mother's house. *Id.*

That same day, on Monday, April 16, 2012, at or around 10:00 a.m., the Central Columbia Elementary and Middle Schools were locked down due to a telephone call to the South Centre Township police chief by an unnamed person who claimed that McNelis might "come to the schools to get his children" and that he "may be under the influence and possibly armed." *Id.* at ¶19.  After the lockdown was initiated, the police chief investigated and determined that McNelis never had any intention of going to the schools to get his children or to do his children or his wife any harm. *Id.*  The police chief never contacted McNelis or his wife as part of the investigation. *Id.* at ¶20.

### E.  Keefer's Report About McNelis.

In April of 2012, McNelis reported to Security Shift Supervisor Michael McCabe, and McCabe reported to Security Operations Supervisor Brian Martonick, who in turn reported to the Manager of Nuclear Security Jim Gorman. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶¶46-48 and *Doc. 63 (Plaintiff's Response)* at ¶¶46-48.  In April of 2012,

Kristopher Keefer was employed by PPL in the controller program. *Id.* at ¶44.

At about 7:20 p.m. on April 16, 2012, Keefer spoke with McCabe about his

concerns about McNelis's behavior. *Id.* at ¶¶22 & 23.  McCabe's written summary

of that conversation contains the following narrative:

> @1920 hours I called Kristopher [Keefer] and he informed that
> there is a concern of another employee that reports directly to
> me related to Daryle McNelis that needs immediate attention.
> Kris stated that Daryle and his wife have been having marital
> problems lately and Daryle has been acting emotionally erratic
> the last couple of days and has been completely diverse from
> his normal character.  Kris informed me that Daryle has been
> not sleeping well and having illusions that his telephone is
> being wire tapped. . . . Kris was worried about Daryle's overall
> safety and the safety of Security and plant personnel at
> Susquehanna.  Kris informed me that Daryle's wife is
> employed by the Central Columbia School district and a picture
> of Daryle was being passed around the Central Columbia
> elementary and middle school facilities to notify the authorities
> if Daryle made an attempt to enter those properties.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶50 and *Doc. 63 (Plaintiff's Response)* at ¶50.  McCabe's notes further

state that Harry Mathias, the school superintendent, had "instituted a lockdown for

approximately two hours until the police felt no further need to keep students

inside (Refer to Tuesday Press Enterprise article on the bottom of page #5)." *Doc.*

*63 (Plaintiff's Additional Facts)* at ¶25.  Keefer denies, however, speaking to

McCabe about Superintendent Mathias. *Id.* at ¶¶25. And Keefer did not speak with
McCabe on the night of the 16th about McNelis using bath salts. *Id.* at ¶36.

Keefer was obligated to report the information about McNelis. *Doc. 57-2*
(*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at
¶51 and *Doc. 63* (*Plaintiff's Response*) at ¶51. And the information conveyed by
Keefer to McCabe regarding McNelis was factually accurate. *Id.* at ¶52. No one
from management ever called Keefer to ask him questions about his perceptions of
McNelis's behavior or conduct, and Keefer does not remember speaking with
anyone from management about the rumors or belief that McNelis was using bath
salts. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶37-38.

### F. Keefer's Report is Passed Along and McNelis's Key Card Is Placed on Hold.

Following his call with Keefer, McCabe placed McNelis's access key card
on administrative hold and briefed Martonick, who said he would brief Gorman
and John Lines, the Site Access Supervisor. *Doc. 57-2 (Defendant PPL
Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶11 and *Doc. 63
(Plaintiff's Response)* at ¶55 and *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶30 &
32. When McCabe spoke to Martonick on April 16th, he did not mention anything
about McNelis's possible use of bath salts. *Doc. 63* (*Plaintiff's Additional Facts*) at
¶33. If someone had spoken to Martonick about McNelis's alleged use of bath

salts, he would have passed that information along to Lines or Gorman. *Id.* at ¶34.

Martonick does not remember McCabe providing any specifics during the April

16th conversation about what McNelis had supposedly said or done that caused the

school lockdown. *Id.* at ¶35. Martonick briefed Gorman about Keefer's report.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material

Facts)* at ¶56 and *Doc. 63 (Plaintiff's Response)* at ¶56.

On April 17, 2012, at 1:00 p.m., McCabe called Kris Lear, the security shift

supervisor, and informed him that the day before the Central Columbia School had

been locked down due to marital issues regarding McNelis. *Doc. 63 (Plaintiff's

Additional Facts)* at ¶39.


### G. The BOP Referral.

On April 17, 2012, Martonick completed a BOP Referral for McNelis, and

Gorman signed the BOP Referral as a concurring supervisor. *Doc. 57-2 (Defendant

PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶¶57-58 and

*Doc. 63 (Plaintiff's Response)* at ¶¶57-58. The BOP Referral states:

> Individual was identified by a peer through Security
> Supervision that Daryle is having marital issues and personal
> behaviors have changed recently. Peer stated that Daryle has
> been acting emotionally erratic the last couple days and has not
> been sleeping well. Peer stated that Daryle is having illusions
> that his telephone is being wire tapped. Peer is concerned about
> Daryle's overall safety and the Safety and Security of those at
> Susquehanna. On 4/16/12 Daryle's actions contributed to

Central Columbia school being locked down related to dialog
that occurred between Daryle and his spouse.

*Id.* at ¶59. The BOP Referral contains no reference to suspected alcohol or drug
use by McNelis, nor does it reference any suspected psychiatric impairment. *Id.* at
¶60.

Although Martonick does not remember being advised that McNelis was
using bath salts, Gorman testified that he believed that, at some point, Martonick
told him that there was an allegation that McNelis had been using bath salts. *See
Doc. 63 (Plaintiff's Additional Facts)* at ¶¶48 & 49; *Doc. 63-8* at 6 *(Martonick
Dep.* at 31); and *Doc. 63-9* at 4 *(Gorman Dep.* at 64-65). Gorman did not ask that
McNelis be drug tested; instead, McNelis was referred to the BOP so that he could
be evaluated by a psychologist. *Doc. 63 (Plaintiff's Additional Facts)* at ¶50. No
one ever suggested to Gorman that McNelis be drug tested. *Id.* at ¶51. Once a
BOP Referral is made, PPL's Site Access Department assumes all further
responsibility for evaluating the individual. *Doc. 57-2 (Defendant PPL
Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶61 and *Doc. 63
(Plaintiff's Response)* at ¶61.

At some point, Martonick showed Gorman a copy of a newspaper article
regarding the school lockdown, and Martonick implied that McNelis's behavior
was part of the lockdown. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶53 & 54 and
*Doc. 57-5* at 13 *(Gorman Dep.* at 41 & 42). The newspaper article does not

21

mention McNelis by name or identify the person as an employee of PPL. *Doc. 63 (Plaintiff's Additional Facts)* at ¶55. Gorman did not speak to anyone in the police department to determine if McNelis's behavior had indeed led to the school lockdown. *Id.* at ¶56.

### H. McNelis's April 17, 2012 Phone Call to Gorman.

McNelis called Gorman on April 17, 2012, to request time off to attend to "personal or family issues." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶62 and *Doc. 63 (Plaintiff's Response)* at ¶62. Gorman granted McNelis's request for time off, and he did not ask McNelis for any additional information regarding the reasons underlying McNelis's request. *Id.* at ¶¶63 & 64. Gorman did, however, ask McNelis about the report that McNelis had been responsible for the lockdown of the Central Columbia schools. *Id.* at ¶65. Unaware at the time of the call that the schools had been placed on lockdown, McNelis responded by saying "I have no idea what you're talking about" and "I don't know what to tell you." *Id.* at ¶¶66 & 67 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶42. Although Gorman implied that he thought McNelis was responsible for the school lockdown, he did not ask McNelis whether his conduct had led to the lockdown. *Doc. 63 (Plaintiff's Additional Facts)* at ¶43.

McNelis called Gorman a second time several days later, during which McNelis told Gorman that he had confirmed that there had been a lockdown of the Central Columbia schools but that law enforcement had not contacted him. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶68 and *Doc. 63* (*Plaintiff's Response*) at ¶68. Gorman did not investigate or attempt to confirm McNelis's role in causing the lockdown of the Central Columbia schools, as McNelis had been referred to the BOP. *Id.* at ¶69.

At no point in time did McNelis decline to provide information in response to Gorman's questions about his time off or the school lockdown. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶46 and *Doc. 63-1* (*McNelis Dep*. at 115).

## I. Lear and Reports of Use of Bath Salts.

Keefer and Paul Siciliano, who both carpooled with McNelis, thought McNelis was using bath salts because of his mood swings and because he was easily agitated. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶59 & 62. Keefer does not remember speaking with anyone from management about McNelis using bath salts. *Id.* at ¶38. And Siciliano testified that he did not speak to anyone in management other than Mr. Steiner about his interactions with McNelis and his concerns about his behavior. *Id.* at ¶ 59 & 68 and *Doc. 63-14* at 7 (*Siciliano Dep*. at 42-43). Nevertheless, according to Kris Lear, who at the time was a security shift

supervisor, on April 18, 2012, Keefer and Siciliano told him that they believed that McNelis had been using bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶57 and *Doc. 57-22 (Lear Dep.* at 14 & 22-23). Lear did not tell anyone in upper management, however, that he had information that McNelis had been using bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶58.

### J. McNelis's Treatment at Geisinger.

On April 18, 2012, McNelis agreed to meet his wife at the Geisinger Medical Center in Danville in order to be evaluated to determine what was causing his behavior. *Doc. 63 (Plaintiff's Additional Facts)* at ¶74. Although McNelis's lab tests came back normal, McNelis decided to admit himself for observation and further evaluation to alleviate his wife's concerns. *Id.* at ¶75. He signed a voluntary consent for inpatient treatment on Geisinger's psychiatric unit. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶70 and *Doc. 63 (Plaintiff's Response)* at ¶70. The Initial Evaluation and Treatment Plan, which was completed by the physician authorizing the admission and signed by McNelis, listed the following under "Initial Findings": "1-2 weeks of paranoid thoughts (concerned over electronic surveillance, mistrustful of wife, concerned about unknown individual spying on him), sleeplessness, questionable

24

auditory hallucinations." *Id.* at ¶71.  Geisinger Health and Progress Notes contain

the following additional information regarding McNelis's presenting condition:

> PRESENTING PROBLEM:  This patient was admitted through
> the emergency department where he appeared with his wife.
> He reports for about a 1-2 week period, he has been
> experiencing paranoid thoughts, mostly regarding electronic
> surveillance.  He is convinced that someone is bugging his
> phone, his car, his computer, and other household objects.  As
> an example, he stated that he was worried that his children's
> matchbox cars were actually antennae.  His wife reports he has
> been paranoid that someone is following him, and he stated that
> he would kill whoever is doing so if he was able.  His wife
> recently moved herself and the children out of the house
> because she was concerned over his erratic behavior and
> paranoid thoughts. . . .

*Id.* at ¶72.

On April 19, 2012, McNelis called Lear from Geisinger, informed him that

he would not be in to work because he had been admitted to the hospital, informed

him that he would probably be in the hospital for a few days, and requested FMLA

forms. *Id.* at ¶76 and *Doc. 63-2 (McNelis Declaration)* at ¶13 & ¶80.  McNelis did

not mention any medical or psychiatric condition on this call, nor did Lear ask any

questions about the reason for McNelis's hospitalization. *Doc. 57-2 (Defendant*

*PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶77 and

*Doc. 63 (Plaintiff's Response)* at ¶77.

McNelis was discharged by Geisinger on April 20, 2012, and staff at

Geisinger gave him a release to return to work on April 23, 2012. *Id.* at ¶78 and

25

*Doc. 63* (*Plaintiff's Additional Facts*) at ¶79.  By the time of his discharge from

Geisinger, McNelis's symptoms had resolved. *Doc. 57-2* (*Defendant PPL*

*Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶79 and *Doc. 63*

(*Plaintiff's Response*) at ¶79.  Geisinger's Discharge Instructions contained the

following statements:

> **Special Instructions**: If you start using or drinking again, your
> life will eventually become unmanageable and full of chaos.
> Stay clean and sober for now.
>
>  . . .
>
> **Caseworker Instructions**: . . . Discontinue or reduce the use of
> alcohol, if you find you cannot stop drinking, consider
> attending AA meeting in your area, call the local hotline
> number . . . for meeting times and locations, or consult the list
> that was given to you at the time of discharge.
>
> **Additional Follow Up Appointments**:
> Caron Foundation
> Appointment for an evaluation and treatment recommendations
> for your drinking

*Id.* at ¶80.  The Caron Foundation is a non-profit group of three residential

treatment centers for alcoholics and drug addicts. *Id.* at ¶81.  McNelis has never

suffered from, or been treated for, paranoia since April of 2012. *Id.* at ¶82.

McNelis never told Gorman that he was admitted to the psychiatric unit at

Geisinger. *Id.* at ¶83.

**K. McNelis Is Directed to the Access Processing Facility.**

McNelis attempted to return to work by calling Gorman on April 23, 2012. *Doc. 63 (Plaintiff's Additional Facts)* at ¶88. Gorman told McNelis that his unrestricted access authorization had been "placed on hold" and that he should report to the Access Processing Facility that day for a meeting with Martonick and John Lines, who was PPL's Supervisor of Site Access and FFD Programs. *Id.* at ¶ 89 and *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶¶ 84 & 85 and *Doc. 63 (Plaintiff's Response)* at ¶¶ 84 & 85. McNelis reported to the Access Processing Facility as instructed, and he met with Martonick, Lines, and Pat Diefenbacher, who was a Site Access Specialist Reviewing Official. *Id.* at ¶¶ 86 & 87 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶91 & 92. At the time, the chain of command was such that Diefenbacher reported directly to Lines, and Lines reported directly to Gorman. *Doc. 63 (Plaintiff's Additional Facts)* at ¶92. After the BOP process was explained to McNelis and after Lines told McNelis that he was required to see Dr. Thompson and that he would have to receive clearance from Dr. Thompson before he could return to work, McNelis was directed to report to the Access Processing Facility the following day. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶87 and *Doc. 63 (Plaintiff's Response)* at ¶87 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶93.

27

On April 24, 2012, McNelis reported to the Access Processing Facility, met with Lines, and prepared a typewritten statement about the events from April 9, 2012 to the then present date. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶88 and *Doc. 63* (*Plaintiff's Response*) at ¶88; and *Doc. 63-3*. When the Site Access department receives a notice of a referral to the BOP, it gathers any information it can and provides it to the psychologist. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶94. Lines did not feel it was important, however, to try to find out the basis for Martonick's conclusion that McNelis's actions or conversations had led to the school lockdown. *Id.* at ¶95. Further, Lines did not ask McNelis any questions after reading his statement, and he did not ask McNelis if he had ever used bath salts. *Doc. 63* (*Plaintiff's Response*) at ¶98. McNelis was not evasive when he spoke to Lines, and Gorman never told Lines that McNelis was evasive with him in answering questions about the school lockdown. *Id.* at ¶¶99 & 100.

**L. McNelis Meets with Dr. Thompson.**

Also on April 24, 2012, McNelis completed an MMPI-2 test administered by psychologist Dr. David Thompson. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶89 and *Doc. 63* (*Plaintiff's Response*) at ¶89. Dr. Thompson is a contracted psychologist who is not employed

by PPL. *Id.* at ¶90. Dr. Thompson performs fitness for duty evaluations
nationwide, for approximately 20 different nuclear power plants. *Id.* at ¶91.

Diefenbacher briefed Dr. Thompson about the situation with McNelis. *Doc.
63 (Plaintiff's Additional Facts)* at ¶103. Thompson understood that there were
concerns about McNelis's behavior, that the police had locked down a school, and
that McNelis had been to Geisinger Medical Center for a few days. *Id.* at ¶104.
Although Dr. Thompson does not remember Diefenbacher or anyone else telling
him about any allegations of illegal drug use by McNelis, according to Lines, he
told Dr. Thompson about the allegations that McNelis was using bath salts. *Id.* at
¶¶105 & 106. According to Lines, he heard of McNelis's alleged use of bath salts
from Martonick. *Id.* at ¶185.

The results of the MMPI-2 did not provide a red flag to Dr. Thompson or
show that McNelis was suffering from a clinical psychological condition. *Id.* at
¶102. Dr. Thompson completed a Confidential Psychological Screening Summary,
dated April 24, 2012, which stated that, based upon "clinical analysis of the
MMPI-2 test results and/or information [supplied by PPL]," his professional
opinion was that McNelis required a "Mandatory Interview." *Doc. 57-2
(Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at
¶92 and *Doc. 63 (Plaintiff's Response)* at ¶92. The Confidential Psychological
Screening Summary further stated: "A recommendation is **NOT** possible at this

time.  A Clinical Interview is necessary before an Unescorted Access

Authorization decision is possible." *Id.* at ¶ 93 (emphasis in original).  Dr.

Thompson interviewed McNelis the following day—April 25, 2012. *Id.* at ¶94.

### M.  Dr. Thompson's April 30, 2012 Report.

Following the clinical interview with McNelis, Dr. Thompson prepared a

Confidential Psychological Screening Summary, dated April 30, 2012, which

stated that a recommendation was "**ON-HOLD PENDING DETERMINATION**

**OF FITNESS**." *Id.* at ¶95 (emphasis in original).  Attached to this Confidential

Psychological Screening Summary was a Confidential Psychological Interview

Memo, which was dated June 8, 2011 (clearly in error). *Id.* at ¶96.  The

Confidential Psychological Interview Memo noted that McNelis admitted

consuming "up to 12 beers per week" and also that "his use of alcohol has, 'at

times,' been an issue of contention with his wife." *Id.* at ¶97.  Both of the quoted

statements in the Memo were accurate. *Id.* at ¶98.  The Confidential Psychological

Interview Memo also accurately noted that McNelis had two prior arrests for

alcohol-related offenses, one for being a minor in possession and one for driving

under the influence. *Id.* at ¶¶99 & 100.

The Confidential Psychological Interview Memo also noted that McNelis

had provided Dr. Thompson with a copy of the Geisinger Discharge Summary,

which noted that McNelis had been "referred to the Caron Foundation for evaluation and treatment for alcohol." *Id.* at ¶101. It is accurate that McNelis was referred by Geisinger to the Caron Foundation, and it is accurate that Geisinger's Discharge Instructions referred McNelis to the Caron Foundation "for an evaluation and treatment recommendations for [his] drinking." *Id.* at ¶¶102 & 103. McNelis never told Dr. Thompson that he believed the Caron Foundation referral to have been made or included in the discharge summary in error. *Id.* at ¶104.

Dr. Thompson's Confidential Psychological Interview Memo also contained several recommendations. *Id.* at ¶105. One of Dr. Thompson's recommendations was "[r]eferral [of] Mr. McNelis for alcohol assessment and possible inpatient treatment . . . ." *Id.* at ¶106. Another of Dr. Thompson's recommendations was "UA [unescorted access authorization] remain on hold pending receipt and review of a report from the facility where [McNelis] receives an alcohol assessment and treatment." *Id.* at ¶107. Dr. Thompson is a substance abuse expert, and he could have performed a substance abuse evaluation himself at that time. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶117 & 118.

### N. Further Events on April 30, 2012.

On April 30, 2012, Nick Steward, another security officer at the plant, informed Lear that he had information from a "reliable source" that McNelis was

31

using bath salts. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶119. Steward did not provide the name of the "reliable source," Lear did not ask him for the name of the "reliable source," and PPL is not aware of the identity of the "reliable source." *Id.* at ¶¶119-121. At the time, although Lear knew that McNelis's badge was on hold and he was not allowed on site, he did not know that McNelis had been referred to the BOP. *Id.* at ¶122 and *Doc. 63-13* (*Lear Dep.* at 29). After he received this information about McNelis's alleged use of bath salts from Steward, Lear did not speak to anyone in management. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶123.

On April 30, 2012, McNelis spoke with Martonick and told him that he had some marital issues, that he was going to marriage counseling, that there had been a misunderstanding as to the doctor's orders, and that he would be providing PPL with an update when he had more information. *Id.* at ¶124. Martonick does not remember hearing from Lines that he had received a report from Thompson as of April 30th. *Id.* at ¶125.

## O. Dr. Thompson's May 1, 2012 Report.

Dr. Thompson prepared a Substance Abuse Expert Determination of Fitness on May 1, 2012, which contained, among other information, the same personal history notations and treatment recommendations contained in the Confidential Psychological Interview Memo. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's*

*Statement of Uncontested Material Facts)* at ¶108 and *Doc. 63 (Plaintiff's*

*Response)* at ¶108. The narrative section of Dr. Thompson's Substance Abuse

Expert Determination of Fitness states: "Mr. McNelis is considered not fit for duty

pending receipt and review of a report from the facility where he receives an

alcohol assessment and possibly treatment." *Id.* at ¶110. The "Conclusion" section

of the Substance Abuse Expert Determination of Fitness provides that "[b]ased

upon clinical analysis of all available data, the individual is" and then there are

four potential determinations:

- ☐ Fit for Duty - Individual is fit to safely and competently perform duties.
- ☐ Fit for Duty and required to complete a program as described in the report narrative.
- ☐ Fitness for Duty cannot be determined until subject completes a program as described in the report narrative.
- ☐ **NOT** Fit for Duty.

*Doc. 63-27* at 2. Dr. Thompson checked the "**NOT** fit for duty" box. *Id.*


**P. Dr. Thompson Makes No Reference to Illegal Drugs.**

Dr. Thompson's Confidential Psychological Interview Memo contains the

following statement: "**ILLEGAL DRUG USAGE**: None." *Id.* at ¶115. Dr.

Thompson's Substance Abuse Expert Determination of Fitness contains no

reference to use of drugs other than prescription medication. *Id.* at ¶116. In fact,

no document prepared by Dr. Thompson and provided to PPL regarding McNelis

contains any reference to use of drugs other than prescription medications. *Id.* at

33

¶117.  Further, no document prepared by Dr. Thompson and provided to PPL regarding McNelis contains any reference to a psychiatric diagnosis or mental health treatment. *Id.* at ¶118.

Although Dr. Thompson does not remember anyone telling him about any allegations of illegal drug use by McNelis, according to Lines, he told Dr. Thompson about the allegations that McNelis was using bath salts. *Id.* at ¶¶105 & 106.  According to Lines, he would have expected Dr. Thompson to ask McNelis about the allegations of drug use and whether he had used bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶190.  After Lines saw Dr. Thompson's report, he did not call Dr. Thompson and ask why there was nothing in it about bath salts. *Id.* at ¶191.  According to Lines, he was not concerned about it because at the time bath salts was not an illegal drug as far as the NRC was concerned, i.e., they were not on the NRC's approved panel of drugs that could be tested for without specific permission from the NRC. *Id.* at ¶¶191 & 192.  Lines made no effort to contact anyone at the NRC to try to obtain approval to test McNelis for bath salts. *Id.* at ¶193.  Nor did he talk to anyone in management about whether PPL could find a way to test McNelis for bath salts. *Id.* at ¶195.

**Q. McNelis's Unescorted Access Authorization is Revoked and the Decision to Terminate His Employment Is Made.**

After receiving Dr. Thompson's report, Lines told Gorman that Dr.

Thompson had deemed McNelis not fit for duty and that he would be terminating

McNelis's unescorted access authorization, and based on Dr. Thompson's

determination, Lines, in fact, revoked McNelis's unescorted access authorization.

*Doc. 63* (*Plaintiff's Additional Facts)* at ¶129 and *Doc. 57-2* (*Defendant PPL*

*Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶119 & 121 and

*Doc. 63* (*Plaintiff's Response)* at ¶119 & 121.  Lines understood that with the "not

fit for duty" designation, if McNelis had gone for an alcohol assessment and

received a clear report from a medical practitioner, he could have submitted it to

Dr. Thompson for reconsideration of his decision that he was not fit for duty. *Doc.*

*63* (*Plaintiff's Additional Facts)* at ¶128.  And Lines told Gorman that if McNelis

obtained a report as required by Dr. Thompson, he would consider granting him

access again. *Id.* at ¶131.

There is nothing in PPL's policies on FFD/BOP or the Site Access Program

that states that a person can be fired before they have been given an opportunity to

address the psychologist's recommendations. *Id.* at ¶134.  A flowchart that is part

of the FFD/BOP policy contemplates that an employee "will be given an

opportunity to comply with any recommendations for treatment, and then at some

point a reviewing official will look at it again and decide whether they're fit for

duty." *Doc. 63-21* (*Lines Dep.* at 94); *Doc. 63-29*; and *Doc. 63* (*Plaintiff's Additional Facts*) at ¶135.

Gorman never read Dr. Thompson's report. *Id.* at ¶130. According to Gorman, Lines did not tell him that McNelis would never be fit for duty, but he also did not tell him that Dr. Thompson had recommended that McNelis go for an alcohol evaluation/assessment. *Id.* at ¶132.

Lines did not make the decision to terminate McNelis's employment. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶120 and *Doc. 63* (*Plaintiff's Response*) at ¶120. Gorman testified that he made the decision to terminate McNelis's employment because: (1) McNelis's unescorted access authorization had been revoked based on the unfavorable fitness for duty determination of Dr. Thompson; and (2) because he was concerned that McNelis had been "evasive and really nonresponsive" during the course of the telephone conversation on April 17, 2012. *Id.* at ¶122.

### R. The SEARP.

On May 7, 2012, Gorman presented his termination recommendation for review by a Susquehanna Elevated Action Review Panel (SEARP), which reviews recommendations for discipline up to, and including termination and which, in this case, consisted of Jeff Helsel, Plant Manager and Vice President of Nuclear

Operations, Carol Moody, Director of Human Resources, and Brad Drysdale, General Manager of Nuclear Maintenance. *Id.* at ¶¶123 & 125 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶136. Martonick, who drafted a SEARP Panel Preparation Checklist in anticipation of the SEARP, presented the case, along with Gorman, to the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶124 and *Doc. 63 (Plaintiff's Response)* at ¶124 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶137. Kevin Cimorelli, the General Manager of Nuclear Programs, was also present at the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶126 and *Doc. 63 (Plaintiff's Response)* at ¶126.

The SEARP checklist sets forth the proposed action as the termination of McNelis's employment and that the basis for the action is that "McNelis was determined to be unfit for duty by the site contract Psychologist." *Doc. 63-55* at 1. The SEARP checklist contains a chronology of the applicable events, which starts with the April 16th report regarding McNelis's behavior and ends with McNelis's April 30th phone call to Martonick. *Id.* at 1-2. The April 17th conversation between McNelis and Gorman is included in the chronology, and the SEARP checklist states that "[d]uring the discussion Mr. McNelis was not forthright in providing information and did not want to address the issues identified and reported on 4/16/12, by saying 'I have nothing to Report at this time.'" *Id.* at 1.

37

The SEARP checklist states that McNelis's explanation for issues surrounding his behavior was that he was suffering from a lack of sleep. *Id.* at 2.  In a section that asks for information about the employee's history and previous action, the SEARP checklist notes that in February of 2010, there had been an anonymous 911 call stating that McNelis was bragging about his use of drugs, but, based upon a lack of credibility, no action had been taken on that information. *Id.* at 2-3.  PPL's General Counsel and Human Resources Department reviewed the termination recommendation prior to the SEARP meeting. *Doc. 63 (Plaintiff's Additional Facts)* at ¶148.

The SEARP did not review any documents other than the SEARP checklist. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶127 and *Doc. 63 (Plaintiff's Response)* at ¶127.  Helsel did not review the BOP referral form, McCabe's notes, McNelis's notes that he had submitted as part of the BOP program, or any of Dr. Thompson's reports. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶153-156.  Helsel contends that HIPAA rules preclude the SEARP from seeing any site access records. *Id.* at ¶ 159.  The only documents or information that the SEARP had to make its decision regarding the propriety of the recommended discipline is what was included in the SEARP checklist and what Gorman said at the meeting. *Id.* at ¶160.  Gorman told the SEARP that McNelis lost access because he was found unfit for duty. *Id.* at ¶ 158.  The school lockdown

was not a stated basis for the termination decision and was not a topic of discussion

at the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of*

*Uncontested Material Facts)* at ¶128 and *Doc. 63 (Plaintiff's Response)* at ¶128.[7]

Helsel does not recall any discussion at the SEARP regarding suspected use of bath

---

[7] PPL points to Helsel's deposition testimony to support this statement of fact.
Without pointing to any contrary evidence, McNelis denies this statement, asserts
that Helsel's recollection of what was discussed at the meeting is an issue of fact,
and contends that "even the *uncontradicted* testimony of interested witnesses
supporting the employer, such as supervisors and other workers, should not be
considered or otherwise weighed." *Doc. 63 (Plaintiff's Response)* at ¶ 128 (italics
in original). He relies on *Reeves v. Sanderson Plumbing Products, Inc.*, where the
Court in addressing the standard for granting judgment as a matter of law under
Fed.R.Civ.P. 50, which "mirrors" the standard for granting summary judgment
under Fed.R.Civ.P. 56, stated that "the court should give credence to the evidence
favoring the nonmovant as well as that 'evidence supporting the moving party that
is uncontradicted and unimpeached, at least to the extent that that evidence comes
from disinterested witnesses.'" 530 U.S. 133, 151 (2000) (quoting 9A C. Wright &
A. Miller, Federal Practice and Procedure §2529, p. 300 (2d ed. 1995)). But courts
in this Circuit have not read *Reeves* as precluding reliance in the summary-
judgment context on undisputed evidence from an interested witness. *See e.g.
Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (stating
that "in considering a motion for summary judgment the court should believe
uncontradicted testimony unless it is inherently implausible even if the testimony is
that of an interested witness") (footnote omitted); *Wilkie v. Geisinger Sys. Servs.*,
No. 3:12-CV-580, 2014 WL 4672489, at *5 (M.D. Pa. Sept. 18, 2014) (Mariani, J.)
(rejecting the plaintiff's argument that under *Reeves*, the court cannot consider any
statements from interested witnesses); *Edgerton v. Wilkes-Barre Home Care
Servs., LLC*, No. 3:12-CV-0191, 2014 WL 131605, at *2 (M.D. Pa. Jan. 13, 2014)
(Brann, J.) (concluding that the plaintiff's "repeated bald assertions that a jury is
not required to believe testimony favorable to [the defendant] do not put facts in
genuine dispute and will not defeat [the defendant]'s summary judgment motion"),
*aff'd*, 600 F. App'x 856 (3d Cir. 2015). Thus, where McNelis has denied a
properly supported statement of material fact submitted by PPL by merely by
pointing to *Reeves*, we deem those facts admitted.

salts by McNelis. *Id.* at ¶129.[8]  Helsel is also not aware of anything in writing

about McNelis supposedly not being forthright with Gorman other than in the

SEARP checklist. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶163.  According to

Helsel, the SEARP permitted Gorman's termination decision to stand because:

> Mr. McNelis, had the opportunity to report his fitness for
> duty issues, and that ultimately our psychologist took away his
> access.  He was not forthright with that information, and there
> was a potential that there could be a safety risk for us
> in protecting the health and safety of the public.  That's the
> bottom line.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶130 and *Doc. 63 (Plaintiff's Response)* at ¶130.[9]

As plant manager, Helsel has sat on more than 50 but less than 100 SEARPs.

*Doc. 63* (*Plaintiff's Additional Facts)* at ¶149.  He does not know of a situation

where a simple loss of unrestricted access was presented to the SEARP, because

that is not considered a disciplinary action. *Id.* at ¶150.  Helsel is also not aware of

any situations where an employee has been sent to the BOP and a psychologist

recommends further follow-up or treatment and the employee was declared unfit

for duty and then terminated. *Id.* at ¶151.  Further, Helsel is not aware of anyone

who was supposedly not cooperative with regard to questions about their behavior

and then allowed to go through the BOP process before being terminated for said

---

[8]  *See* n.7.
[9]  See n.7.

lack of cooperation. *Id.* at ¶164. He did testify, however, that he "would expect

that process to be completed." *Doc. 63-33 (Helsel Dep.* at 55-56).

### S. McNelis Is Notified of the Revocation of His Unescorted Access Authorization and He Is Terminated.

On May 11, 2012, McNelis attended a meeting with Lines and Site Access

Specialist Pat Dieffenbacher at which he was provided with a copy of Dr.

Thompson's Substance Abuse Expert Determination of Fitness. *Doc. 57-2*

*(Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at

¶131 and *Doc. 63 (Plaintiff's Response)* at ¶131. McNelis disagreed with Dr.

Thompson's determination because he didn't "consider [himself] to be an

alcoholic." *Id.* at ¶111. Dr. Thompson never stated to McNelis that he believed

McNelis to be an alcoholic. *Id.* at ¶112. McNelis does not believe he needed an

alcohol assessment and/or treatment. *Id.* at ¶113. McNelis has no evidence,

however, to indicate that Dr. Thompson's determination was not made in good

faith and/or in the exercise of his best medical judgment. *Id.* at ¶114.[10]

---

[10]  Although McNelis admits that he made such a statement at his deposition, he
asserts that the statement does not constitute an admission and that he "hired his
lawyers to collect, marshall, and evaluate the evidence in the case." *Doc. 63
(Plaintiff's Response)* at ¶114. He cites *Surowitz v. Hilton Hotels Corp.*, 383 U.S.
363 (1966), and he summarizes that case, in which the Supreme Court reversed the
dismissal of a shareholder derivate suit pursuant to Fed.R.Civ.P. 23(b), which at
the time provided that a shareholder's complaint must be verified, after questioning
revealed that the plaintiff did not have knowledge of the facts in the complaint.
McNelis further states that "[t]he evidence in this case, as will be shown in

At the meeting with Lines and Dieffenbacher, McNelis was informed that his unescorted access authorization had been revoked. *Id.* at ¶132. Lines told McNelis that if he obtained the required alcohol assessment and treatment certification, he could reapply for access. *Doc. 63 (Plaintiff's Additional Facts)* at ¶167. At the end of the meeting, McNelis was given a form that explained why his unescorted access authorization had been revoked and that provided an explanation of his right to an "independent management review" of the decision. *Id.* at ¶169.

Also on May 11, 2012, immediately following the meeting with Lines and Dieffenbacher, McNelis attended a meeting with Martonick and Jillian Brennan, a Human Resources employee. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶133 and *Doc. 63 (Plaintiff's Response)* at ¶133. At that meeting, McNelis was informed that he was being separated from PPL. *Id.* at ¶134. Gorman signed the letter of termination, which does not explain why McNelis was fired. *Doc. 63 (Plaintiff's Additional Facts)* at ¶182.

---

plaintiff's statement of additional material facts, show very strongly that Thompson miserably failed in his professional duty to Mr. McNelis and that it was due to pressure from PPL for Mr. McNelis to be deemed unfit for duty." *Doc. 63 (Plaintiff's Response)* at ¶114. But he points to no evidence to contradict PPL's statement of fact. For this reason, we deem this fact to be undisputed.

## T.  Dr. Thompson's Further Contacts with Lines and McNelis.

On May 17, 2012, Lines called Dr. Thompson and told him that McNelis's employment had been terminated. *Id.* at ¶196.  According to Dr. Thompson's notes of that telephone call, Lines told him: "This is a new policy of security and HR. This is a new policy by the Security Manager, i.e., the security manager [used or read] the procedures as written." *Doc. 63-36* and *Doc. 63-23* (*Thompson Dep.* at 49-50).  According to Gorman, he did not tell Lines that the policies and procedures that had been used in the past were going to change under his administration as the manager of nuclear security. *Doc. 63 (Plaintiff's Additional Facts)* at ¶199; *Doc. 63-9* (*Gorman Dep.* at 79).  Dr. Thompson's notes also contain the following sentence: "Must go to Substance Abuse Professional to deal with alcohol and/or other substance and follow through with any recommendations." *Doc. 63-36*.  Dr. Thompson could not recall if Lines stated that or if he told Lines that that was what his recommendation was. *Doc. 63-23* (*Thompson Dep.* at 52-53).  During the conversation, Lines said that everyone who loses unescorted access authorization has a right to review of the decision. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶198.

On May 21, 2012, Dr. Thompson spoke with McNelis, who said that he had been terminated and that he was appealing the termination. *Id.* at ¶¶200 & 201. McNelis also told Dr. Thompson that the discharge summary from Geisinger had

been revised to remove the referral recommendation to the Caron Foundation, and he read Dr. Thompson a note authored by Thomas Wickham, who was employed by Geisinger as a Physician's Assistant in psychiatry. *Id.* at ¶205 and *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶74 and *Doc. 63 (Plaintiff's Response)* at ¶74.  The Wickham note provides, in pertinent part, that McNelis's wife "was the source of the Caron Foundation referral.  *We* did not make it." *Doc. 63-37* (italics in original).  McNelis offered to provide Dr. Thompson with a copy of that note, but Dr. Thompson told McNelis to send the note to PPL. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶205.  At some point, however, Dr. Thompson received the Wickham note; he assumes that someone from PPL sent it to him. *Id.* at ¶¶204 & 206.  Dr. Thompson does not remember speaking with Lines or Diefenbacher about the Wickham note, and he would not have expected to since he was told that the decision to revoke McNelis's Unescorted Access Authorization was going through some sort of appeal process. *Id.* at ¶207.  He also did not speak with David Walsh, the "independent manager" who reviewed McNelis's appeal of his loss of unescorted access authorization. *Id.* at ¶208.  Dr. Thompson did, however, call Wickham on May 23, 2012, because he had seen the revised discharge summary and he wanted more information. *Id.* at 209.

Dr. Thompson was surprised to hear that PPL had terminated McNelis as a result of his own report. *Id.* at ¶214. But Dr. Thompson's recommendations for further evaluations are not always followed by PPL because that is all they are— recommendations. *Id.* at ¶216. It is a fairly common practice though for PPL to follow his recommendation for the employee to be given an opportunity to take any corrective steps that Dr. Thompson suggests are required. *Id.* at ¶217.

McNelis also offered to provide Dr. Thompson with documentation that he had gone to a referral and that the substance abuse professional thought he did not need any treatment. *Id.* at ¶203. Again, Dr. Thompson told McNelis to go through PPL, not him. *Id.*

### U.  The Review of the Revocation of McNelis's Unescorted Access Authorization.

On May 22, 2012, McNelis submitted a Request for Review of Denial/Revocation of his unescorted access authorization. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶135 and *Doc. 63 (Plaintiff's Response)* at ¶135. Although McNelis believed that his request for review of the decision to revoke his unescorted access authorization was also a request for review of the termination decision, an employee's right to request review of the decision to revoke unescorted access authorization does not constitute an appeal of a termination decision. *Id.* at ¶¶136 & 137. In support of

his request for review of the decision to revoke his unescorted access authorization, McNelis provided a type-written statement dated May 15, 2012, and the note from Wickham stating that McNelis's wife "was the source of the Caron Foundation referral." *Id.* at ¶¶138 & 139.

McNelis also provided a copy of a police report dated April 16, 2012 regarding the school lockdown. *Id.* at ¶143. The police report states that the decision to lock down the schools was based on a report, from an anonymous source, that McNelis was allegedly "under the influence and possibly armed" and "may come to the [schools] to get his children." *Id.* at ¶144. PPL did not see the police report until after McNelis's employment had been terminated. *Id.* at ¶145.

McNelis also provided a letter from Francis McAndrew, a licensed professional counselor employed by Bloomsburg Psychological Center LLC. *Id.* at ¶140. This letter, which is dated May 22, 2012 and addressed to "To Whom it May Concern," reads:

> I began interviewing Mr. and Mrs. Daryle McNelis for marriage counseling on 5/8/2012. Mr. McNelis reported that he had been told he was terminated from his position, and I saw him to continue his assessment on 5/17/2012. He then explained that PPL wanted a Drug & Alcohol (D&A) assessment completed. I gathered information for a D&A assessment through the sessions on 5/17/2012, and 5/22/2012. Although this report is not in formal presentation format, it is my opinion that he does not meet the criteria for chemical dependency at this time.

*Doc. 63-38.*

David T. Walsh, the independent manager assigned to conduct the review, decided on June 12, 2012 to affirm the decision to revoke McNelis's unescorted access authorization. *Id.* at ¶146. Walsh held a Senior Reactor Operator license conferred by the NRC and was employed by PPL as a Shift Supervisor. *Id.* at ¶147. As a Shift Supervisor at PPL, Walsh was responsible for overseeing the operations of both nuclear reactors, but he had no direct supervisory responsibility for security. *Id.* at ¶148. Walsh's 'independent review" process consisted of simply sitting down at the site access office, looking at the access site file, and then deciding if the proper procedure had been followed. *Doc. 63 (Plaintiff's Additional Facts)* at ¶228. He assumes that the file is complete, and he does not ask any questions of anyone. *Id.* at ¶230. He does not make any determination as to whether an employee is being truthful. *Id.* at ¶232. As part of his review of the file, Walsh learned of the allegations regarding McNelis's use of bath salts. *Id.* at ¶233. The Access-Authorization-Review form completed by Walsh contains a footnote stating that it appeared that McNelis "completed the SAE evaluation as recommended." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶149 and *Doc. 63 (Plaintiff's Response)* at ¶149. Walsh nevertheless decided to affirm the decision to revoke McNelis's unescorted access authorization because "at the time of revocation the process was followed." *Id.* at ¶150. McNelis received a letter dated June 12, 2012 by certified mail

indicating that the independent manager had considered his request for review and affirmed the decision to revoked his unescorted access authorization. *Id.* at ¶151.

Dr. Thompson did not consider McAndrew's letter to be an alcohol assessment report because certain elements had been omitted. *Id.* at ¶141 and *Doc. 57-28 at 23 (Thompson Dep. at 81).* Lines did not interpret McAndrew's letter as addressing Dr. Thompson's recommendation that McNelis receive an alcohol assessment and possibly treatment. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶142 and *Doc. 63 (Plaintiff's Response)* at ¶142.

If the decision to terminate McNelis's employment had not been made, after receiving the documentation received during the appeal process, Lines would have told McNelis how to reapply for access. *Doc. 63 (Plaintiff's Additional Facts)* at ¶215. And if McNelis had not been fired, after hearing from a licensed medical professional that McNelis did not meet the criteria for somebody who suffers from alcohol or substance abuse, Dr. Thompson would have scheduled a second interview with McNelis and then made another recommendation about McNelis's unescorted access authorization. *Id.* at ¶183.

**V. Other Employees Were Not Terminated After Losing Unescorted Access Authorization.**

On June 8, 2012, approximately one month after McNelis was fired, R.S., an employee of the plant, was referred to the BOP program. *Doc. 63 (Plaintiff's Additional Facts)* at ¶238. The supervisor who initiated the referral was Richard Mogavero, and the concurring supervisor was Vilas Shook. *Doc. 65* at 2. The description of the incident or behavior on the referral form provides that after Shook and Mogavero met with R.S. and discussed a recent decrease in his performance, R.S. was asked if anything else may be contributing to recent events, and he responded that he was worried about his health, that his home life seemed to be overburdening, that he felt like things were caving down on him, that he did not feel fit for duty. *Id.* He requested to speak to someone in order to be pointed in the right direction to return to fitness-for-duty status. *Id.*

R.S. was given the MMPI-II, and then he was interviewed by psychologist Dr. John S. Baird, Jr. *Doc. 63 (Plaintiff's Additional Facts)* at ¶239. After a clinical interview, Dr. Baird held that R.S.'s status would be "on-hold" pending a review by a medical review officer (MRO). *Id.* at ¶240. On June 15, 2012, Dr. Baird found that R.S. was not recommended for unescorted access because he was a "potential security risk at the time." *Id.* at ¶241. This was based on R.S.'s stress and possible heart issues. *Id.* On June 20, 2012, Lines notified R.S. of the denial/revocation of his unescorted access authorization. *Id.* at ¶242. R.S. was not

49

fired as a result of his loss of access, and, in fact, he was referred to a course of treatment by Fran McAndrew, which was completed on June 15, 2012. *Id.* at ¶243. On August 23, 2012, R.S. was re-evaluated by Dr. Baird, and Dr. Baird deemed R.S. "acceptable for unescorted access." *Id.* at ¶244.

On May 15, 2012, four days after McNelis's termination, S.W. was referred to the BOP program. *Id.* at ¶245. The supervisor who initiated the referral was Richard Mogavero, and the concurring supervisor was Melanie Leonard. *Doc. 71* at 2. The description of the incident or behavior on the referral form provides that Mogavero contacted S.W. "due to [unreadable] late for scheduled training at the APF." *Id.* Mogavero was told by another officer that S.W. wanted to speak to him. *Id.* When Mogavero spoke to S.W. on the phone, she was upset and crying, and she stated that she thought she was "losing it" and that she had unsuccessfully attempted to receive counseling. *Id.* S.W. was only a few minutes from the Access Processing Facility, and Mogavero instructed her to come inside and meet with him. *Id.* Mogavero and Leonard then met with S.W., who "appeared to be emotionally shaken and who was apologetic for having to do this at work." *Id.*

S.W. was given an MMPI-II exam and then a clinical interview by Dr. Baird that same day. *Doc. 63 (Plaintiff's Additional Facts)* at ¶246. Dr. Baird put S.W.'s access status "on-hold pending an MRO review." *Id.* at ¶247. S.W. was found to have PTSD and adjustment reaction disorder. *Id.* at ¶248. After Dr. Albert Alley

50

conducted an MRO, in July of 2012, Dr. Baird found S.W. acceptable for
unescorted access authorization. *Id.* at ¶249. S.W.'s problems weren't over
though. *Id.* at ¶250. In July of 2013, Dr. Baird examined S.W., he placed S.W.'s
access was "on hold pending an MRO review," and he determined that S.W.
needed a "clinical interview." *Id.* A week later, Dr. Baird determined that S.W.
was "not recommended for unescorted access." *Id.* at ¶251. At Dr. Baird's request,
S.W. saw a psychiatrist, and based on the psychiatrist's report, Dr. Baird suggested
that S.W. see a social worker for counseling for at least five sessions. *Id.* at ¶252.
In August of 2013, S.W. was notified that a decision had been made to revoke her
unescorted access authorization. *Id.* at ¶253. In December of 2013, apparently
after meeting with the counselor as recommended, S.W. took another MMPI-II test
and then met with Dr. Baird, who after a clinical interview granted S.W.
unescorted access. *Id.* at ¶¶254 & 255.

## W. FMLA Paperwork.

A hold was placed on McNelis's access key card because of the BOP
Referral, not because McNelis needed medical leave. *Id.* at ¶152. When McNelis
spoke with Lear on April 19, 2012, in addition to telling Lear that he was in the
hospital, McNelis requested FMLA paperwork. *Id.* at ¶155. At 12:49 a.m. on April
19th, which was only a few minutes after McNelis's call to Lear, Lear sent an e-

mail to Martonick and Gorman informing them of McNelis's request for FMLA paperwork. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶ 80 & 81 and *Doc. 63-18*. Lear asked "[i]f possible could that be emailed to his work email? I don't know if that is possible, it may have to be mailed to his residence." *Doc. 63-18*. His last request was that Martonick get with Carol Parks in H.R. so that McNelis receives the requested information. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶81.

On April 19, 2012 at 2:04 p.m., Martonick sent an e-mail to Parks and notified her that McNelis had requested FMLA paperwork. *Id.* at ¶82. He provided Parks with McNelis's address and cell phone number. *Doc. 63-19*. At 10:45 a.m. the next day, Parks sent an e-mail to Mary Beth Salla stating that she had spoken to McNelis, that he had checked himself into the hospital, and that he was being discharged that day and released to return to work on Monday, April 23, 2012. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶83. She mentioned that there were "other access issues in this case," and she asked Salla to "Please E-MAIL him a possible package" of forms. *Id.* and *Doc. 63-19*. Ten minutes later Salla sent an e-mail to Parks attaching the forms she had sent to McNelis. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶84.

A letter was prepared addressed to McNelis and dated April 20, 2012 (FMLA Letter), which contained instructions for completing PPL's FMLA request form and an FMLA medical certification form, copies of which were enclosed.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶156 & 157 *and Doc. 63 (Plaintiff's Response)* at ¶156 & 157. The FMLA Letter contained the correct home address for McNelis. *Id.* at ¶158. PPL did not have McNelis's personal e-mail address, and McNelis did not have access to his work e-mail at any time after April 17 as his access had an administrative hold placed on it and he never returned to work after that date. *Doc. 63 (Plaintiff's Additional Facts)* at ¶85. According to McNelis, he never received any FMLA paperwork from PPL. *Id.* at ¶86.

McNelis never completed an FMLA application or request form. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶160 and *Doc. 63 (Plaintiff's Response)* at ¶160. McNelis also never submitted an FMLA medical certification form to PPL. *Id.* at ¶161. In fact, McNelis never had any further discussions with anybody at PPL about the issue of FMLA leave. *Id.* at ¶162.

## V.  PPL Is Entitled to Summary Judgement as to the ADA, RA, and PHRA Claims.

PPL contends that it is entitled to summary judgment as to the ADA, RA, and PHRA claims for numerous reasons including: (1) because it receives no federal financial assistance, it cannot be liable under the RA; (2) the PHRA claims are preempted by the Atomic Energy Act and its implementing

regulations; (3) the ADA claims are time barred because McNelis failed to timely file his charge with the EEOC; and (4) McNelis did not plead or exhaust a claim based on being regarded as a drug addict.[11] PPL also addresses the merits of the ADA, RA, and PHRA claims. Because we agree with PPL that it is entitled to summary judgment on the merits, we do not address PPL's other contentions.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as here, the plaintiff contends that the defendant's stated reason for the adverse action is a pretext for discrimination, the *McDonnell Douglas*[12] burden-shifting analysis applies to an ADA discrimination claim.[13]

---

[11] McNelis's vocational expert, Terry P. Leslie, opines that PPL regarded McNelis "as having a disability involving the use of alcohol and/or drugs and/or having a psychological disorder . . . ." *Doc. 63-43* at 6. Based on Leslie's report, PPL assumed that McNelis would attempt to proceed on a theory that PPL regarded him as disabled because it perceived him as a drug addict or drug user even though McNelis did not plead such in his second amended complaint. PPL's assumption was correct as McNelis does rely on that theory in his briefs.

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

[13] The same analysis as under the ADA generally applies to a PHRA claim and to an RA claim. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) ("[W]e note that the Rehab Act, ADA, and PHRA ("the Acts") are all to be

That analysis has three stages:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting

*McDonnell Douglas*, 411 U.S. at 802). "Although the burden of production of

evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at

all times." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

To establish a prima facie case of discrimination under the ADA, "a plaintiff

must show (1) that he is disabled within the meaning of the ADA, (2) that he is

otherwise qualified for the job, with or without reasonable accommodations, and

(3) that he was subjected to an adverse employment decision as a result of

discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir.

2010). A individual is "disabled" under the ADA if he: (1) has a physical or

mental impairment that substantially limits one or more of his major life activities;

(2) has a record of such an impairment; or (3) is regarded as having such an

---

interpreted consistently, and that all have the same standard for determination of liability."). Accordingly, we will only discuss McNelis's ADA claim because our analysis of that claim applies as well to the PHRA and RA claims.

impairment. 42 U.S.C. § 12102(1). McNelis proceeds under the third, "regarded as" prong of the disability definition contending that PPL erroneously regarded him as an illegal drug user, as an alcoholic, and/or as psychotic. We assume for the sake of argument that McNelis can satisfy the first element of a prima facie case, i.e. that he was disabled within the meaning of the ADA because PPL regarded him as disabled.

Although PPL construed the second amended complaint as containing a claim that McNelis's referral to the BOP was discriminatory, in his briefs, McNelis clarifies that he is not claiming that the referral to the BOP was discriminatory. *See Doc. 64 at 24-25* (Plaintiff does not dispute his behavior was unusual in the days leading up [to] the BOP referral and that his actual behavior justified the referral. What was plainly illegal, however, is how Defendant handled things *thereafter*.") (italics in original). Rather, McNelis claims that PPL took two adverse actions against him: (1) it revoked his unescorted access authorization; and (2) it fired him. *Id.* at 48 ("Plaintiff does not contend the referral to the BOP was the discriminatory act which harmed him. It was the loss of access in the form of being held unfit for duty, and the corresponding termination, that were adverse actions grounded in management's misperceptions that caused him harm."). We address each claimed adverse action in turn.

## A. Revocation of Unescorted Access Authorization.

PPL contends that in revoking McNelis's unescorted access authorization it relied on Dr. Thompson's determination that McNelis was not fit for duty. It is not clear if PPL is arguing that McNelis does not meet the second and third elements of a prima facie case, or if it is arguing that given Dr. Thompson's determination, it had a legitimate nondiscriminatory reason for revoking McNelis's unescorted access authorization and McNelis cannot show pretext. We assume without deciding that McNelis can establish a prima facie case with regard to the revocation of his unescorted access authorization. Thus, we proceed to the latter steps of the *McDonnell Douglas* analysis.

### 1. Legitimate Nondiscriminatory Reason.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). An employer satisfies its burden of production by introducing evidence that would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id.* "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting

paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

Here, PPL asserts that it revoked McNelis's unescorted access authorization because Dr. Thompson found him unfit for duty. This is a legitimate, nondiscriminatory reason for revoking McNelis's unescorted access authorization.

### 2. Pretext.

Once the defendant meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff. To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Daniels,* 776 F.3d at 198-99. To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (citations omitted). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was

wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (quoting *Fuentes*, 32 F.3d at 765).  Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, 32 F.3d at 765.

In an attempt to show that PPL's reliance on Dr. Thompson's determination that he was not fit for duty was pretext for disability discrimination, McNelis contends that PPL "rigged the process."  In this regard, McNelis asserts that PPL rigged the BOP process either by failing to tell Dr. Thompson of the allegations that he was using bath salts or by telling Dr. Thompson of those allegations and then convincing Dr. Thompson to "bury any mention of" bath salts in his report because PPL could not test for bath salts and "fixing" the report was an easy way for PPL to have a basis to fire him even though it could not determine with any degree of certainty whether he was using bath salts. *Doc. 64* at 34-36.  The problem with the theory that PPL rigged the process by not telling Dr. Thompson of the allegations that McNelis was using bath salts is that it does not make any sense; why if, as McNelis asserts, PPL was looking for a reason to fire him, would

it not tell Dr. Thompson of information that would have the potential to increase the likelihood that Dr. Thompson would find McNelis unfit for duty? And the problem with the theory that PPL told Dr. Thompson about the allegations that McNelis was using bath salts and then rigged the process by convincing him to find Mr. Nelis unfit for duty without mentioning bath salts in his report is that there is not sufficient evidence to support that theory.

As set forth in the statement of material facts section of this Report and Recommendation and footnote 10, because McNelis failed to respond to PPL's statement of fact that McNelis has no evidence to indicate that Dr. Thompson's determination was not made in good faith and/or in the exercise of his best medical judgment, that fact is deemed undisputed. Nevertheless, we will address McNelis's arguments that there is evidence to support his contention that PPL rigged the process. Although McNelis make numerous arguments suggesting that PPL rigged the process, viewing the evidence the light most favorable to McNelis as the nonmoving party, we nevertheless conclude that he has not presented sufficient evidence from which a reasonable factfinder could conclude that PPL rigged the process.

McNelis points to the fact that Lines asserts that he told Dr. Thompson of the allegations that McNelis was using bath salts, but Lines was not concerned when Dr. Thompson's report did not mention bath salts because bath salts were not

on an approved panel of illegal drugs that PPL could test for unless given specific permission from the NRC.  That Lines took what may be considered a nonchalant attitude toward the lack of any mention of drug use in Dr. Thompson's report, does not lead to a reasonable inference that PPL in any way interfered with Dr. Thompson's professional judgment.

McNelis also contends that there is something nefarious about the fact that Dr. Thompson in his April 30, 2012 report determined that McNelis's unescorted access authorization was "on hold pending [a] determination of fitness," but then the next day, Dr. Thompson determined that McNelis was "not fit for duty." *See Doc. 64* at 37.  McNelis suggests that Dr. Thompson changed his opinion after he learned that Nick Steward had informed Lear that he had information from a reliable source that McNelis was using bath salts.  According to McNelis, a jury could find that based on Dr. Thompson's unexplained change within 24 hours that he was "a hack" for PPL and that the change reflects the perception of PPL's management about McNelis, rather than Dr. Thompson's own professional judgment. *See Doc. 64* at 53.  But McNelis has not presented evidence from which a reasonable trier of fact could conclude that Dr. Thompson, in fact, learned of Nick Steward's allegation.  Moreover, Dr. Thompson did not change his opinion. Dr. Thompson is a substance abuse expert as well as a psychologist, and his April 30th report was a psychological assessment, whereas his May 1st report was a

"Substance Abuse Expert Determination of Fitness." *See Docs. 57-30* and *57-32*. Further, in addition to providing no evidence that anyone at PPL interfered with Dr. Thompson's professional judgment, Dr. Thompson specifically denies any such interference. *See Doc. 82-2* (*Thompson Decl.* at ¶7) ("At no time was I asked or told by anyone at PPL to 'bury' or otherwise avoid reference to rumored use of unlawful drugs by Mr. McNelis. PPL did not in any way attempt to influence or interfere with my clinical evaluations of Mr. McNelis, my determinations of fitness for duty, and/or my continuing treatment recommendations for this individual.").

McNelis also suggests that given that Dr. Thompson was a substance abuse expert, he could have performed the alcohol assessment that he recommended and that fact that he did not suggests that PPL did not want him to conduct the evaluation. But Dr. Thompson recommended more than just an alcohol assessment, he recommended an "alcohol assessment and possible inpatient treatment." *Doc. 57-32* at 2. Further, the fact that Dr. Thompson did not do an alcohol assessment himself does not lead to a reasonable inference of manipulation by PPL.

McNelis also contends that Dr. Thompson erred by checking the box on the fitness for duty form that read "Not Fit for Duty." Instead, according to McNelis, Dr. Thompson should have checked the box that read "Fitness for Duty cannot be

determined until subject completes a program as described in the report narrative."

Dr. Thompson, however, asserts that he did not check the wrong box:

> I did not mistakenly check the wrong box on the SAE
> Determination of Fitness. Instead, I determined in the exercise
> of sound professional judgment that Mr. McNelis was not fit for
> duty at the time of the evaluation. This is distinct from a
> determination that Mr. McNelis' fitness for duty could not be
> determined pending competition [sic] of a program as described
> in the narrative.

Doc. 82-2 (*Thompson Decl.* at ¶5). Moreover, that McNelis disagrees with Dr. Thompson's opinion does not lead to a reasonable inference of manipulation by PPL.

McNelis also contends that Dr. Thompson should have changed his position on his fitness-for-duty determination after McNelis provided McAndrew's letter stating his opinion that McNelis does not meet the criteria for chemical dependency and Wickham's note stating that the referral to the Caron Foundation was at the behest of McNelis's wife. McNelis contends that instead of being an advocate for him, Dr. Thompson simply let the appeal process work itself out. But it was not Dr. Thompson's role to be an advocate for anyone. 10 C.F.R. § 26.187 ("The SAE is not an advocate for the licensee or other entity, or the individual."). Rather, his function was "to protect public health and safety and the common defense and security by professionally evaluating the individual and recommending appropriate education/treatment, follow-up tests, and aftercare." *Id.*

The Wickham note and the McAndrew letter were not submitted until after Dr. Thompson already made his fitness for duty determination, and the fact that Dr. Thompson did not change his opinion based on these items after McNelis had already been terminated, cannot reasonably be seen to lead to an inference that PPL manipulated Dr. Thompson's professional judgment.

In sum, while McNelis makes many assertions that he contends support his assertion that PPL rigged the process, he has not provided evidence from which a reasonable factfinder could reach that conclusion. And in the absence of evidence that PPL interfered with Dr. Thompson's professional judgment, it was reasonable for PPL to revoke McNelis's unescorted access authorization based on Dr. Thompson's determination that McNelis was not fit for duty, and no inference of pretext arises from PPL's reliance on Dr. Thompson's determination. Accordingly, PPL is entitled to summary judgment as to McNelis's claims under the ADA, the RA, and the PHRA with regard to the revocation of McNelis's unescorted access authorization.

### B. Termination.

With respect to the termination, PPL argues that McNelis cannot establish the second element of a prima facie case, i.e., that he was otherwise qualified for the job.

Under the ADA, a qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id*. Further, an employer "[m]ay require that employees employed in sensitive positions comply with the regulations . . . of the Nuclear Regulatory Commission that apply to employment in sensitive positions subject to such regulations." 29 C.F.R. § 1630.16(b)(6).

Whether an individual is a qualified individual is determined using a two-step test. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). "First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* (internal quotation marks and citation omitted). Second, the court must consider whether "the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The plaintiff has the burden to show that he was qualified at the time of the employment decision. *Id.*

65

Here, it is undisputed that all individuals working inside PPL's Susquehanna Steam Electric Station are required to maintain unescorted access authorization. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶28 and *Doc. 63 (Plaintiff's Response)* at ¶28. Because McNelis worked inside the Susquehanna Steam Electric Station, he was required to maintain unescorted access authorization. Numerous courts have held that unescorted access authorization is an essential job function in the nuclear power industry and without such an individual is not otherwise qualified. *See e.g. Lute v. Dominion Nuclear Connecticut, Inc.,* No. 3:12-CV-01412 MPS, 2015 WL 1456769, at *11 (D. Conn. Mar. 30, 2015) (concluding that plaintiff's failure to maintain unescorted access authorization "means that he cannot show that he was 'otherwise qualified to perform the essential functions of his job,' and thus cannot establish a prima facie case of discrimination under the ADA"); *Sysko v. PPL Corp.*, 3:CV-07-0470, 2009 WL 4725240 at *11 (M.D.Pa. 2009) ("Revocation of his unescorted access status rendered Plaintiff 'unqualified' for his position as an Instrument and Control Technician. As a matter of law, Plaintiff cannot sustain his burden of showing that he was a qualified individual under the ADA or PHRA."); *McCoy v. Pennsylvania Power & Light Co.*, 933 F. Supp. 438, 443 (M.D. Pa. 1996) (finding that "NRC regulations make security clearance an essential component of plaintiff's former job as a nuclear plant operator" and that "maintaining security clearance is an

66

essential job function and any revocation or suspension of that status renders an employee ineligible, i.e. not qualified, under NRC regulations, to work as a nuclear plant operator").

McNelis attempts to distinguish the cases that have held that unescorted access authorization is an essential function of the job in the nuclear industry by asserting that in large part those cases were decided before the 2009 enactment of the ADAAA. But *Lute* was decided in 2015. Moreover, while the 2009 amendments liberalized the definition of disability, a plaintiff still must show that he was qualified for the job.

McNelis also contends that PPL manipulated Dr. Thompson's opinions. But we have already addressed that contention and determined that McNelis has not pointed to evidence from which a reasonable factfinder could come to such a conclusion.

McNelis further contends that he was, in fact, fit for duty. He asserts that in making his fitness-for-duty determination, Dr. Thompson relied on the Geisinger discharge summary, which contained a referral to the Caron Foundation, but, according to McNelis, Dr. Thompson erreonsly relied on the referral to the Caron Foundation because that referral was made at the request of McNelis's wife. Regardless of the impetus for the referral, it is undisputed that it is accurate that McNelis was referred by Geisinger to the Caron Foundation, and it is accurate that

Geisinger's Discharge Instructions referred McNelis to the Caron Foundation "for an evaluation and treatment recommendations for [his] drinking." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶¶102 & 103 and *Doc. 63 (Plaintiff's Response)* at ¶¶102 & 103. Further, McNelis never told Dr. Thompson that he believed the Caron Foundation referral to have been made or included in the discharge summary in error. *Id.* at ¶104. Also, the Geisinger discharge summary is not the only thing that Dr. Thompson referenced with regard to McNelis's use of alcohol, *see id.* at ¶¶97-100 (noting that McNelis admitted consuming up to 12 beers per week, that his use of alcohol has, at times, been an issue of contention with his wife, and that he had two prior arrests for alcohol-related offenses), and McNelis has not presented any evidence that Dr. Thompson would have made a different determination if he had known that the referral to the Caron Foundation was made at the behest of McNelis's wife.

McNelis also points to the fact that Geisinger said he could return to work when it released him from the hospital. But there is no evidence that Geisinger was making, or was qualified to make, a fitness-for-duty determination in accordance with the NRC regulations. *See* 10 C.F.R. § 26.189(a) ("A determination of fitness must be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise, as verified by the

licensee or other entity, to evaluate the specific fitness issues presented by the individual.").

We note that McNelis does not argue that he could do the job of a Nuclear Security Officer with a reasonable accommodation. *See Doc. 64* at 51 ("McNelis did not have a disability and wasn't asking for any accommodations.").   And an employer "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability" solely because he is regarded as disabled. 42 U.S.C.A. § 12201(h).[14]   "[W]here a plaintiff  brings a 'regarded-as' claim, as here, [he] must demonstrate that [he] was 'a qualified individual without the benefit of any reasonable accommodation.'" *Wiseman v. Convention Ctr. Auth. of the Metro. Gov't of Nashville & Davidson Cty.*, No. 3:14-C-01911, 2016 WL 54922, at *12 (M.D. Tenn. Jan. 5, 2016) (quoting *Hoback v. City of Chattanooga*, 10-C-74, 2012 WL 3834828, at *5 (E.D. Tenn. Sept. 4, 2012), *aff'd*, 550 F. App'x 257 (6th Cir. 2013)).   "Thus, the question of his qualification must be decided without regard to any potential accommodation." *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11

---

[14] In 2004, the Third Circuit held that employees "regarded as" disabled under the ADA "are entitled to reasonable accommodation in the same way as are those who are actually disabled." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 775 (3d Cir. 2004).  But *Williams* was decided before the 2009 amendments to the ADA, which among other things, amended the ADA to specifically provide that "regarded as" plaintiffs are not entitled to reasonable accommodations.

n.13 (6th Cir. 2012); *See also Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 606 F. App'x 639, 642 (3d Cir. 2015) (holding the district court properly dismissed ADA and PHRA claim because "Kiniropoulos was not entitled to a reasonable accommodation because he alleges that he was "regarded as" having an impairment, not that he had such an impairment").

Given that at the time of his termination, McNelis did not have unescorted access authorization, an essential requirement for his job as a Nuclear Security Officer, McNelis cannot show that he was a qualified individual under the ADA. Accordingly, PPL is entitled to summary judgment as to McNelis's claims under the ADA, the RA, and the PHRA with regard to McNelis's termination.[15]

## VI. FMLA.

In his second amended complaint, McNelis claims that PPL violated the FMLA by failing to provide him with necessary FMLA paperwork after he requested such, by refusing allow him to return to work, and by firing him. PPL contends that the McNelis's FMLA claims are barred by the statute of limitations. PPL also contends that it is entitled to summary judgment on the merits of McNelis's FMLA claims.

---

[15] Because we conclude that McNelis cannot establish a prima facie case, we do not reach the latter steps of the *McDonnell Douglas* framework.

## A.  Statute of Limitations.

The statute of limitations for an FMLA claim is generally two years.  29

U.S.C. § 2617(c)(1) ("Except as provided in paragraph (2), an action may be

brought under this section not later than 2 years after the date of the last event

constituting the alleged violation for which the action is brought.").  But the statute

of limitations is extended to three years for a willful violation of the FMLA. 29

U.S.C. §2617(c)(2) ("In case of such action brought for willful violation of section

2615 of this title, such action may be brought within 3 years of the date of the last

event constituting the alleged violation for which such action is brought.").  "The

plaintiff bears the burden of proving a willful violation in order to get the benefit of

the extended three-year statute of limitations." *Woida v. Genesys Reg'l Med. Ctr.*,

4 F. Supp. 3d 880, 893 (E.D. Mich. 2014).

Here, McNelis was terminated on May 11, 2012, but he did not assert an

FMLA claim until more than two years later—on September 17, 2014, when he

filed his second amended complaint.  Thus, unless the purported violations were

willful, McNelis's FMLA claims are barred by the statute of limitations.

Under the FMLA, "an employer's actions are 'willful' when 'the employer

either knew or showed reckless disregard for the matter of whether its conduct was

prohibited by the statute.'" *McDonald v. SEIU Healthcare Pennsylvania*, No. 1:13-

CV-2555, 2014 WL 4672493, at *14 (M.D. Pa. Sept. 18, 2014) (quoting

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)). "Mere negligence is not enough." *Id.*

### 1. If PPL Sent the FMLA Paperwork to McNelis's Work Email, a Reasonable Factfinder Could Conclude that PPL Willfully Violated the FMLA.

McNelis contends that the purported violations were willful because PPL sent the FMLA forms that he had requested to his work email even though it knew that he was not at work at the time, that his access to his work email had been cut off, and that he may not have access to his work email in the future. PPL replies that it sent the FMLA forms by regular mail to McNelis's home address. It also asserts that even assuming that it sent the forms to his work email, that was a "simple mistake, made by individuals in PPL's Employee Health Department with no knowledge of McNelis' personal circumstances and no motive to discriminate against him," and thus cannot be deemed a willful violation. *Doc. 82* at 3. But given that the April 20, 2012 email from Carol Parks to Mary Beth Salla mentioned that there were "other access issues in his case," *doc. 63-19*, it is for the factfinder to determine what the individuals responsible for sending the paperwork knew about McNelis's access to his work email. Further, it is a question of fact for the factfinder to determine whether, if PPL sent the FMLA paperwork to McNelis at his work email when he did not have access to that email, that amounts to a willful violation. Thus, if there is evidence from which a reasonable factfinder

72

could conclude that PPL sent the FMLA paperwork to McNelis's work email, instead of his home address (a question we address in the next section), we cannot conclude that McNelis's claim that PPL violated the FMLA by failing to provide him with the necessary paperwork is barred by the statute of limitations. While the method of sending the forms may show that PPL willfully breached its duty to send McNelis the FMLA paperwork that he requested, because PPL's refusal to return McNelis to his position and its termination of his employment was based on his failure to maintain unescorted access authorization and his alleged failure to self-report his fitness-for-duty issues, not on McNelis failing to return the necessary FMLA paperwork or on any other basis that apparently depended on whether McNelis received the FMLA paperwork,[16] it is difficult to see how the method of sending the forms shows that PPL willfully breached its duties under the FMLA by refusing to allow McNelis to return to work or by firing him. But because the parties do not make this distinction, we do not use it as a basis for our decision.

---

[16] Although PPL does not contend that it refused to reinstate McNelis because he failed to return the FMLA forms, it does argue McNelis forfeited his FMLA rights by not returning a medical certification form. We reject that argument in a later section of this Report and Recommendation.

### 2. There Is a Genuine Factual Dispute About Whether PPL Sent the FMLA Paperwork to McNelis's Work Email or to his Home Address.

While McNelis contends that PPL sent the FMLA paperwork by email to his work email, PPL contends that it mailed the paperwork to his home address. PPL attached to its response to McNelis's surreply brief a declaration from Mary Beth Salla, who in April of 2012 was a benefits administrator with PPL and whose job responsibilities included the provision of FMLA forms and paperwork to PPL employees. *See Doc. 90-1* at ¶2. Salla asserts that, on or about April 20, 2012, she sent, by U.S. Mail, a packet of FMLA forms and paperwork to McNelis. *Id.* at ¶3. She states that had the FMLA paperwork been emailed to McNelis, the cover letter would not have contained his home address. *Id.* at ¶4. Instead, it would have contained only McNelis's internal email code at the Susquehanna Steam Electric Station. *Id.* at ¶4. Further, according to Salla, if the FMLA materials had been emailed to McNelis, a copy of the email message to which the materials were attached as well as a copy of the letter bearing McNelis's internal mail code would have been retained for the file as opposed to a copy of the cover letter bearing McNelis's street address. *Id.* at ¶5.

### a. We Will Consider Salla's Declaration.

McNelis contends that the court should not consider Salla's declaration because PPL had not previously identified Salla as a witness in its initial

74

disclosures or discovery responses.  PPL responds that it served its initial

disclosures before McNelis amended the complaint to add FMLA claims and it did

not supplement its initial disclosures or its responses to McNelis's interrogatories

to name Salla because it only became aware of McNelis's contention that it

emailed the FMLA paperwork to him when he made that argument in his brief in

opposition to the motion for summary judgment.  According to PPL, although it

was aware of McNelis's contention that he did not receive the FMLA paperwork,

until McNelis filed his brief in opposition, it was not aware that the actual method

of delivery was in dispute, and, thus, until McNelis filed his brief in opposition, it

did not consider Salla to be an individual with relevant knowledge.  Nevertheless,

PPL contends that Salla's identity and the subject matter of her knowledge was

disclosed to McNelis in October of 2014, when it supplemented its document

production by producing McNelis's entire FMLA file, which included the April 20,

2012 emails from Parks to Salla and from Salla to Parks regarding the FMLA

paperwork. *See Doc. 96-1* at 10-14.

Federal Rule of Civil Procedure 26(a) requires a party to make initial

disclosures of, among other things, the identity of "each individual likely to have

discoverable information—along with the subjects of that information—that the

disclosing party may use to support its claims or defenses, unless the use would be

solely for impeachment."  Rule 26(e) requires a party to supplement or correct its

initial disclosures and responses to discovery requests "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 37(c)(1) provides an enforcement mechanism for Rules 26(a) and 26(e):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition to or in lieu of exclusion, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Fed.R.Civ.P. 37(c)(1).

Although Rule 37 is written in mandatory terms, it expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose or if the failure to disclose was harmless. The non-producing party has the burden to prove "substantial justification for its conduct or that the failure to produce was harmless." *Tolerico v. Home Depot*, 205 F.R.D. 169, 175 (M.D. Pa. 2002). "[D]istrict courts in this circuit have defined 'substantial justification' as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with this disclosure request.'" *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 590370, at *7 (M.D. Pa. Feb. 12, 2016) (quoting *Tolerico*, 205 F.R.D. at 175). "A party's

misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *Tolerico*, 205 F.R.D. at 176 (quoting *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 369 (M.D. Ala. 2001)).

Further, the district court has discretion in deciding whether to issue sanctions under Rule 37. *Newman v. GHS Osteopathic, Inc.*, 60 F.3d. 153, 156 (3d Cir. 1995). The United States Court of Appeals for the Third Circuit has identified factors to consider in deciding whether to exclude or permit the testimony of a previously undisclosed witness: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses are to testify; (2) the ability of that party to cure the prejudice; (3) the extent to which the waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or willfulness in failing to comply with the court's order. *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985). The court should also consider the importance of the excluded testimony. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991). "The exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *In re Paoli*

*RR Yard PCB Litigation*, 35 F.3d 717, 791-92 (3d Cir. 1994) (quoting *Pennypack,*

559 F.2d at 905).

Here given that, in October of 2014, PPL produced McNelis's entire FMLA

file, which included the April 20, 2012 emails involving Salla and given that the

importance of the method of delivery of the FMLA paperwork was not readily

apparent to PPL until the briefing on the motion for summary judgment, we

conclude that PPL's failure to specifically list Salla as a witness was harmless and

that McNelis was not prejudiced by the failure.  Thus, we will consider Salla's

declaration.

### b. Salla's Declaration Creates a Genuine Dispute of Material Fact.

Although Salla's declaration provides support for PPL's contention that it

mailed the FMLA paperwork to McNelis, McNelis testified at his deposition that

he did not receive the FMLA paperwork. *See Doc. 57-6* (*McNelis Dep*. at 122-

123).[17]  McNelis also points to the emails regarding his request for FMLA

---

[17] Although PPL contends that McNelis admitted that he does not know whether he received the FMLA paperwork and simply misplaced it, that is not the only characterization of McNelis's testimony that is possible.  After McNelis testified at his deposition that he did not receive the FMLA paperwork but that the address on the paperwork was his correct address, the following exchange took place:

> Q.  Do you recall this rough time frame, April of 2012 were you having difficulties to your knowledge with your mail?
> A.  Not that I'm aware of.

paperwork, some of which mention emailing the paperwork to McNelis. *See Doc. 63-18* (April 19, 2012 email from Lear to Martonick and Gorman asking "[i]f possible could [the FMLA paperwork] be emailed to his work email? I don't know if that is possible, it may have to be mailed to his residence."); *Doc. 63-19* (April 20, 2012 email from Parks to Salla asking Salla to "[p]lease E-MAIL him a possible package" of forms). McNelis also points out that Salla emailed Parks and attached a copy of the FMLA package for McNelis, but she did not state that she had mailed the package to McNelis even though Parks had asked her to email it. *See Doc. 63-20.* Based on McNelis's denial of receipt[18] of the FMLA paperwork

---

> Q. Had you ever had difficulties in the past with material being sent to you by mail from PPL?
> A. Just getting stuff placed in the wrong mailbox out front, I've had that happen. Not from PPL, I don't think, I ever had any mailings from PPL.
> Q. Okay. Is it possible that you received this letter dated April 20, 2012 and it somehow got misplaced?
> A. I don't know.

*See Doc. 57-6* (*McNelis Dep.* at 122-123). Viewing McNelis's testimony in the light most favorable to him, as we must since he is the nonmoving party, given that McNelis testified that he did not know if it was possible that the paperwork was received and misplaced immediately after he testified about the postal service putting mail in the wrong mailbox, we cannot conclude that McNelis admitted that he may have received the FMLA paperwork and simply misplaced it.

[18] In a footnote in one of its briefs, PPL asserts that McNelis has not rebutted the presumption of receipt under the mailbox rule. *Doc. 58* at 17 n.1. "Under the mailbox rule, if a letter 'properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time, and was received by the person to whom it was addressed.'" *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 319 (3d Cir. 2014)

coupled with the emails about the paperwork that mention possibly emailing it to McNelis, a reasonable factfinder could find that PPL did not mail the paperwork to McNelis. Thus, there is genuine issue of material fact about whether PPL mailed the FMLA paperwork to his home or emailed it to his work email. Accordingly, PPL is not entitled to summary judgment as to the FMLA claims on the basis that those claims are barred by the statute of limitations.

## B. The Merits.

### 1. FMLA Standards.

"Congress enacted the FMLA in 1993 to accommodate 'the important societal interest in assisting families, by establishing a minimum labor standard for

---

(quoting *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884)). When mail is sent via regular mail, the mailbox rule creates only a weak presumption of receipt. *Id*. The presumption is a "bursting bubble" presumption, under which "the party the presumption operates against has the burden of producing evidence to rebut the presumption," and "'introduction of evidence to rebut [the] presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *Id*. at 320 (quoting *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3d Cir. 2006) (in turn quoting *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 830 (3d Cir. 1994)). "Moreover, the 'quantum of evidence; needed to burst an evidentiary presumption's bubble in a civil case is 'minimal.'" *Id*. (quoting *McCann*, 458 F.3d at 288). And "evidence sufficient to nullify the presumption of receipt under the mailbox rule may consist solely of the addressee's positive denial of receipt, creating an issue of fact for the jury." *Id*. at 321. Here, McNelis's denial of receipt of the FMLA paperwork bursts the mailbox rule's presumption and creates a genuine issue of material fact about whether PPL mailed the FMLA paperwork to his home or emailed it to his work email.

leave.'" *Sommer v. The Vanguard Group,* 461 F.3d 397, 398-99 (3d Cir. 2006) (quoting *Churchill v. Star Enters.,* 183 F.3d 184, 192 (3d Cir. 1999)). "The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (quoting 29 U.S.C. § 2601(b)(1) and (2)). "The FMLA endeavors to accomplish these purposes 'in a manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29 U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct." *Id.* "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1–year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2612(a)). With regard to leave for an employee's own health, eligible employees are entitled to a total of twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of his or her position. *Callison*, 430 F.3d at 119. During the leave, an employer must maintain the employee's group health benefits, and following a qualified absence, the

employee is generally entitled to be reinstated to his or her former position or an alternative one with equivalent pay, benefits, and working conditions. 29 U.S.C. § 2614(a) & (c).

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C.S. § 2615(a)(1). Claims brought under Section 2615(a)(1) are known as interference claims. *Sommer,* 461 F.3d at 399. Additionally, the FMLA prohibits retaliating against an employee for having exercised or attempted to exercise his rights under the FMLA. "FMLA retaliation claims are rooted in the FMLA regulations." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citing 29 C.F.R. § 825.220(c)).

### 2. Interference Claims.

To establish an FMLA interference claim, an employee must show that he or she was entitled to benefits under the FMLA and that he or she was denied those benefits. *Budhun*, 765 F.3d at 252. More specifically, a plaintiff must establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she

was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison,* 430 F.3d at 120. Because an interference claim is not about discrimination, "a *McDonnell-Douglas* burden-shifting analysis is not required." *Sommer,* 461 F.3d at 399.

PPL only addresses the fifth element of a prima facie interference case. PPL contends that McNelis forfeited his FMLA rights by not returning a medical-certification form. But given that we have determined that there is a genuine factual dispute about whether PPL mailed the FMLA paperwork to McNelis or sent it to his work email, to which he did not have access, PPL is not entitled to summary judgment on the basis that McNelis failed to return a medical-certification form.

PPL also argues that McNelis was not denied any benefits to which he was entitled. In this regard, PPL contends that McNelis requested and was granted leave in connection with his hospital stay from April 18, 2012 through April 20, 2012. Thus, according to PPL, McNelis received all of the leave he needed and/or requested for an FMLA-qualifying reason. McNelis does not specifically respond to this argument; instead, he contends that he was denied reinstatement after he was released from Geisinger. It appeared from the second amended complaint that

McNelis pleaded three distinct FMLA claims: (1) failure to provide FMLA paperwork after he requested such; (2) refusal to allow him to return to work; and (3) termination of his employment. But given McNelis's brief in opposition, it appears either that he has abandoned the first claim or that he considers the first and second basis stated above to be one claim. To the extent there are three separate claims, we recommend that PPL be granted summary judgment as to the first claim because McNelis has not responded to PPL's assertion that he received all the leave to which he was entitled. To the extent that the claim is a blend of the failure to receive the FMLA paperwork and the failure to reinstate, for the following reasons, we also recommend that PPL be granted summary judgment.

Although the FMLA generally requires that an employee be restored to his position following FMLA leave, "[a]n employee has not greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. §825.216(a). And "[t]he failure to restore an employee to [his] position at the conclusion of [his] leave does not violate the FMLA if the employee remains unable to perform an 'essential function' of the position." *Budhun*, 765 F.3d at 254 (quoting 29 C.F.R. §825.216(c)). Because McNelis's key card was placed on hold and he was referred to the BOP before he requested FMLA paperwork and because, as discussed above, unescorted access authorization was an essential

84

function of his job, McNelis cannot show that the failure to allow him to return to

his position as a Nuclear Security Officer while the BOP process was unfolding

was the denial of a benefit to which he was entitled under the FMLA.

Accordingly, we recommend that PPL be granted summary judgment as to

McNelis's interference claim regarding the failure to reinstate him.

### 3. Retaliation Claim.

McNelis contends that PPL violated the FMLA by firing him. "[F]iring an

employee for a valid request for FMLA leave may constitute interference with the

employee's FMLA rights as well as retaliation against the employee." *Erdman v.

Nationwide Ins. Co.,* 582 F.3d 500, 509 (3d Cir. 2009). Here the parties have

treated McNelis's claim based on his termination as a retaliation claim, and so that

is how we will address the claim.

"FMLA retaliation claims based on circumstantial evidence are governed by

the burden-shifting framework established by *McDonnell Douglas . . . ." Budhun,*

765 F.3d at 256. To establish a prima facie case, a plaintiff "must establish

establish that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered

an adverse employment decision, and (3) the adverse action was causally related to

her invocation of rights.'" *Id.* (quoting *Lichtenstein v. Univ. of Pittsburgh Med.

Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). PPL contends that McNelis cannot

85

establish the third element—causation. Although McNelis does not specifically address the causation element, he contends that he can show pretext, and he points to the same evidence he set forth as pretext in the ADA context. Thus, we address whether McNelis's evidence creates a genuine factual dispute as to causation.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal connection between his protected activity and the adverse action taken by the defendant. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir. 2000). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.,* 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997)). But the "court's analysis of temporal proximity must focus on the factual circumstances of the individual case." *Fischer v. Transue*, 1:04-CV-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008).

Here, McNelis requested FMLA paperwork on April 19, 2012, and although the exact date that Gorman decided termination was appropriate is not clear from the record, it was sometime after Dr. Thompson's May 1, 2012 report determining McNelis not fit for duty. Thus, construing the evidence in the light most favorable to McNelis, there was a period of 12 days from the date he requested the paperwork and the date the decision to terminate him was made. Given the

circumstances of this case, the timing alone is not unduly suggestive of retaliation. McNelis was referred to the BOP before he requested FMLA paperwork and the decision to terminate him was made after the BOP process came to an end after Dr. Thompson found McNelis not fit for duty, and it is reasonable to believe that that is the time that such a decision would usually be made. In these circumstances, timing alone does not support an inference of causation.

"Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon v. Lancaster Jewish Community Center Assoc.,* 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell,* 206 F.3d at 280). For example, actual antagonistic conduct or animus against the plaintiff during the relevant period may demonstrate causation. *Marra,* 497 F.3d at 302. Also, other types of circumstantial evidence, such as inconsistent reasons given by the defendant for the action or the defendant treating others differently from the way it treated the plaintiff, may give rise to an inference of causation. *Id.* In sum, to establish causation in the retaliation context, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "In the absence of that proof the plaintiff must show that from the

87

'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Id.* (quoting *Farrell,* 206 F.3d at 281). In this regard, "'[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity.'" *Reaves v. Pennsylvania State Police*, 597 F. App'x 92, 97-98 (3d Cir. 2015) (quoting *Ross v. Gilhuly,* 755 F.3d 185, 194 (3d Cir. 2014)); *see also LeBoon,* 503 F.3d at 233–34 (affirming summary judgment because employee could not establish the causation element of a prima facie case based on tense relationship with her supervisor where that tense relationship predated the employee's protected activity).

McNelis's arguments regarding pretext are insufficient to raise a genuine dispute of material fact as to whether his termination was caused by his request for FMLA paperwork or his leave. McNelis points out that some of the supervisors at PPL believed that he was responsible for the school lockdown, they failed to investigate his alleged drug use, and they mentioned the 2010 anonymous call in the SEARP checklist. Those facts, however, do not support an inference of causation of retaliation for exercise of FMLA rights. McNelis also contends that PPL tried to rig the BOP process by interfering with Dr. Thompson's professional judgment. As discussed already, McNelis does not have facts to support that contention. Also, Lines's post-termination explanation to Dr. Thompson that

McNelis was fired based on a new policy and that Dr. Thompson failed to change his determination after he learned of the Wickham note and McAndrew's letter does not raise an inference that the termination was caused by McNelis's invocation of the FMLA. Nor does McNelis's contention that the SEARP review and Walsh's review of the revocation of McNelis's unescorted access authorization were cursory raise an inference the McNelis's invocation of the FMLA was a cause of his termination.

McNelis contends that the determination that he was unfit for duty is not an automatic trigger for him to be fired, and he points to two other employees—R.S. and S.W.—who were not fired after they lost their unescorted access authorization. At first blush, this appears to suggest that PPL treated McNelis differently than it treated others similarly situated, which in the retaliation context may lead to an inference of causation. But R.S. and S.W. were not similarly situated to McNelis because R.S. and S.W. self-reported that they had fitness for duty problems, whereas in his telephone call to Gorman on April 17, 2012, McNelis merely asked for time off to attend to personal or family issues, and one of the basis for Gorman's decision to terminate McNelis was that he was evasive during the April 17, 2012 call. While McNelis contends that he was not evasive because he answered all of Gorman's questions about his time off and the school lockdown, there is no evidence that during the April 17th call McNelis reported the problems

that he was experiencing regarding lack of sleep and paranoia. McNelis also contends that if Gorman thought he was being evasive, he should have fired him on April 17th instead of waiting until May. But the fact that Gorman waited for the already started BOP process to play out, does not raised an inference of causation.

Finally, McNelis points to a form title Decision Making Leave/Termination Recommendation Form" singed on May 7, 2012 by Helsel and 5/8/12 by someone from PPL's HR department. McNelis points out that that form lists the recommended action as termination, and while it states that McNelis no longer has unescorted access, it does not mention that McNelis was evasive during the April 17, 2012 call. *See Doc*. 88-3. We note that the SEARP checklist also sets forth the basis for the proposed action as "McNelis was determined to be unfit for duty by the site contract Psychologist." *See Doc. 63-55* at 1. But the SEARP checklist does in the body of the document state that McNelis was not forthright in providing information during the April 17th phone call. *Id*. The mere omission from one form of one of the purported reasons for termination does not lead to a reasonable inference of a causal connection between the termination and McNelis's invocation of the FMLA.

In sum, construing McNelis's evidence in combination and in the light most favorable to McNelis, we nevertheless conclude that he has not presented evidence from which a reasonable trier of fact could conclude that his termination was based

on the fact that he requested FMLA paperwork or that he took leave, which should have been deemed FMLA leave.

## VII. Motion to Preclude McNelis's Vocational Expert.

PPL filed a motion to preclude McNelis's vocational expert, Terry Leslie, from testifying. In his expert report, Mr. Leslie opines that PPL regarded McNelis "as having a disability involving the use of alcohol and/or drugs and/or having a psychological disorder . . . ." *Doc. 63-43* at 6. We have determined that, assuming of the sake of argument that PPL regarded McNelis as disabled, PPL is nevertheless entitled to summary judgment as to McNelis's ADA, RA, and PHRA claim for other reasons. Given our assumption that PPL regarded McNelis as disabled and that Mr. Leslie's report addresses only the question of whether PPL regarded McNelis as disabled, we need not address the motion to preclude Leslie from testifying. Thus, we recommend that that motion be denied without prejudice to PPL refiling the motion in the event that the district court disagrees with our recommendation that PPL be granted summary judgment as to the ADA, RA, and PHRA claims.

## VIII. Recommendations.

Accordingly, for the foregoing reasons, it is recommended PPL's motion (doc. 57) for summary judgment be granted. It is also recommended that PPL's

motion (doc. 81) to preclude McNelis's vocational expert be denied without

prejudice.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 23rd day of March, 2016.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYLE MCNELIS, | : | Case No. 4:13-CV-02612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA POWER & | : | |
| LIGHT, SUSQUEHANNA, LLC, | : | |
| | : | (Magistrate Judge Schwab) |
| Defendant. | : | |

**MEMORANDUM**
September 19, 2016

Before the Court for disposition are Defendant Pennsylvania Power & Light,

Susquehanna, LLC's (hereinafter "PPL") Motion for Summary Judgment and

Motion to Preclude Plaintiff's Expert.[1]  Magistrate Judge Susan E. Schwab has

prepared a Report and Recommendation concerning these matters.  For the

following reasons, this Report and Recommendation will be adopted in its entirety.

Defendant Pennsylvania Power & Light, Susquehanna LLC's Motion for Summary

Judgment will be granted.  Because Defendant is entitled to summary judgment on

all claims, Defendant's Motion to Preclude Plaintiff's Expert is denied as moot.

---

[1] Also pending before the Court are Defendant's Motion to Strike Plaintiff's Untimely Reply and
Plaintiff's Motion For Leave to File His Reply Brief Out of Time.  These Motions relate to
Plaintiff's untimely Reply Brief to Defendant's Response to Plaintiff's Objections.  Having
reviewed the briefs filed concerning these motions and cognizant that the Report and
Recommendation advises the dismissal of Plaintiff's entire case, the Court has considered
Plaintiff's Reply Brief.  The attached Order addresses the disposition of these Motions.

1

# I.  BACKGROUND/PROCEDURAL HISTORY

The extensive factual background and procedural history of this case is set forth in thorough detail in Judge Schwab's Report and Recommendation and is adopted by this Court.

# II.  LEGAL STANDARD
## A. REPORT AND RECOMMENDATION

Upon designation, a magistrate judge may "conduct hearings, including evidentiary hearings, and ... submit to a judge of the court proposed findings of fact and recommendations."[2]  Once filed, this Report and Recommendation is disseminated to the parties in the case who then have the opportunity to file written objections.[3]  When objections are timely filed, the District Court must conduct a *de novo* review of those portions of the report to which objections are made.[4] Although the standard of review for objections is *de novo*, the extent of review lies within the discretion of the District Court, and the court may otherwise rely on the recommendations of the magistrate judge to the extent it deems proper.[5]

For portions of the Report and Recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no

---

[2] 28 U.S.C. 636(b)(1)(B).
[3] 28 U.S.C. 636(b)(1).
[4] 28 U.S.C. 636(b)(1); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).
[5] *Rieder v. Apfel*, 115 F.Supp.2d 496, 499 (M.D.Pa. 2000) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).

clear error on the face of the record in order to accept the recommendation."[6]

Regardless of whether timely objections are made by a party, the District Court

may accept, not accept, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge.[7]

### B. SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[8]  A fact is "material" where it "might affect the outcome of the suit

under the governing law."[9]  A dispute is "genuine" where "the evidence is such

that a reasonable jury," giving credence to the evidence favoring the nonmovant

and making all inferences in the nonmovant's favor, "could return a verdict for the

nonmoving party."[10]

The burden of establishing the nonexistence of a "genuine issue" is on the

party moving for summary judgment.[11]  The moving party may satisfy this burden

by either (i) submitting affirmative evidence that negates an essential element of

---

[6] Fed.R.Civ.P. 72(b), advisory committee notes; *see also Univac Dental Co. v. Dentsply Intern., Inc.,* 702 F.Supp.2d 465, 469 (M.D.Pa. 2010) (citing *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987)) (explaining that judges should give some review to every report and recommendation).

[7] 28 U.S.C. § 636(b)(1); Local Rule 72.31.

[8] Fed. R. Civ. P. 56(a).

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Id.*

[11] *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).

the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.[12]

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15]  Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's

---

[12] *Id.* at 331.

[13] *Anderson*, 477 U.S. at 250.

[14] Fed. R. Civ. P. 56(c)(1); *see also Anderson*, 477 U.S. at 248–50.

[15] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).

assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[16]

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.[17] Credibility determinations are the province of the factfinder, not the District Court.[18] Although the court may consider any materials in the record, it need only consider those materials cited.[19]

## III. DISCUSSION

Having reviewed those portions of the Report to which no objections were made, the Court is satisfied that, on its face, the Report and Recommendation has no clear error. Furthermore, following a *de novo* review of those portions of the report to which an objection was made, the Court will adopt the Report and Recommendation in its entirety and thus grant Defendant's Motion for Summary Judgment. Defendant's Motion to Preclude Plaintiff's Expert will be denied as moot. Plaintiff's specific objections to the Report and Recommendation and this Court's findings in response will be discussed in detail below.

---

[16] Fed. R. Civ. P. 56(e)(2).
[17] *Anderson*, 477 U.S. at 249.
[18] *BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).
[19] Fed. R. Civ. P. 56(c)(3).

### 1. The Report and Recommendation Did Not Err In Finding that McNelis Was Not a "Qualified Individual"[20]

Plaintiff first objects to the Report and Recommendation's finding that he was not a "qualified individual" as required to establish a prima facie case under the ADA, RA, and PHRA.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[21] When the plaintiff's allegations of intentional discrimination are supported only by circumstantial evidence, the Court must follow the *McDonnell-Douglas*[22] burden-shifting framework. That analysis proceeds as follows:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[23]

---

[20] All discussion specifically references the ADA. However, this Court's conclusions and their accompanying reasoning apply equally to the RA and PHRA. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (noting that the Rehab Act, ADA, and PHRA are to be interpreted consistently, and with the same standard for determination of liability).

[21] 42 U.S.C. § 12112(a).

[22] 411 U.S. 792, 802–804 (1973).

[23] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802).

A prima facie case of disability discrimination – the first step of the *McDonnell-Douglas* framework – requires that plaintiff establish (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination.[24]

Here, Plaintiff objects to the Report and Recommendation's finding that he cannot show that he was qualified for the position of Nuclear Security Officer. Specifically, Plaintiff argues that the Report erred because (1) a temporary loss of access does not mean as a matter of law that an individual is not qualified, (2) a jury could find, based on discharge instructions from Geisinger Medical Center, that Plaintiff was qualified, and (3) the prima facie case of disability discrimination is no longer relevant once the employer has filed a motion for summary judgment with an asserted legitimate, nondiscriminatory reason.[25]

When establishing a prima facie case of disability discrimination, a plaintiff is found to be qualified when "with or without reasonable accommodation, [they] can perform the essential functions of the employment position that such individual holds or desires."[26] The determination of whether a plaintiff is a "qualified

---

[24] *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

[25] Pl.'s Objections to the Magistrate's Report and Recommendation ("Objections"), at 3-9.

[26] 42 U.S.C. 12111(8).

individual" at the time of the adverse employment action follows a two-step

analysis:

> First, a court must consider whether "the individual satisfies the
> prerequisites for the position, such as possessing the appropriate educational
> background, employment experience, skills, licenses, etc." Second, the
> court must consider "whether or not the individual can perform the essential
> functions of the position held or desired, with or without reasonable
> accommodation."[27]

The plaintiff has the burden under this analysis of showing that he was qualified at

the time of the adverse employment action.[28]

Addressing Plaintiff's first argument that a temporary loss of access does not

mean that an individual is not qualified, the Court finds this objection to be without

merit. Specifically, the Court notes that case law within the United States Court of

Appeals for the Third Circuit and elsewhere has specified that a failure to maintain

UAA (unescorted access authorization) renders an employee unqualified, as a

matter of law, to work in a nuclear power industry.[29] Plaintiff attempts to conceal

this principle by arguing that PPL's policy permitted him an opportunity to prove

---

[27] *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (quoting 29 C.F.R. pt. 1630, App. at 353-54). In determining the essential functions of a position, an employer may "require that employees employed in sensitive positions comply with the regulations (if any) of . . . the Nuclear Regulatory Commission. 29 C.F.R. § 1630.16(b)(6).

[28] *Id.*

[29] *See McCoy v. Pennsylvania Power & Light Co.*, 933 F. Supp. 438, 443 (M.D.Pa. 1996); *Sysko v. PPL Corp.*, No. 3:07-CV-0470, 2009 WL 4725240 at *11 (M.D.Pa. Dec. 2, 2009); *Lute v. Dominion Nuclear Connecticut, Inc.*, No. 3:12-CV-01412, 2015 WL 1456769, at *11 (D.Conn. Mar. 30, 2015); *Wetherbee v. Southern Nuclear Operating Co., Inc.*, No. 1:08-CV-2138, 2010 WL 11428172, at *7 (N.D.Ga. Mar. 17, 2010).

that he was not unfit for duty.[30]  Such an attempt is, however, unpersuasive given the well-settled case law which holds that loss of UAA renders an employee within the nuclear power industry unqualified for purposes of the ADA.  Here, it is undisputed that Plaintiff's UAA was revoked.[31]  At that time, he became unqualified for his position as a Nuclear Security Officer Level II.

Plaintiff further objects by arguing that, based on discharge instructions from Geisinger Medical Center, a jury could reasonably find that Plaintiff was qualified for his position at the time of the adverse employment action.  Again, however, the Court finds that this argument contradicts established law.  Specifically, like the Report and Recommendation, this Court finds that Plaintiff has failed to identify facts of record which indicate that Geisinger was qualified under the Nuclear Regulatory Commission regulations to make such a determination.[32]  Therefore, the Court finds that Geisinger's discharge instructions do not present a genuine dispute of material fact as to Plaintiff's qualification.

---

[30] Objections, at 4.

[31] Def. PPL Susquehanna LLC's Statement of Uncontested Material Facts ("Def.'s SUMF") ¶ 119, at 23.

[32] *See* 10 C.F.R. § 26.189(a)  ("A determination of fitness must be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise, as verified by the licensee or other entity, to evaluate the specific fitness issues presented by the individual."); *see also Exelon Generation Company, LLC v. Local 15, International Brotherhood of Electrical Workers, AFL-CIO,* 140 F. Supp. 3d 751, 763 (N.D. Ill. 2015) (noting that Section 26.189 stipulates that "a party may not seek a determination of fitness from someone other than the authorized SAE").

Finally, Plaintiff argues that a discussion of qualification is moot because, once a defendant has adduced a legitimate, nondiscriminatory reason, the prima facie case "drops out of the picture." In support thereof, Plaintiff cites *Reeves v. Sanderson Plumbing Prods., Inc.*[33] and *U.S. Postal Serv. Bd. Of Governors v. Aikens*.[34] The Plaintiff's citation to and interpretation of these cases is inapposite.

First, in *Reeves*, the Supreme Court noted that it is the "**presumption of discrimination** [that] "drops out of the picture" once the defendant meets its burden of production," not the prima facie case.[35] Second, Plaintiff distorts the holding in *Aikens*, which held and reaffirmed that, once the defendant has introduced a legitimate nondiscriminatory reason, the presumption of discrimination "drops from the case," and the District Court is "in a position to decide the ultimate factual issue."[36]

Having reviewed *de novo* whether Plaintiff was a "qualified individual," I find that the Report and Recommendation did not err in finding that Plaintiff failed to establish a prima facie case of disability discrimination under the ADA, PHRA, and RA.

---

[33] 530 U.S. 133, 143 (2000).
[34] 460 U.S. 711 (1983).
[35] *Reeves,* 530 U.S. at 143.
[36] *Aikens*, 460 U.S. at 714.

### 2. The Report and Recommendation Did Not Err In Determining That A Reasonable Jury Could Not Find That PPL's Legitimate, Non-Discriminatory Reasons Were Pretextual

Plaintiff next objects to the Report and Recommendation's determination that a reasonable jury could not find that PPL's firing of McNelis was pretextual.

As noted above, the three-step *McDonnell-Douglas* framework requires that, once the defendant has adduced a legitimate, non-discriminatory reason, the burden of production and persuasion again rests with the plaintiff to prove that this reason is simply pretext for unlawful discrimination.[37]  Plaintiff argues specifically in his second objection that PPL's legitimate discriminatory reasons were pretext because 1) McNelis did not refuse to answer questions about the lockdown, and 2) there was a delay between Plaintiff's April 17, 2012 conversation with Jim Gorman, Manager of Nuclear Security, and his ultimate termination.

The Court finds these objections to be without merit.  Specifically, concerning the issue of "evasiveness," the Court notes that Plaintiff had a duty to self-report "fitness for duty issues."[38]  Issues which require this reporting include, among other things, "impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and

---

[37] *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08 (1993) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).

[38] Def.'s SUMF ¶ 16, at 5.

11

security."[39] Fatigue is, thereafter, defined as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest."[40] Here, the undisputed facts indicate that Plaintiff was suffering from fatigue during the telephone conversation with Mr. Gorman and failed to "self-report" these issues. The Court notes that Plaintiff admitted himself to Geisinger Medical Center on April 18, 2012 with "sleeplessness," "1-2 weeks of paranoid thoughts," and "questionable auditory hallucinations."[41] Because of the revelation that such symptoms had been ongoing for two weeks, it is clear that Plaintiff was experiencing symptoms requiring self-reporting and that he failed to do so either during his April 17, 2012 conversation with Mr. Gorman, or at any time prior.[42] His failure, therefore, to timely report these issues constitutes a violation of known PPL policy.[43]

Second, Plaintiff argues that Mr. Gorman's delay in terminating Plaintiff for evasiveness at the April 17, 2012 meeting demonstrates pretext. However, given the Behavior Observation Program ("BOP") established by PPL in accordance with Nuclear Regulatory Commission ("NRC") regulations, it is difficult to grasp how such a failure demonstrates pretext. Plaintiff supports his contention by citing to Jeff Helsel's deposition in which he stated that he was unaware of anyone who

---

[39] Id. ¶ 7, at 3.
[40] Id. ¶ 13, at 5.
[41] Id. ¶ 70-71, at 15.
[42] Id. ¶¶ 62-68, at 13-14.
[43] Id. ¶ 16, at 5.

12

was uncooperative when questioned by management, but then allowed to go through the BOP process.[44] However, a full analysis of Mr. Helsel's deposition reveals that he next stated that, even with the occurrence of evasive answers, he would "expect that [BOP] process to be completed."[45]

Finally, in support of his theory of pretext, Plaintiff cites to *Fuentes v. Perskie*,[46] in which the Third Circuit noted the "difficult burden" on Plaintiff at the pretext stage of the *McDonnell-Douglas* framework. Specifically, the *Fuentes* Court noted that the plaintiff's evidence of pretext "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[47] In the case at bar, Plaintiff's evidence of pretext has failed to allow for such an inference. Specifically, the Court finds that the evidence adduced by Plaintiff would not allow a factfinder "reasonably to infer" that Defendant's legitimate nondiscriminatory reasons were either a fabrication or a non-motivator of the employment action.

---

[44] Objections, at 12.

[45] Helsel Dep. 56:13-14.

[46] *Fuentes v. Perskie*, F.3d 759, 765 (3d Cir. 1994).

[47] *Id.* The Third Circuit in *Fuentes* further noted that, to avoid summary judgment, a "non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action **that a reasonable factfinder *could* rationally find them "unworthy of credence,"** (citation omitted), and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis added).

13

Having reviewed *de novo* the factual record concerning Plaintiff's second objection, the Court finds that Plaintiff has failed to produce evidence demonstrating that Defendant's legitimate, non-discriminatory reasons were pretext. The Report and Recommendation therefore did not err in determining that a reasonable jury could not find that PPL's legitimate, non-discriminatory reasons were pretextual.

### 3. The Report and Recommendation Did Not Err In Finding That Helsel's Testimony That the Rumors of McNelis' Use of Illegal Drugs Were Not Discussed in the SEARP Was an Undisputed Fact[48]

Plaintiff next objects to the Report and Recommendation's finding that Jeff Helsel's testimony stating the Susquehanna Elevated Action Review Panel (SEARP) did not consider allegations of McNelis' prior drug use was an undisputed fact.

Plaintiff specifically argues that, although there is no evidence within the factual record contradicting this testimony, it should nonetheless be considered a disputed fact. In support of this proposition, Plaintiff argued that 1) under *Reeves v. Sanderson Plumbing Prods., Inc.*, he did not have to produce evidence contradicting Helsel's testimony, and 2) the Court is not bound by the Third

---

[48] Plaintiff first makes the argument in his third objection that PPL "rigged the BOP process" by failing to investigate or inform Dr. Thompson of the allegations that Plaintiff was using bath salts. Like the Report and Recommendation, this Court finds that acceptance of this omission as evidence of pretext requires not only viewing the evidence in the light most favorable to Plaintiff, but also suspending reason in favor of the Plaintiff. This Court therefore agrees with the finding of the Report and Recommendation concerning this issue.

14

Circuit case of *Lauren W. v. DeFlaminis*[49] to the extent it contradicts *Reeves*. The Court finds both of these objections to be without merit.

Like the Report and Recommendation, I note the many cases within the Third Circuit which have rejected an interpretation of *Reeves* which precludes reliance on undisputed evidence from an interested witness at the summary judgment stage.[50] Furthermore, to the extent that Plaintiff argues that *DeFlaminis* should not be followed, the Court notes that it has previously addressed the balance between *Reeves* and *DeFlaminis*. Specifically, in *Edgerton v. Wilkes-Barre Home Care Services, LLC*, the Court stated:

> The Third Circuit's opinion in *Schoonejongen v. Curtiss–Wright Corp.,* 143 F.3d 120 (3d Cir.1998), considers the issue at length, and reasons that, contrary to Ms. Edgerton's position, a nonmoving party cannot defeat summary judgment by raising the mere possibility that the jury may disbelieve a witness's testimony. (Citations omitted). To successfully oppose a summary judgment motion, the nonmoving party must, rather, point to circumstances revealed by the record as a whole that might cause a reasonable jury to doubt the facts (supported by testimony) asserted by the movant. (Citations Omitted).[51]

---

[49] *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2009).

[50] *See, e.g., Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (stating that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness"); *Wilkie v. Geisinger Sys. Servs.*, No. 3:12-CV-580, 2014 WL 4672489, at *5 (M.D. Pa. Sept. 18, 2014) (Mariani, J.) (rejecting the plaintiff's argument that under Reeves, the court cannot consider any statements from interested witnesses); *Phinizy v. Pharmacare*, 569 F.Supp.2d 512, 518 (W.D.Pa. 2008) (Cercone, J.).

[51] *Edgerton v. Wilkes-Barre Home Care Services, LLC*, 2014 WL 131605, at *2 (M.D.Pa. Jan. 13, 2014), *aff'd* 600 F.App'x 856 (3d Cir. 2015).

That decision was affirmed on appeal. The Court sees no reason to abandon both this reasoned conclusion and Third Circuit precedent in the instant case. Therefore, in the absence of evidence sufficient to "cause a reasonable jury to doubt the facts" of his testimony, the Court will adopt the Report and Recommendation's conclusion that Helsel's testimony concerning the SEARP was an undisputed fact.

**4. The Report and Recommendation Did Not Err In Finding That McNelis Lost the Right to Challenge Thompson's Credibility By Not Doing So At His Own Deposition**

Plaintiff next argues that the Report and Recommendation erred in finding that he lost his right to challenge Dr. David Thompson's credibility by not doing so at his deposition. In support of this proposition, Plaintiff repeats an argument addressed and rejected by the Report and Recommendation, i.e. that he has shown that "a reasonable jury could find that Thompson's good faith and credibility are subject to error."[52] Plaintiff, however, admitted in his deposition that he has no evidence to indicate that Dr. Thompson did not act in good faith.[53] Furthermore, since the deposition, he has otherwise failed to adduce any additional evidence bringing Dr. Thompson's conduct into doubt. Therefore, based on the lack of evidence demonstrating a genuine dispute as to material fact, the Court finds that the Report and Recommendation did not err in finding that Dr. Thompson's

---

[52] Objections, at 22.
[53] Def.'s SUMF ¶ 114, at 22.

16

determination was made in good faith and/or in the exercise of his best medical judgment.

### 5. The Report and Recommendation Did Not Err In Finding That The Timing of Thompson's "Unfit for Duty" Determination Was Not Suspicious

Plaintiff next objects to the Report and Recommendation's finding that Thompson's "unfit for duty" determination was not suspicious.[54]  Specifically, Plaintiff argues that, because PPL employee Kris Lear was informed by Nick Steward on April 30, 2012 that a reliable source had told him that Plaintiff was using bath salts, Dr. Thompson's Substance Abuse Expert (SAE) Determination of Fitness of May 1, 2012 was influenced by this new allegation and thus, suspicious.

The Court however, finds two flaws with this argument.  First, I find no credence to the "distinction without a difference" argument advanced by Plaintiff which suggests that Dr. Thompson changed one single report from day to day.  In this BOP referral process, the undisputed facts establish that Dr. Thompson made two separate reports: first, the Confidential Interview Memo of April 30, 2012, and second, the Substance Abuse Expert Determination of Fitness on May 1, 2012.[55] Furthermore, Plaintiff has adduced no evidence contradicting the testimony of Lear in which he stated that he did not tell management of the allegations.[56]  Plaintiff

---

[54] Objections, at 22-23.
[55] Def.'s SUMF ¶¶ 95, 108, at 19, 21.
[56] Pl.'s Statement of Additional Material Facts ("Pl.'s SAMF") ¶ 58, at 9.

instead argues within his objections[57] that the Report and Recommendation erred

because there is evidence that John Lines told Dr. Thompson about the prior

allegations of drug use before the MMMPI test on April 24, 2012.[58] Dr.

Thompson, however, has no recollection of being told about the bath salt

allegations.[59] Assuming for the sake of argument that Lines did in fact tell Dr.

Thompson of the drug use allegations, the Court finds it illogical to suggest that a

new report of alleged drug use by Nick Steward, in addition to prior known

allegations, would in any way alter the judgment of Dr. Thompson.[60]

Having reviewed *de novo* the factual record relating to Plaintiff's objection,

this Court does not find error in the Report and Recommendation's conclusion that

the timing of Dr. Thompson's "unfit for duty" determination was not suspicious.

### 6. The Report and Recommendation Did Not Err In Finding That R.S. And S.W. Were Not Proper Comparators to McNelis

Plaintiff argues next that the Report and Recommendation erred in finding

that R.S. and S.W. were not proper comparators to McNelis.

The Report and Recommendation had found that R.S. and S.W., who were

not terminated following loss of unescorted access authorization, were not proper

---

[57] Objections, at 23.

[58] Lines Dep. 44: 22–45: 3; 46: 10-24.

[59] Pl.'s SAMF 105, at 15.

[60] Furthermore, to the extent Plaintiff argues that Lines exerted pressure on Thompson to change his determination based on the bath salt usage allegations, the Court notes that Dr. Thompson in his declaration denied any such interference by Defendant PPL. Thompson Decl. ¶ 7. Plaintiff has failed to adduce anything other than allegations to dispute this declaration.

comparators because they self-reported their fitness for duty issues.[61]  Plaintiff, however, contests this finding by arguing that he was unable to self-report because 1) he knew nothing about the school lockdown prior to his April 17, 2012 phone call with Jim Gorman, 2) he did not refuse to answer Jim Gorman's questions and later got back to Gorman concerning the lockdown, and 3) he did self-report to PPL his need for inpatient therapy for sleep issues prior to his return to work.[62]

The Court finds these arguments to be without merit.  Specifically, as discussed in depth in response to the second objection, Plaintiff's failure to self-report did not involve the school lockdown, but rather his continued issues with sleeplessness and paranoid thoughts.  As previously explained, the discharge notice from Geisinger Medical Center noted that such symptoms had persisted from one to two weeks prior to his inpatient hospitalization.[63]  Therefore, Plaintiff's argument that he did not fail to self-report holds no weight.  The undisputed facts demonstrate that, prior to his inpatient admission on April 18, 2012, Plaintiff was experiencing sleeplessness and paranoid thoughts.  There is no evidence in the record indicating that he self-reported these fitness for duty issues.

Therefore, because this Court finds that there is no evidence in the factual record indicating that Plaintiff self-reported his known fitness for duty issues, I

---

[61] Report and Recommendation, at 89.
[62] Objections, at 24.
[63] Def.'s SUMF ¶ 71, at 15.

conclude, like the Report and Recommendation, that R.S. and S.W. were not proper comparators.

### 7. The Report and Recommendation Did Not Err in Finding That There is No Genuine Dispute As to Material Fact Concerning McNelis' FMLA Interference and Retaliation Claims

Finally, Plaintiff argues that the Report and Recommendation erred in finding that Defendant was entitled to summary judgment on both his FMLA interference and retaliation claims.

Plaintiff first objects to the Report and Recommendation's finding that Defendant is entitled to summary judgment on the Plaintiff's FMLA interference claim. The interference clause of the FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA.[64] To establish an FMLA interference claim, an employee must specifically establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."[65]

---

[64] 29 U.S.C. § 2615(a)(1).
[65] *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014).

Although the FMLA generally requires that an employee be restored to his position following FMLA leave, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."[66] Therefore, the failure to restore plaintiff employee to his pre-leave position does not constitute a violation of the FMLA "if the employee remains unable to perform an 'essential function' of the position."[67]

Here, Plaintiff objects to the finding of the Report and Recommendation that, because of his loss of unescorted access authorization (UAA), he was no longer able to perform an "essential function" of his position as a Nuclear Security Officer II.[68] The Court, following the detailed analysis above, found that UAA was an "essential function." Therefore, Plaintiff's loss of UAA prior to his request for FMLA paperwork[69] rendered him outside the protection of the interference clause.

Plaintiff next objects to the Report and Recommendation's finding that Defendant is entitled to summary judgment on the Plaintiff's FMLA retaliation claim. "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the

---

[66] 29 C.F.R. §825.216(a).
[67] *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 254 (3d Cir. 2014) (quoting 29 C.F.R. §825.216(c)).
[68] Objections, at 25.
[69] Def.'s SUMF ¶¶ 52-53, at 28-29.

employee."[70]  To succeed on a retaliation claim under the FMLA, the employee

must prove the following elements: 1) the employee invoked his right to FMLA-

qualifying leave, 2) the employee suffered an adverse employment action, and 3)

the adverse action was causally related to the employee's invocation of his FMLA

rights.[71]  Unlike interference claims, retaliation claims require proof of the

employer's retaliatory intent; "[a]ccordingly, claims based on circumstantial

evidence have been assessed under the burden-shifting framework established

in *McDonnell Douglas Corp. v. Green*.[72],[73]

Plaintiff disputes the Report and Recommendation's finding that he failed to

show that Defendant's legitimate, non-discriminatory reasons were pretext.  The

Court engaged in an analysis above concerning Plaintiff's repeated failure to show

pretext.  In support of his FMLA retaliation claim, Plaintiff raises additional

arguments of pretext.[74]  Like the Report and Recommendation, however, the Court

finds that, even when viewing all presented evidence in the light most favorable,

referenced evidence of pretext would not allow a factfinder "reasonably to infer"

that his termination bears a causal connection with his request for FMLA

paperwork or taken FMLA leave.

---

[70] *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).
[71] *Lichtenstein v. University of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (*citing Erdman*, 582 F.3d at 508–09).
[72] 411 U.S. 792 (1973).
[73] *Lichtenstein*, 691 F.3d at 302.
[74] Objections, at 88-90.

Therefore, having reviewed *de novo* Plaintiff's objections to the Report and Recommendation's findings, the Court finds no error and thus will grant summary judgment as to Plaintiff's interference and retaliation FMLA claims.

## IV.    CONCLUSION

Based on the above discussion and analysis, the Court adopts in its entirety the Report and Recommendation of Magistrate Judge Schwab.  Defendant PPL's Motion for Summary Judgment is granted.  Defendant PPL's Motion to Preclude Plaintiff's Vocational Expert is denied as moot.

An appropriate Order follows.

BY THE COURT:

      s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYLE MCNELIS, | : | Case No. 4:13-CV-02612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA POWER & | : | |
| LIGHT, SUSQUEHANNA, LLC, | : | |
| | : | |
| Defendant. | : | |

## **ORDER**
September 19, 2016

AND NOW, in accordance with the Memorandum of this same date, IT IS

HEREBY ORDERED THAT:

1. United States Magistrate Judge Susan E. Schwab's Report and

   Recommendation (ECF No. 104) is ADOPTED in its entirety.

2. Defendant's Motion for Summary Judgment (ECF No. 57) is GRANTED.

3. Defendant's Motion to Preclude Plaintiff's Expert (ECF No. 81) is DENIED

   as moot.

4. Defendant's Motion to Strike Response as Untimely (ECF No. 116) is

   DENIED.

5. Plaintiff's Motion for Leave to File His Reply Brief Out of Time (ECF NO.

   119) is GRANTED.

6. The Clerk is directed to enter final judgment in favor of Defendant and to close the case.

7. A Certificate of Appealability will not issue.

BY THE COURT:

___s/ Matthew W. Brann_____
Matthew W. Brann
United States District Judge

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Middle District of Pennsylvania

| | | |
|---|---|---|
| DARYLE MCNELIS | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  4:13-CV-02612 |
| PENNSYLVANIA POWER & LIGHT, SUSQUEHANNA, LLC, | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑ other:   Judgment be and is hereby entered in favor of Defendant Pennsylvania Power & Light, Susquehanna, LLC
and against Plaintiff, in accordance with this Court's Order, entered 9/19/2016, ECF No 123   granting
Defendant's motion for summary judgment, ECF No. 57.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☑ decided by Judge   Matthew W. Brann _____ on a motion for
summary judgment, ECF Nos. 57.

Date:  ___September 19, 2016___

*PETER J. WELSH, ACTING CLERK OF COURT*

*Kathy A. McLaughlin*
*Signature of Clerk or Deputy Clerk*
*Deputy*

**FILED**
**WILLIAMSPORT**

SEP 19 2016

PER _____
**DEPUTY CLERK**