## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### No. 16-3883

### DARYLE R. McNELIS,

**Appellant,**

**v.**

### PPL SUSQUEHANNA, LLC,

**Appellee.**

**ON APPEAL FROM THE ORDER ENTERED SEPTEMBER 19, 2016, AND THE FINAL JUDGMENT WHICH WAS ENTERED ON SEPTEMBER 19, 2016, BY THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA CIVIL ACTION NO. 4:13-CV-02612-MWB**

## OPENING BRIEF OF APPELLANT

### ORAL ARGUMENT IS REQUESTED

Ralph E. Lamar
8515 Braun Loop
Arvada, Colorado 80005
(303) 345-3600
ralphlamar@ymail.com

Marc E. Weinstein
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
(267) 513-1942
marc@meweinsteinlaw.com
**Attorneys for Appellant**

**Dated: January 23, 2017**

# I. CORPORATE DISCLOSURE STATEMENT

Not required by this party.

# II. TABLE OF CONTENTS

Corporate Disclosure Statement…………………………………………………..i

Table of Contents………………………………………………………………………i

Table of Authorities……………………………………………………………………iv

Jurisdictional statement  …………………………………………………………...1

Issues presented for review  …………………………………………………....1

Statement of Related Cases…………………………………………………………4

Concise Statement of the Case  ……………….……………..………………….4

Material Facts.…………………………………………………………………….....5

Summary of Argument  ……………………….…………………………………....20

Argument  …………………………………………………………………………..24

I.      THE DISTRICT COURT ERRED IN FINDING THAT BECAUSE McNELIS TEMPORARILY LOST ACCESS AT THE PLANT HE WAS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA………………………………………………………24

Standard of Review……………………………………………………………..24

Legal standards for courts at summary judgment………………………..24

An overview of the ADA's "regarded as" protection………………………26

The District Court's First Error – a temporary loss of access alone

is not fatal to an ADA claim…………………………………………………28

The District Court's Second Error – McNelis presented evidence

upon which a jury could find he <u>was</u> a qualified individual with a

disability………………………………………………………………………..34

II.    THE DISTRICT COURT ERRED IN FINDING THAT A
       REASONABLE JURY COULD NOT FIND THAT PPL'S
       REASONS FOR McNELIS' FIRING WERE PRETEXTUAL….37

Standard of review………………………………………………………37

Legal standard for determining whether evidence of pretext exists…...37

The District Court's Errors……………………………………………38

1.    There was ample evidence for a jury to find that plaintiff

was not "evasive" in the phone call with Gorman………………….…..39

2.    There was ample evidence from which a jury could

find that Gorman's "loss of access" reason was pretextual……………..42

3.    The District Court erred in determining that the timing of

Thompson's second report - just a day after his first – could

not be suggestive of pretext……………………………………………..44

III.    THE DISTRICT COURT ERRED IN FINDING THAT HELSEL'S
        TESTIMONY THAT THE RUMORS OF McNELIS' USE OF
        ILLEGAL DRUGS WERE NOT DISCUSSED IN THE SEARP
        WAS AN UNDISPUTED FACT PURSUANT TO THE HOLDING
        OF *LAUREN W. v. DeFLAMINIS*………………………………47

Standard of review……………………………………………………..47

The District Court's Error…………………………………………..….47

Even if this court finds that McNelis has not produced  sufficient evidence of pretext to challenge Helsel's testimony, this Court is not bound by *DeFlaminis* as the holding of that case is inconsistent with the holding of the U.S. Supreme Court in *Reeves*………………....51

IV.    THE   DISTRICT   COURT   ERRED   IN   ADOPTING   THE MAGISTRATE'S  FINDING  THAT  BECAUSE  McNELIS  DID NOT CHALLENGE THOMPSON'S CREDIBILITY <u>AT HIS OWN DEPOSITION</u> HE LOST THE RIGHT TO CHALLENGE IT AT ANY    SUBSEQUENT    POINT    IN    THE    LITIGATION PROCESS……………………………………………………………55

Standard of review……………………………………………………..55

The District Court's Error…………………………………………………55

Conclusion…………………………………………………………………57

Request for Oral Argument…………………………………………………57

XII.  CERTIFICATE OF COMPLIANCE WITH RULE 32(A)……………...58

XIII.  CERTIFICATE OF COMPLIANCE WITH RULE 25.3……………...59

CERTIFICATE OF SERVICE………………………………………………..60

## III.  TABLE OF AUTHORITIES

**U.S. Supreme Court**                                                 Page #

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

149-151 (2000)…………………………………..…23, 25, 47-8, 52, 54

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963)………………… 24, 55

*Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999)………………..26

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)(per curiam)……………..24

*University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct.

2517, 2523 (2013)……………………………………………………………26

**Third Circuit Court of Appeals**

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082

(3d Cir. 1996)……………………………………………………………………25

*Andrews v. City of Philadelphia*, 895 F .2d 469, 484 (3d Cir. 1990)…25, 38

*Armour v. County of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001)…….49, 52

*Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3d Cir. 1998)…………28

*Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)……………37-8, 45, 51

*Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313

(3d Cir 2000)……………………………………………………………..25

*Healey v. New York Life Ins. Co.*, 860 F.2d 1209, 1218

(3d Cir. 1988)……………………………………………………………46

*Hill v. City of Scranton*, 411 F.3d 118, 131 n.22 (3d Cir. 2005)……….49, 53

*Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)……..37

*Josey v. John R. Hollingsworth, Corp.*, 996 F.2d 632, 637

(3d Cir. 1993)……………………………………………………………38

*Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996)…………………..29

*Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007)…24, 45, 47, 53

*Marzano v Computer Science Corp., Inc.*, 91 F. 3d 497 (3d Cir. 1997)..43

*Poulis  v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 867

(3d Cir. 1984)…………………………………………………………….54

*Taylor v. Phoenixville School District*, 184 F.3d 296, 306

(3d Cir. 1999)…………………………………………………………..36

*Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611

(3d Cir. 20016)………………………………………………………28, 34

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998)…49

*Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000)……………………26

*Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061,

1072 (3d Cir. 1996), (*en banc*), *cert. denied*, 5321 U.S. 1129

(1997)……………………………………………………………24, 37, 47, 55

*Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006)…………………49, 53

*Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661,

671 (3d Cir. 1999)……………………………………………………………..33

**Third Circuit Unpublished Decisions**

*Edgerton v. Wilkes-Barre Home Care Services, LLC.*,

No. 3:12-CV-0191, 2014 WL 131605 at *2 (M.D. Pa. Jan. 13, 2014)*,

Aff'd,* 600 Fed.App'x. 856 (3d Cir. 2015)……………………………………49

**Other U.S. Circuit Courts of Appeal**

*George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)……………………43

*Hilton v. Wright*, 673 F.3d 120, 129 (2nd Cir. 2012)………………………...27

*Hopkins v. Andaya*, 958 F.2d 881, 888 (10th Cir.1992)……………………38

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)…………..27

**U.S. District Courts**

*Lute v. Dominion Nuclear Connecticut, Inc.*, No. 3:12-CV-01412,

2015 WL 1456769, at *11 (D. Conn. Mar. 30, 2015)…………………………31

*McCoy v. Pa. Power & Light Co.*, 933 F. Supp. 438 (M.D. Pa. 1996)…..29-30

*Sysko v. PPL Corp.*, No. 3:07-CV-0470, 2009 WL 4725240, *11

(M.D. Pa. Dec. 2, 2009)…………………………………………………………30

*Weatherbee v. Southern Nuclear Operating Co., Inc.*, No. 1:08-CV-2138,

2010 WL 11428172, at *7 (N.D. Ga. Mar. 17, 2010)………………………..31

**Federal Statutes**

42 U.S.C. § 12101, Sec. 2.(b)(4)…………………………………………………..32

42 U.S.C. § 12102(2)(C)…………………………………………………………..26

42 U.S.C. § 12102(3)(A)…………………………………………………………..27

42 U.S.C. § 12111(8).…..…………………………………………………………32

42 U.S.C. § 12114(b)(3)…………………………………………………………..27

**Federal Rules of Civil Procedure**

F.R.C.P. 56(a)…………………………………………………………………..24

**Federal Regulations**

29 C.F.R. pt. 1630, App. § 1630.2(l)………………………………………..26

**Other**

EEOC Technical Assistance Manual, § 2.2(c), p. II-11, ¶ 2…………….27

## IV.    JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over McNelis' federal questions pursuant to 28 U.S.C. §1331 and §1343, and supplemental jurisdiction of the state law claim pursuant to 42 U.S.C. §1367.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because it involves an appeal from a final order on all claims.  Final judgment was entered on September 19, 2016 (Vol. I, JA-120) upon the District Court's ruling that same day granting Defendant's Motion for Summary Judgment. Vol. I, JA-118-19.  McNelis timely filed his notice of appeal on October 17, 2016.  Vol. I, JA-1-2.

## V.    ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in holding McNelis had not created a genuine issue of material fact as to whether he was a qualified individual with a disability because he had temporarily lost access to his position as a security guard at a nuclear power plant, thereby resulting in the dismissal of his ADA claim at summary judgment, and preventing him from challenging the termination under the ADA's "regarded as" provisions?

_Suggested Answer and Reason_:        Yes.

The District Court erred when it determined McNelis was not a qualified individual with a disability just because he temporarily lost his access as a security guard at a nuclear power plant. It erred by failing  to recognize that an employer that takes an adverse action based upon an erroneous perception of a medical condition can be liable under the ADA. The Court's decision creates the incongruous situation that there is ADA protection for persons with <u>actual</u> disabilities, but <u>not</u> for persons who are <u>erroneously regarded</u> as having a disability, contrary to the express language of the statute.

2.    Did the District Court err in holding there were no genuine issues of material facts regarding whether PPL's reason for McNelis' termination was pretextual such that a jury could find in favor of McNelis on his claim of disability discrimination under the ADA?

*<u>Suggested Answer and Reason</u>*:          Yes.

The District Court erred when it determined McNelis had not provided evidence of pretext because it failed to consider the facts in a light most favorable to McNelis as the non-moving party, contrary to its role at summary judgment.   It also failed to consider the totality of the circumstances McNelis presented at the summary judgment stage as

required by *Andrews v. City of Philadelphia*, 895 F .2d 469, 484 (3d Cir. 1990).

3.      Did the District Court err in holding that the plant manager's testimony – as an interested witness - that the rumors of McNelis' drug use were not discussed in the SEARP, and that PPL's justification for McNelis' firing was only for losing access, and not being forthcoming about his issues, were *undisputed* facts.

     *Suggested Answer and Reason*:          Yes.

The District Court erred when it determined that under the holding of *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007), a court is *required* to credit the uncontradicted testimony of an interested witness, and therefore the plant manager's testimony was considered to be undisputed fact.  McNelis presented evidence of pretext allowing him to challenge the plant manager's credibility and a jury could find the plant manager was lying about the discussion of McNelis' termination even if he was not directly contradicted on his testimony about the topic of discussion.

4.      Did the District Court err in finding that McNelis lost the right to challenge a witness' credibility later in the case by not doing so at his deposition?

     *Suggested Answer and Reason*:          Yes.

The District Court erred in holding that McNelis waived his right to later challenge the credibility of a witness when he stated at his deposition that he had no basis to challenge it. That holding is in direct conflict with the U.S. Supreme Court's holding in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963).

## VI.   STATEMENT OF RELATED CASES

There are no prior, nor related cases.

## VII.   CONCISE STATEMENT OF THE CASE

McNelis filed his complaint against PPL, pro se, on October 22, 2013, alleging the termination of his employment constituted a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, et. seq., and the Rehabilitation Act, 29 U.S.C. § 794, et. seq., on the basis of "regarded as" disabilities.   Vol. II, JA- 132-135.   He retained counsel and filed a first amended complaint which added a claim under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951, et. seq.   Vol. II, JA-136-149.   The Court granted McNelis' motion to file a second amended complaint to add a claim under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, et. seq.  The second amended complaint was filed on September 17, 2014. Vol. II, JA-150-165.

After discovery closed, PPL moved for summary judgment. Docket#57.  The Magistrate issued its Report and Recommendation that Defendant's Motion be Granted.  Vo. I, JA-3-94.  Plaintiff timely filed his objections.   On September 19, 2016, the District Court issued a memorandum adopting the Magistrate's Report & Recommendation and granted PPL's motion.  The District Court dismissed McNelis' complaint, and entered judgment that day.  Vol. I, JA-95-117, 118-119, 120.

## MATERIAL FACTS FOR THIS APPEAL

**I.     The events leading to the Behavioral Observation Program (BOP) referral.**

McNelis became employed full-time by PPL as a Nuclear Security Officer Level I in June of 2009.   Vol. IV, JA-710, p. 31:7 – 32:16.  He was later promoted to a Nuclear Security Officer Level II.   *Id.*, JA-710-11, p. 33:18 – 34:25.  At the time of McNelis' termination in 2012 he had just been recommended for a promotion to the controller program.  *Id.*, JA-711, p. 35:1 – 25; JA-713, p. 48:16 - 19.

**II.     McNelis experiences a short period of psychological difficulty.**

During the week of April 9 – 16, 2012, McNelis was having difficulty sleeping as a result of working overtime, being stressed out from

technological issues with his computer and phone, and home renovations necessitated by a flood.  As a result, he became increasingly paranoid.  Vol. IV, JA- 725, ¶¶7-8.  Kris Keefer, McNelis' friend, also a security officer at the plant, developed concerns about McNelis' state of mind.  Vol. IV, JA-741-42, p. 65:25 – 66:3; JA-714, p. 56:6 -19.  McNelis was fixated on whether someone had broken into his telephone and his home computer.  He felt there were cameras in his coalbin and his car.  Vol. IV, JA-732, p. 15:13- 16:10.  Keefer knew McNelis was also having marital problems.  *Id.*, p. 16:12-25.

Keefer believed McNelis was also obsessing about bath salts.  McNelis was doing a lot of research about the different names it was sold under and as to why it was sold as plant food.  Vol. IV, JA-733, p. 18:25 – 19:22.  McNelis indicated to Keefer that he had tried bath salts but did not indicate when that had been.  *Id.*, p. 20:10 – 21:10.[1]

On Sunday April 15, 2012, Keefer went to McNelis' home after work

---

[1] McNelis tried bath salts in February or March of 2010 when they were legal.  Vol. IV, JA-716, p. 66:16 – 67:15.  McNelis used them maybe once or twice after that in late 2010 or early 2011.  *Id.*, JA-717, p. 71:16 – 72:24.  McNelis did not use baths salts after that time.  *Id.*, p. 73:13 – 15. Bath salts were not made illegal in Pennsylvania until August 22, 2011.  Vol. V, JA-795-96.  While the DEA took action in September of 2011 to ban the stimulants found in bath salts, Congress did not pass a comprehensive bill banning bath salts on the federal level until July 9, 2012.  Vol. V, JA-800.  See www.portal.state.pa.us/portal/server.pt/document/1395136/bath_salts_fact_sheet_pdf.

and stayed there until 3:30 a.m. on the morning of the 16th.  Vol. IV, JA-742, p. 67:16 – 69:9.  That day, around 10:00 a.m., the Central Columbia Elementary and Middle Schools were locked down due to a telephone call to the police chief by an unnamed person who claimed McNelis might "come to the schools to get his children" and that he "may be under the influence and possibly armed."  Vol. IV, JA-748.  After the lockdown was initiated, the police determined McNelis never had any intention of going to the schools to get his children, or of doing them, or his wife any harm.  *Id.*

### III.   Suspicions about McNelis' behavior are reported to PPL.

Later that day, Keefer called shift supervisor Mike McCabe to discuss his concerns about McNelis' behavior.  Vol. IV, JA-751; JA-735-36, p. 37:18 – 38:3.  Keefer explained McNelis had been acting emotionally erratic the last couple of days and had not been himself.  Vol. IV, JA-751.  Keefer  said  he was worried about McNelis' safety and that of security and plant personnel. He also stated that McNelis' wife worked at the Central Columbia School District and the school superintendent, had "instituted a lockdown for approximately two hours until the police felt no further need to keep students inside (Refer to Tuesday Press Enterprise article on the bottom of page #5)." Vol. IV, JA-751.

Later that evening McCabe contacted the shift supervisor on duty and

shared the concerns about McNelis, and asked that his keycard be placed on administrative hold until Brian Martonick, the Security Supervisor, could be briefed. *Id.* McCabe then spoke with Martonick and explained the situation. *Id.* Martonick said he would brief his supervisor Jim Gorman, the Manager of Nuclear Security. *Id.*; Vol. IV, JA-753, p. 16:3 – 6.

**IV.    McNelis <u>independently</u> requests time off to address his sleep issues and Gorman asks about the school lockdown.**

The next day (April 17) McNelis called Gorman on his own initiative to tell Gorman he would not be in to work the next shift and would need some time off. Vol. IV, JA-719, p. 107:17 – 108:4; JA-720, p. 110:21 - 23. Gorman said "What's going on? The school is locked down. *Rumor* around here is that the school is locked down because of you." *Id.* (italics supplied). This was the first time McNelis had even heard the school had been locked down. *Id.*; *Id.*, p. 112: 7 – 9. McNelis told Gorman "I don't know what you're talking about but I'll find out." *Id.*, p. 111:16 – 112:2.

McNelis called Gorman back and said the school had been locked down but that he had no contact with law enforcement about the situation. Vol. IV, JA-719, p. 109:12 – 23; JA-720, p. 113:5 - 11. At no point in time did McNelis decline to provide information in response to Gorman's questions. Vol. IV, JA-721, p. 115:13 – 17.

## V.    The Behavioral Observation Program (BOP) referral.

Later on April 17, 2012, Martonick issued a referral for McNelis to enter the BOP.  Vol. V, JA-778.  Martonick told Gorman of the allegation that McNelis had been using bath salts.  Vol. IV, JA-768, p. 64:14 – 65:6. Gorman decided not to require that McNelis be drug tested but instead approved the referral to the BOP program so McNelis could get evaluated by the company psychologist.  *Id.*, p. 65:15 – 66:1.

PPL management made the BOP referral, in part, because McNelis had been "acting emotionally erratic" and his lack of sleep.   Vol. V, JA-778. It was also noted that he had "illusions [sic] that his phone is being wire tapped."   The note on the BOP referral form ended by stating "On 4/16/2012 Daryle's action contributed to Central Columbia School being locked down related to dialog that occurred between Daryle and his spouse." Vol. V, JA-778.    Martonick told Gorman that McNelis' behavior was a cause of the lockdown.  Vol. IV, JA-767, p. 41:16 – 25.

## VI.    McNelis receives medical help for his sleep issues.

On April 18, one day after informing Gorman of his need for time off, McNelis decided to go to Geisinger Medical Center for an evaluation to determine what was causing his behavior.  Vol. IV, JA-726, ¶11.  Although the lab tests came back normal, McNelis decided to admit himself for

observation and further evaluation to alleviate his wife's concerns.  *Id.*, ¶12.
The hospital staff determined McNelis' symptoms were caused by extreme
sleep deprivation, and he was released on April 21, 2012.  *Id.*, ¶14.
McNelis was given a release to return to work with a return date of April 23,
2012 with no restrictions.  *Id.*, ¶¶15, 17.

### VII.    PPL refuses to allow McNelis to return to work.

McNelis attempted to return to work by calling Gorman, on April 23,
2012.  *Id.*, ¶17.   Gorman told McNelis that his unrestricted access
authorization had been "placed on hold" and that he should report to the
Access Processing Facility (APF) that day.  *Id.*, ¶18.  McNelis went to the
APF that day, as instructed by Gorman.  Vol. IV, JA-726, ¶19.  He met with
John Lines, a Supervisor for Security Access and Training.     Lines
reported directly to Gorman.  Vol. V, JA-809-10, p. 13:25 – 14:6.  Lines told
McNelis he would need to see Dr. David G. Thompson, one of PPL's
psychologists, and that McNelis would need to receive  clearance from
Thompson before he could return to work.  Vol. IV, JA-726-27, ¶19.

### VIII.   McNelis' participation in the BOP.

The next day, April 24, 2012, McNelis again met with Lines.  McNelis
prepared a detailed written statement for Lines regarding the events of the
previous few days.  Vol. IV, JA-729-30; Vol. V, JA-819, p. 36:11 - 13.  Later

on the 24th McNelis was given an MMPI-II.  Vol. V, JA860-70.  The results did <u>not</u> provide a red flag to Thompson or indicate that McNelis was suffering from a clinical psychological condition.  Vol. V, JA-874, p. 28:6 – 16; p. 28:19 – 29:4.  Thompson understood there were concerns about McNelis' behavior, that the police had locked down a school due to his alleged behavior, and that McNelis had checked into Geisinger Medical Center for a few days.  Vol. V, JA-875, p. 31:17 – 32:8; JA-877, p. 40:11 – 41:3.

As part of the BOP process Lines also met with Thompson.  Lines told Thompson about the allegations that McNelis was using bath salts.  Vol. V, JA-823, p. 46:10 – 14; 22-25.  Lines believed bath salts could cause a change of perception or personality of the person using them.  *Id.*, JA-824, p. 47:8 -12.    Thompson interviewed McNelis on April 25, 2012.  Vol. V, JA-890; JA-874, p. 26:14 – 27:3.  Thompson is a substance abuse expert.  Vol. V, JA-825, p. 48: 5-8.  When there is an allegation of illegal drug use it is very important for PPL to ensure the allegations are not just <u>unsubstantiated</u> third hand comments.  *Id.*, JA-831-32, p. 56:23 – 57:4.

**IX.    Dr. Thompson places McNelis' Authorization for Unescorted Access "on hold".**

Five days later, on April 30, 2012, Thompson recommended that McNelis' unescorted access authorization be placed "on-hold pending [a]

determination of fitness". Vol. V, JA-891; JA879, p. 47:15 – 25.    Thus,    as

of April 30, McNelis only needed to complete a substance abuse evaluation

for his unescorted access status to be reinstated. Vol. V, JA-891.

### X.    The new allegations of McNelis' use of bath salts.

On April 30, 2012 Kris Lear, a shift supervisor, was informed by Nick

Steward, another Security Officer at the plant, that he had information from a

"reliable source" that McNelis was using bath salts. Vol. IV, JA-777.

### XI.    McNelis tells PPL of the errors in his medical records.

On April 30, 2012, McNelis spoke with Martonick and told him that he

had some marital issues, that he was going to marriage counseling and that

there had been a misunderstanding as to the Geisinger discharge orders

regarding an alcohol assessment and that he would be providing PPL with an

update when he had more information. Vol. IV, JA-761, p. 61:15 – 24.

### XII.    Thompson issues a new report, one day later.

The day after Thompson recommended McNelis' unescorted status

authorization be placed "on hold" pending a [determination] of fitness" he

changed his recommendation. This time he pronounced McNelis "not fit for

duty". Vol. V, JA-897-98. In the body of his second report Thompson stated

that "it is recommended that Mr. McNelis be referred to IBH [the company's

EAP provider at the time] for the following actions: Referral Mr. McNelis for

alcohol assessment and possible inpatient treatment at more cost effective program than Caron.  Mr. McNelis is not considered fit for duty pending receipt and review of a report of the facility where he receives an alcohol assessment and possibly treatment."

After receiving Thompson's second report Lines told Gorman he would be terminating McNelis' unauthorized access.  Vol. V, JA-834, p. 60: 7-19.  Lines told Gorman that if McNelis obtained a report as required by Thompson then he would consider granting him access again.  Vol. V, JA-835, p. 61:2 – 17.  In telling this to Gorman, Lines was following PPL's Fitness for Duty BOP policy which contemplates that an *employee will be given an opportunity to comply with any recommendation(s) of the psychologist* and then a reviewing official would decide whether the employee was fit for duty.  Vol. V, JA-901; JA-846-52, p. 88:2 – 94:22. (emphasis supplied).[2]

---

[2] PPL's Fitness for Duty BOP Policy and the Site Access Program policy are designed to implement federal NRC guidelines and regulations.  Vol. V, JA-812, p. 19: 6-10.   The NRC's regulations about fitness for duty and site access are designed not only to protect the plant and the public but to protect the employees as well.  Vol. V, JA-853, p. 98:15-21; Vol. V, JA-915, p. 51:12 – 17.  Employees should be given a fair opportunity to present their side of the story.  Vol. V, JA-853-54, p. 98:22 – 99:1.

**XIII.   In violation of PPL policy Gorman fires McNelis before he has a chance to be evaluated.**

With no further input from Lines, or Dr. Thompson, Gorman decided to fire McNelis.   On May 7, 2012, Gorman directed Martonick to prepare the draft of the termination form used by the Susquehanna Elevated Action Review Panel (SEARP).   Vol. V, JA-902-04; Vol. IV, JA-758, p. 48:22 – 49:8; Vol. V, JA-905.   The SEARP is a panel of three  employees who review termination recommendations.   Vol. IV, JA-753, p. 15:15-22; *Id.*, p. 17:14-17; JA-754, p. 19:9-15; *Id.*, p. 19:24 – 20:8.

At Gorman's behest, Martonick included on the form where it asks for information about *prior actions relating to the proposed action* that in February 2010 there was an anonymous 9-1-1 call stating that McNelis was bragging about his use of drugs and that, based upon a lack of credibility, no action had been taken at that time.   Vol. V, JA-906-07; Vol. IV, JA-762, p. 64:6 – 23.   Although Martonick knew the February 2010 allegation had been discredited he nonetheless considered it an "important" piece of McNelis' history and therefore relevant to include it in a document that was recommending his termination.   Vol. IV, JA-763, p. 67:4 – 19.   Martonick admitted though, that he saw nothing from a medical professional to suggest

that McNelis' 2012 issues were caused by anything <u>other</u> than a lack of sleep.  Vol. IV, JA-762, p. 63:1- 10.

Martonick presented the case to the panel on May 7, 2012.  Vol. IV, JA-759, p. 50:8 – 16.  Gorman was there.  *Id*., p. 50:19 – 23; p. 53:9 – 17.  The plant manager, Jeff Helsel, also attended.  *Id.*, p. 51:5 - 13.  Gorman recommended that McNelis' be fired.  Vol. IV, JA-760, p. 54:10 – 14; JA-764, p. 70:19 - 24.

### XIV.  PPL's SEARP was simply Gorman's rubber stamp.

Gorman told the panel that McNelis lost access because he was found unfit for duty.  Vol. V, JA-917, p. 65:18 – 23.  According to Helsel – who has sat on 50 - 100 SEARP's - there has never been even one instance where a simple loss of unauthorized access was presented to the SEARP for a termination, because *loss of access alone* is *not* considered a disciplinary action.  Vol. V, JA-909, p. 17:11 – 19, JA-910, p. 22:14 – 24. (emphasis added).  Moreover, Helsel is unaware of any other instance where an employee was summarily fired when the psychologist recommended further follow-up or treatment in order to reinstate unescorted access privileges.  *Id.*, p. 23: 4 – 24:11.

### XV.   Gorman's "rationale" for firing McNelis.

Gorman says he fired McNelis because McNelis was determined to be unfit for duty.   Gorman also claims he fired McNelis because he was allegedly concerned about McNelis' openness and his purported unwillingness to be forthcoming during the telephone conversation on April17.   Vol. IV, JA-771-72, p. 81:14 – 82:1.

Gorman vaguely claims McNelis said something to the effect that he was unwilling to discuss the school lockdown at the time.  Vol. IV, JA-772, p. 82:23 – 83:9.   Gorman claims there was a credible source that McNelis' behavior had contributed to the school lockdown.  Vol. IV, JA-776, p. 98:8-17. Gorman admits he conducted no investigation into the facts of the school lockdown. *Id.*, p. 98:18 – 23.

Notably, not one of these reasons was included in McNelis' termination letter.  Vol. V, JA-919; Vol. IV, JA-771, p. 80:24 – 81:6.

### XVI.  Thompson was surprised to hear of McNelis' firing, Lines tells him it was pursuant to a "new policy".

The SEARP approved Gorman's decision to fire McNelis' on May, 7, 2012.  Ten days later, on May 17, 2012, Lines called Thompson.  Lines told Thompson that McNelis' employment had been terminated due to a "new policy" for security.  Vol. V, JA-978; Vol. V, 879-80, p. 49:17 – 50:22.  Lines'

statement was untrue as there was <u>no</u> "new policy" regarding a loss of access at the time.  Vol. IV, JA-771, p. 79:15 – 22.  Thompson was surprised to hear that PPL had terminated McNelis as a result of his own report.  Vol. V, JA-886, p. 74:22 – 75:6.

### XVII. McNelis' efforts to address the error in the medical record.

On May 21, 2012, McNelis told Thompson that he had been terminated.  Vol. V, JA-881, p. 55:20 – 56:10.   McNelis also told Thompson that he was going to send Thompson another Geisinger report in order to establish his fitness for duty.  McNelis also told Thompson he was appealing the decision to terminate his employment.  *Id.*, p. 56:1 – 10.   Thompson spoke with McNelis again on the 21st.  McNelis told him that the discharge summary from Geisinger had been revised and Geisinger had removed the recommendation for an alcohol evaluation.  Then McNelis read Thompson a letter from Thomas Wickham, a physician's assistant at Geisinger, dated May 21, 2012, which stated pertinently that "[McNelis'] wife was the source of the Caron Foundation referral.  We did not make it."  Vol. V, JA-979; Vol. V, JA-882, p. 59:6 – 60:6.

On May 22, 2012, McNelis obtained a report from Fran McAndrew, a certified drug and alcohol counselor.  Vol. V, JA-980; Vol. IV, JA-727, ¶25.  McAndrew indicated he had "gathered information for a D&A assessment

through the sessions on 5/17/2012, and 5/22/2012. Although the report is not in formal presentation format, *it is my opinion that he does not meet the criteria for chemical dependency at this time.*" Vol. V, JA-980. The report was provided to PPL. Vol. IV, JA-727, ¶25; Vol. V, JA-883, p. 62:12 – 63:20.

**XVIII. PPL did not fire other employees who had temporarily lost access.**

On June 8, 2012, R.S., was accepted into the BOP. Vol. IX, JA-1464. He was given the MMPI-II, and a clinical interview by psychologist Dr. John S. Baird, Jr. Vol. IX, JA-1468. Baird determined that R.S.' status would be "on-hold" pending a review by a medical review officer (MRO). Vol. IX, JA-1468.

On June 15, 2012, Baird determined that R.S. was not recommended for unescorted access because he was a "potential security risk at the time." This was based on R.S.' stress and possible heart issues. Vol. IX, JA-1469-70. R.S. however, was <u>not</u> fired as a result of his loss of access. Instead, R.S. was referred to a course of treatment by Fran McAndrew which was completed on June 15, 2012. Vol. IX, JA-1471.[3] On August 23, 2012, R.S.

---

[3] The same Fran McAndrew who provided McNelis with a statement that he did not meet the criteria for a person who suffers from alcoholism. Vol. V, JA-980.

was re-evaluated by Baird and deemed "acceptable for unescorted access." Vol. IX, JA-1473.

On May 15, 2012, S.W. was referred to the BOP.  Vol. IX, JA-1474. S.W. was given an MMPI-II exam and then a clinical interview by Baird that same day.  Vol. IX, JA-1475. Baird put S.W. access status "on-hold pending an MRO review".  *Id.*   S.W. was found to have PTSD and adjustment reaction disorder.  Vol. IX, JA-1476.  Dr. Alley examined S.W. and on July 18 or 20, 2012, Baird found S.W. acceptable for unescorted access authorization.  Vol. IX, JA-1478.

On July 30, 2013, Baird again had cause to examine S.W.  He determined that S.W.'s access would be placed "on hold pending an MRO review" and that S.W. needed a "clinical interview".  Vol. IX, JA-1481.  On August 7, 2013, Baird opined that S.W. was "not recommended for unescorted access".  Vol. IX, JA-1486.

S.W. then saw a psychiatrist at Baird's request.  Baird suggested, based on the psychiatrist's report, that S.W. see a social worker for counseling for at least five sessions.  Vol. IX, JA-1485-87. On August 7, 2013, S.W. was notified that a decision had been made to deny or revoke unescorted access authorization.  Vol. IX, JA-1486. S.W. was *not* fired as a result of a loss of access.

On Wednesday December 4, 2013, after meeting with the social worker, S.W. took an MMPI-II test.  S.W.  met with Baird the following day.  Vol. IX, JA-1488.  Baird concluded S.W. needed a clinical interview.  After the interview, granted S.W. unescorted access.  Vol. IX, JA-1489.

## VI.    SUMMARY OF ARGUMENT

"To see a brick you must stand very close, but to see a wall it is necessary to stand far away." – Jose Ortega y Gossett

Daryle McNelis was successfully performing his job as a security guard when he experienced a bout of sleep related issues in April of 2012.  On his own initiative McNelis notified PPL of his need for time off to address those concerns, which he did at a local hospital.  Unbeknownst to him, McNelis had already been ordered to participate in PPL's BOP, in part, due to an unsubstantiated rumor that he was the cause of a local school lockdown.  He was also unaware of rumors circulating in the workplace that he was using illegal drugs – bath salts.

When McNelis was released from the hospital to return to work *with no restrictions* he fully cooperated with the BOP process.  The company psychologist found that McNelis was *not* suffering from a clinical psychological condition, and there was *no* evidence of any use of illegal drugs.

20

The *only* thing preventing McNelis from being returned to work was the requirement by the psychologist that McNelis address an errant comment in the hospital's discharge papers that he should have an evaluation for alcohol abuse. Prior to that date (and afterwards too) *everyone* who had participated in PPL's BOP process had been allowed to get an evaluation as recommended by the company's psychologist. There were no exceptions. However, McNelis wasn't allowed to follow-up and to get an evaluation from a drug and alcohol counselor showing he was not an alcoholic – instead Gorman summarily fired him.

The District Court erred in holding that McNelis' temporary loss of access, (which stemmed from a partially improper referral to the BOP as a result of a rumor that he caused a local school lockdown), meant that he was not a qualified individual with a disability and therefore no longer enjoyed the protections of the ADA. A temporary loss of access does not *a priori* result in a person being removed from the protections of the ADA.

As to his actual fitness for duty McNelis presented evidence which showed that 1) he had nothing to do with the school lockdown; 2) the hospital's discharge notes suggesting an evaluation by an alcohol abuse counselor was not its medical recommendation but simply a request by Ms. McNelis; and 3) a certified substance abuse counselor, whose opinion has

been accepted by PPL's psychologist in the past, opined that McNelis did not meet the criteria for alcohol abuse.

The District Court also erred in finding that McNelis had not provided evidence upon which a reasonable jury could find that PPL's reasons for his firing were pretextual. Gorman's purported reasons for McNelis' firing smack of pretext. As far as being found "unfit for duty", the record contains no evidence that he was anything but *temporarily* unfit for duty. The record also shows that PPL always allowed its employees to follow through with the psychologists' recommendation, without exception.

As to McNelis' purported failure to be "forthcoming" with Gorman about the school lockdown, the record shows that although McNelis knew nothing of the incident he offered to find out what had happened and then called Gorman back to report that he had no contact with the police. Gorman never told Lines that McNelis had been evasive in answering his questions. Gorman's meager offering that McNelis had been "evasive" is so subjective, and is at such odds with other record circumstantial evidence, that it cannot be accepted at the summary judgment state. Maybe a jury would believe Gorman, but – assuredly – it might not.

What was lost on the Magistrate and the District Court in their respective reviews of the case was the *complete* picture (the brick wall) -

22

that McNelis did nothing wrong, did not have any ongoing unaddressed medical or psychological issues, and didn't refuse to answer the questions about the school lockdown. In examining the case as a whole rather than deconstructing each brick, a jury could reasonably find that PPL's actions here were sufficiently inexplicable and aberrant such that something else (discrimination) was afoot.

Dr. Thompson was surprised to hear that McNelis had been fired for being found unfit for duty and was told it was due to a "new" policy – a policy that PPL has now admitted did not exist. McNelis' termination was justified by its' resurrection of an unsubstantiated anonymous report of drug use on his part that had been rejected by PPL more than two years previously. A reasonable jury of McNelis' peers could hold that PPL erroneously regarded him as having a disability when he had none, and that it terminated his employment because of its erroneous perception. Simply put, PPL used unfounded fears to fire Plaintiff because its managers, principally Jim Gorman, were afraid of him.

The District Court also erred by crediting testimony from employer witnesses and treating their testimony as undisputed fact, contrary to the holding of the U.S. Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000) but, according to the Court,

completely proper under the holding of *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007).   The Court's errors also included the legal conclusion that McNelis could not challenge the testimony of Dr. Thompson at summary judgment because he did not do so at his own deposition, contrary to the holding in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963).

## X.  ARGUMENT

### I.    THE DISTRICT COURT ERRED IN FINDING THAT BECAUSE McNELIS TEMPORARILY LOST ACCESS AT THE PLANT HE WAS NOT A QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA.

**Standard of Review.**

The standard of review of the District Court's summary judgment order is *de novo,* applying the same standards as the district court. *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996), (*en banc*), *cert. denied*, 521 U.S. 1129 (1997).

**Legal standards for courts at summary judgment.**

Summary judgment should be granted only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  F.R.C.P. 56(a).  The court is to view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866

(2014)(per curiam).  These requirements are to be applied with added rigor in discrimination cases, where intent and credibility are crucial issues. *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313 (3d Cir 2000).

When a defendant moves for summary judgment, "a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149-151 (2000).  As part of its analysis a court should be cognizant of the fact that the whole of the evidence can be greater than the sum of its parts, and that the evidence must be taken *in its totality*.

> "A play cannot be understood on the basis of some of its scenes but only on its entire performance, ...a discrimination analysis must concentrate not only on individual incidents but on the overall scenario."

> *Andrews v. City of Philadelphia*, 895 F .2d 469, 484 (3d Cir. 1990).

As the Third Circuit has recognized,

> "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it. … Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled … because of crabbed notions of relevance or excessive mistrust of juries."

> *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996).

**An overview of the ADA's "regarded as" protection.**

McNelis contends he was erroneously regarded as having a disability in the form of alcoholism, mental illness and/or illegal drug use, and that this misperception was a motivating factor in his firing.[4]  The ADA protects persons from being erroneously regarded as having a disability.  42 U.S.C. § 12102(2)(C).  The purpose of the "regarded as" prong is to provide a cause of action to individuals who suffered an adverse action because of myths, fears and stereotypes.  See *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999); 29 C.F.R. pt. 1630, App. § 1630.2(l).

Under the "regarded as" prong as defined by the ADAAA, a person is considered "disabled" if "the individual establishes that he or she has been subjected to an action ... because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).[5]  When Congress

---

[4] Disparate treatment discrimination cases under the ADA are governed by the same standards applicable to Title VII actions.  *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000).  Under Title VII a plaintiff may win when they show the protected characteristic was a motivating factor in the adverse employment decision.  *Univ. of Texas Southwest Medical Center v. Nassar*, 570 U.S. __, 133 S. Ct. 2517, 2523 (2013).

[5] Prior to the passage of the ADAAA in 2008, an employee had to show that an employer erroneously regarded him as having a substantial limitation in a major life activity. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999).  The ADAAA significantly expanded the availability of "regarded as" claims.  According to the revised statute, "[a]n individual

26

passed the ADA there was a concern that employment decisions would be made about illegal drug use so Congress protected persons who were *erroneously* regarded as currently using illegal drugs. 42 U.S.C. § 12114(b)(3). Under the ADA's "regarded as" prong, a determination of whether the person has been erroneously regarded as having a disability is *rarely* susceptible of resolution at the summary judgment stage. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)(emphasis supplied). Evidence of pretext is *also* probative of whether an employer regarded the employee as having a disability. *Id.*

In short, pursuant to the impetus to protect persons from being erroneously regarded as having a disabling condition, employment decisions cannot be based on unsubstantiated concerns or fears about safety, insurance, liability, workers' compensation costs, etc. EEOC Technical Assistance Manual, § 2.2(c), p. II-11, ¶ 2. "Even an innocent misperception based on nothing more than a mistake of fact as to the

---

meets the requirement of 'being regarded as having [a disabling] impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). This eliminates from the analysis: does the person's impairment substantially limit a major life activity? Now, the mere existence of an impairment establishes coverage under the "regarded as" prong, provided the individual has been subjected to a prohibited action under the ADA. See *Hilton v. Wright*, 673 F.3d 120, 129 (2nd Cir. 2012).

severity, or even the existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3d Cir. 1998).

**The District Court's First Error – a temporary loss of access alone is not fatal to an ADA claim.**

To establish a valid claim under the ADA, McNelis must establish that he (1) had a disability;  (2) was qualified to perform his job, with or without reasonable accommodation;  and (3) suffered adverse employment action because of that disability.  *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 20016).

Instantly, the District Court held that because McNelis had lost his unescorted access he could not establish that he was a qualified individual with a disability based upon the fact that NRC regulations require that persons in certain positions within the nuclear industry maintain such access.  However, the District Court failed to recognize that a temporary loss of access is not an automatic disqualifying event under the law.  It was this misunderstanding of McNelis' claim that led to the District Court's error on the law.

There are several flaws with the Court's conclusion.  The first of which, and the most important, is that its ruling, in effect, says the ADA

does not apply to the nuclear power industry.  Medical issues in terms of qualification to perform a job are at the heart of <u>all</u> ADA issues (either with or without a reasonable accommodation) yet the District Court has completely abrogated the Act by saying that once a psychologist opines that person does not have access that is the end of the story.  Its' ruling abolishes the protections of the ADA for workers in sensitive positions within the nuclear industry without any legislative or case authority to support it.

Second, the District Court based its conclusion on the holdings from two Middle District cases and two from other states.[6]  Vol. I, JA-102.  But it did not make any effort to examine the facts of the cases it cited.  All of the cases can be explained by other aspects of the ADA, and are distinguishable from the instant case.

Starting with *McCoy v. Pa. Power & Light Co.*, 933 F. Supp. 438 (M.D. Pa. 1996), the plaintiff there was hospitalized for alcoholism and depression. The company psychologist took him out of service. The company then transferred McCoy from his nuclear plant operator position to a loading dock position where there was no requirement that he maintain access.  The issue

---

[6] The relevant legal standards are the same under the ADA, Rehab Act and PHRA; therefore McNelis will only refer to the ADA throughout this brief. *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996).

was whether McCoy could be accommodated within his position. The Court found that based upon the regulations McCoy could not be accommodated in his original position.[7] So the question in McCoy was whether the employer failed to grant him a reasonable accommodation. That issue is completely different than the question here, as McNelis was not seeking an accommodation. The sole question for this Court is whether McNelis is a qualified individual with a disability. *McCoy* is inapposite.

In *Sysko v. PPL Corp.*, No. 3:07-CV-0470, 2009 WL 4725240, *11 (M.D. Pa. Dec. 2, 2009) the plaintiff was denied unescorted access based upon behavioral issues by the company psychologist (Dr. Baird) and was to be re-evaluated at a later date. As in *McCoy*, the plaintiff was offered two alternative positions, including one on the loading dock. He was later reinstated after an evaluation (by Dr. Thompson) and then sued over his loss of access. *Sysko* is also inapposite for the same reason *McCoy* is – McNelis is not challenging his temporary loss of access. McNelis is challenging what PPL did to him thereafter. Indeed, *McCoy* and *Sysko* show what PPL should have – and would have – done for McNelis had Gorman not harbored unfounded fears and misimpressions as to his condition.

---

[7] It did go on to find that the transfer of McCoy to the loading dock position was a reasonable accommodation and therefore he had no claim. See *McCoy*, at 443.

The District Court also cited *Lute v. Dominion Nuclear Connecticut, Inc.*, No. 3:12-CV-01412, 2015 WL 1456769, at \*11 (D.Conn. Mar. 30, 2015). There, the plaintiff lost his access due to issues with alcohol.  In dismissing Lute's claims for unlawful termination the District Court found that he had lost his access, and *while being given an opportunity to have it reinstated* he had <u>not</u> manifested any intention of trying to regain it, despite being told of his need to do so.   <u>There was nothing temporary about his loss of access.</u> Unlike McNelis and the comparators he's put forward, Lute did not proceed with the process of reinstatement.  In *Lute* the district court did not hold that a temporary loss of access would deny the plaintiff the protections of the Americans with Disabilities Act.  Yet that's what the District Court did here.

Finally, in *Weatherbee v. Southern Nuclear Operating Co., Inc.*, No. 1:08-CV-2138, 2010 WL 11428172, at \*7 (N.D.Ga. Mar. 17, 2010) the plaintiff applied for a position as a plant engineer.  Once the company learned that he had emotional issues it required that he be evaluated by a plant psychologist.  Plaintiff was not treating with anyone for his bi-polar condition.  A recommendation was made that he could work but he should not be allowed to work on safety sensitive systems for one year.  The company withdrew the job offer because working on safety sensitive systems was an essential function of the position.  Weatherbee claimed that he should

31

have been allowed to work as an engineer but not assigned to work on safety sensitive systems. His claim was for a failure to accommodate.[8] The District Court granted the employer's motion for summary judgment (under the old ADA) on the basis that Weatherbee had not established that it had regarded him as precluded from working in a class or broad range of jobs[9] and because working on safety sensitive systems was an essential function of the position.

As shown, none of the preceding cases stands for the proposition, as held by the Court here, that once access is lost an employee *immediately* loses all protections of the law.

Contrary to the Court's finding that McNelis was effecting to "conceal" the law regarding the application of qualification standards to an ADA claim (Vol. I, JA-102) McNelis argued that a *temporary* loss of access does not mean as a matter of law that an individual is not qualified. If that were so the ADA would not protect anyone with an *actual* disability who needs time off for treatment of to recover from a flare-up of an illness. It is beyond question that time off for treatment for a medical condition can qualify as a

---

[8] Under the ADA it is not a reasonable accommodation to be completely excused from performing an essential function of the position. 42 U.S.C. §12111(8).

[9] The ADAAA was passed, in part, to address the unduly restrictive approach Courts too often employed of whether an individual was regarded as having a disability. 42 U.S.C. § 12101, Sec. 2. (b)(4).

reasonable accommodation under the law. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 671 (3d Cir. 1999). Obviously then, a temporary period of disability/unfitness does not automatically exclude someone from the protection of the ADA by treating them as unqualified.

The logical extension of the District Court's opinion means that persons with actual disabilities are protected under the law if they need time off for treatment but that those persons who are erroneously regarded as having a disability have no protections *whatsoever* – no way to legally challenge an erroneous perception. Surely, this is not how the ADA is to be interpreted given the impetus of the Act to protect persons from unfounded *erroneous* assumptions about an individual's ability to perform his job.

In addition to the preceding, the Court's holding is also incongruously at odds with PPL's acknowledgement that NRC regulations are designed not only to protect the plant but to protect the employee from unfounded accusations (Vol. V, JA-853, p. 98:15-21; Vol. V, JA-915, p. 51:12 – 17), which is exactly what a jury could find happened here.

33

**The District Court's Second Error – McNelis presented evidence upon which a jury could find he <u>was</u> a qualified individual with a disability.**

Not only did the District Court err from a legal perspective when it found McNelis to be unqualified due to a temporary loss of access, but it erred in rejecting plaintiff's evidence that he was a qualified individual with a disability.  See *Turner*, *supra*, 440 F.3d at 611.  Specifically, it found that plaintiff's reliance on Geisinger's discharge instructions was insufficient because it was not certified by the NRC to make such a determination.  Vol. I, JA-103.  This holding overlooked facts upon which a reasonable jury could find for plaintiff.

First, plaintiff's hospitalization was for his sleep issues which was the only *legitimate* basis for the BOP referral (the school lockdown was not a legitimate one as McNelis had nothing to do with it and neither were the rumors of drug use as he was not engaged in any drug use).  McNelis was released without restrictions for his sleep issues and Dr. Thompson did not hold that he needed any further treatment or evaluation for those issues.

Second, PPL accepts releases by outside medical providers and Thompson did not quibble with the hospital's release insofar as the sleep issues went (he is not a medical expert in that field).  Thompson's only

34

recommendation was that a follow-up was necessary for the one part of the medical record that was erroneous – the part about an alcohol evaluation. As explained by Geisinger once the error in the discharge instructions was acted upon by Thompson, the recommendation by the hospital for an alcohol evaluation was <u>not</u> a medical one, but simply an effort to appease Ms. McNelis, who is not an expert in the field.  Vol. V, JA-979; Vol. V, JA-882, p. 59:6 – p. 60:6.

Third, as to Thompson's recommendation for an alcohol evaluation McNelis addressed that too, with a report from Fran McAndrew, a substance abuse expert whose opinions had been accepted by PPL's psychologists in the past, Vol. IX, JA-1470-72, who opined here that McNelis did *not meet the criteria for chemical dependency at this time.*  Vol. V, JA-980.[10]  So there was no logical reason preventing McNelis from being found fit for duty and regaining access, and a jury could therefore find McNelis to be qualified to do the job, contrary to the finding of the District

---

[10] Any suggestion that this report was issued "too late" to be relied upon by McNelis because it came after his firing demonstrates the irrationality of the Court's holding that PPL was entitled to fire McNelis immediately upon his loss of access without giving him the opportunity to challenge or otherwise address Thompson's recommendation.  The "interactive process" in an actual disability case under the ADA contemplates an opportunity for a full exchange of information between the parties, not a chance for the employer to get rid of the employee before he or she has had an opportunity to provide information that may result in a productive process.

Court.  The District Court's finding that a medical report <u>has</u> to be issued by a provider certified by the NRC is not supported by the facts and is also unsupported by the caselaw and should be rejected by this Court as an unnecessary hurdle under the ADA.[11]

But even if this Court holds that under the NRC regulations a determination of fitness *must* be made by a provider certified by the NRC it was PPL's actions that prevented McNelis from ultimately receiving a fair evaluation by Thompson and PPL should not benefit from its own malfeasance.  Given the evidence presented by plaintiff a reasonable jury could find that McNelis satisfied the second prong of a prima facie case.[12]

---

[11] It appears to have been lost on the District Court that the individuals who are certified by the NRC to make fitness determinations are not medical doctors but psychologists and that those individuals work exclusively for nuclear power plants.  Such a holding effectively means that individuals will never be able to challenge a company psychologist who has issued, in effect, a medical opinion because they will not be able to obtain a competing opinion from someone who works for the very company that is engaging in the challenged discriminatory conduct.  This the ADA does not require.

[12] There is no dispute that McNelis suffered an adverse employment action – the first half of the third prong of a prima facie case.  See *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999).  The remainder of the third prong is that the adverse action occurred as a result of discrimination – the ultimate issue in dispute here and inextricably tied-in to the first prong, which is that plaintiff have a disability.

## II. THE DISTRICT COURT ERRED IN FINDING THAT A REASONABLE JURY COULD NOT FIND THAT PPL'S REASONS FOR McNELIS' FIRING WERE PRETEXTUAL

**Standard of review.**

The standard of review of the District Court's summary judgment order is *de novo.* *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996), (*en banc*), *cert. denied*, 521 U.S. 1129 (1997).

After deciding McNelis had not established a prima facie case of discrimination the Court nonetheless proceeded to analyze McNelis' evidence of pretext to determine if he was able to establish the third prong of a prima facie case.

**Legal standard for determining whether evidence of pretext exists.**

Once McNelis established a prima facie case, the burden shifts to PPL to articulate one or more legitimate, nondiscriminatory reasons for its employment decision. *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). A plaintiff can establish pretext and preclude a summary judgment by adducing evidence which either: 1) casts sufficient doubt upon the legitimate reason offered by the defendant so that a fact finder could reasonably conclude that the proffered reason was a fabrication; or 2)

37

allows a fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse action.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  As to circumstantial evidence "We better know there is a fire whence we see much smoke rising than we could know it by one or two witnesses swearing to it.  The witnesses may commit perjury, but the smoke cannot."  *Hopkins v. Andaya*, 958 F.2d 881, 888 (10th Cir.1992).  At the summary judgment stage, if the plaintiff presents evidence from which a finding of pretext may be inferred, even if it is not the only possible inference, there is a question of fact which must be decided by a jury.  *Josey v. John R. Hollingsworth, Corp.*, 996 F.2d 632, 637 (3d Cir. 1993).

### The District Court's Errors.

The District Court held that plaintiff had failed to present facts sufficient for a jury to find that Defendant's proffered reasons for his termination were pre-textual.  It reached this erroneous conclusion by a) misconstruing the facts and/or failing to consider the facts in a light most favorable to the plaintiff, as it is required to do at summary judgment; b) failing to assess the comparators circumstances in a light most favorable to McNelis; c) balkanizing its consideration of the facts; i.e. not considering

the totality of the circumstances as the Third Circuit prescribed in *Andrews v. City of Philadelphia*, 895 F.2d 469, 484 (3d Cir. 1990).

**1.    There was ample evidence for a jury to find that plaintiff was not "evasive" in the phone call with Gorman.**

Gorman contended that McNelis was fired, in part, due to being evasive during the phone call.  But there was ample evidence – both direct and circumstantial – from which a jury could disbelieve such an assertion. The District Court, however, failed to consider this evidence.  First, McNelis' own testimony that he told Gorman he had no knowledge of the lock down but offered to look into the matter, and that he never refused to answer any of Gorman's questions establishes that he was not evasive. Vol. IV, JA-719, p. 107:17 – 108:4; JA-720, p. 110:21 – 23; 111:16 – 112:2; 112: 7 – 9.  Vol. IV, JA-721, p. 115:13 – 17. This alone creates a genuine factual dispute on the issue.  A jury could determine, upon hearing from both sides, that McNelis is more credible and that he was not, in fact, evasive with Gorman.

Second, the circumstantial evidence could lead a jury to believe that McNelis was not evasive.  For example, McNelis called Gorman back after looking into it.  Obviously a jury could find that fact is not reflective of evasiveness on McNelis' part.  The Court overlooked the fact that McNelis

did not actually fail to self-report – he independently spoke with Gorman about his sleep issues and asked for time off to get treatment.  Vol. IV, JA-719, p. 107:17 – 108:4; JA-720, p. 110:21 - 23.  A jury could find that his act of seeking medical treatment and telling PPL about it met his obligations, contrary to the Court's conclusion that he completely failed to do so.  Again, this presents a portrait of someone who's not being evasive.

Further, in contrast to Gorman, Lines testified that McNelis was not evasive when they spoke.  Vol. V, JA-822, p. 42:7 – 15.  Gorman never told Lines that McNelis had been evasive in answering questions about the school lockdown.  Vol. V, JA-844, p. 84:11-15.  Finally, there was nothing in the termination letter suggesting there was evasiveness on McNelis' part. Vol. V, JA-919.  A jury could easily find the allegation of "evasiveness" was just pretext.

Yet, instead of focusing on the evidence of pretext, the District Court assigned a *different* reason for McNelis' termination and then decided there was no evidence that *this* reason was pretextual.   The District Court decided that McNelis was fired for not self-reporting his fitness for duty issues.  Vol. I, JA-105-06.    PPL, however, never asserted McNelis was fired for failing to self-report under its policy.  Gorman did not recommend McNelis' firing for failing to self-report, but instead on the purported

40

evasiveness during the phone call.   Vol. II, JA-222, Def. Statement of Fact#122.   Second, McNelis did self-report the issue of which he was aware – the sleep issue.   Vol. IV, JA-719, p. 107:17 – 108:4; JA-720, p. 110:21 - 23.

The District Court proceeded to conclude that given the BOP was established pursuant to NRC regulations it "is difficult to grasp how the delay in the firing demonstrates pretext".   Vol. I, JA-106. What the District Court failed to do was consider that a reasonable jury could find that a lengthy delay in firing when the purported reason was such a serious violation of rules could mean that there was no actual evasiveness on McNelis' part and it was just a made up justification.

There is nothing in the record showing Gorman did anything about the purported "evasiveness" between the time it allegedly happened and the time he slipped it into the SEARP report.   There were no contemporaneous notes.  There were no discussions with HR or McNelis' direct supervisors about it.  Suddenly, the "evasiveness" appeared when Gorman and Martonick prepared the SEARP termination form.

There is more evidence upon which a jury could find that the alleged evasiveness on McNelis' part was pretextual.   The only reason given by Helsel on the company's form for his firing was McNelis' loss of access.

41

Vol. III, JA-561.  Contrary to the District Court's assessment, a jury could look at these facts and consider them to be suggestive of pretext.

As another example of the Court's discounting of evidence in McNelis' favor, the Court brushed off McNelis' reliance on Helsel's testimony that he was unaware of anyone who failed to cooperate but was allowed to go through the whole process before being fired (Vol. V, JA-916, p. 55:20 – p. 56:13).  The District Court disregarded this testimony based on Helsel's subsequent qualification that nonetheless he would have "expected the BOP process to be completed".  This acceptance of self-serving testimony by an interested witness, and simultaneous discounting of the evidence in favor of McNelis' is just another example of how the District Court stepped into the shoes of a fact-finder.

**2.    There was ample evidence from which a jury could find that Gorman's "loss of access" reason was pretextual.**

Again, like with the "evasiveness" charge, the record presents ample evidence – especially when viewed in McNelis' favor – from which a jury could find that McNelis was not fired for his loss of access.  The most plain evidence comes from the comparators.  They too lost their access, but were not fired.  In fact R.S. and S.W. were not fired after losing access on several occasions.  So these circumstances cast doubt on Gorman's

42

explanation.  A jury could easily find that for whatever reason McNelis was fired, it assuredly was *not* due to his loss of access.

The District Court, again, discounted this evidence, rather than viewing it in the light most favor to McNelis.  The Court erroneously distinguished R.S. and S.W. from McNelis, *asserting* that they – unlike McNelis – were not fired for failing to self-report their fitness issues.  Vol. I, JA-112-13.  But as noted above, McNelis was *not* fired for failing to self-report his fitness for duty issues.  The Court mistakenly made this determination.

Even if the Court had gotten that right, the law does not require that comparators be *exactly* the same in every single respect in order to be compared to the plaintiff.  While the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances, but they do not have to be identical.  *Marzano v Computer Science Corp., Inc.*, 91 F. 3d 497 (3d Cir. 1997). "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).

 In this case, because there is a genuine issue of fact as to whether McNelis *actually* was <u>evasive</u> about the school lockdown, a jury could find

43

that R.S. and S.W. are proper comparators.[13] A jury could also find that because R.S. and S.W. did not get summarily fired upon losing their access, another reason must have prompted Gorman.

**3.    The District Court erred in determining that the timing of Thompson's second report - just a day after his first – could not be suggestive of pretext.**

On April 30, 2012, Thompson recommended McNelis' unescorted status authorization be placed "on hold" pending a [determination] of fitness". Vol. V, JA-891; JA879, p. 47:15 – 25.  That same day supervisor Kris Lear received another report of McNelis' alleged use of bath salts.   Vol. IV, JA-777.  The very next day Thompson issued a new report holding that McNelis was "unfit for duty".   Vol. V, JA-897-98.

---

[13] Another example of how the Court viewed the facts in a light most favorable to PPL, is that the Magistrate's factual findings show that the comparators *actually* failed to self-report their issues.  R.S. only reported something after meeting with his supervisors who were criticizing his performance after the BOP referral was made and asking him if anything was wrong.  Then, and only then, did R.S. tell them he was having problems. Vol. I, JA-51, ¶1, Subsection V.  So R.S. knew he was having problems but didn't report them until the supervisors asked him, after the BOP referral was made.  S.W. told her supervisor that she was "losing it" and that she had unsuccessfully tried to get counseling.  Vol. I, JA-52, ¶1. Clearly she knew she was having problems but didn't discuss it with management until after a BOP referral had been made.   Given the preceding, even if a jury were to find that McNelis failed to self-report, R.S. and S.W. were proper comparators and the Court's rejection of them as such constituted error.

Plaintiff argued that the timing of Dr. Thompson's second report was suspicious, coming a day after his first report, and Lear's last notation about alleged drug use by McNelis.  The District Court decided that, given Lear's uncontradicted statement that he did not tell anyone in management of the allegations, and the fact that Thompson issued two separate reports, there was nothing suspicious about the issuance of the second one where Thompson held McNelis "unfit for duty."  In reaching this conclusion, the District Court held that, given Lines' testimony that he told Dr. Thompson of the earlier allegations of McNelis drug use, it was "illogical" to believe that a new allegation of drug use by McNelis would in any way alter the judgment of Dr. Thompson.

The District Court erred in reaching this conclusion by failing to recognize that employment discrimination does not always manifest itself in rational ways.[14]  In fact, the Third Circuit has counseled that discrimination

---

[14] Its error was also based on its conclusion that, pursuant to the holding of *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007), a Court is *required* to credit the uncontradicted testimony of an interested witness Lear's testimony that he told no one in management of the newest allegations of drug use was uncontradicted.  However, see plaintiff's argument at Subsection III, *infra* that he is not required to produce any evidence to contradict Lear's testimony.  Moreover, it defies belief that an employee in a nuclear power plant who learns of illegal drug use by a co-worker would fail to notify the company of those rumors, yet that is exactly how the Court held, in spite of Lear's fantastic claim.  Pursuant to *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994), a jury could find just based on

is not always rational (*Healey v. New York Life Ins. Co.*, 860 F.2d 1209, 1218 (3d Cir. 1988)) and the Court's failure to acknowledge this, as well as its resolution of disputed facts, which is contrary to its function at this stage of the proceedings,  led it to find the facts in favor of PPL as the moving party.

A jury could find that Thompson needed no further information in order to issue his second report, that it was a simple document to produce and could have been issued on the 30th, and that its issuance a day after the first report, the very next day after the last rumor of McNelis' illegal drug use, is therefore suspicious.  Given that Thompson's finding of unfitness for duty was one of the purported reasons for plaintiff's firing a jury could find that he was told of this most recent allegation of drug use and issued a report that PPL could rely on to justify McNelis' firing.

The District Court's finding that it is illogical to believe that a new report of drug use would influence Thompson if he had not been influenced by the first report, assumes facts that a jury has not found yet – that Thompson was initially informed of the drug use by Lines.  Thompson doesn't remember ever being told of the rumors of the illegal drug use (Vol.

the absurdity of Lear's contention, that he is lying and that he <u>did</u> notify management on April 30 that he had received a report that McNelis was using bathsalts.

V, JA-875, p. 32:9-21).  In short, the District Court did not view this scenario in a light most favorable to McNelis as the long-established summary judgment rules prescribe.

### III. THE DISTRICT COURT ERRED IN FINDING THAT HELSEL'S TESTIMONY THAT THE RUMORS OF McNELIS' USE OF ILLEGAL DRUGS WERE NOT DISCUSSED IN THE SEARP WAS AN UNDISPUTED FACT PURSUANT TO THE HOLDING OF *LAUREN W. v. DeFLAMINIS*.

**Standard of review.**

The standard of review of the District Court's *statement of the law* in ruling on summary judgment is *de novo*.  *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996), (*en banc*), *cert. denied*, 521 U.S. 1129 (1997).

**The District Court's Error**

The District Court erred in adopting the Magistrate's holding as set forth in footnotes 7 and 8 (Vol. I, JA-41-2) of its R&R that, based upon the Third Circuit's holding in *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007), Helsel's testimony that the SEARP panel did not discuss the school lockdown or the suspected use of bath salts as a basis for McNelis' firing should be simply accepted as an *undisputed fact*, and that Plaintiff's reliance on the holding of the U.S. Supreme Court in *Reeves v. Sanderson*

*Plumbing Products, Inc.,* 530 U.S. 133, 149-151 (2000) to challenge Helsel's testimony was misplaced.

The importance of this erroneous legal conclusion is that the Magistrate then completely credited Helsel's statement that McNelis' firing had *nothing* to do with rumors of suspected illegal drug use, and that it was only based upon his having fitness for duty issues, not being forthcoming about those issues, being an unacceptable safety risk, and ultimately losing access**.** Vol. I, JA-41-42, JA-41 fn. 7.

Plaintiff argued that the U.S. Supreme Court held in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149-151 (2000) that a court should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, *at least to the extent that that evidence comes from disinterested witnesses* is the law of the land, and that Helsel's testimony in paragraphs 128 to 130 of Defendant's statement of facts (Vol. II, JA-223), as coming from an interested witness, should be ignored by the Court at this stage of the proceedings, as it is a question left for the jury, not the Court.

This holding of *Reeves* is unequivocal, and to the extent that the Third Circuit held differently in *DeFlaminis* the Third Circuit is wrong.[15] However, even without accepting the holding of *Reeves* on its face the District Court and Magistrate erred in applying the holding of *DeFlaminis* without engaging in any substantive analysis to the facts of this case.

Specifically, the District Court and Magistrate erred in believing that plaintiff had to come up with evidence *directly* contradicting Helsel's testimony on the exact points of his testimony in order to take advantage of the holding of *Reeves*. Plaintiff has shown numerous instances of pretext in this case, so a jury is not required to believe Helsel's testimony, even though he has not been impeached or specifically contradicted on this

---

[15] In rejecting plaintiff's argument, the District Court relied on its own holding in *Edgerton v. Wilkes Barre Home Care Services*. The District Court's opinion in *Edgerton* was flawed as the Court relied upon a Third Circuit holding (*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998)) that pre-dated the Supreme Court's ruling in *Reeves*, in an effort to reconcile its holding with *DeFlaminis*. While the Court's *s* decision was ultimately affirmed by the Third Circuit (600 F.App'x. 856 (3d. Cir. 2015)) it bears noting that the order affirming it was unpublished and did not specifically mention *Reeves* or *DeFlaminis*. Therefore, that holding does not stand for a clear adoption of the holding of *DeFlaminis* or the District Court's rationale on that particular issue. In its opinion here the District Court made no effort to address McNelis' citations to the precedential holdings of this Court in *Armour v. County of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001); *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006); or *Hill v. City of Scranton*, 411 F.3d 118, 131 n.22 (3d Cir. 2005) which expressly followed the holding of *Reeves*, and which could not be overturned absent an *en banc* ruling by the Third Circuit.

particular point.  McNelis has not simply claimed, without any proof to back it up, the equivalent of "this just wasn't fair."    Plaintiff produced significant evidence of pretext which call into question PPL's actions and intent in this case (contrary to the District Court's conclusion).[16]

Besides the overwhelming evidence of pretext as a whole, there is one very specific area of pretext that makes Helsel's completely self-serving testimony something a jury could feel free to disbelieve, evidence which the Magistrate and District Court improperly rejected.  Martonick included on the SEARP form where it asks for information about "prior actions relating" to the proposed termination, that in February 2010 there was an anonymous 9-1-1 call stating that McNelis was bragging about his use of drugs.  Martonick included this information in the SEARP despite the fact that no action had been taken against McNelis in 2010 due to a *lack of credibility*.  Vol. V, JA-906-07; Vol. IV, JA-762, p. 64:6-13.    Nonetheless, Martonick considered it an "important piece" of Plaintiff's history, in light of the more recent unsupported allegations of McNelis' recent, illegal use of bath salts.  Vol. IV, JA-763, p. 67:4-19.  Martonick saw nothing from a medical professional suggesting McNelis' 2012 issues were caused by anything other than a lack of sleep.  Vol. IV, JA-762, p. 63:1-10.  This form prepared by

---

[16] For a full description of this evidence see Section II, p. 37-47, *supra*.

Martonick was used to justify Gorman's recommendation of McNelis' termination to the SEARP panel.

If lack of sleep was Plaintiff's problem why was a two year old *unsubstantiated* rumor of drug use that was *never acted upon*, an "important piece" of McNelis' history?  It wasn't - unless Martonick, Gorman and Lines really *were* worried about the bath salts rumors.  With this in mind, connected with the importance of the SEARP document and the setting itself, Helsel's statement that McNelis' rumored use of bath salts never came up at the SEARP strains credulity to the breaking point and pursuant to the holding of *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994), allows a jury to decide whether Helsel is telling the truth or not.  Indeed, that is the reason for having jury trials.

**Even if this court finds that McNelis has not produced sufficient evidence of pretext to challenge Helsel's testimony, this Court is <u>not</u> bound by *DeFlaminis* as the holding of that case is inconsistent with the holding of the U.S. Supreme Court in *Reeves*.**

To the extent this Court determines that Plaintiff *is* required to show through *directly* contradictory testimony that Helsel *himself* is not being truthful on a particular point in order to have the Court disregard his testimony at summary judgment, pursuant to the holding of *DeFlaminis*,

Plaintiff contends the Third Circuit's holding in *DeFlaminis* contradicts the holding of *Reeves* and cannot be followed.

In *Reeves*, 530 U.S. at 149-151, 120 S.Ct. at 2110, the Supreme Court held that when evaluating a summary judgment motion in an employment discrimination case, a court should give no credence to unimpeached testimony presented by moving party witnesses. The Court cautioned that the role of the jury must be preserved with respect to the determination of credibility, the weighing of evidence, and the drawing of legitimate inferences from the facts:

> Thus, although the court should review the record as a whole, it *must disregard* all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.

*Reeves*, 530 U.S. at 151, 120 S.Ct. at 2110.

Subsequently, in *Armour v. County of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001), the Third Circuit held that on a summary judgment record, a court would give credence only to evidence supporting the moving party that *was uncontradicted and unimpeached, if it came from a disinterested witness.*

In *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005), the Court read *Reeves* to preclude even consideration of testimony from an interested witness:

> The fact that [the plaintiffs] *do not directly challenge* [an interested witness' testimony]...is irrelevant...when evaluating a summary judgment motion, a court *should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant.*

*Id.*, 411 F.3d at 131 n.22.[17]

In *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006), the court noted that a district court when ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50 "must disregard all evidence favorable to the moving party that the jury is not required to believe."

In *DeFlaminis*, the panel read the *Reeves* rule out of existence.

> [I]n considering a motion for summary judgment, the court *should believe uncontradicted testimony* unless it is inherently implausible, *even if the testimony is that of an interested witness.*

*Id.*, 480 F.3d at 272. (emphasis added).

*DeFlaminis* is plainly inconsistent with *Reeves*, and the Third Circuit panel was not free to ignore the Supreme Court's holding in that case. *See*

---

[17] *See also Hill,* 411 F.3d at 129, n.16 (rejecting the uncontradicted testimony of an interested witness on the issue of whether an employee was forced to resign).

*Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 867 (3d Cir. 1984). *DeFlaminis'* observation that on a summary judgment record the court should believe uncontradicted testimony of an interested witness unless inherently implausible, cannot exist in the same jurisprudential universe where the Supreme Court instructs that on a summary judgment record, a court  must disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence only to evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses. *Reeves*, 530 U.S. at 151, 120 S.Ct. at 2110.

*DeFlaminis* does not control because it contradicts the Supreme Court, is the newest panel decision, and clearly contradicts *Armour*, *Hill* and *Springer*.  Tthe District Court erred by holding that it could credit the unimpeached testimony of Helsel as an interested witness for the moving party.

## IV. THE DISTRICT COURT ERRED IN ADOPTING THE MAGISTRATE'S FINDING THAT BECAUSE McNELIS DID NOT CHALLENGE THOMPSON'S CREDIBILITY <u>AT HIS OWN DEPOSITION</u> HE LOST THE RIGHT TO CHALLENGE IT AT ANY SUBSEQUENT POINT IN THE LITIGATION PROCESS

### Standard of review.

The standard of review of the District Court's statement of the law in ruling on summary judgment is *de novo*. *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996), (*en banc*), *cert. denied*, 521 U.S. 1129 (1997).

### The District Court's Error.

In its Report & Recommendation the Magistrate held that because McNelis testified at his deposition that he did not have any evidence of Dr. Thompson's bad faith in the BOP process, <u>or otherwise challenge his credibility</u>, the Court is <u>required</u> to accept all of Dr. Thompson's testimony. It considered, but summarily rejected, McNelis' reliance on the Supreme Court's holding in *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963) that litigants are not required to know the parameters of their lawsuits and cannot be penalized for failing to know the evidence that supports their case. Vol. I, JA-43-44, n. 10.

In ruling on plaintiff's objections to the R&R the District Court held that McNelis had admitted in his deposition that he has no evidence to

indicate that Dr. Thomson did not act in good faith and "since the deposition McNelis has otherwise failed to adduce any evidence bringing Dr. Thompson's conduct into doubt."   It then adopted the Magistrate's finding that Dr. Thompson's determination was made in good faith and/or in the best exercise of his medical judgment. Vol. I, JA-110-11.

In reaching its conclusion the District Court erred in failing to acknowledge that the Magistrate's ruling that McNelis' deposition testimony was a binding judicial admission is not only *unsupported* by any caselaw, and is contradicted by the holding of *Surowitz*, but it misapprehends and marginalizes the role of discovery and counsel's role in the litigation process.[18]  McNelis hired his counsel to marshal the facts and to apply the law and present a cohesive case to the Court. A plaintiff is not required to know or understand all the elements of his case or how it will be tried.  See *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1963).   As discovery proceeds McNelis may, or may not, understand and comprehend all of the evidence that is obtained during that process.

---

[18]  The District Court's statement that there had been "no additional evidence adduced that brought Thompson's conduct into doubt" is simply further error as to the misapplication of the holding of *DeFlaminis,* that defense witnesses must  be believed in the absence of direct contradictory evidence in clear contravention of the holding of the Supreme Court in *Reeves.*  See arguments set forth at Subsection III, p. 51-54, *supra*.

By accepting PPL's argument the District Court fundamentally uprooted the lengthy history of jurisprudence in the federal system explicating the role of counsel and decades of case law detailing the purpose of counsel advanced discovery in civil cases.

## XI.  CONCLUSION

WHEREFORE, for the reasons as set forth above, McNelis respectfully requests that this Court: 1) reverse the decision of the District Court Granting PPL's motion for summary judgment on his ADA, Rehab Act and PHRA claims, and remand for trial.

Oral argument is requested because the matters include ones of first impression and/or are significant enough to require the Court's full consideration.

Respectfully submitted this date of January 23, 2017.

__*s/Ralph E. Lamar*_____
Ralph E. Lamar
Counsel for Appellant

__*s/Marc E. Weinstein*_____
Marc E. Weinstein
Counsel for Appellant

## XII.  CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(B)(iii).   In preparing this certification, I relied on the word processing system used to prepare the brief.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. app. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Word in 14 point Arial font.

__*s/Ralph E. Lamar*_____
Ralph E. Lamar
Counsel for Appellant

## XIII.   CERTIFICATE OF COMPLIANCE WITH RULE 25.3

Undersigned counsel hereby certifies that:

1.      All required privacy redactions have been made;

2.      The hard copies of the pleadings submitted to the clerk's office are exact copies of the ECF filing; and

3.      The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, Webroot SecureAnywhere v9.0.15.40, updated January 16, 2017, and, according to the program, is free of viruses.

4.      I am a member of the Third Circuit, duly admitted and currently in good standing.

A copy of each of the orders being appealed are attached hereto.

Respectfully submitted this 23rd day of January 2017.

___*s/Ralph E. Lamar*_____
Ralph E. Lamar
Counsel for Appellant

1.      I am a member of the Third Circuit, duly admitted and currently in good standing.

___*s/Marc E. Weinstein*_____
Marc E. Weinstein
Counsel for Appellant

## **<u>CERTIFICATE OF SERVICE</u>**

I, Ralph E. Lamar, hereby certify that the foregoing Brief was served today, the 23rd day of January, 2017, via electronic mail upon the following as Counsel for Appellee with its express consent:

> Alfred J. Johnston
> Darren Creasy
> Post & Schell, P.C.
> Four Penn Center
> 1600 John F. Kennedy Blvd.
> Philadelphia, PA 19103

I also hereby certify that seven (7) copies of the foregoing Brief were placed in the U.S Mail for First Class delivery to the Clerk of Court on January 23, 2017.  In addition, the Brief was filed in electronic format via e-mail to electronic_briefs@ca3.uscourts.gov, on January 23, 2017.  I also certify that the text of the electronic brief is identical to the text in the hard paper copies.

> *    s/Ralph E. Lamar*
> Ralph E. Lamar

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 16-3883

### DARYLE R. McNELIS,

**Appellant,**

**v.**

### PPL SUSQUEHANNA, LLC,

**Appellee.**

**ON APPEAL FROM THE ORDER ENTERED SEPTEMBER 19, 2016, AND THE FINAL JUDGMENT WHICH WAS ENTERED ON SEPTEMBER 19, 2016, BY THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA CIVIL ACTION NO. 4:13-CV-02612-MWB**

## JOINT APPENDIX – VOLUME I, JA-1-120

Ralph E. Lamar
8515 Braun Loop
Arvada, Colorado 80005
(303) 345-3600
ralphlamar@ymail.com

Marc E. Weinstein
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
(267) 513-1942
marc@meweinsteinlaw.com
Attorneys for Appellant

**Dated: January 23, 2017**

# TABLE OF CONTENTS FOR JOINT APPENDIX

| Docket # | Description | Vol. | JA- |
|---|---|---|---|
| **VOLUME I** | | | |
| | Table of Contents for Joint Appendix | 1 | i |
| 125 | Notice of Appeal | 1 | 1 |
| 104 | Report & Recommendation | 1 | 3 |
| 122 | Memorandum | 1 | 95 |
| 123 | Order | 1 | 118 |
| 124 | Judgment | 1 | 120 |
| **VOLUME II** | | | |
| | Docket Entries | 2 | 121 |
| 1 | Complaint | 2 | 132 |
| 10 | First Amended Complaint | 2 | 136 |
| 30 | Second Amended Complaint | 2 | 150 |
| 31 | Answer to Second Amended Complaint | 2 | 166 |
| 57 | Motion for Summary Judgment - Def.'s Statement of Uncontested Material Facts | 2 | 200 |
| | Exhibit 1 (Filed Under Seal) | 2 | 233 |
| | Exhibit 2 Jeff Helsel's deposition [1-68] | 2 | 234 |
| | Exhibit 3 James Gorman's deposition [1-120] | 2 | 252 |
| | Exhibit 4 Daryle McNelis' deposition [1-288] | 2 | 284 |
| | Exhibit 5 Job Description | 2 | 360 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| **VOLUME III** | | | |
| Exhibit 6 e-mail string from February 2010 | | 2 | 362 |
| Exhibit 7 John Lines' deposition [1-110] | | 3 | 365 |
| Exhibit 8 Drug Fact Sheet | | 3 | 395 |
| Exhibit 9 Plaintiff's Resp. to Def. First Req. for Admission | | 3 | 397 |
| Exhibit 10 Notes | | 3 | 401 |
| Exhibit 11 Heather McNelis' deposition [1-82] | | 3 | 403 |
| Exhibit 12 Press Enterprise Article | | 3 | 426 |
| Exhibit 13 South Centre Township Police File | | 3 | 428 |
| Exhibit 14 Brian Martonick's deposition [1-78] | | 3 | 434 |
| Exhibit 15 BOP referral form | | 3 | 456 |
| Exhibit 16 Geisinger Consent for Treatment Form | | 3 | 458 |
| Exhibit 17 Geisinger Initial evaluation Form | | 3 | 460 |
| Exhibit 18 Geisinger H&P Notes | | 3 | 462 |
| Exhibit 19 Thomas Wickham's deposition [1-70] | | 3 | 466 |
| Exhibit 20 Kris Lear's deposition [1-63] | | 3 | 486 |
| Exhibit 21 e-mail April 19, 2012 | | 3 | 504 |
| Exhibit 22 Geisinger Discharge Instructions | | 3 | 506 |
| Exhibit 23 Caron Foundation Description | | 3 | 510 |
| Exhibit 24 SEARP checklist | | 3 | 514 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| **VOLUME III** | | | |
| Exhibit 25 | Daryle McNelis' April 24, 2012 statement | 3 | 518 |
| Exhibit 26 | Dr. Thompson's deposition [1-91] | 3 | 521 |
| Exhibit 27 | Psychological Screening Summary April 24 | 3 | 546 |
| Exhibit 28 | Psychological Screening Summary April 30 | 3 | 548 |
| Exhibit 29 | Psychological Interview Memo | 3 | 550 |
| Exhibit 30 | Determination of Fitness | 3 | 555 |
| Exhibit 31 | Revocation of Unescorted Access | 3 | 558 |
| Exhibit 32 | Termination Recommendation Form | 3 | 560 |
| Exhibit 33 | Request for Review of Denial/Revocation | 3 | 562 |
| Exhibit 34 | McNelis' Appeal Statement | 3 | 564 |
| Exhibit 35 | Thomas Wickham's statement | 3 | 567 |
| **VOLUME IV** | | | |
| Exhibit 36 | Fran McAndrew's letter of May 22, 2012 | 4 | 569 |
| Exhibit 37 | Fran McAndrew's deposition [1-73] | 4 | 571 |
| Exhibit 38 | Access Authorization Review | 4 | 606 |
| Exhibit 39 | David Walsh's deposition [1-56] | 4 | 608 |
| Exhibit 40 | Letter to McNelis June 12, 2012 | 4 | 624 |
| Exhibit 41 | FMLA form | 4 | 627 |
| Exhibit 42 | Computer Screen | 4 | 630 |
| Exhibit 43 | PHRC Form IN-5 | 4 | 632 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| **VOLUME IV** | | | |
| | Exhibit 44 PHRA letter November 27, 2012 | 4 | 640 |
| | Exhibit 45 EEOC Intake Questionnaire | 4 | 642 |
| | Exhibit 46  EEOC Notice July 25, 2013 | 4 | 649 |
| | Exhibit 47 Right to Sue Letter July 25, 2013 | 4 | 651 |
| 63 | Plaintiff's Answer to Statement of Facts re Motion for Summary Judgment | 4 | 653 |
| | Exhibit A Deposition of Daryle McNelis [26-37, 42-49, 54-57, 62-73, 102-117, 122-125, 162-169] | 4 | 708 |
| | Exhibit B Declaration of Daryle McNelis | 4 | 725 |
| | Exhibit C Statement of Daryle McNelis April 24, 2012 | 4 | 729 |
| | Exhibit D  Kris Keefer's deposition [14-25, 34-45, 50-69, 82-85] | 4 | 731 |
| | Exhibit E Police Report | 4 | 744 |
| | Exhibit F Heather McNelis' deposition [42-45] | 4 | 749 |
| | Exhibit G Notes re Daryle McNelis | 4 | 751 |
| | Exhibit H Brian Martonick's deposition [14-33, 46-73] | 4 | 752 |
| | Exhibit I  James Gorman's deposition [26-29, 38-41, 62-69, 74-101] | 4 | 765 |
| | Exhibit J Lear's notes | 4 | 777 |

-iv-

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| **VOLUME V** | | | |
| Exhibit K BOP Referral | | 5 | 778 |
| Exhibit L Article | | 5 | 779 |
| Exhibit M Kris Lear deposition [28-29, 34-35, 45-47] | | 5 | 780 |
| Exhibit N Paul Siciliano deposition [18-37, 42-45] | | 5 | 788 |
| Exhibit O Article re Corbett signing law banning bath salts | | 5 | 795 |
| Exhibit P PA law, DEA ban put squeeze on bath salts | | 5 | 796 |
| Exhibit Q Fact Sheet for Bath Salts | | 5 | 800 |
| Exhibit R April 19, 2012 e-mail | | 5 | 803 |
| Exhibit S April 20, 2012 e-mail chain | | 5 | 804 |
| Exhibit T April 20, 2012 e-mail | | 5 | 805 |
| Exhibit U John Lines' deposition [13-14, 18-21, 31-34 36, 38-39, 42, 46-52, 55-58, 60-62, 64-65, 68-72, 84, 87-94, 98-104] | | 5 | 808 |
| Exhibit V MMPI-2 | | 5 | 860 |
| Exhibit W Dr. Thompson deposition [6-9, 22-81, 86-91] | | 5 | 871 |
| Exhibit X Psychological Screening Interview | | 5 | 890 |
| Exhibit Y Psychological Screening Summary | | 5 | 891 |
| Exhibit Z Def. Objections and Responses to Plaintiff's 3rd Req. for Production and 2nd Interrogatories | | 5 | 892 |
| Exhibit AA Determination of Fitness | | 5 | 897 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| Exhibit BB Psychological Interview Memo | | 5 | 899 |
| Exhibit CC SAE Flowchart | | 5 | 901 |
| Exhibit DD SEARP Panel Prep Checklist | | 5 | 902 |
| Exhibit EE May 7, 2012 e-mail | | 5 | 905 |
| Exhibit FF February 10, 2010 e-mail chain | | 5 | 906 |
| Exhibit GG Jeff Helsel's deposition [14-17, 22-29, 38-57, 62-68] | | 5 | 908 |
| Exhibit HH May 11, 2012 termination letter | | 5 | 919 |
| Exhibit II Dr. Thompson's CV and file | | 5 | 920 |
| Exhibit JJ Dr. Thompson's notes of May 17, 2012 | | 5 | 978 |
| Exhibit KK Thomas Wickham's notes May 16, 2012 | | 5 | 979 |
| Exhibit LL Fran McAndrew's May 22, 2012 letter | | 5 | 980 |
| Exhibit MM David Walsh's deposition [17, 24, 26, 28-29, 31, 34-37, 42-46, 49-50] | | 5 | 981 |
| Exhibit NN Access Authorization Review | | 5 | 999 |
| Exhibit OO Review of Unescorted Access Authorization | | 5 | 1000 |
| **VOLUME VI** | | | |
| Exhibit FFF Terry Leslie CV | | 6 | 1003 |
| Exhibit GGG Terry Leslie Report | | 6 | 1009 |
| Exhibit HHH Def. Objections and Supp. Resp. to Interrogs. | | 6 | 1018 |
| Exhibit III PHRC IN-5 Form | | 6 | 1026 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| Exhibit JJJ November 27, 2012 letter from PHRC | | 6 | 1035 |
| Exhibit KKK EEOC charge detail inquiry | | 6 | 1036 |
| Exhibit LLL EEOC Intake Questionnaire | | 6 | 1038 |
| Exhibit MMM EEOC Notice of Charge of Discrimination | | 6 | 1042 |
| Exhibit NNN Letter from EEOC March 20, 2013 | | 6 | 1043 |
| Exhibit OOO Notice of Right to Sue | | 6 | 1044 |
| Exhibit PPP Patricia Diefenbacher deposition [6-9] | | 6 | 1045 |
| Exhibit QQQ Plaintiff's First Supplemental responses | | 6 | 1047 |
| Exhibit RRR SEARP NDAP Revision 4 | | 6 | 1049 |
| Exhibit SSS SEARP Panel Preparation Checklist | | 6 | 1053 |
| Exhibit TTT 2012 EEOC worksharing agreement | | 6 | 1056 |

**VOLUME VII**

| Exhibit UUU  PPL Annual Report 2012 | 7 | 1062 |
|---|---|---|

**VOLUME VIII**

| Exhibit VVV News Report | 8 | 1292 |
|---|---|---|
| Exhibit WWW FY 2014 EEOC worksharing agreement | 8 | 1294 |
| Exhibit 48   First Amended Complaint in PPL v. US | 8 | 1302 |
| Exhibit 49   Declaration of Dr. Thompson | 8 | 1321 |
| Exhibit XXX Declaration of Daryle McNelis | 8 | 1325 |
| Exhibit YYY Notification of Denial/Revocation | 8 | 1326 |
| Exhibit ZZZ Termination Recommendation Form | 8 | 1327 |

| Docket# | Description | Vol. | JA- |
|---------|-------------|------|-----|
| Exhibit 50 | Declaration of Mary Beth Salla | 8 | 1328 |
| Exhibit AAAA | Computer screen | 8 | 1334 |
| Exhibit BBBB | Family and Medical Leaves policy | 8 | 1335 |
| Exhibit A | Self-Executing Disclosures of Defendant | 8 | 1337 |
| Exhibit B | October 14, 2014 e-mail | 8 | 1345 |
| Exhibit C | April 20, 2012 e-mail | 8 | 1348 |

**VOLUME IX – FILED UNDER SEAL**

| | | | |
|---|---|---|---|
| Exhibit 1 Fitness for Duty BOP Procedures NDAP | | 9 | 1351 |
| Exhibit PP BOP Referral for R.S. | | 9 | 1464 |
| Exhibit QQ Psychological Interview Memo June 11, 2012 | | 9 | 1465 |
| Exhibit RR Psychological Screening Summary | | 9 | 1469 |
| Exhibit SS Notification of Denial/Revocation | | 9 | 1470 |
| Exhibit TT Psychological Interview Memo | | 9 | 1471 |
| Exhibit UU Psychological Screening Summary | | 9 | 1473 |
| Exhibit VV BOP Referral for S.W. | | 9 | 1474 |
| Exhibit WW Psychological Screening Summary | | 9 | 1475 |
| Exhibit XX Psychological Interview Memo May 15, 2012 | | 9 | 1476 |
| Exhibit YY Psychological Screening Summary | | 9 | 1478 |
| Exhibit ZZ  Psychological Screening Summary | | 9 | 1481 |
| Exhibit AAA Psychological Screening Summary | | 9 | 1484 |
| Exhibit BBB Psychological Interview Memo | | 9 | 1485 |

| Docket# | Description | Vol. | JA- |
|---|---|---|---|
| Exhibit CCC Notification of Denial/Revocation | | 9 | 1486 |
| Exhibit DDD Psychological Screening Summary | | 9 | 1488 |
| Exhibit EEE Psychological Screening Summary | | 9 | 1489 |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Civil Action No. 4:CV13-2612

DARYLE McNELIS,

Plaintiff,

v.

PENNSYLVANIA POWER & LIGHT, SUSQUEHANNA, LLC

Defendant.

## NOTICE OF APPEAL TO THE UNITED STATES COURT
## OF APPEALS FOR THE THIRD CIRCUIT

Notice is hereby given that Daryle McNelis, Plaintiff in the above captioned action, files this his Notice of Appeal to the United States Court of Appeals for the 3rd Circuit of the following order of the Court: 1) The District Court's Adoption of the Magistrate's Report & Recommendation that Summary Judgment be Granted, which order was issued on September 19, 2016 (Docket #122, 123).

Final Judgment was entered in this case on September 19, 2016 (Docket #124) and the case is ripe for appeal.

The parties to the Judgment and Orders appealed from and the names and addresses of its attorneys are as follows:

For Defendant Pennsylvania Power & Light:

Alfred J. Johnston
Darren Creasy
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

JA-000001

This 17th day of October, 2016.

_s/Ralph E. Lamar_____
Ralph E. Lamar
CO Attorney I.D. No. 44123
PA Attorney I.D. No. 78974
8515 Braun Loop
Arvada, CO 80005
(303) 345-3600
ralphlamar@ymail.com

_s/Marc E. Weinstein, Esq._
Marc E. Weinstein
500 Office Center Drive
Suite 400
Fort Washington, PA 19034
(267) 513-1942
marc@meweinsteinlaw.com

ATTORNEYS FOR PLAINTIFF

JA-000002

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARYLE MCNELIS,               :    CIVIL NO: 4:13-CV-02612
                              :
          Plaintiff           :
                              :    (Judge Brann)
     v.                       :
                              :    (Magistrate Judge Schwab)
PENNSYLVANIA POWER &          :
LIGHT, SUSQUEHANNA, LLC,      :
                              :
          Defendant           :
                              :

## REPORT AND RECOMMENDATION

### I. Introduction.

In this employment discrimination case, the plaintiff, Daryle McNelis,

claims that the defendant, Pennsylvania Power & Light, Susquehanna, LLC (PPL),

violated the Americans with Disabilities Act, the Rehabilitation Act, the

Pennsylvania Human Relations Act, and the Family and Medical Leave Act.

Currently pending is PPL's motion for summary judgment. For the reasons

discussed below, we recommend that PPL's motion for summary judgment be

granted. We also recommend that PPL's motion to preclude the testimony of

McNelis's vocational expert be denied without prejudice to PPL refiling such

motion should the district court conclude that PPL is not entitled to summary

judgment.

JA-000003

## II. Background and Procedural History.

McNelis began this action by filing a *pro se* complaint.  Counsel later entered an appearance on behalf of McNelis and filed an amended complaint and then a second amended complaint.  McNelis, who worked as a Nuclear Security Officer at PPL's Susquehanna Steam Electric Station, claims that PPL denied him access to the Station and terminated his employment after a coworker expressed safety concerns about him, after he was hospitalized, and after a psychologist determined, erroneously according to McNelis, that he was not fit for duty pending an alcohol assessment and possibly treatment for alcohol issues.  Although McNelis contends that he then obtained a letter from a rehabilitation counselor stating that he did not meet the criteria for alcohol treatment, his appeal of the revocation of his access to the station was nevertheless denied.  McNelis claims that PPL, which erroneously regarded him as disabled due to a false perception about his mental health and/or whether he was an alcoholic, violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*,[5] the Rehabilitation Act (RA), 29 U.S.C. § 794 *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.*  He also claims that PPL violated the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, by failing to

---

[5] References to the ADA are references to the ADA as amended by the ADA Amendments Act of 2008 (ADAAA), which became effective on January 1, 2009. *See* Pub.L. No. 110–325, 122 Stat. 3553 (codified at 42 U.S.C. § 12101 *et seq.*).

JA-000004

provide him with necessary FMLA paperwork after he requested such, by refusing allow him to return to work, and by firing him.

PPL filed an answer to the second amended complaint, and the parties engaged in discovery, which at times was contentious and required the intervention of the undersigned. In June of 2015, the defendant filed a motion for summary judgment, and in August of 2015, it filed a motion to preclude the testimony of McNelis's vocational expert. After those motions were fully briefed, the case was referred, with the agreement of the parties, to Chief Magistrate Judge Carlson for a settlement conference. Although a settlement was not reached at the settlement conference, after the conference Judge Carlson reached out to the parties in a further attempt to settle the case. Having recently been informed by Judge Carlson that the parties have not settled the case, we turn now to the pending motion for summary judgment and motion to preclude McNelis's vocational expert.

## III. Summary Judgment Standards.

PPL moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not

present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether

JA-000007

there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV. Material Facts.

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to appropriately challenge the material facts tendered by the defendant means that those facts must be deemed admitted. Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.* In accordance with the standard of review for a motion for summary judgment, the following facts are either

JA-000009

undisputed or are the version of the facts asserted by McNelis, the nonmoving party.[6]

## A. NRC Regulations and PPL Policies Regarding Fitness for Duty.

PPL operates the Susquehanna Steam Electric Station, which is a nuclear power plant. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶1 and *Doc. 63* (*Plaintiff's Statement of Additional Material Facts in Support of His Opposition to Defendant's Motion for Summary Judgment and His Response to Defendant's Statement of Undisputed Material Facts—section titled Response to Defendant's Statement of Undisputed Material Facts*) (hereinafter *Plaintiff's Response*) at ¶1. The Nuclear Regulatory Commission (NRC) requires that all nuclear power plants adopt Fitness for Duty (FFD) programs that prescribe, among other things, unescorted access requirements for employees entering upon secured and vital areas of the nuclear facility. *Id.* at ¶2. NRC licensees authorized to operate a nuclear power reactor are required "to provide high assurance that individuals granted unescorted access are trustworthy and reliable and do not constitute an unreasonable risk to public health

---

[6] PPL sets forth 186 statements of fact, and McNelis sets forth an additional 295 statements of fact. Given our determination that PPL is entitled to summary judgment as to certain claims for certain reasons, we do not address all the arguments by PPL for summary judgment, and we set forth only those facts that are material to the issues we address in this Report an Recommendation.

JA-000010

and safety." *Id.* at ¶3. NRC licensees authorized to operate a nuclear power reactor must also "[p]rovide reasonable measures for the early detection of persons who are not fit to perform the duties that require them to be subject to the FFD program." *Id.* at ¶4.

NRC regulations require that a nuclear power plant's unescorted-access-authorization program include a background investigation, psychological assessment, and behavioral observation of individuals to be granted unescorted access. *Id.* at ¶5. NRC regulations further require that a nuclear power plant's unescorted-access-authorization program include "[b]ehavioral observation, conducted by supervisors and management personnel, designed to detect individual behavioral changes." *Id.* at ¶6. Potentially disqualifying behaviors include those "that may indicate possible use, sale, or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security." *Id.* at ¶7. Where an individual's fitness is questionable, a licensee "shall take immediate action to prevent the individual" from continuing to perform his or her job duties. *Id.* at ¶8.

NRC regulations also require the implementation of a review procedure for denials or revocations of unescorted access authorization, and they set forth minimum standards for such a procedure. *Id.* at ¶9. "The procedure must provide

that the employee is informed of the grounds for denial or revocation and allow the employee an opportunity to provide additional relevant information, and provide an opportunity for an objective review of the information on which the denial or revocation was based. The procedure may be an impartial and independent internal management review." *Id.*

PPL's Fitness for Duty/Behavior Observation Program (FFD/BOP) and Site Access Program policy are designed to implement NRC guidelines and regulations. *Doc. 63 (Plaintiff's Statement of Additional Material Facts in Support of His Opposition to Defendant's Motion for Summary Judgment and His Response to Defendant's Statement of Undisputed Material Facts—section titled Plaintiff's Statement of Additional Material Facts in Opposition to Defendant's Motion for Summary Judgment) (hereinafter Plaintiff's Additional Facts)* at ¶ ¶220 & 221. In accordance with NRC regulations, PPL's FFD/BOP is intended "to provide high assurance that personnel who have been granted unescorted access continue to be reliable, trustworthy, [and] mentally and physically fit to perform their duties safely and competently." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶11 and *Doc. 63 (Plaintiff's Response)* at ¶11. Specifically, PPL's FFD/BOP procedures require behavioral observation:

> Behavioral observation must be performed by individuals who
> are trained to detect behaviors that may indicate possible use,

10

JA-000012

sale or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security.

*Id.* at ¶12. Fatigue is defined as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest." *Id.* at ¶13.

A refusal to provide, or the falsification of, any personal-history information is sufficient cause for denial or unfavorable termination of unescorted access or unescorted-access-authorization status. *Id.* at ¶14. Personal history information includes "any information that may be necessary for the reviewing official to make a determination of the individual's trustworthiness and reliability." *Id.* at ¶15.

Every PPL employee subject to the FFD/BOP is responsible to self-report potential fitness for duty issues to his or her supervisor, and a failure to do so is grounds for disciplinary action. *Id.* at ¶16. Additionally, "all individuals shall report any FFD concerns about other individuals to their Supervisor or to Site Access Services." *Id.* at ¶18. PPL's FFD/BOP procedures also require that supervisors be vigilant in identifying any changes in employee behavior and initiate a BOP Referral upon detecting a change in behavior. *Id.* at ¶17. In determining whether a BOP Referral is appropriate, PPL's FFD/BOP procedures provide management personnel with "Behavior Observation Questions" as a guideline. *Id.* at ¶19. Included in the list of "Behavior Observation Questions" are the following:

> Have you noticed any changes in the employee's thinking
> pattern?
> • See things that aren't there (hallucinations)
> • False beliefs (delusions)
> • Bizarre or unusual ideas

*Id.* at ¶20.

Upon receipt of a BOP Referral, PPL's Site Access Services is required to, among other things, place on Administrative Hold/Suspension the access key card of the individual that is the subject of the BOP Referral, interview the individual, and "use professional personnel (psychologist, MRO [Medical Review Officer], Substance abuse, etc.) to determine [the] course of action." *Id.* at ¶21. A determination of fitness for duty "can only be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise . . . to evaluate the specific fitness issues presented by the individual." *Id.* at ¶22. Where a BOP clinician determines in the scope of a mandatory clinical interview that drug and/or alcohol concerns may be present, the individual is also required to be evaluated by a Substance Abuse Expert (SAE). *Id.* at ¶23. The SAE is not an advocate for PPL or the individual. *Id.* at ¶24. Rather, the SAE's function is to protect public health and safety and the common defense and security by professionally evaluating the individual. *Id.* The SAE must satisfy certain licensing/certification and training prerequisites, including training on the "[t]he role of the SAE in making determinations of fitness and . . . continuing treatment

recommendations . . . ." *Id.* at ¶25.  While a BOP clinician may function as both a Psychologist and an SAE, separate documentation for each type of evaluation is required to be completed and provided to PPL's Site Access Services personnel. *Id.* at ¶26.  Neither the individual nor PPL "may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional . . . ." *Id.* at ¶27.

All individuals working inside PPL's Susquehanna Steam Electric Station are required to maintain unescorted access authorization. *Id.* at ¶28.

### B.  McNelis's Employment as a Nuclear Security Officer.

PPL hired McNelis in June of 2009 as a Nuclear Security Officer I. *Id.* at ¶29.  McNelis later became a Nuclear Security Officer II, and he remained in that position until his termination. *Id.* at ¶30.  A PPL Nuclear Security Officer is an armed officer responsible for, among other things, conducting surveillance, protecting vital areas of the plant, preventing radiological sabotage, using force, including, if necessary, deadly force, to neutralize threats, and responding to medical and/or fire emergencies. *Id.* at ¶31.   At all times while on duty at PPL, McNelis was armed with a semiautomatic pistol. *Id.* at ¶32.  While on patrol, which occurred multiple times per shift, he was also armed with a .223 caliber AR-15 assault rifle. *Id.*

13

Prior to McNelis's termination, Mike McCabe, McNelis's supervisor, had recommended him for a promotion to the controller program, and McNelis was just waiting for Jim Gorman, the Manager of Nuclear Security, to decide when the training program for that position would begin. *Doc. 63 (Plaintiff's Additional Facts)* at ¶7.

### C. 2010 Anonymous Report and McNelis's Use of Bath Salts.

In February of 2010, PPL received an anonymous report that McNelis had been overheard bragging openly about his use of drugs. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶33 and *Doc. 63 (Plaintiff's Response)* at ¶33. The anonymous report was sent via e-mail to PPL by Joseph Lesperance, State Emergency Operations Center Watch Officer at the Pennsylvania Emergency Management Agency. *Id.* at ¶34. Lesperance's e-mail reflects that he had received the report by way of an anonymous telephone call to the Columbia County 911 service. *Id.* at ¶35. Because the report was submitted anonymously, it was deemed not credible, and PPL determined that no "for cause" drug testing of McNelis was warranted. *Id.* at ¶36. PPL did not approach McNelis about the report, and the report was not pursued further. *Id.* at ¶37.

McNelis admits to ingesting bath salts approximately three times in February-March 2010, when they were still legal. *Id.* at ¶38 and *Doc. 63*

(*Plaintiff's Additional Facts*) at ¶ 69. McNelis also placed an order for bath salts over the internet in April 2010. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶39 and *Doc. 63 (Plaintiff's Response)* ¶39. Specifically, McNelis paid approximately $50.00 for bath salts to be delivered to his home, but when they were delivered, his wife threw them out. *Id.* at ¶40 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶70. McNelis used bath salts maybe once or twice after that in late 2010 or early 2011. *Doc. 63 (Plaintiff's Additional Facts )* at ¶71. He has not used bath salts since that time. *Id.* at ¶ 72.

"Bath salts" is a generic name for synthetic derivatives of cathinone. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶1 and *Doc. 63 (Plaintiff's Response)* at ¶42. The chemical compound, which is ingested by the user, affects the central nervous system in various ways. *Id.* Beginning in August of 2011, bath salts were illegal in Pennsylvania. *Doc. 63 (Plaintiff's Additional Facts )* at ¶73. While the DEA took emergency action in September of 2011 to federally ban the stimulants often found in bath salts, Congress did not pass a comprehensive bill banning synthetic bath salts on the federal level until July of 2012. *Id.*

McNelis never disclosed to his supervisor at PPL the fact that he had ingested bath salts. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶43 and *Doc. 63 (Plaintiff's Response)* at ¶43.

15

### D. McNelis's Problems in April of 2012.

During the week of April 9–16, 2012, McNelis was having difficulty sleeping as a result of working an excessive number of hours and as a result of being stressed out by tech issues with his computer and phone and by home renovations necessitated by a flood. *Doc. 63 (Plaintiff's Additional Facts)* at ¶8. As a result, he became increasingly paranoid. *Id.*

In the days prior to April 16, 2012, Kris Keefer, McNelis's best friend, who was also a security officer for PPL at the nuclear plant, developed concerns about McNelis's state of mind. *Id.* at ¶10. For instance, McNelis was fixated on whether someone had broken into his telephone and his home computer, and he felt that there were cameras in his coal bin and in his car. *Id.* at ¶11. McNelis was also having problems with his wife. *Id.* at ¶12.

According to Keefer, McNelis was also obsessing about bath salts. *Id.* at ¶13. He was doing a lot of research about the different names that bath salts were sold under and the fact that they were sold as plant food. *Id.* at ¶13. McNelis told Keefer that he had tried bath salts, but he did not tell Keefer when that had been. *Id.* at ¶14.

On April 16, 2012, McNelis had an argument with his wife. *Id.* at ¶9. As a result of the argument, McNelis's wife left their home with their children. *Id.*

16.  Keefer went to McNelis's home around 6:00 a.m. on April 16, 2012, in response to a phone call from McNelis's wife, who was a seventh grade English teacher at the Central Columbia Middle School. *Id.* at ¶¶16 & 17.  Although McNelis's wife was scheduled to work, she did not go to work that day. *Id.* at ¶17.  Instead, she took her children to her mother's house. *Id.*

That same day, on Monday, April 16, 2012, at or around 10:00 a.m., the Central Columbia Elementary and Middle Schools were locked down due to a telephone call to the South Centre Township police chief by an unnamed person who claimed that McNelis might "come to the schools to get his children" and that he "may be under the influence and possibly armed." *Id.* at ¶19.  After the lockdown was initiated, the police chief investigated and determined that McNelis never had any intention of going to the schools to get his children or to do his children or his wife any harm. *Id.*  The police chief never contacted McNelis or his wife as part of the investigation. *Id.* at ¶20.

### E.  Keefer's Report About McNelis.

In April of 2012, McNelis reported to Security Shift Supervisor Michael McCabe, and McCabe reported to Security Operations Supervisor Brian Martonick, who in turn reported to the Manager of Nuclear Security Jim Gorman. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

17

*Facts)* at ¶¶46-48 and *Doc. 63 (Plaintiff's Response)* at ¶¶46-48. In April of 2012,

Kristopher Keefer was employed by PPL in the controller program. *Id.* at ¶44.

At about 7:20 p.m. on April 16, 2012, Keefer spoke with McCabe about his

concerns about McNelis's behavior. *Id.* at ¶¶22 & 23. McCabe's written summary

of that conversation contains the following narrative:

> @1920 hours I called Kristopher [Keefer] and he informed that
> there is a concern of another employee that reports directly to
> me related to Daryle McNelis that needs immediate attention.
> Kris stated that Daryle and his wife have been having marital
> problems lately and Daryle has been acting emotionally erratic
> the last couple of days and has been completely diverse from
> his normal character. Kris informed me that Daryle has been
> not sleeping well and having illusions that his telephone is
> being wire tapped. . . . Kris was worried about Daryle's overall
> safety and the safety of Security and plant personnel at
> Susquehanna. Kris informed me that Daryle's wife is
> employed by the Central Columbia School district and a picture
> of Daryle was being passed around the Central Columbia
> elementary and middle school facilities to notify the authorities
> if Daryle made an attempt to enter those properties.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶50 and *Doc. 63 (Plaintiff's Response)* at ¶50. McCabe's notes further

state that Harry Mathias, the school superintendent, had "instituted a lockdown for

approximately two hours until the police felt no further need to keep students

inside (Refer to Tuesday Press Enterprise article on the bottom of page #5)." *Doc.*

*63 (Plaintiff's Additional Facts)* at ¶25. Keefer denies, however, speaking to

McCabe about Superintendent Mathias. *Id.* at ¶¶25.  And Keefer did not speak with McCabe on the night of the 16th about McNelis using bath salts. *Id.* at ¶36.

Keefer was obligated to report the information about McNelis. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶51 and *Doc. 63* (*Plaintiff's Response*) at ¶51.  And the information conveyed by Keefer to McCabe regarding McNelis was factually accurate. *Id.* at ¶52.  No one from management ever called Keefer to ask him questions about his perceptions of McNelis's behavior or conduct, and Keefer does not remember speaking with anyone from management about the rumors or belief that McNelis was using bath salts. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶37-38.

### F.  Keefer's Report is Passed Along and McNelis's Key Card Is Placed on Hold.

Following his call with Keefer, McCabe placed McNelis's access key card on administrative hold and briefed Martonick, who said he would brief Gorman and John Lines, the Site Access Supervisor. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶11 and *Doc. 63 (Plaintiff's Response)* at ¶55 and *Doc. 63* (*Plaintiff's Additional Facts)* at ¶¶30 & 32.  When McCabe spoke to Martonick on April 16th, he did not mention anything about McNelis's possible use of bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶33.  If someone had spoken to Martonick about McNelis's alleged use of bath

salts, he would have passed that information along to Lines or Gorman. *Id.* at ¶34.

Martonick does not remember McCabe providing any specifics during the April

16th conversation about what McNelis had supposedly said or done that caused the

school lockdown. *Id.* at ¶35. Martonick briefed Gorman about Keefer's report.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶56 and *Doc. 63 (Plaintiff's Response)* at ¶56.

On April 17, 2012, at 1:00 p.m., McCabe called Kris Lear, the security shift

supervisor, and informed him that the day before the Central Columbia School had

been locked down due to marital issues regarding McNelis. *Doc. 63 (Plaintiff's*

*Additional Facts)* at ¶39.


### G. The BOP Referral.

On April 17, 2012, Martonick completed a BOP Referral for McNelis, and

Gorman signed the BOP Referral as a concurring supervisor. *Doc. 57-2 (Defendant*

*PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶¶57-58 and

*Doc. 63 (Plaintiff's Response)* at ¶¶57-58. The BOP Referral states:

> Individual was identified by a peer through Security
> Supervision that Daryle is having marital issues and personal
> behaviors have changed recently. Peer stated that Daryle has
> been acting emotionally erratic the last couple days and has not
> been sleeping well. Peer stated that Daryle is having illusions
> that his telephone is being wire tapped. Peer is concerned about
> Daryle's overall safety and the Safety and Security of those at
> Susquehanna. On 4/16/12 Daryle's actions contributed to

JA-000022

Central Columbia school being locked down related to dialog
that occurred between Daryle and his spouse.

*Id.* at ¶59.  The BOP Referral contains no reference to suspected alcohol or drug
use by McNelis, nor does it reference any suspected psychiatric impairment. *Id.* at
¶60.

Although Martonick does not remember being advised that McNelis was
using bath salts, Gorman testified that he believed that, at some point, Martonick
told him that there was an allegation that McNelis had been using bath salts. *See
Doc. 63 (Plaintiff's Additional Facts)* at ¶¶48 & 49; *Doc. 63-8* at 6 (*Martonick
Dep.* at 31); and *Doc. 63-9* at 4 (*Gorman Dep.* at 64-65).  Gorman did not ask that
McNelis be drug tested; instead, McNelis was referred to the BOP so that he could
be evaluated by a psychologist. *Doc. 63 (Plaintiff's Additional Facts)* at ¶50.  No
one ever suggested to Gorman that McNelis be drug tested. *Id.* at ¶51.  Once a
BOP Referral is made, PPL's Site Access Department assumes all further
responsibility for evaluating the individual. *Doc. 57-2 (Defendant PPL
Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶61 and *Doc. 63
(Plaintiff's Response)* at ¶61.

At some point, Martonick showed Gorman a copy of a newspaper article
regarding the school lockdown, and Martonick implied that McNelis's behavior
was part of the lockdown. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶53 & 54 and
*Doc. 57-5* at 13 (*Gorman Dep.* at 41 & 42).  The newspaper article does not

mention McNelis by name or identify the person as an employee of PPL. *Doc. 63 (Plaintiff's Additional Facts)* at ¶55. Gorman did not speak to anyone in the police department to determine if McNelis's behavior had indeed led to the school lockdown. *Id.* at ¶56.

### H. McNelis's April 17, 2012 Phone Call to Gorman.

McNelis called Gorman on April 17, 2012, to request time off to attend to "personal or family issues." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶62 and *Doc. 63 (Plaintiff's Response)* at ¶62. Gorman granted McNelis's request for time off, and he did not ask McNelis for any additional information regarding the reasons underlying McNelis's request. *Id.* at ¶¶63 & 64. Gorman did, however, ask McNelis about the report that McNelis had been responsible for the lockdown of the Central Columbia schools. *Id.* at ¶65. Unaware at the time of the call that the schools had been placed on lockdown, McNelis responded by saying "I have no idea what you're talking about" and "I don't know what to tell you." *Id.* at ¶¶66 & 67 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶42. Although Gorman implied that he thought McNelis was responsible for the school lockdown, he did not ask McNelis whether his conduct had led to the lockdown. *Doc. 63 (Plaintiff's Additional Facts)* at ¶43.

JA-000024

McNelis called Gorman a second time several days later, during which McNelis told Gorman that he had confirmed that there had been a lockdown of the Central Columbia schools but that law enforcement had not contacted him. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶68 and *Doc. 63 (Plaintiff's Response)* at ¶68. Gorman did not investigate or attempt to confirm McNelis's role in causing the lockdown of the Central Columbia schools, as McNelis had been referred to the BOP. *Id.* at ¶69.

At no point in time did McNelis decline to provide information in response to Gorman's questions about his time off or the school lockdown. *Doc. 63 (Plaintiff's Additional Facts)* at ¶46 and *Doc. 63-1 (McNelis Dep.* at 115).

## I. Lear and Reports of Use of Bath Salts.

Keefer and Paul Siciliano, who both carpooled with McNelis, thought McNelis was using bath salts because of his mood swings and because he was easily agitated. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶59 & 62. Keefer does not remember speaking with anyone from management about McNelis using bath salts. *Id.* at ¶38. And Siciliano testified that he did not speak to anyone in management other than Mr. Steiner about his interactions with McNelis and his concerns about his behavior. *Id.* at ¶ 59 & 68 and *Doc. 63-14* at 7 *(Siciliano Dep.* at 42-43). Nevertheless, according to Kris Lear, who at the time was a security shift

supervisor, on April 18, 2012, Keefer and Siciliano told him that they believed that McNelis had been using bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶57 and *Doc. 57-22 (Lear Dep.* at 14 & 22-23). Lear did not tell anyone in upper management, however, that he had information that McNelis had been using bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶58.

### J. McNelis's Treatment at Geisinger.

On April 18, 2012, McNelis agreed to meet his wife at the Geisinger Medical Center in Danville in order to be evaluated to determine what was causing his behavior. *Doc. 63 (Plaintiff's Additional Facts)* at ¶74. Although McNelis's lab tests came back normal, McNelis decided to admit himself for observation and further evaluation to alleviate his wife's concerns. *Id.* at ¶75. He signed a voluntary consent for inpatient treatment on Geisinger's psychiatric unit. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶70 and *Doc. 63 (Plaintiff's Response)* at ¶70. The Initial Evaluation and Treatment Plan, which was completed by the physician authorizing the admission and signed by McNelis, listed the following under "Initial Findings": "1-2 weeks of paranoid thoughts (concerned over electronic surveillance, mistrustful of wife, concerned about unknown individual spying on him), sleeplessness, questionable

24

auditory hallucinations." *Id.* at ¶71. Geisinger Health and Progress Notes contain

the following additional information regarding McNelis's presenting condition:

> PRESENTING PROBLEM: This patient was admitted through
> the emergency department where he appeared with his wife.
> He reports for about a 1-2 week period, he has been
> experiencing paranoid thoughts, mostly regarding electronic
> surveillance. He is convinced that someone is bugging his
> phone, his car, his computer, and other household objects. As
> an example, he stated that he was worried that his children's
> matchbox cars were actually antennae. His wife reports he has
> been paranoid that someone is following him, and he stated that
> he would kill whoever is doing so if he was able. His wife
> recently moved herself and the children out of the house
> because she was concerned over his erratic behavior and
> paranoid thoughts. . . .

*Id.* at ¶72.

On April 19, 2012, McNelis called Lear from Geisinger, informed him that

he would not be in to work because he had been admitted to the hospital, informed

him that he would probably be in the hospital for a few days, and requested FMLA

forms. *Id.* at ¶76 and *Doc. 63-2 (McNelis Declaration)* at ¶13 & ¶80. McNelis did

not mention any medical or psychiatric condition on this call, nor did Lear ask any

questions about the reason for McNelis's hospitalization. *Doc. 57-2 (Defendant*

*PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶77 and

*Doc. 63 (Plaintiff's Response)* at ¶77.

McNelis was discharged by Geisinger on April 20, 2012, and staff at

Geisinger gave him a release to return to work on April 23, 2012. *Id.* at ¶78 and

*Doc. 63* (*Plaintiff's Additional Facts*) at ¶79. By the time of his discharge from Geisinger, McNelis's symptoms had resolved. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶79 and *Doc. 63* (*Plaintiff's Response*) at ¶79. Geisinger's Discharge Instructions contained the following statements:

> **Special Instructions**: If you start using or drinking again, your life will eventually become unmanageable and full of chaos. Stay clean and sober for now.
>
>  . . .
>
> **Caseworker Instructions**: . . . Discontinue or reduce the use of alcohol, if you find you cannot stop drinking, consider attending AA meeting in your area, call the local hotline number . . . for meeting times and locations, or consult the list that was given to you at the time of discharge.
>
> **Additional Follow Up Appointments**:
> Caron Foundation
> Appointment for an evaluation and treatment recommendations for your drinking

*Id.* at ¶80. The Caron Foundation is a non-profit group of three residential treatment centers for alcoholics and drug addicts. *Id.* at ¶81. McNelis has never suffered from, or been treated for, paranoia since April of 2012. *Id.* at ¶82. McNelis never told Gorman that he was admitted to the psychiatric unit at Geisinger. *Id.* at ¶83.

26

JA-000028

### K.  McNelis Is Directed to the Access Processing Facility.

McNelis attempted to return to work by calling Gorman on April 23, 2012. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶88.  Gorman told McNelis that his unrestricted access authorization had been "placed on hold" and that he should report to the Access Processing Facility that day for a meeting with Martonick and John Lines, who was PPL's Supervisor of Site Access and FFD Programs. *Id.* at ¶ 89 and *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶¶ 84 & 85 and *Doc. 63* (*Plaintiff's Response*) at ¶¶ 84 & 85. McNelis reported to the Access Processing Facility as instructed, and he met with Martonick, Lines, and Pat Diefenbacher, who was a Site Access Specialist Reviewing Official. *Id.* at ¶¶ 86 & 87 and *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶91 & 92.  At the time, the chain of command was such that Diefenbacher reported directly to Lines, and Lines reported directly to Gorman. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶92.  After the BOP process was explained to McNelis and after Lines told McNelis that he was required to see Dr. Thompson and that he would have to receive clearance from Dr. Thompson before he could return to work, McNelis was directed to report to the Access Processing Facility the following day. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶87 and *Doc. 63* (*Plaintiff's Response*) at ¶87 and *Doc. 63* (*Plaintiff's Additional Facts*) at ¶93.

On April 24, 2012, McNelis reported to the Access Processing Facility, met with Lines, and prepared a typewritten statement about the events from April 9, 2012 to the then present date. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶88 and *Doc. 63* (*Plaintiff's Response*) at ¶88; and *Doc. 63-3*.  When the Site Access department receives a notice of a referral to the BOP, it gathers any information it can and provides it to the psychologist. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶94.  Lines did not feel it was important, however, to try to find out the basis for Martonick's conclusion that McNelis's actions or conversations had led to the school lockdown. *Id.* at ¶95.  Further, Lines did not ask McNelis any questions after reading his statement, and he did not ask McNelis if he had ever used bath salts. *Doc. 63* (*Plaintiff's Response*) at ¶98.  McNelis was not evasive when he spoke to Lines, and Gorman never told Lines that McNelis was evasive with him in answering questions about the school lockdown. *Id.* at ¶¶99 & 100.

**L.  McNelis Meets with Dr. Thompson.**

Also on April 24, 2012, McNelis completed an MMPI-2 test administered by psychologist Dr. David Thompson. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶89 and *Doc. 63* (*Plaintiff's Response*) at ¶89.  Dr. Thompson is a contracted psychologist who is not employed

by PPL. *Id.* at ¶90.  Dr. Thompson performs fitness for duty evaluations

nationwide, for approximately 20 different nuclear power plants. *Id.* at ¶91.

Diefenbacher briefed Dr. Thompson about the situation with McNelis. *Doc.*

*63* (*Plaintiff's Additional Facts)* at ¶103.  Thompson understood that there were

concerns about McNelis's behavior, that the police had locked down a school, and

that McNelis had been to Geisinger Medical Center for a few days. *Id.* at ¶104.

Although Dr. Thompson does not remember Diefenbacher or anyone else telling

him about any allegations of illegal drug use by McNelis, according to Lines, he

told Dr. Thompson about the allegations that McNelis was using bath salts. *Id.* at

¶¶105 & 106.  According to Lines, he heard of McNelis's alleged use of bath salts

from Martonick. *Id.* at ¶185.

The results of the MMPI-2 did not provide a red flag to Dr. Thompson or

show that McNelis was suffering from a clinical psychological condition. *Id.* at

¶102.  Dr. Thompson completed a Confidential Psychological Screening Summary,

dated April 24, 2012, which stated that, based upon "clinical analysis of the

MMPI-2 test results and/or information [supplied by PPL]," his professional

opinion was that McNelis required a "Mandatory Interview." *Doc. 57-2*

(*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at

¶92 and *Doc. 63* (*Plaintiff's Response)* at ¶92.  The Confidential Psychological

Screening Summary further stated: "A recommendation is **NOT** possible at this

time. A Clinical Interview is necessary before an Unescorted Access

Authorization decision is possible." *Id.* at ¶ 93 (emphasis in original). Dr.

Thompson interviewed McNelis the following day—April 25, 2012. *Id.* at ¶94.

### M. Dr. Thompson's April 30, 2012 Report.

Following the clinical interview with McNelis, Dr. Thompson prepared a

Confidential Psychological Screening Summary, dated April 30, 2012, which

stated that a recommendation was "**ON-HOLD PENDING DETERMINATION**

**OF FITNESS**." *Id.* at ¶95 (emphasis in original). Attached to this Confidential

Psychological Screening Summary was a Confidential Psychological Interview

Memo, which was dated June 8, 2011 (clearly in error). *Id.* at ¶96. The

Confidential Psychological Interview Memo noted that McNelis admitted

consuming "up to 12 beers per week" and also that "his use of alcohol has, 'at

times,' been an issue of contention with his wife." *Id.* at ¶97. Both of the quoted

statements in the Memo were accurate. *Id.* at ¶98. The Confidential Psychological

Interview Memo also accurately noted that McNelis had two prior arrests for

alcohol-related offenses, one for being a minor in possession and one for driving

under the influence. *Id.* at ¶¶99 & 100.

The Confidential Psychological Interview Memo also noted that McNelis

had provided Dr. Thompson with a copy of the Geisinger Discharge Summary,

JA-000032

which noted that McNelis had been "referred to the Caron Foundation for evaluation and treatment for alcohol." *Id.* at ¶101.  It is accurate that McNelis was referred by Geisinger to the Caron Foundation, and it is accurate that Geisinger's Discharge Instructions referred McNelis to the Caron Foundation "for an evaluation and treatment recommendations for [his] drinking." *Id.* at ¶¶102 & 103. McNelis never told Dr. Thompson that he believed the Caron Foundation referral to have been made or included in the discharge summary in error. *Id.* at ¶104.

Dr. Thompson's Confidential Psychological Interview Memo also contained several recommendations. *Id.* at ¶105.  One of Dr. Thompson's recommendations was "[r]eferral [of] Mr. McNelis for alcohol assessment and possible inpatient treatment . . . ." *Id.* at ¶106.  Another of Dr. Thompson's recommendations was "UA [unescorted access authorization] remain on hold pending receipt and review of a report from the facility where [McNelis] receives an alcohol assessment and treatment." *Id.* at ¶107.  Dr. Thompson is a substance abuse expert, and he could have performed a substance abuse evaluation himself at that time. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶117 & 118.

### N.  Further Events on April 30, 2012.

On April 30, 2012, Nick Steward, another security officer at the plant, informed Lear that he had information from a "reliable source" that McNelis was

31

using bath salts. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶119. Steward did not provide the name of the "reliable source," Lear did not ask him for the name of the "reliable source," and PPL is not aware of the identity of the "reliable source." *Id.* at ¶¶119-121. At the time, although Lear knew that McNelis's badge was on hold and he was not allowed on site, he did not know that McNelis had been referred to the BOP. *Id.* at ¶122 and *Doc. 63-13* (*Lear Dep.* at 29). After he received this information about McNelis's alleged use of bath salts from Steward, Lear did not speak to anyone in management. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶123.

On April 30, 2012, McNelis spoke with Martonick and told him that he had some marital issues, that he was going to marriage counseling, that there had been a misunderstanding as to the doctor's orders, and that he would be providing PPL with an update when he had more information. *Id.* at ¶124. Martonick does not remember hearing from Lines that he had received a report from Thompson as of April 30th. *Id.* at ¶125.

**O. Dr. Thompson's May 1, 2012 Report.**

Dr. Thompson prepared a Substance Abuse Expert Determination of Fitness on May 1, 2012, which contained, among other information, the same personal history notations and treatment recommendations contained in the Confidential Psychological Interview Memo. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's*

*Statement of Uncontested Material Facts)* at ¶108 and *Doc. 63 (Plaintiff's Response)* at ¶108. The narrative section of Dr. Thompson's Substance Abuse Expert Determination of Fitness states: "Mr. McNelis is considered not fit for duty pending receipt and review of a report from the facility where he receives an alcohol assessment and possibly treatment." *Id.* at ¶110. The "Conclusion" section of the Substance Abuse Expert Determination of Fitness provides that "[b]ased upon clinical analysis of all available data, the individual is" and then there are four potential determinations:

☐   Fit for Duty - Individual is fit to safely and competently perform duties.
☐   Fit for Duty and required to complete a program as described in the report narrative.
☐   Fitness for Duty cannot be determined until subject completes a program as described in the report narrative.
☐   **NOT** Fit for Duty.

*Doc. 63-27* at 2. Dr. Thompson checked the "**NOT** fit for duty" box. *Id.*


**P. Dr. Thompson Makes No Reference to Illegal Drugs.**

Dr. Thompson's Confidential Psychological Interview Memo contains the following statement: "**ILLEGAL DRUG USAGE**: None." *Id.* at ¶115. Dr. Thompson's Substance Abuse Expert Determination of Fitness contains no reference to use of drugs other than prescription medication. *Id.* at ¶116. In fact, no document prepared by Dr. Thompson and provided to PPL regarding McNelis contains any reference to use of drugs other than prescription medications. *Id.* at

JA-000035

¶117.  Further, no document prepared by Dr. Thompson and provided to PPL regarding McNelis contains any reference to a psychiatric diagnosis or mental health treatment. *Id.* at ¶118.

Although Dr. Thompson does not remember anyone telling him about any allegations of illegal drug use by McNelis, according to Lines, he told Dr. Thompson about the allegations that McNelis was using bath salts. *Id.* at ¶¶105 & 106.  According to Lines, he would have expected Dr. Thompson to ask McNelis about the allegations of drug use and whether he had used bath salts. *Doc. 63 (Plaintiff's Additional Facts)* at ¶190.  After Lines saw Dr. Thompson's report, he did not call Dr. Thompson and ask why there was nothing in it about bath salts. *Id.* at ¶191.  According to Lines, he was not concerned about it because at the time bath salts was not an illegal drug as far as the NRC was concerned, i.e., they were not on the NRC's approved panel of drugs that could be tested for without specific permission from the NRC. *Id.* at ¶¶191 & 192.  Lines made no effort to contact anyone at the NRC to try to obtain approval to test McNelis for bath salts. *Id.* at ¶193.  Nor did he talk to anyone in management about whether PPL could find a way to test McNelis for bath salts. *Id.* at ¶195.

JA-000036

**Q. McNelis's Unescorted Access Authorization is Revoked and the Decision to Terminate His Employment Is Made.**

After receiving Dr. Thompson's report, Lines told Gorman that Dr. Thompson had deemed McNelis not fit for duty and that he would be terminating McNelis's unescorted access authorization, and based on Dr. Thompson's determination, Lines, in fact, revoked McNelis's unescorted access authorization. *Doc. 63 (Plaintiff's Additional Facts)* at ¶129 and *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶119 & 121 and *Doc. 63 (Plaintiff's Response)* at ¶119 & 121.  Lines understood that with the "not fit for duty" designation, if McNelis had gone for an alcohol assessment and received a clear report from a medical practitioner, he could have submitted it to Dr. Thompson for reconsideration of his decision that he was not fit for duty. *Doc. 63 (Plaintiff's Additional Facts)* at ¶128.  And Lines told Gorman that if McNelis obtained a report as required by Dr. Thompson, he would consider granting him access again. *Id.* at ¶131.

There is nothing in PPL's policies on FFD/BOP or the Site Access Program that states that a person can be fired before they have been given an opportunity to address the psychologist's recommendations. *Id.* at ¶134.  A flowchart that is part of the FFD/BOP policy contemplates that an employee "will be given an opportunity to comply with any recommendations for treatment, and then at some point a reviewing official will look at it again and decide whether they're fit for

35

duty." *Doc. 63-21* (*Lines Dep.* at 94); *Doc. 63-29*; and *Doc. 63* (*Plaintiff's Additional Facts*) at ¶135.

Gorman never read Dr. Thompson's report. *Id.* at ¶130. According to Gorman, Lines did not tell him that McNelis would never be fit for duty, but he also did not tell him that Dr. Thompson had recommended that McNelis go for an alcohol evaluation/assessment. *Id.* at ¶132.

Lines did not make the decision to terminate McNelis's employment. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts*) at ¶120 and *Doc. 63* (*Plaintiff's Response*) at ¶120. Gorman testified that he made the decision to terminate McNelis's employment because: (1) McNelis's unescorted access authorization had been revoked based on the unfavorable fitness for duty determination of Dr. Thompson; and (2) because he was concerned that McNelis had been "evasive and really nonresponsive" during the course of the telephone conversation on April 17, 2012. *Id.* at ¶122.

### R. The SEARP.

On May 7, 2012, Gorman presented his termination recommendation for review by a Susquehanna Elevated Action Review Panel (SEARP), which reviews recommendations for discipline up to, and including termination and which, in this case, consisted of Jeff Helsel, Plant Manager and Vice President of Nuclear

Operations, Carol Moody, Director of Human Resources, and Brad Drysdale, General Manager of Nuclear Maintenance. *Id.* at ¶¶123 & 125 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶136. Martonick, who drafted a SEARP Panel Preparation Checklist in anticipation of the SEARP, presented the case, along with Gorman, to the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶124 and *Doc. 63 (Plaintiff's Response)* at ¶124 and *Doc. 63 (Plaintiff's Additional Facts)* at ¶137. Kevin Cimorelli, the General Manager of Nuclear Programs, was also present at the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶126 and *Doc. 63 (Plaintiff's Response)* at ¶126.

The SEARP checklist sets forth the proposed action as the termination of McNelis's employment and that the basis for the action is that "McNelis was determined to be unfit for duty by the site contract Psychologist." *Doc. 63-55* at 1. The SEARP checklist contains a chronology of the applicable events, which starts with the April 16th report regarding McNelis's behavior and ends with McNelis's April 30th phone call to Martonick. *Id.* at 1-2. The April 17th conversation between McNelis and Gorman is included in the chronology, and the SEARP checklist states that "[d]uring the discussion Mr. McNelis was not forthright in providing information and did not want to address the issues identified and reported on 4/16/12, by saying 'I have nothing to Report at this time.'" *Id.* at 1.

The SEARP checklist states that McNelis's explanation for issues surrounding his behavior was that he was suffering from a lack of sleep. *Id.* at 2. In a section that asks for information about the employee's history and previous action, the SEARP checklist notes that in February of 2010, there had been an anonymous 911 call stating that McNelis was bragging about his use of drugs, but, based upon a lack of credibility, no action had been taken on that information. *Id.* at 2-3. PPL's General Counsel and Human Resources Department reviewed the termination recommendation prior to the SEARP meeting. *Doc. 63 (Plaintiff's Additional Facts)* at ¶148.

The SEARP did not review any documents other than the SEARP checklist. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶127 and *Doc. 63 (Plaintiff's Response)* at ¶127. Helsel did not review the BOP referral form, McCabe's notes, McNelis's notes that he had submitted as part of the BOP program, or any of Dr. Thompson's reports. *Doc. 63 (Plaintiff's Additional Facts)* at ¶¶153-156. Helsel contends that HIPAA rules preclude the SEARP from seeing any site access records. *Id.* at ¶ 159. The only documents or information that the SEARP had to make its decision regarding the propriety of the recommended discipline is what was included in the SEARP checklist and what Gorman said at the meeting. *Id.* at ¶160. Gorman told the SEARP that McNelis lost access because he was found unfit for duty. *Id.* at ¶ 158. The school lockdown

was not a stated basis for the termination decision and was not a topic of discussion

at the SEARP. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of*

*Uncontested Material Facts)* at ¶128 and *Doc. 63 (Plaintiff's Response)* at ¶128.[7]

Helsel does not recall any discussion at the SEARP regarding suspected use of bath

---

[7] PPL points to Helsel's deposition testimony to support this statement of fact. Without pointing to any contrary evidence, McNelis denies this statement, asserts that Helsel's recollection of what was discussed at the meeting is an issue of fact, and contends that "even the *uncontradicted* testimony of interested witnesses supporting the employer, such as supervisors and other workers, should not be considered or otherwise weighed." *Doc. 63 (Plaintiff's Response)* at ¶ 128 (italics in original). He relies on *Reeves v. Sanderson Plumbing Products, Inc.*, where the Court in addressing the standard for granting judgment as a matter of law under Fed.R.Civ.P. 50, which "mirrors" the standard for granting summary judgment under Fed.R.Civ.P. 56, stated that "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure §2529, p. 300 (2d ed. 1995)). But courts in this Circuit have not read *Reeves* as precluding reliance in the summary-judgment context on undisputed evidence from an interested witness. *See e.g. Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (stating that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness") (footnote omitted); *Wilkie v. Geisinger Sys. Servs.*, No. 3:12-CV-580, 2014 WL 4672489, at *5 (M.D. Pa. Sept. 18, 2014) (Mariani, J.) (rejecting the plaintiff's argument that under *Reeves*, the court cannot consider any statements from interested witnesses); *Edgerton v. Wilkes-Barre Home Care Servs., LLC*, No. 3:12-CV-0191, 2014 WL 131605, at *2 (M.D. Pa. Jan. 13, 2014) (Brann, J.) (concluding that the plaintiff's "repeated bald assertions that a jury is not required to believe testimony favorable to [the defendant] do not put facts in genuine dispute and will not defeat [the defendant]'s summary judgment motion"), *aff'd*, 600 F. App'x 856 (3d Cir. 2015). Thus, where McNelis has denied a properly supported statement of material fact submitted by PPL by merely by pointing to *Reeves*, we deem those facts admitted.

salts by McNelis. *Id.* at ¶129.[8]  Helsel is also not aware of anything in writing

about McNelis supposedly not being forthright with Gorman other than in the

SEARP checklist. *Doc. 63 (Plaintiff's Additional Facts)* at ¶163.  According to

Helsel, the SEARP permitted Gorman's termination decision to stand because:

> Mr. McNelis, had the opportunity to report his fitness for
> duty issues, and that ultimately our psychologist took away his
> access.  He was not forthright with that information, and there
> was a potential that there could be a safety risk for us
> in protecting the health and safety of the public.  That's the
> bottom line.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material*

*Facts)* at ¶130 and *Doc. 63 (Plaintiff's Response)* at ¶130.[9]

As plant manager, Helsel has sat on more than 50 but less than 100 SEARPs.

*Doc. 63 (Plaintiff's Additional Facts)* at ¶149.  He does not know of a situation

where a simple loss of unrestricted access was presented to the SEARP, because

that is not considered a disciplinary action. *Id.* at ¶150.  Helsel is also not aware of

any situations where an employee has been sent to the BOP and a psychologist

recommends further follow-up or treatment and the employee was declared unfit

for duty and then terminated. *Id.* at ¶151.  Further, Helsel is not aware of anyone

who was supposedly not cooperative with regard to questions about their behavior

and then allowed to go through the BOP process before being terminated for said

---

[8]  *See* n.7.
[9]  See n.7.

JA-000042

lack of cooperation. *Id.* at ¶164. He did testify, however, that he "would expect
that process to be completed." *Doc. 63-33 (Helsel Dep.* at 55-56).

### S. McNelis Is Notified of the Revocation of His Unescorted Access Authorization and He Is Terminated.

On May 11, 2012, McNelis attended a meeting with Lines and Site Access
Specialist Pat Dieffenbacher at which he was provided with a copy of Dr.
Thompson's Substance Abuse Expert Determination of Fitness. *Doc. 57-2
(Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at
¶131 and *Doc. 63 (Plaintiff's Response)* at ¶131. McNelis disagreed with Dr.
Thompson's determination because he didn't "consider [himself] to be an
alcoholic." *Id.* at ¶111. Dr. Thompson never stated to McNelis that he believed
McNelis to be an alcoholic. *Id.* at ¶112. McNelis does not believe he needed an
alcohol assessment and/or treatment. *Id.* at ¶113. McNelis has no evidence,
however, to indicate that Dr. Thompson's determination was not made in good
faith and/or in the exercise of his best medical judgment. *Id.* at ¶114.[10]

---

[10] Although McNelis admits that he made such a statement at his deposition, he
asserts that the statement does not constitute an admission and that he "hired his
lawyers to collect, marshall, and evaluate the evidence in the case." *Doc. 63
(Plaintiff's Response)* at ¶114. He cites *Surowitz v. Hilton Hotels Corp.*, 383 U.S.
363 (1966), and he summarizes that case, in which the Supreme Court reversed the
dismissal of a shareholder derivate suit pursuant to Fed.R.Civ.P. 23(b), which at
the time provided that a shareholder's complaint must be verified, after questioning
revealed that the plaintiff did not have knowledge of the facts in the complaint.
McNelis further states that "[t]he evidence in this case, as will be shown in

At the meeting with Lines and Dieffenbacher, McNelis was informed that his unescorted access authorization had been revoked. *Id.* at ¶132. Lines told McNelis that if he obtained the required alcohol assessment and treatment certification, he could reapply for access. *Doc. 63 (Plaintiff's Additional Facts)* at ¶167. At the end of the meeting, McNelis was given a form that explained why his unescorted access authorization had been revoked and that provided an explanation of his right to an "independent management review" of the decision. *Id.* at ¶169.

Also on May 11, 2012, immediately following the meeting with Lines and Dieffenbacher, McNelis attended a meeting with Martonick and Jillian Brennan, a Human Resources employee. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶133 and *Doc. 63 (Plaintiff's Response)* at ¶133. At that meeting, McNelis was informed that he was being separated from PPL. *Id.* at ¶134. Gorman signed the letter of termination, which does not explain why McNelis was fired. *Doc. 63 (Plaintiff's Additional Facts)* at ¶182.

---

plaintiff's statement of additional material facts, show very strongly that Thompson miserably failed in his professional duty to Mr. McNelis and that it was due to pressure from PPL for Mr. McNelis to be deemed unfit for duty." *Doc. 63 (Plaintiff's Response)* at ¶114. But he points to no evidence to contradict PPL's statement of fact. For this reason, we deem this fact to be undisputed.

JA-000044

### T.  Dr. Thompson's Further Contacts with Lines and McNelis.

On May 17, 2012, Lines called Dr. Thompson and told him that McNelis's employment had been terminated. *Id.* at ¶196.  According to Dr. Thompson's notes of that telephone call, Lines told him: "This is a new policy of security and HR. This is a new policy by the Security Manager, i.e., the security manager [used or read] the procedures as written." *Doc. 63-36* and *Doc. 63-23* (*Thompson Dep.* at 49-50).  According to Gorman, he did not tell Lines that the policies and procedures that had been used in the past were going to change under his administration as the manager of nuclear security. *Doc. 63 (Plaintiff's Additional Facts)* at ¶199; *Doc. 63-9* (*Gorman Dep.* at 79).  Dr. Thompson's notes also contain the following sentence: "Must go to Substance Abuse Professional to deal with alcohol and/or other substance and follow through with any recommendations." *Doc. 63-36*.  Dr. Thompson could not recall if Lines stated that or if he told Lines that that was what his recommendation was. *Doc. 63-23* (*Thompson Dep.* at 52-53).  During the conversation, Lines said that everyone who loses unescorted access authorization has a right to review of the decision. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶198.

On May 21, 2012, Dr. Thompson spoke with McNelis, who said that he had been terminated and that he was appealing the termination. *Id.* at ¶¶200 & 201. McNelis also told Dr. Thompson that the discharge summary from Geisinger had

been revised to remove the referral recommendation to the Caron Foundation, and he read Dr. Thompson a note authored by Thomas Wickham, who was employed by Geisinger as a Physician's Assistant in psychiatry. *Id.* at ¶205 and *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶74 and *Doc. 63 (Plaintiff's Response)* at ¶74. The Wickham note provides, in pertinent part, that McNelis's wife "was the source of the Caron Foundation referral. *We* did not make it." *Doc. 63-37* (italics in original). McNelis offered to provide Dr. Thompson with a copy of that note, but Dr. Thompson told McNelis to send the note to PPL. *Doc. 63 (Plaintiff's Additional Facts)* at ¶205. At some point, however, Dr. Thompson received the Wickham note; he assumes that someone from PPL sent it to him. *Id.* at ¶¶204 & 206. Dr. Thompson does not remember speaking with Lines or Diefenbacher about the Wickham note, and he would not have expected to since he was told that the decision to revoke McNelis's Unescorted Access Authorization was going through some sort of appeal process. *Id.* at ¶207. He also did not speak with David Walsh, the "independent manager" who reviewed McNelis's appeal of his loss of unescorted access authorization. *Id.* at ¶208. Dr. Thompson did, however, call Wickham on May 23, 2012, because he had seen the revised discharge summary and he wanted more information. *Id.* at 209.

Dr. Thompson was surprised to hear that PPL had terminated McNelis as a result of his own report. *Id.* at ¶214. But Dr. Thompson's recommendations for further evaluations are not always followed by PPL because that is all they are—recommendations. *Id.* at ¶216. It is a fairly common practice though for PPL to follow his recommendation for the employee to be given an opportunity to take any corrective steps that Dr. Thompson suggests are required. *Id.* at ¶217.

McNelis also offered to provide Dr. Thompson with documentation that he had gone to a referral and that the substance abuse professional thought he did not need any treatment. *Id.* at ¶203. Again, Dr. Thompson told McNelis to go through PPL, not him. *Id.*

### U. The Review of the Revocation of McNelis's Unescorted Access Authorization.

On May 22, 2012, McNelis submitted a Request for Review of Denial/Revocation of his unescorted access authorization. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶135 and *Doc. 63 (Plaintiff's Response)* at ¶135. Although McNelis believed that his request for review of the decision to revoke his unescorted access authorization was also a request for review of the termination decision, an employee's right to request review of the decision to revoke unescorted access authorization does not constitute an appeal of a termination decision. *Id.* at ¶¶136 & 137. In support of

JA-000047

his request for review of the decision to revoke his unescorted access authorization, McNelis provided a type-written statement dated May 15, 2012, and the note from Wickham stating that McNelis's wife "was the source of the Caron Foundation referral." *Id.* at ¶¶138 & 139.

McNelis also provided a copy of a police report dated April 16, 2012 regarding the school lockdown. *Id.* at ¶143. The police report states that the decision to lock down the schools was based on a report, from an anonymous source, that McNelis was allegedly "under the influence and possibly armed" and "may come to the [schools] to get his children." *Id.* at ¶144. PPL did not see the police report until after McNelis's employment had been terminated. *Id.* at ¶145.

McNelis also provided a letter from Francis McAndrew, a licensed professional counselor employed by Bloomsburg Psychological Center LLC. *Id.* at ¶140. This letter, which is dated May 22, 2012 and addressed to "To Whom it May Concern," reads:

> I began interviewing Mr. and Mrs. Daryle McNelis for marriage counseling on 5/8/2012. Mr. McNelis reported that he had been told he was terminated from his position, and I saw him to continue his assessment on 5/17/2012. He then explained that PPL wanted a Drug & Alcohol (D&A) assessment completed. I gathered information for a D&A assessment through the sessions on 5/17/2012, and 5/22/2012. Although this report is not in formal presentation format, it is my opinion that he does not meet the criteria for chemical dependency at this time.

*Doc. 63-38.*

David T. Walsh, the independent manager assigned to conduct the review, decided on June 12, 2012 to affirm the decision to revoke McNelis's unescorted access authorization. *Id.* at ¶146.  Walsh held a Senior Reactor Operator license conferred by the NRC and was employed by PPL as a Shift Supervisor. *Id.* at ¶147. As a Shift Supervisor at PPL, Walsh was responsible for overseeing the operations of both nuclear reactors, but he had no direct supervisory responsibility for security. *Id.* at ¶148.  Walsh's 'independent review" process consisted of simply sitting down at the site access office, looking at the access site file, and then deciding if the proper procedure had been followed. *Doc. 63 (Plaintiff's Additional Facts)* at ¶228.  He assumes that the file is complete, and he does not ask any questions of anyone. *Id.* at ¶230.   He does not make any determination as to whether an employee is being truthful. *Id.* at ¶232.  As part of his review of the file, Walsh learned of the allegations regarding McNelis's use of bath salts. *Id.* at ¶233.  The Access-Authorization-Review form completed by Walsh contains a footnote stating that it appeared that McNelis "completed the SAE evaluation as recommended." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶149 and *Doc. 63 (Plaintiff's Response)* at ¶149. Walsh nevertheless decided to affirm the decision to revoke McNelis's unescorted access authorization because "at the time of revocation the process was followed." *Id.* at ¶150.  McNelis received a letter dated June 12, 2012 by certified mail

indicating that the independent manager had considered his request for review and affirmed the decision to revoked his unescorted access authorization. *Id.* at ¶151.

Dr. Thompson did not consider McAndrew's letter to be an alcohol assessment report because certain elements had been omitted. *Id.* at ¶141 and *Doc. 57-28* at 23 (*Thompson Dep*. at 81). Lines did not interpret McAndrew's letter as addressing Dr. Thompson's recommendation that McNelis receive an alcohol assessment and possibly treatment. *Doc. 57-2* (*Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶142 and *Doc. 63* (*Plaintiff's Response)* at ¶142.

If the decision to terminate McNelis's employment had not been made, after receiving the documentation received during the appeal process, Lines would have told McNelis how to reapply for access. *Doc. 63* (*Plaintiff's Additional Facts)* at ¶215. And if McNelis had not been fired, after hearing from a licensed medical professional that McNelis did not meet the criteria for somebody who suffers from alcohol or substance abuse, Dr. Thompson would have scheduled a second interview with McNelis and then made another recommendation about McNelis's unescorted access authorization. *Id.* at ¶183.

48

## V. Other Employees Were Not Terminated After Losing Unescorted Access Authorization.

On June 8, 2012, approximately one month after McNelis was fired, R.S., an employee of the plant, was referred to the BOP program. *Doc. 63 (Plaintiff's Additional Facts)* at ¶238. The supervisor who initiated the referral was Richard Mogavero, and the concurring supervisor was Vilas Shook. *Doc. 65* at 2. The description of the incident or behavior on the referral form provides that after Shook and Mogavero met with R.S. and discussed a recent decrease in his performance, R.S. was asked if anything else may be contributing to recent events, and he responded that he was worried about his health, that his home life seemed to be overburdening, that he felt like things were caving down on him, that he did not feel fit for duty. *Id.* He requested to speak to someone in order to be pointed in the right direction to return to fitness-for-duty status. *Id.*

R.S. was given the MMPI-II, and then he was interviewed by psychologist Dr. John S. Baird, Jr. *Doc. 63 (Plaintiff's Additional Facts)* at ¶239. After a clinical interview, Dr. Baird held that R.S.'s status would be "on-hold" pending a review by a medical review officer (MRO). *Id.* at ¶240. On June 15, 2012, Dr. Baird found that R.S. was not recommended for unescorted access because he was a "potential security risk at the time." *Id.* at ¶241. This was based on R.S.'s stress and possible heart issues. *Id.* On June 20, 2012, Lines notified R.S. of the denial/revocation of his unescorted access authorization. *Id.* at ¶242. R.S. was not

fired as a result of his loss of access, and, in fact, he was referred to a course of treatment by Fran McAndrew, which was completed on June 15, 2012. *Id.* at ¶243. On August 23, 2012, R.S. was re-evaluated by Dr. Baird, and Dr. Baird deemed R.S. "acceptable for unescorted access." *Id.* at ¶244.

On May 15, 2012, four days after McNelis's termination, S.W. was referred to the BOP program. *Id.* at ¶245. The supervisor who initiated the referral was Richard Mogavero, and the concurring supervisor was Melanie Leonard. *Doc. 71* at 2. The description of the incident or behavior on the referral form provides that Mogavero contacted S.W. "due to [unreadable] late for scheduled training at the APF." *Id.* Mogavero was told by another officer that S.W. wanted to speak to him. *Id.* When Mogavero spoke to S.W. on the phone, she was upset and crying, and she stated that she thought she was "losing it" and that she had unsuccessfully attempted to receive counseling. *Id.* S.W. was only a few minutes from the Access Processing Facility, and Mogavero instructed her to come inside and meet with him. *Id.* Mogavero and Leonard then met with S.W., who "appeared to be emotionally shaken and who was apologetic for having to do this at work." *Id.*

S.W. was given an MMPI-II exam and then a clinical interview by Dr. Baird that same day. *Doc. 63 (Plaintiff's Additional Facts)* at ¶246. Dr. Baird put S.W.'s access status "on-hold pending an MRO review." *Id.* at ¶247. S.W. was found to have PTSD and adjustment reaction disorder. *Id.* at ¶248. After Dr. Albert Alley

50

conducted an MRO, in July of 2012, Dr. Baird found S.W. acceptable for unescorted access authorization. *Id.* at ¶249. S.W.'s problems weren't over though. *Id.* at ¶250. In July of 2013, Dr. Baird examined S.W., he placed S.W.'s access was "on hold pending an MRO review," and he determined that S.W. needed a "clinical interview." *Id.* A week later, Dr. Baird determined that S.W. was "not recommended for unescorted access." *Id.* at ¶251. At Dr. Baird's request, S.W. saw a psychiatrist, and based on the psychiatrist's report, Dr. Baird suggested that S.W. see a social worker for counseling for at least five sessions. *Id.* at ¶252. In August of 2013, S.W. was notified that a decision had been made to revoke her unescorted access authorization. *Id.* at ¶253. In December of 2013, apparently after meeting with the counselor as recommended, S.W. took another MMPI-II test and then met with Dr. Baird, who after a clinical interview granted S.W. unescorted access. *Id.* at ¶¶254 & 255.

## W. FMLA Paperwork.

A hold was placed on McNelis's access key card because of the BOP Referral, not because McNelis needed medical leave. *Id.* at ¶152. When McNelis spoke with Lear on April 19, 2012, in addition to telling Lear that he was in the hospital, McNelis requested FMLA paperwork. *Id.* at ¶155. At 12:49 a.m. on April 19th, which was only a few minutes after McNelis's call to Lear, Lear sent an e-

mail to Martonick and Gorman informing them of McNelis's request for FMLA paperwork. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶¶ 80 & 81 and *Doc. 63-18*. Lear asked "[i]f possible could that be emailed to his work email?  I don't know if that is possible, it may have to be mailed to his residence." *Doc. 63-18*.  His last request was that Martonick get with Carol Parks in H.R. so that McNelis receives the requested information. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶81.

On April 19, 2012 at 2:04 p.m., Martonick sent an e-mail to Parks and notified her that McNelis had requested FMLA paperwork. *Id.* at ¶82.  He provided Parks with McNelis's address and cell phone number. *Doc. 63-19*.  At 10:45 a.m. the next day, Parks sent an e-mail to Mary Beth Salla stating that she had spoken to McNelis, that he had checked himself into the hospital, and that he was being discharged that day and released to return to work on Monday, April 23, 2012. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶83.  She mentioned that there were "other access issues in this case," and she asked Salla to "Please E-MAIL him a possible package" of forms. *Id.* and *Doc. 63-19*.  Ten minutes later Salla sent an e-mail to Parks attaching the forms she had sent to McNelis. *Doc. 63* (*Plaintiff's Additional Facts*) at ¶84.

A letter was prepared addressed to McNelis and dated April 20, 2012 (FMLA Letter), which contained instructions for completing PPL's FMLA request form and an FMLA medical certification form, copies of which were enclosed.

*Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶156 & 157 *and Doc. 63 (Plaintiff's Response)* at ¶156 & 157. The FMLA Letter contained the correct home address for McNelis. *Id.* at ¶158. PPL did not have McNelis's personal e-mail address, and McNelis did not have access to his work e-mail at any time after April 17 as his access had an administrative hold placed on it and he never returned to work after that date. *Doc. 63 (Plaintiff's Additional Facts)* at ¶85. According to McNelis, he never received any FMLA paperwork from PPL. *Id.* at ¶86.

McNelis never completed an FMLA application or request form. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶160 and *Doc. 63 (Plaintiff's Response)* at ¶160. McNelis also never submitted an FMLA medical certification form to PPL. *Id.* at ¶161. In fact, McNelis never had any further discussions with anybody at PPL about the issue of FMLA leave. *Id.* at ¶162.

## V. PPL Is Entitled to Summary Judgement as to the ADA, RA, and PHRA Claims.

PPL contends that it is entitled to summary judgment as to the ADA, RA, and PHRA claims for numerous reasons including: (1) because it receives no federal financial assistance, it cannot be liable under the RA; (2) the PHRA claims are preempted by the Atomic Energy Act and its implementing

regulations; (3) the ADA claims are time barred because McNelis failed to timely file his charge with the EEOC; and (4) McNelis did not plead or exhaust a claim based on being regarded as a drug addict.[11] PPL also addresses the merits of the ADA, RA, and PHRA claims. Because we agree with PPL that it is entitled to summary judgment on the merits, we do not address PPL's other contentions.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as here, the plaintiff contends that the defendant's stated reason for the adverse action is a pretext for discrimination, the *McDonnell Douglas*[12] burden-shifting analysis applies to an ADA discrimination claim.[13]

---

[11] McNelis's vocational expert, Terry P. Leslie, opines that PPL regarded McNelis "as having a disability involving the use of alcohol and/or drugs and/or having a psychological disorder . . . ." *Doc. 63-43* at 6. Based on Leslie's report, PPL assumed that McNelis would attempt to proceed on a theory that PPL regarded him as disabled because it perceived him as a drug addict or drug user even though McNelis did not plead such in his second amended complaint. PPL's assumption was correct as McNelis does rely on that theory in his briefs.

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

[13] The same analysis as under the ADA generally applies to a PHRA claim and to an RA claim. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) ("[W]e note that the Rehab Act, ADA, and PHRA ("the Acts") are all to be

That analysis has three stages:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting

*McDonnell Douglas*, 411 U.S. at 802). "Although the burden of production of

evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at

all times." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

To establish a prima facie case of discrimination under the ADA, "a plaintiff

must show (1) that he is disabled within the meaning of the ADA, (2) that he is

otherwise qualified for the job, with or without reasonable accommodations, and

(3) that he was subjected to an adverse employment decision as a result of

discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir.

2010). A individual is "disabled" under the ADA if he: (1) has a physical or

mental impairment that substantially limits one or more of his major life activities;

(2) has a record of such an impairment; or (3) is regarded as having such an

---

interpreted consistently, and that all have the same standard for determination of liability."). Accordingly, we will only discuss McNelis's ADA claim because our analysis of that claim applies as well to the PHRA and RA claims.

impairment. 42 U.S.C. § 12102(1). McNelis proceeds under the third, "regarded as" prong of the disability definition contending that PPL erroneously regarded him as an illegal drug user, as an alcoholic, and/or as psychotic. We assume for the sake of argument that McNelis can satisfy the first element of a prima facie case, i.e. that he was disabled within the meaning of the ADA because PPL regarded him as disabled.

Although PPL construed the second amended complaint as containing a claim that McNelis's referral to the BOP was discriminatory, in his briefs, McNelis clarifies that he is not claiming that the referral to the BOP was discriminatory. *See Doc. 64 at 24-25* (Plaintiff does not dispute his behavior was unusual in the days leading up [to] the BOP referral and that his actual behavior justified the referral. What was plainly illegal, however, is how Defendant handled things *thereafter.*") (italics in original). Rather, McNelis claims that PPL took two adverse actions against him: (1) it revoked his unescorted access authorization; and (2) it fired him. *Id.* at 48 ("Plaintiff does not contend the referral to the BOP was the discriminatory act which harmed him. It was the loss of access in the form of being held unfit for duty, and the corresponding termination, that were adverse actions grounded in management's misperceptions that caused him harm."). We address each claimed adverse action in turn.

## A. Revocation of Unescorted Access Authorization.

PPL contends that in revoking McNelis's unescorted access authorization it relied on Dr. Thompson's determination that McNelis was not fit for duty. It is not clear if PPL is arguing that McNelis does not meet the second and third elements of a prima facie case, or if it is arguing that given Dr. Thompson's determination, it had a legitimate nondiscriminatory reason for revoking McNelis's unescorted access authorization and McNelis cannot show pretext. We assume without deciding that McNelis can establish a prima facie case with regard to the revocation of his unescorted access authorization. Thus, we proceed to the latter steps of the *McDonnell Douglas* analysis.

### 1. Legitimate Nondiscriminatory Reason.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). An employer satisfies its burden of production by introducing evidence that would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id*. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting

paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

Here, PPL asserts that it revoked McNelis's unescorted access authorization because Dr. Thompson found him unfit for duty. This is a legitimate, nondiscriminatory reason for revoking McNelis's unescorted access authorization.

### 2. **Pretext**.

Once the defendant meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff. To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action. *Daniels,* 776 F.3d at 198-99. To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (citations omitted). "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was

wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (quoting *Fuentes*, 32 F.3d at 765). Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, 32 F.3d at 765.

In an attempt to show that PPL's reliance on Dr. Thompson's determination that he was not fit for duty was pretext for disability discrimination, McNelis contends that PPL "rigged the process." In this regard, McNelis asserts that PPL rigged the BOP process either by failing to tell Dr. Thompson of the allegations that he was using bath salts or by telling Dr. Thompson of those allegations and then convincing Dr. Thompson to "bury any mention of" bath salts in his report because PPL could not test for bath salts and "fixing" the report was an easy way for PPL to have a basis to fire him even though it could not determine with any degree of certainty whether he was using bath salts. *Doc. 64* at 34-36. The problem with the theory that PPL rigged the process by not telling Dr. Thompson of the allegations that McNelis was using bath salts is that it does not make any sense; why if, as McNelis asserts, PPL was looking for a reason to fire him, would

it not tell Dr. Thompson of information that would have the potential to increase the likelihood that Dr. Thompson would find McNelis unfit for duty? And the problem with the theory that PPL told Dr. Thompson about the allegations that McNelis was using bath salts and then rigged the process by convincing him to find Mr. Nelis unfit for duty without mentioning bath salts in his report is that there is not sufficient evidence to support that theory.

As set forth in the statement of material facts section of this Report and Recommendation and footnote 10, because McNelis failed to respond to PPL's statement of fact that McNelis has no evidence to indicate that Dr. Thompson's determination was not made in good faith and/or in the exercise of his best medical judgment, that fact is deemed undisputed. Nevertheless, we will address McNelis's arguments that there is evidence to support his contention that PPL rigged the process. Although McNelis make numerous arguments suggesting that PPL rigged the process, viewing the evidence the light most favorable to McNelis as the nonmoving party, we nevertheless conclude that he has not presented sufficient evidence from which a reasonable factfinder could conclude that PPL rigged the process.

McNelis points to the fact that Lines asserts that he told Dr. Thompson of the allegations that McNelis was using bath salts, but Lines was not concerned when Dr. Thompson's report did not mention bath salts because bath salts were not

60

on an approved panel of illegal drugs that PPL could test for unless given specific permission from the NRC.  That Lines took what may be considered a nonchalant attitude toward the lack of any mention of drug use in Dr. Thompson's report, does not lead to a reasonable inference that PPL in any way interfered with Dr. Thompson's professional judgment.

McNelis also contends that there is something nefarious about the fact that Dr. Thompson in his April 30, 2012 report determined that McNelis's unescorted access authorization was "on hold pending [a] determination of fitness," but then the next day, Dr. Thompson determined that McNelis was "not fit for duty." *See Doc. 64* at 37.  McNelis suggests that Dr. Thompson changed his opinion after he learned that Nick Steward had informed Lear that he had information from a reliable source that McNelis was using bath salts.  According to McNelis, a jury could find that based on Dr. Thompson's unexplained change within 24 hours that he was "a hack" for PPL and that the change reflects the perception of PPL's management about McNelis, rather than Dr. Thompson's own professional judgment. *See Doc. 64* at 53.  But McNelis has not presented evidence from which a reasonable trier of fact could conclude that Dr. Thompson, in fact, learned of Nick Steward's allegation.  Moreover, Dr. Thompson did not change his opinion. Dr. Thompson is a substance abuse expert as well as a psychologist, and his April 30th report was a psychological assessment, whereas his May 1st report was a

61

"Substance Abuse Expert Determination of Fitness." *See Docs. 57-30* and *57-32*. Further, in addition to providing no evidence that anyone at PPL interfered with Dr. Thompson's professional judgment, Dr. Thompson specifically denies any such interference. *See Doc. 82-2* (*Thompson Decl.* at ¶7) ("At no time was I asked or told by anyone at PPL to 'bury' or otherwise avoid reference to rumored use of unlawful drugs by Mr. McNelis. PPL did not in any way attempt to influence or interfere with my clinical evaluations of Mr. McNelis, my determinations of fitness for duty, and/or my continuing treatment recommendations for this individual.").

McNelis also suggests that given that Dr. Thompson was a substance abuse expert, he could have performed the alcohol assessment that he recommended and that fact that he did not suggests that PPL did not want him to conduct the evaluation. But Dr. Thompson recommended more than just an alcohol assessment, he recommended an "alcohol assessment and possible inpatient treatment." *Doc. 57-32* at 2. Further, the fact that Dr. Thompson did not do an alcohol assessment himself does not lead to a reasonable inference of manipulation by PPL.

McNelis also contends that Dr. Thompson erred by checking the box on the fitness for duty form that read "Not Fit for Duty." Instead, according to McNelis, Dr. Thompson should have checked the box that read "Fitness for Duty cannot be

JA-000064

determined until subject completes a program as described in the report narrative."

Dr. Thompson, however, asserts that he did not check the wrong box:

> I did not mistakenly check the wrong box on the SAE Determination of Fitness. Instead, I determined in the exercise of sound professional judgment that Mr. McNelis was not fit for duty at the time of the evaluation. This is distinct from a determination that Mr. McNelis' fitness for duty could not be determined pending competition [sic] of a program as described in the narrative.

*Doc. 82-2* (*Thompson Decl.* at ¶5). Moreover, that McNelis disagrees with Dr. Thompson's opinion does not lead to a reasonable inference of manipulation by PPL.

McNelis also contends that Dr. Thompson should have changed his position on his fitness-for-duty determination after McNelis provided McAndrew's letter stating his opinion that McNelis does not meet the criteria for chemical dependency and Wickham's note stating that the referral to the Caron Foundation was at the behest of McNelis's wife. McNelis contends that instead of being an advocate for him, Dr. Thompson simply let the appeal process work itself out. But it was not Dr. Thompson's role to be an advocate for anyone. 10 C.F.R. § 26.187 ("The SAE is not an advocate for the licensee or other entity, or the individual."). Rather, his function was "to protect public health and safety and the common defense and security by professionally evaluating the individual and recommending appropriate education/treatment, follow-up tests, and aftercare." *Id.*

The Wickham note and the McAndrew letter were not submitted until after Dr. Thompson already made his fitness for duty determination, and the fact that Dr. Thompson did not change his opinion based on these items after McNelis had already been terminated, cannot reasonably be seen to lead to an inference that PPL manipulated Dr. Thompson's professional judgment.

In sum, while McNelis makes many assertions that he contends support his assertion that PPL rigged the process, he has not provided evidence from which a reasonable factfinder could reach that conclusion. And in the absence of evidence that PPL interfered with Dr. Thompson's professional judgment, it was reasonable for PPL to revoke McNelis's unescorted access authorization based on Dr. Thompson's determination that McNelis was not fit for duty, and no inference of pretext arises from PPL's reliance on Dr. Thompson's determination. Accordingly, PPL is entitled to summary judgment as to McNelis's claims under the ADA, the RA, and the PHRA with regard to the revocation of McNelis's unescorted access authorization.

### B. Termination.

With respect to the termination, PPL argues that McNelis cannot establish the second element of a prima facie case, i.e., that he was otherwise qualified for the job.

64

Under the ADA, a qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id*. Further, an employer "[m]ay require that employees employed in sensitive positions comply with the regulations . . . of the Nuclear Regulatory Commission that apply to employment in sensitive positions subject to such regulations." 29 C.F.R. § 1630.16(b)(6).

Whether an individual is a qualified individual is determined using a two-step test. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). "First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* (internal quotation marks and citation omitted). Second, the court must consider whether "the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The plaintiff has the burden to show that he was qualified at the time of the employment decision. *Id.*

JA-000067

Here, it is undisputed that all individuals working inside PPL's Susquehanna Steam Electric Station are required to maintain unescorted access authorization. *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶28 and *Doc. 63 (Plaintiff's Response)* at ¶28. Because McNelis worked inside the Susquehanna Steam Electric Station, he was required to maintain unescorted access authorization. Numerous courts have held that unescorted access authorization is an essential job function in the nuclear power industry and without such an individual is not otherwise qualified. *See e.g. Lute v. Dominion Nuclear Connecticut, Inc.,* No. 3:12-CV-01412 MPS, 2015 WL 1456769, at *11 (D. Conn. Mar. 30, 2015) (concluding that plaintiff's failure to maintain unescorted access authorization "means that he cannot show that he was 'otherwise qualified to perform the essential functions of his job,' and thus cannot establish a prima facie case of discrimination under the ADA"); *Sysko v. PPL Corp.*, 3:CV-07-0470, 2009 WL 4725240 at *11 (M.D.Pa. 2009) ("Revocation of his unescorted access status rendered Plaintiff 'unqualified' for his position as an Instrument and Control Technician. As a matter of law, Plaintiff cannot sustain his burden of showing that he was a qualified individual under the ADA or PHRA."); *McCoy v. Pennsylvania Power & Light Co.*, 933 F. Supp. 438, 443 (M.D. Pa. 1996) (finding that "NRC regulations make security clearance an essential component of plaintiff's former job as a nuclear plant operator" and that "maintaining security clearance is an

essential job function and any revocation or suspension of that status renders an

employee ineligible, i.e. not qualified, under NRC regulations, to work as a nuclear

plant operator").

McNelis attempts to distinguish the cases that have held that unescorted

access authorization is an essential function of the job in the nuclear industry by

asserting that in large part those cases were decided before the 2009 enactment of

the ADAAA.  But *Lute* was decided in 2015.  Moreover, while the 2009

amendments liberalized the definition of disability, a plaintiff still must show that

he was qualified for the job.

McNelis also contends that PPL manipulated Dr. Thompson's opinions.  But

we have already addressed that contention and determined that McNelis has not

pointed to evidence from which a reasonable factfinder could come to such a

conclusion.

McNelis further contends that he was, in fact, fit for duty.  He asserts that in

making his fitness-for-duty determination, Dr. Thompson relied on the Geisinger

discharge summary, which contained a referral to the Caron Foundation, but,

according to McNelis, Dr. Thompson erreonsly relied on the referral to the Caron

Foundation because that referral was made at the request of McNelis's wife.

Regardless of the impetus for the referral, it is undisputed that it is accurate that

McNelis was referred by Geisinger to the Caron Foundation, and it is accurate that

JA-000069

Geisinger's Discharge Instructions referred McNelis to the Caron Foundation "for an evaluation and treatment recommendations for [his] drinking." *Doc. 57-2 (Defendant PPL Susquehanna LLC's Statement of Uncontested Material Facts)* at ¶¶102 & 103 and *Doc. 63 (Plaintiff's Response)* at ¶¶102 & 103.  Further, McNelis never told Dr. Thompson that he believed the Caron Foundation referral to have been made or included in the discharge summary in error. *Id.* at ¶104.  Also, the Geisinger discharge summary is not the only thing that Dr. Thompson referenced with regard to McNelis's use of alcohol, *see id*. at ¶¶97-100 (noting that McNelis admitted consuming up to 12 beers per week, that his use of alcohol has, at times, been an issue of contention with his wife, and that he had two prior arrests for alcohol-related offenses), and McNelis has not presented any evidence that Dr. Thompson would have made a different determination if he had known that the referral to the Caron Foundation was made at the behest of McNelis's wife.

McNelis also points to the fact that Geisinger said he could return to work when it released him from the hospital.  But there is no evidence that Geisinger was making, or was qualified to make, a fitness-for-duty determination in accordance with the NRC regulations. *See* 10 C.F.R. § 26.189(a) ("A determination of fitness must be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise, as verified by the

licensee or other entity, to evaluate the specific fitness issues presented by the individual.").

We note that McNelis does not argue that he could do the job of a Nuclear Security Officer with a reasonable accommodation. *See Doc. 64* at 51 ("McNelis did not have a disability and wasn't asking for any accommodations."). And an employer "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability" solely because he is regarded as disabled. 42 U.S.C.A. § 12201(h).[14] "[W]here a plaintiff brings a 'regarded-as' claim, as here, [he] must demonstrate that [he] was 'a qualified individual without the benefit of any reasonable accommodation.'" *Wiseman v. Convention Ctr. Auth. of the Metro. Gov't of Nashville & Davidson Cty.*, No. 3:14-C-01911, 2016 WL 54922, at *12 (M.D. Tenn. Jan. 5, 2016) (quoting *Hoback v. City of Chattanooga*, 10-C-74, 2012 WL 3834828, at *5 (E.D. Tenn. Sept. 4, 2012), *aff'd*, 550 F. App'x 257 (6th Cir. 2013)). "Thus, the question of his qualification must be decided without regard to any potential accommodation." *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 11

---

[14] In 2004, the Third Circuit held that employees "regarded as" disabled under the ADA "are entitled to reasonable accommodation in the same way as are those who are actually disabled." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 775 (3d Cir. 2004). But *Williams* was decided before the 2009 amendments to the ADA, which among other things, amended the ADA to specifically provide that "regarded as" plaintiffs are not entitled to reasonable accommodations.

n.13 (6th Cir. 2012); *See also Kiniropoulos v. Northampton Cty. Child Welfare Serv.*, 606 F. App'x 639, 642 (3d Cir. 2015) (holding the district court properly dismissed ADA and PHRA claim because "Kiniropoulos was not entitled to a reasonable accommodation because he alleges that he was "regarded as" having an impairment, not that he had such an impairment").

Given that at the time of his termination, McNelis did not have unescorted access authorization, an essential requirement for his job as a Nuclear Security Officer, McNelis cannot show that he was a qualified individual under the ADA. Accordingly, PPL is entitled to summary judgment as to McNelis's claims under the ADA, the RA, and the PHRA with regard to McNelis's termination.[15]

## VI. FMLA.

In his second amended complaint, McNelis claims that PPL violated the FMLA by failing to provide him with necessary FMLA paperwork after he requested such, by refusing allow him to return to work, and by firing him. PPL contends that the McNelis's FMLA claims are barred by the statute of limitations. PPL also contends that it is entitled to summary judgment on the merits of McNelis's FMLA claims.

---

[15] Because we conclude that McNelis cannot establish a prima facie case, we do not reach the latter steps of the *McDonnell Douglas* framework.

## A. Statute of Limitations.

The statute of limitations for an FMLA claim is generally two years. 29 U.S.C. § 2617(c)(1) ("Except as provided in paragraph (2), an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."). But the statute of limitations is extended to three years for a willful violation of the FMLA. 29 U.S.C. §2617(c)(2) ("In case of such action brought for willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought."). "The plaintiff bears the burden of proving a willful violation in order to get the benefit of the extended three-year statute of limitations." *Woida v. Genesys Reg'l Med. Ctr.*, 4 F. Supp. 3d 880, 893 (E.D. Mich. 2014).

Here, McNelis was terminated on May 11, 2012, but he did not assert an FMLA claim until more than two years later—on September 17, 2014, when he filed his second amended complaint. Thus, unless the purported violations were willful, McNelis's FMLA claims are barred by the statute of limitations.

Under the FMLA, "an employer's actions are 'willful' when 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *McDonald v. SEIU Healthcare Pennsylvania*, No. 1:13-CV-2555, 2014 WL 4672493, at *14 (M.D. Pa. Sept. 18, 2014) (quoting

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)).  "Mere negligence is not enough." *Id.*

### 1.  If PPL Sent the FMLA Paperwork to McNelis's Work Email, a Reasonable Factfinder Could Conclude that PPL Willfully Violated the FMLA.

McNelis contends that the purported violations were willful because PPL sent the FMLA forms that he had requested to his work email even though it knew that he was not at work at the time, that his access to his work email had been cut off, and that he may not have access to his work email in the future.  PPL replies that it sent the FMLA forms by regular mail to McNelis's home address.  It also asserts that even assuming that it sent the forms to his work email, that was a "simple mistake, made by individuals in PPL's Employee Health Department with no knowledge of McNelis' personal circumstances and no motive to discriminate against him," and thus cannot be deemed a willful violation. *Doc. 82* at 3.  But given that the April 20, 2012 email from Carol Parks to Mary Beth Salla mentioned that there were "other access issues in his case," *doc. 63-19*, it is for the factfinder to determine what the individuals responsible for sending the paperwork knew about McNelis's access to his work email.  Further, it is a question of fact for the factfinder to determine whether, if PPL sent the FMLA paperwork to McNelis at his work email when he did not have access to that email, that amounts to a willful violation.  Thus, if there is evidence from which a reasonable factfinder

could conclude that PPL sent the FMLA paperwork to McNelis's work email, instead of his home address (a question we address in the next section), we cannot conclude that McNelis's claim that PPL violated the FMLA by failing to provide him with the necessary paperwork is barred by the statute of limitations. While the method of sending the forms may show that PPL willfully breached its duty to send McNelis the FMLA paperwork that he requested, because PPL's refusal to return McNelis to his position and its termination of his employment was based on his failure to maintain unescorted access authorization and his alleged failure to self-report his fitness-for-duty issues, not on McNelis failing to return the necessary FMLA paperwork or on any other basis that apparently depended on whether McNelis received the FMLA paperwork,[16] it is difficult to see how the method of sending the forms shows that PPL willfully breached its duties under the FMLA by refusing to allow McNelis to return to work or by firing him. But because the parties do not make this distinction, we do not use it as a basis for our decision.

---

[16] Although PPL does not contend that it refused to reinstate McNelis because he failed to return the FMLA forms, it does argue McNelis forfeited his FMLA rights by not returning a medical certification form. We reject that argument in a later section of this Report and Recommendation.

73

### 2. There Is a Genuine Factual Dispute About Whether PPL Sent the FMLA Paperwork to McNelis's Work Email or to his Home Address.

While McNelis contends that PPL sent the FMLA paperwork by email to his work email, PPL contends that it mailed the paperwork to his home address. PPL attached to its response to McNelis's surreply brief a declaration from Mary Beth Salla, who in April of 2012 was a benefits administrator with PPL and whose job responsibilities included the provision of FMLA forms and paperwork to PPL employees. *See Doc. 90-1* at ¶2. Salla asserts that, on or about April 20, 2012, she sent, by U.S. Mail, a packet of FMLA forms and paperwork to McNelis. *Id.* at ¶3. She states that had the FMLA paperwork been emailed to McNelis, the cover letter would not have contained his home address. *Id.* at ¶4. Instead, it would have contained only McNelis's internal email code at the Susquehanna Steam Electric Station. *Id.* at ¶4. Further, according to Salla, if the FMLA materials had been emailed to McNelis, a copy of the email message to which the materials were attached as well as a copy of the letter bearing McNelis's internal mail code would have been retained for the file as opposed to a copy of the cover letter bearing McNelis's street address. *Id.* at ¶5.

### a. We Will Consider Salla's Declaration.

McNelis contends that the court should not consider Salla's declaration because PPL had not previously identified Salla as a witness in its initial

74

disclosures or discovery responses.  PPL responds that it served its initial

disclosures before McNelis amended the complaint to add FMLA claims and it did

not supplement its initial disclosures or its responses to McNelis's interrogatories

to name Salla because it only became aware of McNelis's contention that it

emailed the FMLA paperwork to him when he made that argument in his brief in

opposition to the motion for summary judgment.  According to PPL, although it

was aware of McNelis's contention that he did not receive the FMLA paperwork,

until McNelis filed his brief in opposition, it was not aware that the actual method

of delivery was in dispute, and, thus, until McNelis filed his brief in opposition, it

did not consider Salla to be an individual with relevant knowledge.  Nevertheless,

PPL contends that Salla's identity and the subject matter of her knowledge was

disclosed to McNelis in October of 2014, when it supplemented its document

production by producing McNelis's entire FMLA file, which included the April 20,

2012 emails from Parks to Salla and from Salla to Parks regarding the FMLA

paperwork. *See Doc. 96-1* at 10-14.

Federal Rule of Civil Procedure 26(a) requires a party to make initial

disclosures of, among other things, the identity of "each individual likely to have

discoverable information—along with the subjects of that information—that the

disclosing party may use to support its claims or defenses, unless the use would be

solely for impeachment."  Rule 26(e) requires a party to supplement or correct its

initial disclosures and responses to discovery requests "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 37(c)(1) provides an enforcement mechanism for Rules 26(a) and 26(e):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition to or in lieu of exclusion, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Fed.R.Civ.P. 37(c)(1).

Although Rule 37 is written in mandatory terms, it expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose or if the failure to disclose was harmless. The non-producing party has the burden to prove "substantial justification for its conduct or that the failure to produce was harmless." *Tolerico v. Home Depot*, 205 F.R.D. 169, 175 (M.D. Pa. 2002). "[D]istrict courts in this circuit have defined 'substantial justification' as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with this disclosure request.'" *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 590370, at *7 (M.D. Pa. Feb. 12, 2016) (quoting *Tolerico,* 205 F.R.D. at 175). "A party's

misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *Tolerico*, 205 F.R.D. at 176 (quoting *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 369 (M.D. Ala. 2001)).

Further, the district court has discretion in deciding whether to issue sanctions under Rule 37. *Newman v. GHS Osteopathic, Inc.*, 60 F.3d. 153, 156 (3d Cir. 1995). The United States Court of Appeals for the Third Circuit has identified factors to consider in deciding whether to exclude or permit the testimony of a previously undisclosed witness: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses are to testify; (2) the ability of that party to cure the prejudice; (3) the extent to which the waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; and (4) bad faith or willfulness in failing to comply with the court's order. *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-905 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985). The court should also consider the importance of the excluded testimony. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991). "The exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *In re Paoli*

*RR Yard PCB Litigation*, 35 F.3d 717, 791-92 (3d Cir. 1994) (quoting *Pennypack,*

559 F.2d at 905).

Here given that, in October of 2014, PPL produced McNelis's entire FMLA

file, which included the April 20, 2012 emails involving Salla and given that the

importance of the method of delivery of the FMLA paperwork was not readily

apparent to PPL until the briefing on the motion for summary judgment, we

conclude that PPL's failure to specifically list Salla as a witness was harmless and

that McNelis was not prejudiced by the failure. Thus, we will consider Salla's

declaration.

### b. Salla's Declaration Creates a Genuine Dispute of Material Fact.

Although Salla's declaration provides support for PPL's contention that it

mailed the FMLA paperwork to McNelis, McNelis testified at his deposition that

he did not receive the FMLA paperwork. *See Doc. 57-6* (*McNelis Dep.* at 122-

123).[17]  McNelis also points to the emails regarding his request for FMLA

---

[17] Although PPL contends that McNelis admitted that he does not know whether he received the FMLA paperwork and simply misplaced it, that is not the only characterization of McNelis's testimony that is possible. After McNelis testified at his deposition that he did not receive the FMLA paperwork but that the address on the paperwork was his correct address, the following exchange took place:

> Q. Do you recall this rough time frame, April of 2012 were you having difficulties to your knowledge with your mail?
> A. Not that I'm aware of.

paperwork, some of which mention emailing the paperwork to McNelis. *See Doc. 63-18* (April 19, 2012 email from Lear to Martonick and Gorman asking "[i]f possible could [the FMLA paperwork] be emailed to his work email? I don't know if that is possible, it may have to be mailed to his residence."); *Doc. 63-19* (April 20, 2012 email from Parks to Salla asking Salla to "[p]lease E-MAIL him a possible package" of forms). McNelis also points out that Salla emailed Parks and attached a copy of the FMLA package for McNelis, but she did not state that she had mailed the package to McNelis even though Parks had asked her to email it. *See Doc. 63-20.* Based on McNelis's denial of receipt[18] of the FMLA paperwork

---

    Q. Had you ever had difficulties in the past with material being sent to you by mail from PPL?
    A. Just getting stuff placed in the wrong mailbox out front, I've had that happen. Not from PPL, I don't think, I ever had any mailings from PPL.
    Q. Okay. Is it possible that you received this letter dated April 20, 2012 and it somehow got misplaced?
    A. I don't know.

*See Doc. 57-6* (*McNelis Dep.* at 122-123). Viewing McNelis's testimony in the light most favorable to him, as we must since he is the nonmoving party, given that McNelis testified that he did not know if it was possible that the paperwork was received and misplaced immediately after he testified about the postal service putting mail in the wrong mailbox, we cannot conclude that McNelis admitted that he may have received the FMLA paperwork and simply misplaced it.

[18]  In a footnote in one of its briefs, PPL asserts that McNelis has not rebutted the presumption of receipt under the mailbox rule. *Doc. 58* at 17 n.1. "Under the mailbox rule, if a letter 'properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed . . . that it reached its destination at the regular time, and was received by the person to whom it was addressed.'" *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 319 (3d Cir. 2014)

coupled with the emails about the paperwork that mention possibly emailing it to McNelis, a reasonable factfinder could find that PPL did not mail the paperwork to McNelis. Thus, there is genuine issue of material fact about whether PPL mailed the FMLA paperwork to his home or emailed it to his work email. Accordingly, PPL is not entitled to summary judgment as to the FMLA claims on the basis that those claims are barred by the statute of limitations.

## B. The Merits.

### 1. FMLA Standards.

"Congress enacted the FMLA in 1993 to accommodate 'the important societal interest in assisting families, by establishing a minimum labor standard for

---

(quoting *Rosenthal v. Walker,* 111 U.S. 185, 193 (1884)). When mail is sent via regular mail, the mailbox rule creates only a weak presumption of receipt. *Id.* The presumption is a "bursting bubble" presumption, under which "the party the presumption operates against has the burden of producing evidence to rebut the presumption," and "'introduction of evidence to rebut [the] presumption destroys that presumption, leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *Id.* at 320 (quoting *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3d Cir. 2006) (in turn quoting *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 830 (3d Cir. 1994)). "Moreover, the 'quantum of evidence; needed to burst an evidentiary presumption's bubble in a civil case is 'minimal.'" *Id.* (quoting McCann, 458 F.3d at 288). And "evidence sufficient to nullify the presumption of receipt under the mailbox rule may consist solely of the addressee's positive denial of receipt, creating an issue of fact for the jury." *Id.* at 321. Here, McNelis's denial of receipt of the FMLA paperwork bursts the mailbox rule's presumption and creates a genuine issue of material fact about whether PPL mailed the FMLA paperwork to his home or emailed it to his work email.

JA-000082

leave.'" *Sommer v. The Vanguard Group,* 461 F.3d 397, 398-99 (3d Cir. 2006) (quoting *Churchill v. Star Enters.,* 183 F.3d 184, 192 (3d Cir. 1999)). "The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (quoting 29 U.S.C. § 2601(b)(1) and (2)). "The FMLA endeavors to accomplish these purposes 'in a manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29 U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct." *Id.* "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1–year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2612(a)). With regard to leave for an employee's own health, eligible employees are entitled to a total of twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of his or her position. *Callison*, 430 F.3d at 119. During the leave, an employer must maintain the employee's group health benefits, and following a qualified absence, the

employee is generally entitled to be reinstated to his or her former position or an alternative one with equivalent pay, benefits, and working conditions. 29 U.S.C. § 2614(a) & (c).

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C.S. § 2615(a)(1). Claims brought under Section 2615(a)(1) are known as interference claims. *Sommer,* 461 F.3d at 399. Additionally, the FMLA prohibits retaliating against an employee for having exercised or attempted to exercise his rights under the FMLA. "FMLA retaliation claims are rooted in the FMLA regulations." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citing 29 C.F.R. § 825.220(c)).

## 2. Interference Claims.

To establish an FMLA interference claim, an employee must show that he or she was entitled to benefits under the FMLA and that he or she was denied those benefits. *Budhun*, 765 F.3d at 252. More specifically, a plaintiff must establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she

was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison,* 430 F.3d at 120. Because an interference claim is not about discrimination, "a *McDonnell-Douglas* burden-shifting analysis is not required." *Sommer,* 461 F.3d at 399.

PPL only addresses the fifth element of a prima facie interference case. PPL contends that McNelis forfeited his FMLA rights by not returning a medical-certification form. But given that we have determined that there is a genuine factual dispute about whether PPL mailed the FMLA paperwork to McNelis or sent it to his work email, to which he did not have access, PPL is not entitled to summary judgment on the basis that McNelis failed to return a medical-certification form.

PPL also argues that McNelis was not denied any benefits to which he was entitled. In this regard, PPL contends that McNelis requested and was granted leave in connection with his hospital stay from April 18, 2012 through April 20, 2012. Thus, according to PPL, McNelis received all of the leave he needed and/or requested for an FMLA-qualifying reason. McNelis does not specifically respond to this argument; instead, he contends that he was denied reinstatement after he was released from Geisinger. It appeared from the second amended complaint that

JA-000085

McNelis pleaded three distinct FMLA claims: (1) failure to provide FMLA paperwork after he requested such; (2) refusal to allow him to return to work; and (3) termination of his employment.  But given McNelis's brief in opposition, it appears either that he has abandoned the first claim or that he considers the first and second basis stated above to be one claim.  To the extent there are three separate claims, we recommend that PPL be granted summary judgment as to the first claim because McNelis has not responded to PPL's assertion that he received all the leave to which he was entitled.  To the extent that the claim is a blend of the failure to receive the FMLA paperwork and the failure to reinstate, for the following reasons, we also recommend that PPL be granted summary judgment.

Although the FMLA generally requires that an employee be restored to his position following FMLA leave, "[a]n employee has not greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. §825.216(a).  And "[t]he failure to restore an employee to [his] position at the conclusion of [his] leave does not violate the FMLA if the employee remains unable to perform an 'essential function' of the position." *Budhun*, 765 F.3d at 254 (quoting 29 C.F.R. §825.216(c)).  Because McNelis's key card was placed on hold and he was referred to the BOP before he requested FMLA paperwork and because, as discussed above, unescorted access authorization was an essential

function of his job, McNelis cannot show that the failure to allow him to return to his position as a Nuclear Security Officer while the BOP process was unfolding was the denial of a benefit to which he was entitled under the FMLA. Accordingly, we recommend that PPL be granted summary judgment as to McNelis's interference claim regarding the failure to reinstate him.

### 3. Retaliation Claim.

McNelis contends that PPL violated the FMLA by firing him. "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009). Here the parties have treated McNelis's claim based on his termination as a retaliation claim, and so that is how we will address the claim.

"FMLA retaliation claims based on circumstantial evidence are governed by the burden-shifting framework established by *McDonnell Douglas* . . . ." *Budhun*, 765 F.3d at 256. To establish a prima facie case, a plaintiff "must establish establish that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'" *Id.* (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). PPL contends that McNelis cannot

85

establish the third element—causation.  Although McNelis does not specifically

address the causation element, he contends that he can show pretext, and he points

to the same evidence he set forth as pretext in the ADA context.  Thus, we address

whether McNelis's evidence creates a genuine factual dispute as to causation.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal

connection between his protected activity and the adverse action taken by the

defendant. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir. 2000).

"In certain narrow circumstances, an 'unusually suggestive' proximity in time

between the protected activity and the adverse action may be sufficient, on its own,

to establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.,*

497 F.3d 286, 302 (3d Cir. 2007) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d

1286, 1302 (3d Cir. 1997)).  But the "court's analysis of temporal proximity must

focus on the factual circumstances of the individual case." *Fischer v. Transue*,

1:04-CV-2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008).

Here, McNelis requested FMLA paperwork on April 19, 2012, and although

the exact date that Gorman decided termination was appropriate is not clear from

the record, it was sometime after Dr. Thompson's May 1, 2012 report determining

McNelis not fit for duty.  Thus, construing the evidence in the light most favorable

to McNelis, there was a period of 12 days from the date he requested the

paperwork and the date the decision to terminate him was made.  Given the

circumstances of this case, the timing alone is not unduly suggestive of retaliation. McNelis was referred to the BOP before he requested FMLA paperwork and the decision to terminate him was made after the BOP process came to an end after Dr. Thompson found McNelis not fit for duty, and it is reasonable to believe that that is the time that such a decision would usually be made. In these circumstances, timing alone does not support an inference of causation.

"Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon v. Lancaster Jewish Community Center Assoc.,* 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell,* 206 F.3d at 280). For example, actual antagonistic conduct or animus against the plaintiff during the relevant period may demonstrate causation. *Marra,* 497 F.3d at 302. Also, other types of circumstantial evidence, such as inconsistent reasons given by the defendant for the action or the defendant treating others differently from the way it treated the plaintiff, may give rise to an inference of causation. *Id.* In sum, to establish causation in the retaliation context, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "In the absence of that proof the plaintiff must show that from the

'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Id.* (quoting *Farrell,* 206 F.3d at 281). In this regard, "'[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity.'" *Reaves v. Pennsylvania State Police*, 597 F. App'x 92, 97-98 (3d Cir. 2015) (quoting *Ross v. Gilhuly,* 755 F.3d 185, 194 (3d Cir. 2014)); *see also LeBoon,* 503 F.3d at 233–34 (affirming summary judgment because employee could not establish the causation element of a prima facie case based on tense relationship with her supervisor where that tense relationship predated the employee's protected activity).

McNelis's arguments regarding pretext are insufficient to raise a genuine dispute of material fact as to whether his termination was caused by his request for FMLA paperwork or his leave. McNelis points out that some of the supervisors at PPL believed that he was responsible for the school lockdown, they failed to investigate his alleged drug use, and they mentioned the 2010 anonymous call in the SEARP checklist. Those facts, however, do not support an inference of causation of retaliation for exercise of FMLA rights. McNelis also contends that PPL tried to rig the BOP process by interfering with Dr. Thompson's professional judgment. As discussed already, McNelis does not have facts to support that contention. Also, Lines's post-termination explanation to Dr. Thompson that

McNelis was fired based on a new policy and that Dr. Thompson failed to change his determination after he learned of the Wickham note and McAndrew's letter does not raise an inference that the termination was caused by McNelis's invocation of the FMLA. Nor does McNelis's contention that the SEARP review and Walsh's review of the revocation of McNelis's unescorted access authorization were cursory raise an inference the McNelis's invocation of the FMLA was a cause of his termination.

McNelis contends that the determination that he was unfit for duty is not an automatic trigger for him to be fired, and he points to two other employees—R.S. and S.W.—who were not fired after they lost their unescorted access authorization. At first blush, this appears to suggest that PPL treated McNelis differently than it treated others similarly situated, which in the retaliation context may lead to an inference of causation. But R.S. and S.W. were not similarly situated to McNelis because R.S. and S.W. self-reported that they had fitness for duty problems, whereas in his telephone call to Gorman on April 17, 2012, McNelis merely asked for time off to attend to personal or family issues, and one of the basis for Gorman's decision to terminate McNelis was that he was evasive during the April 17, 2012 call. While McNelis contends that he was not evasive because he answered all of Gorman's questions about his time off and the school lockdown, there is no evidence that during the April 17th call McNelis reported the problems

89

that he was experiencing regarding lack of sleep and paranoia.  McNelis also

contends that if Gorman thought he was being evasive, he should have fired him on

April 17th instead of waiting until May.  But the fact that Gorman waited for the

already started BOP process to play out, does not raised an inference of causation.

Finally, McNelis points to a form title Decision Making Leave/Termination

Recommendation Form" singed on May 7, 2012 by Helsel and 5/8/12 by someone

from PPL's HR department.  McNelis points out that that form lists the

recommended action as termination, and while it states that McNelis no longer has

unescorted access, it does not mention that McNelis was evasive during the April

17, 2012 call. *See Doc*. 88-3.  We note that the SEARP checklist also sets forth the

basis for the proposed action as "McNelis was determined to be unfit for duty by

the site contract Psychologist." *See Doc. 63-55* at 1.  But the SEARP checklist

does in the body of the document state that McNelis was not forthright in

providing information during the April 17th phone call. *Id*.  The mere omission

from one form of one of the purported reasons for termination does not lead to a

reasonable inference of a causal connection between the termination and

McNelis's invocation of the FMLA.

In sum, construing McNelis's evidence in combination and in the light most

favorable to McNelis, we nevertheless conclude that he has not presented evidence

from which a reasonable trier of fact could conclude that his termination was based

JA-000092

on the fact that he requested FMLA paperwork or that he took leave, which should have been deemed FMLA leave.

## VII. Motion to Preclude McNelis's Vocational Expert.

PPL filed a motion to preclude McNelis's vocational expert, Terry Leslie, from testifying.  In his expert report, Mr. Leslie opines that PPL regarded McNelis "as having a disability involving the use of alcohol and/or drugs and/or having a psychological disorder . . . ." *Doc. 63-43* at 6.  We have determined that, assuming of the sake of argument that PPL regarded McNelis as disabled, PPL is nevertheless entitled to summary judgment as to McNelis's ADA, RA, and PHRA claim for other reasons.  Given our assumption that PPL regarded McNelis as disabled and that Mr. Leslie's report addresses only the question of whether PPL regarded McNelis as disabled, we need not address the motion to preclude Leslie from testifying.  Thus, we recommend that that motion be denied without prejudice to PPL refiling the motion in the event that the district court disagrees with our recommendation that PPL be granted summary judgment as to the ADA, RA, and PHRA claims.

## VIII. Recommendations.

Accordingly, for the foregoing reasons, it is recommended PPL's motion (doc. 57) for summary judgment be granted.  It is also recommended that PPL's

JA-000093

motion (doc. 81) to preclude McNelis's vocational expert be denied without prejudice.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 23rd day of March, 2016.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

JA-000094

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYLE MCNELIS, | : | Case No. 4:13-CV-02612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA POWER & | : | |
| LIGHT, SUSQUEHANNA, LLC, | : | |
| | : | (Magistrate Judge Schwab) |
| Defendant. | : | |

## **MEMORANDUM**
September 19, 2016

Before the Court for disposition are Defendant Pennsylvania Power & Light,

Susquehanna, LLC's (hereinafter "PPL") Motion for Summary Judgment and

Motion to Preclude Plaintiff's Expert.[1]  Magistrate Judge Susan E. Schwab has

prepared a Report and Recommendation concerning these matters.  For the

following reasons, this Report and Recommendation will be adopted in its entirety.

Defendant Pennsylvania Power & Light, Susquehanna LLC's Motion for Summary

Judgment will be granted.  Because Defendant is entitled to summary judgment on

all claims, Defendant's Motion to Preclude Plaintiff's Expert is denied as moot.

---

[1] Also pending before the Court are Defendant's Motion to Strike Plaintiff's Untimely Reply and
Plaintiff's Motion For Leave to File His Reply Brief Out of Time.  These Motions relate to
Plaintiff's untimely Reply Brief to Defendant's Response to Plaintiff's Objections.  Having
reviewed the briefs filed concerning these motions and cognizant that the Report and
Recommendation advises the dismissal of Plaintiff's entire case, the Court has considered
Plaintiff's Reply Brief.  The attached Order addresses the disposition of these Motions.

1

JA-000095

# I.    BACKGROUND/PROCEDURAL HISTORY

The extensive factual background and procedural history of this case is set forth in thorough detail in Judge Schwab's Report and Recommendation and is adopted by this Court.

# II.    LEGAL STANDARD
## A. REPORT AND RECOMMENDATION

Upon designation, a magistrate judge may "conduct hearings, including evidentiary hearings, and ... submit to a judge of the court proposed findings of fact and recommendations."[2]  Once filed, this Report and Recommendation is disseminated to the parties in the case who then have the opportunity to file written objections.[3]  When objections are timely filed, the District Court must conduct a *de novo* review of those portions of the report to which objections are made.[4]  Although the standard of review for objections is *de novo*, the extent of review lies within the discretion of the District Court, and the court may otherwise rely on the recommendations of the magistrate judge to the extent it deems proper.[5]

For portions of the Report and Recommendation to which no objection is made, the court should, as a matter of good practice, "satisfy itself that there is no

---

[2] 28 U.S.C. 636(b)(1)(B).

[3] 28 U.S.C. 636(b)(1).

[4] 28 U.S.C. 636(b)(1); *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

[5] *Rieder v. Apfel*, 115 F.Supp.2d 496, 499 (M.D.Pa. 2000) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).

JA-000096

clear error on the face of the record in order to accept the recommendation."[6]

Regardless of whether timely objections are made by a party, the District Court

may accept, not accept, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge.[7]

### B. SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[8] A fact is "material" where it "might affect the outcome of the suit

under the governing law."[9] A dispute is "genuine" where "the evidence is such

that a reasonable jury," giving credence to the evidence favoring the nonmovant

and making all inferences in the nonmovant's favor, "could return a verdict for the

nonmoving party."[10]

The burden of establishing the nonexistence of a "genuine issue" is on the

party moving for summary judgment.[11] The moving party may satisfy this burden

by either (i) submitting affirmative evidence that negates an essential element of

---

[6] Fed.R.Civ.P. 72(b), advisory committee notes; *see also Univac Dental Co. v. Dentsply Intern., Inc.,* 702 F.Supp.2d 465, 469 (M.D.Pa. 2010) (citing *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987)) (explaining that judges should give some review to every report and recommendation).

[7] 28 U.S.C. § 636(b)(1); Local Rule 72.31.

[8] Fed. R. Civ. P. 56(a).

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Id.*

[11] *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).

3

the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.[12]

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15] Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's

---

[12] *Id.* at 331.

[13] *Anderson*, 477 U.S. at 250.

[14] Fed. R. Civ. P. 56(c)(1); *see also Anderson*, 477 U.S. at 248–50.

[15] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).

JA-000098

assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[16]

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.[17]  Credibility determinations are the province of the factfinder, not the District Court.[18]  Although the court may consider any materials in the record, it need only consider those materials cited.[19]

## III.  DISCUSSION

Having reviewed those portions of the Report to which no objections were made, the Court is satisfied that, on its face, the Report and Recommendation has no clear error.  Furthermore, following a *de novo* review of those portions of the report to which an objection was made, the Court will adopt the Report and Recommendation in its entirety and thus grant Defendant's Motion for Summary Judgment.  Defendant's Motion to Preclude Plaintiff's Expert will be denied as moot.  Plaintiff's specific objections to the Report and Recommendation and this Court's findings in response will be discussed in detail below.

---

[16] Fed. R. Civ. P. 56(e)(2).
[17] *Anderson*, 477 U.S. at 249.
[18] *BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).
[19] Fed. R. Civ. P. 56(c)(3).

JA-000099

### 1. The Report and Recommendation Did Not Err In Finding that McNelis Was Not a "Qualified Individual"[20]

Plaintiff first objects to the Report and Recommendation's finding that he was not a "qualified individual" as required to establish a prima facie case under the ADA, RA, and PHRA.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[21] When the plaintiff's allegations of intentional discrimination are supported only by circumstantial evidence, the Court must follow the *McDonnell-Douglas*[22] burden-shifting framework. That analysis proceeds as follows:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[23]

---

[20] All discussion specifically references the ADA. However, this Court's conclusions and their accompanying reasoning apply equally to the RA and PHRA. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (noting that the Rehab Act, ADA, and PHRA are to be interpreted consistently, and with the same standard for determination of liability).

[21] 42 U.S.C. § 12112(a).

[22] 411 U.S. 792, 802–804 (1973).

[23] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *McDonnell Douglas*, 411 U.S. at 802).

JA-000100

A prima facie case of disability discrimination – the first step of the *McDonnell-Douglas* framework – requires that plaintiff establish (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination.[24]

Here, Plaintiff objects to the Report and Recommendation's finding that he cannot show that he was qualified for the position of Nuclear Security Officer. Specifically, Plaintiff argues that the Report erred because (1) a temporary loss of access does not mean as a matter of law that an individual is not qualified, (2) a jury could find, based on discharge instructions from Geisinger Medical Center, that Plaintiff was qualified, and (3) the prima facie case of disability discrimination is no longer relevant once the employer has filed a motion for summary judgment with an asserted legitimate, nondiscriminatory reason.[25]

When establishing a prima facie case of disability discrimination, a plaintiff is found to be qualified when "with or without reasonable accommodation, [they] can perform the essential functions of the employment position that such individual holds or desires."[26] The determination of whether a plaintiff is a "qualified

---

[24] *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).
[25] Pl.'s Objections to the Magistrate's Report and Recommendation ("Objections"), at 3-9.
[26] 42 U.S.C. 12111(8).

JA-000101

individual" at the time of the adverse employment action follows a two-step

analysis:

> First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation."[27]

The plaintiff has the burden under this analysis of showing that he was qualified at

the time of the adverse employment action.[28]

Addressing Plaintiff's first argument that a temporary loss of access does not

mean that an individual is not qualified, the Court finds this objection to be without

merit. Specifically, the Court notes that case law within the United States Court of

Appeals for the Third Circuit and elsewhere has specified that a failure to maintain

UAA (unescorted access authorization) renders an employee unqualified, as a

matter of law, to work in a nuclear power industry.[29] Plaintiff attempts to conceal

this principle by arguing that PPL's policy permitted him an opportunity to prove

---

[27] *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (quoting 29 C.F.R. pt. 1630, App. at 353-54). In determining the essential functions of a position, an employer may "require that employees employed in sensitive positions comply with the regulations (if any) of . . . the Nuclear Regulatory Commission. 29 C.F.R. § 1630.16(b)(6).

[28] *Id.*

[29] *See McCoy v. Pennsylvania Power & Light Co.*, 933 F. Supp. 438, 443 (M.D.Pa. 1996); *Sysko v. PPL Corp.*, No. 3:07-CV-0470, 2009 WL 4725240 at *11 (M.D.Pa. Dec. 2, 2009); *Lute v. Dominion Nuclear Connecticut, Inc.*, No. 3:12-CV-01412, 2015 WL 1456769, at *11 (D.Conn. Mar. 30, 2015); *Wetherbee v. Southern Nuclear Operating Co., Inc.*, No. 1:08-CV-2138, 2010 WL 11428172, at *7 (N.D.Ga. Mar. 17, 2010).

JA-000102

that he was not unfit for duty.[30]  Such an attempt is, however, unpersuasive given the well-settled case law which holds that loss of UAA renders an employee within the nuclear power industry unqualified for purposes of the ADA.  Here, it is undisputed that Plaintiff's UAA was revoked.[31]  At that time, he became unqualified for his position as a Nuclear Security Officer Level II.

Plaintiff further objects by arguing that, based on discharge instructions from Geisinger Medical Center, a jury could reasonably find that Plaintiff was qualified for his position at the time of the adverse employment action.  Again, however, the Court finds that this argument contradicts established law.  Specifically, like the Report and Recommendation, this Court finds that Plaintiff has failed to identify facts of record which indicate that Geisinger was qualified under the Nuclear Regulatory Commission regulations to make such a determination.[32]  Therefore, the Court finds that Geisinger's discharge instructions do not present a genuine dispute of material fact as to Plaintiff's qualification.

---

[30] Objections, at 4.

[31] Def. PPL Susquehanna LLC's Statement of Uncontested Material Facts ("Def.'s SUMF") ¶ 119, at 23.

[32] *See* 10 C.F.R. § 26.189(a)  ("A determination of fitness must be made by a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise, as verified by the licensee or other entity, to evaluate the specific fitness issues presented by the individual."); *see also Exelon Generation Company, LLC v. Local 15, International Brotherhood of Electrical Workers, AFL-CIO,* 140 F. Supp. 3d 751, 763 (N.D. Ill. 2015) (noting that Section 26.189 stipulates that "a party may not seek a determination of fitness from someone other than the authorized SAE").

9

Finally, Plaintiff argues that a discussion of qualification is moot because, once a defendant has adduced a legitimate, nondiscriminatory reason, the prima facie case "drops out of the picture." In support thereof, Plaintiff cites *Reeves v. Sanderson Plumbing Prods., Inc.*[33] and *U.S. Postal Serv. Bd. Of Governors v. Aikens.*[34] The Plaintiff's citation to and interpretation of these cases is inapposite.

First, in *Reeves*, the Supreme Court noted that it is the "**presumption of discrimination** [that] "drops out of the picture" once the defendant meets its burden of production," not the prima facie case.[35] Second, Plaintiff distorts the holding in *Aikens*, which held and reaffirmed that, once the defendant has introduced a legitimate nondiscriminatory reason, the presumption of discrimination "drops from the case," and the District Court is "in a position to decide the ultimate factual issue."[36]

Having reviewed *de novo* whether Plaintiff was a "qualified individual," I find that the Report and Recommendation did not err in finding that Plaintiff failed to establish a prima facie case of disability discrimination under the ADA, PHRA, and RA.

---

[33] 530 U.S. 133, 143 (2000).
[34] 460 U.S. 711 (1983).
[35] *Reeves,* 530 U.S. at 143.
[36] *Aikens*, 460 U.S. at 714.

JA-000104

### 2. The Report and Recommendation Did Not Err In Determining That A Reasonable Jury Could Not Find That PPL's Legitimate, Non-Discriminatory Reasons Were Pretextual

Plaintiff next objects to the Report and Recommendation's determination

that a reasonable jury could not find that PPL's firing of McNelis was pretextual.

As noted above, the three-step *McDonnell-Douglas* framework requires that,

once the defendant has adduced a legitimate, non-discriminatory reason, the

burden of production and persuasion again rests with the plaintiff to prove that this

reason is simply pretext for unlawful discrimination.[37]  Plaintiff argues specifically

in his second objection that PPL's legitimate discriminatory reasons were pretext

because 1) McNelis did not refuse to answer questions about the lockdown, and 2)

there was a delay between Plaintiff's April 17, 2012 conversation with Jim

Gorman, Manager of Nuclear Security, and his ultimate termination.

The Court finds these objections to be without merit.  Specifically,

concerning the issue of "evasiveness," the Court notes that Plaintiff had a duty to

self-report "fitness for duty issues."[38]  Issues which require this reporting include,

among other things, "impairment from fatigue or any cause that, if left unattended,

may constitute a risk to public health and safety or the common defense and

---

[37] *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08 (1993) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).
[38] Def.'s SUMF ¶ 16, at 5.

JA-000105

security."[39]  Fatigue is, thereafter, defined as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest."[40]  Here, the undisputed facts indicate that Plaintiff was suffering from fatigue during the telephone conversation with Mr. Gorman and failed to "self-report" these issues. The Court notes that Plaintiff admitted himself to Geisinger Medical Center on April 18, 2012 with "sleeplessness," "1-2 weeks of paranoid thoughts," and "questionable auditory hallucinations."[41]  Because of the revelation that such symptoms had been ongoing for two weeks, it is clear that Plaintiff was experiencing symptoms requiring self-reporting and that he failed to do so either during his April 17, 2012 conversation with Mr. Gorman, or at any time prior.[42] His failure, therefore, to timely report these issues constitutes a violation of known PPL policy.[43]

Second, Plaintiff argues that Mr. Gorman's delay in terminating Plaintiff for evasiveness at the April 17, 2012 meeting demonstrates pretext.  However, given the Behavior Observation Program ("BOP") established by PPL in accordance with Nuclear Regulatory Commission ("NRC") regulations, it is difficult to grasp how such a failure demonstrates pretext.  Plaintiff supports his contention by citing to Jeff Helsel's deposition in which he stated that he was unaware of anyone who

---

[39] Id. ¶ 7, at 3.
[40] Id. ¶ 13, at 5.
[41] Id. ¶ 70-71, at 15.
[42] Id. ¶¶ 62-68, at 13-14.
[43] Id. ¶ 16, at 5.

JA-000106

was uncooperative when questioned by management, but then allowed to go through the BOP process.[44]  However, a full analysis of Mr. Helsel's deposition reveals that he next stated that, even with the occurrence of evasive answers, he would "expect that [BOP] process to be completed."[45]

Finally, in support of his theory of pretext, Plaintiff cites to *Fuentes v. Perskie*,[46] in which the Third Circuit noted the "difficult burden" on Plaintiff at the pretext stage of the *McDonnell-Douglas* framework.  Specifically, the *Fuentes* Court noted that the plaintiff's evidence of pretext "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[47]  In the case at bar, Plaintiff's evidence of pretext has failed to allow for such an inference.  Specifically, the Court finds that the evidence adduced by Plaintiff would not allow a factfinder "reasonably to infer" that Defendant's legitimate nondiscriminatory reasons were either a fabrication or a non-motivator of the employment action.

---

[44] Objections, at 12.

[45] Helsel Dep. 56:13-14.

[46] *Fuentes v. Perskie*, F.3d 759, 765 (3d Cir. 1994).

[47] *Id.* The Third Circuit in *Fuentes* further noted that, to avoid summary judgment, a "non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action **that a reasonable factfinder *could* rationally find them "unworthy of credence,"** (citation omitted), and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis added).

JA-000107

Having reviewed *de novo* the factual record concerning Plaintiff's second objection, the Court finds that Plaintiff has failed to produce evidence demonstrating that Defendant's legitimate, non-discriminatory reasons were pretext. The Report and Recommendation therefore did not err in determining that a reasonable jury could not find that PPL's legitimate, non-discriminatory reasons were pretextual.

### 3. The Report and Recommendation Did Not Err In Finding That Helsel's Testimony That the Rumors of McNelis' Use of Illegal Drugs Were Not Discussed in the SEARP Was an Undisputed Fact[48]

Plaintiff next objects to the Report and Recommendation's finding that Jeff Helsel's testimony stating the Susquehanna Elevated Action Review Panel (SEARP) did not consider allegations of McNelis' prior drug use was an undisputed fact.

Plaintiff specifically argues that, although there is no evidence within the factual record contradicting this testimony, it should nonetheless be considered a disputed fact. In support of this proposition, Plaintiff argued that 1) under *Reeves v. Sanderson Plumbing Prods., Inc.*, he did not have to produce evidence contradicting Helsel's testimony, and 2) the Court is not bound by the Third

---

[48] Plaintiff first makes the argument in his third objection that PPL "rigged the BOP process" by failing to investigate or inform Dr. Thompson of the allegations that Plaintiff was using bath salts. Like the Report and Recommendation, this Court finds that acceptance of this omission as evidence of pretext requires not only viewing the evidence in the light most favorable to Plaintiff, but also suspending reason in favor of the Plaintiff. This Court therefore agrees with the finding of the Report and Recommendation concerning this issue.

14

Circuit case of *Lauren W. v. DeFlaminis*[49] to the extent it contradicts *Reeves*. The Court finds both of these objections to be without merit.

Like the Report and Recommendation, I note the many cases within the Third Circuit which have rejected an interpretation of *Reeves* which precludes reliance on undisputed evidence from an interested witness at the summary judgment stage.[50] Furthermore, to the extent that Plaintiff argues that *DeFlaminis* should not be followed, the Court notes that it has previously addressed the balance between *Reeves* and *DeFlaminis*. Specifically, in *Edgerton v. Wilkes-Barre Home Care Services, LLC*, the Court stated:

> The Third Circuit's opinion in *Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120 (3d Cir.1998), considers the issue at length, and reasons that, contrary to Ms. Edgerton's position, a nonmoving party cannot defeat summary judgment by raising the mere possibility that the jury may disbelieve a witness's testimony. (Citations omitted). To successfully oppose a summary judgment motion, the nonmoving party must, rather, point to circumstances revealed by the record as a whole that might cause a reasonable jury to doubt the facts (supported by testimony) asserted by the movant. (Citations Omitted).[51]

---

[49] *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2009).

[50] *See, e.g., Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (stating that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness"); *Wilkie v. Geisinger Sys. Servs.*, No. 3:12-CV-580, 2014 WL 4672489, at *5 (M.D. Pa. Sept. 18, 2014) (Mariani, J.) (rejecting the plaintiff's argument that under Reeves, the court cannot consider any statements from interested witnesses); *Phinizy v. Pharmacare*, 569 F.Supp.2d 512, 518 (W.D.Pa. 2008) (Cercone, J.).

[51] *Edgerton v. Wilkes-Barre Home Care Services, LLC*, 2014 WL 131605, at *2 (M.D.Pa. Jan. 13, 2014), *aff'd* 600 F.App'x 856 (3d Cir. 2015).

That decision was affirmed on appeal. The Court sees no reason to abandon both this reasoned conclusion and Third Circuit precedent in the instant case. Therefore, in the absence of evidence sufficient to "cause a reasonable jury to doubt the facts" of his testimony, the Court will adopt the Report and Recommendation's conclusion that Helsel's testimony concerning the SEARP was an undisputed fact.

**4. The Report and Recommendation Did Not Err In Finding That McNelis Lost the Right to Challenge Thompson's Credibility By Not Doing So At His Own Deposition**

Plaintiff next argues that the Report and Recommendation erred in finding that he lost his right to challenge Dr. David Thompson's credibility by not doing so at his deposition. In support of this proposition, Plaintiff repeats an argument addressed and rejected by the Report and Recommendation, i.e. that he has shown that "a reasonable jury could find that Thompson's good faith and credibility are subject to error."[52] Plaintiff, however, admitted in his deposition that he has no evidence to indicate that Dr. Thompson did not act in good faith.[53] Furthermore, since the deposition, he has otherwise failed to adduce any additional evidence bringing Dr. Thompson's conduct into doubt. Therefore, based on the lack of evidence demonstrating a genuine dispute as to material fact, the Court finds that the Report and Recommendation did not err in finding that Dr. Thompson's

---

[52] Objections, at 22.
[53] Def.'s SUMF ¶ 114, at 22.

16

determination was made in good faith and/or in the exercise of his best medical
judgment.

### 5. The Report and Recommendation Did Not Err In Finding That The Timing of Thompson's "Unfit for Duty" Determination Was Not Suspicious

Plaintiff next objects to the Report and Recommendation's finding that
Thompson's "unfit for duty" determination was not suspicious.[54]  Specifically,
Plaintiff argues that, because PPL employee Kris Lear was informed by Nick
Steward on April 30, 2012 that a reliable source had told him that Plaintiff was
using bath salts, Dr. Thompson's Substance Abuse Expert (SAE) Determination of
Fitness of May 1, 2012 was influenced by this new allegation and thus, suspicious.

The Court however, finds two flaws with this argument.  First, I find no
credence to the "distinction without a difference" argument advanced by Plaintiff
which suggests that Dr. Thompson changed one single report from day to day.  In
this BOP referral process, the undisputed facts establish that Dr. Thompson made
two separate reports: first, the Confidential Interview Memo of April 30, 2012, and
second, the Substance Abuse Expert Determination of Fitness on May 1, 2012.[55]
Furthermore, Plaintiff has adduced no evidence contradicting the testimony of Lear
in which he stated that he did not tell management of the allegations.[56]  Plaintiff

---

[54] Objections, at 22-23.
[55] Def.'s SUMF ¶¶ 95, 108, at 19, 21.
[56] Pl.'s Statement of Additional Material Facts ("Pl.'s SAMF") ¶ 58, at 9.

JA-000111

instead argues within his objections[57] that the Report and Recommendation erred

because there is evidence that John Lines told Dr. Thompson about the prior

allegations of drug use before the MMMPI test on April 24, 2012.[58]  Dr.

Thompson, however, has no recollection of being told about the bath salt

allegations.[59]  Assuming for the sake of argument that Lines did in fact tell Dr.

Thompson of the drug use allegations, the Court finds it illogical to suggest that a

new report of alleged drug use by Nick Steward, in addition to prior known

allegations, would in any way alter the judgment of Dr. Thompson.[60]

Having reviewed *de novo* the factual record relating to Plaintiff's objection,

this Court does not find error in the Report and Recommendation's conclusion that

the timing of Dr. Thompson's "unfit for duty" determination was not suspicious.

### 6.  The Report and Recommendation Did Not Err In Finding That R.S. And S.W. Were Not Proper Comparators to McNelis

Plaintiff argues next that the Report and Recommendation erred in finding

that R.S. and S.W. were not proper comparators to McNelis.

The Report and Recommendation had found that R.S. and S.W., who were

not terminated following loss of unescorted access authorization, were not proper

---

[57] Objections, at 23.

[58] Lines Dep. 44: 22–45: 3; 46: 10-24.

[59] Pl.'s SAMF 105, at 15.

[60] Furthermore, to the extent Plaintiff argues that Lines exerted pressure on Thompson to change his determination based on the bath salt usage allegations, the Court notes that Dr. Thompson in his declaration denied any such interference by Defendant PPL. Thompson Decl. ¶ 7.  Plaintiff has failed to adduce anything other than allegations to dispute this declaration.

comparators because they self-reported their fitness for duty issues.[61]  Plaintiff,

however, contests this finding by arguing that he was unable to self-report because

1) he knew nothing about the school lockdown prior to his April 17, 2012 phone

call with Jim Gorman, 2) he did not refuse to answer Jim Gorman's questions and

later got back to Gorman concerning the lockdown, and 3) he did self-report to

PPL his need for inpatient therapy for sleep issues prior to his return to work.[62]

     The Court finds these arguments to be without merit.  Specifically, as

discussed in depth in response to the second objection, Plaintiff's failure to self-

report did not involve the school lockdown, but rather his continued issues with

sleeplessness and paranoid thoughts.  As previously explained, the discharge notice

from Geisinger Medical Center noted that such symptoms had persisted from one

to two weeks prior to his inpatient hospitalization.[63]  Therefore, Plaintiff's

argument that he did not fail to self-report holds no weight.  The undisputed facts

demonstrate that, prior to his inpatient admission on April 18, 2012, Plaintiff was

experiencing sleeplessness and paranoid thoughts.  There is no evidence in the

record indicating that he self-reported these fitness for duty issues.

     Therefore, because this Court finds that there is no evidence in the factual

record indicating that Plaintiff self-reported his known fitness for duty issues, I

---

[61] Report and Recommendation, at 89.

[62] Objections, at 24.

[63] Def.'s SUMF ¶ 71, at 15.

19

conclude, like the Report and Recommendation, that R.S. and S.W. were not proper comparators.

### 7. The Report and Recommendation Did Not Err in Finding That There is No Genuine Dispute As to Material Fact Concerning McNelis' FMLA Interference and Retaliation Claims

Finally, Plaintiff argues that the Report and Recommendation erred in finding that Defendant was entitled to summary judgment on both his FMLA interference and retaliation claims.

Plaintiff first objects to the Report and Recommendation's finding that Defendant is entitled to summary judgment on the Plaintiff's FMLA interference claim. The interference clause of the FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA.[64] To establish an FMLA interference claim, an employee must specifically establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."[65]

---

[64] 29 U.S.C. § 2615(a)(1).

[65] *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014).

JA-000114

Although the FMLA generally requires that an employee be restored to his position following FMLA leave, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."[66] Therefore, the failure to restore plaintiff employee to his pre-leave position does not constitute a violation of the FMLA "if the employee remains unable to perform an 'essential function' of the position."[67]

Here, Plaintiff objects to the finding of the Report and Recommendation that, because of his loss of unescorted access authorization (UAA), he was no longer able to perform an "essential function" of his position as a Nuclear Security Officer II.[68] The Court, following the detailed analysis above, found that UAA was an "essential function." Therefore, Plaintiff's loss of UAA prior to his request for FMLA paperwork[69] rendered him outside the protection of the interference clause.

Plaintiff next objects to the Report and Recommendation's finding that Defendant is entitled to summary judgment on the Plaintiff's FMLA retaliation claim. "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the

---

[66] 29 C.F.R. §825.216(a).
[67] *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 254 (3d Cir. 2014) (quoting 29 C.F.R. §825.216(c)).
[68] Objections, at 25.
[69] Def.'s SUMF ¶¶ 52-53, at 28-29.

JA-000115

employee."[70]  To succeed on a retaliation claim under the FMLA, the employee

must prove the following elements: 1) the employee invoked his right to FMLA-

qualifying leave, 2) the employee suffered an adverse employment action, and 3)

the adverse action was causally related to the employee's invocation of his FMLA

rights.[71]  Unlike interference claims, retaliation claims require proof of the

employer's retaliatory intent; "[a]ccordingly, claims based on circumstantial

evidence have been assessed under the burden-shifting framework established

in *McDonnell Douglas Corp. v. Green*.[72],[73]

Plaintiff disputes the Report and Recommendation's finding that he failed to

show that Defendant's legitimate, non-discriminatory reasons were pretext.  The

Court engaged in an analysis above concerning Plaintiff's repeated failure to show

pretext.  In support of his FMLA retaliation claim, Plaintiff raises additional

arguments of pretext.[74]  Like the Report and Recommendation, however, the Court

finds that, even when viewing all presented evidence in the light most favorable,

referenced evidence of pretext would not allow a factfinder "reasonably to infer"

that his termination bears a causal connection with his request for FMLA

paperwork or taken FMLA leave.

---

[70] *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).
[71] *Lichtenstein v. University of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (*citing Erdman,* 582 F.3d at 508–09).
[72] 411 U.S. 792 (1973).
[73] *Lichtenstein*, 691 F.3d at 302.
[74] Objections, at 88-90.

JA-000116

Therefore, having reviewed *de novo* Plaintiff's objections to the Report and Recommendation's findings, the Court finds no error and thus will grant summary judgment as to Plaintiff's interference and retaliation FMLA claims.

## IV.    CONCLUSION

Based on the above discussion and analysis, the Court adopts in its entirety the Report and Recommendation of Magistrate Judge Schwab.  Defendant PPL's Motion for Summary Judgment is granted.  Defendant PPL's Motion to Preclude Plaintiff's Vocational Expert is denied as moot.

An appropriate Order follows.


BY THE COURT:


   s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

JA-000117

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYLE MCNELIS, | : | Case No. 4:13-CV-02612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA POWER & | : | |
| LIGHT, SUSQUEHANNA, LLC, | : | |
| | : | |
| Defendant. | : | |

## **ORDER**
September 19, 2016

AND NOW, in accordance with the Memorandum of this same date, IT IS

HEREBY ORDERED THAT:

1. United States Magistrate Judge Susan E. Schwab's Report and

    Recommendation (ECF No. 104) is ADOPTED in its entirety.

2. Defendant's Motion for Summary Judgment (ECF No. 57) is GRANTED.

3. Defendant's Motion to Preclude Plaintiff's Expert (ECF No. 81) is DENIED

    as moot.

4. Defendant's Motion to Strike Response as Untimely (ECF No. 116) is

    DENIED.

5. Plaintiff's Motion for Leave to File His Reply Brief Out of Time (ECF NO.

    119) is GRANTED.

JA-000118

6.  The Clerk is directed to enter final judgment in favor of Defendant and to close the case.

7.  A Certificate of Appealability will not issue.

BY THE COURT:


___s/ Matthew W. Brann_____
Matthew W. Brann
United States District Judge

JA-000119

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Pennsylvania

| | | |
|---|---|---|
| DARYLE MCNELIS | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.  4:13-CV-02612 |
| PENNSYLVANIA POWER & LGHT, SUSQUEHANNA, LLC, | ) | |
| _Defendant_ | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that _(check one)_:

☐ the plaintiff _(name)_ _____ recover from the defendant _(name)_ _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant _(name)_ _____ recover costs from the plaintiff _(name)_ _____ .

☑ other:  Judgment be and is hereby entered in favor of Defendant Pennsylvania Power & Light, Susquehanna, LLC and against Plaintiff, in accordance with this Court's Order, entered 9/19/2016, ECF No. 123  granting Defendant's motion for summary judgment, ECF No. 57.

This action was _(check one)_:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☑ decided by Judge  Matthew W. Brann _____ on a motion for summary judgment, ECF Nos. 57.

Date:  ____September 19, 2016____

PETER J. WELSH, ACTING CLERK OF COURT

_Kathy A. McLaughlin_
_Signature of Clerk or Deputy Clerk_

Deputy

**FILED
WILLIAMSPORT**

SEP 19 2016

PER _____
**DEPUTY CLERK**

JA-000120

## **CERTIFICATE OF SERVICE**

I, Ralph E. Lamar, hereby certify that the foregoing Volume I

(included with the brief), II ,III, IV, V, VI, VII, VIII, and IX (sealed) of the Joint

Appendix were served today, the 23rd day of January, 2017, via electronic

mail upon the following as Counsel for Appellee with its express consent:

> Alfred J. Johnston
> Darren Creasy
> Post & Schell, P.C.
> Four Penn Center
> 1600 John F. Kennedy Blvd.
> Philadelphia, PA 19103

I also hereby certify that four (4) copies of the foregoing Joint

Appendix (Volume II through IX) were placed in the U.S Mail for First Class

delivery to the Clerk of Court on January 23, 2017.   In addition, the Joint

Appendix was filed in electronic format via e-mail to

electronic_briefs@ca3.uscourts.gov, on January 23, 2017.

I also certify that the text of the electronic joint appendix is identical to

the text in the hard paper copies.

> ___*s/Ralph E. Lamar*_____
> Ralph E. Lamar