# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## Appellate Docket Number 16-3883

### DARYLE RAYMOND MCNELIS,

**Appellant,**

v.

### PENNSYLVANIA POWER & LIGHT COMPANY,

**Appellee.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA NO. 4:13-CV-02612-MWB

## BRIEF OF APPELLEE

A. JAMES JOHNSTON, ESQUIRE
DARREN M. CREASY, ESQUIRE
POST & SCHELL, P.C.
FOUR PENN CENTER
1600 J.F.K. BOULEVARD
PHILADELPHIA, PA  19103
(215) 587-1000

**COUNSEL FOR APPELLEE**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................ iii

I.  COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ...................................................1

II.  COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................................................................2

III.  COUNTER-STATEMENT OF THE CASE ..................................3

IV.  COUNTERSTATEMENT OF FACTS ........................................6

    A.  PPL's Legally-mandated Fitness-for-duty Standards ...................6

    B.  McNelis' Employment History....................................11

    C.  McNelis' Admitted Use of Bath Salts .............................12

    D.  The Keefer Report..............................................13

    E.  Request for Time Off and Inpatient Treatment at Geisinger.......................................................15

    F.  Dr. Thompson's Reports and FFD Determination ....................18

    G.  Revocation of UAA and Termination of Employment .................22

    H.  Request for Review............................................24

V.  COUNTER-STATEMENT OF RELATED CASES AND PROCEEDINGS ..................................................27

VI.  COUNTER-STATEMENT OF THE STANDARD OF REVIEW .........28

VII.  SUMMARY OF ARGUMENT.....................................30

VIII.  ARGUMENT..................................................33

    A.  PPL Was Entitled to Summary Judgment Because McNelis Was Not a Qualified Individual With a Disability..................................................33

## **TABLE OF CONTENTS (CONTINUED)**

**PAGE**

      1.     **McNelis Was Not Qualified**.......................................................**34**

      2.     **ADA Protections in the Nuclear Power Industry** ................**41**

      3.     **McNelis' Qualification "Evidence" Is Irrelevant**................**43**

  B.    **PPL Was Also Entitled to Summary Judgment Because McNelis Failed to Create a Triable Issue of Pretext**........................................................................................**46**

      1.     **McNelis Failed to Self-report His Known State of Impairment to Gorman** ...........................................**46**

      2.     **R.S. and S.W. Are Not Proper Comparators** ......................**51**

      3.     **Dr. Thompson's Reports are Consistent and Not Pretextual**..........................................................**53**

  C.    **McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Jeff Helsel** ..................**56**

  D.    **McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Dr. Thompson** ..........................**60**

**IX.**    **CONCLUSION** ..........................................................................**62**

**CERTIFICATION OF BAR MEMBERSHIP**

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

**CERTIFICATION OF SERVICE UPON COUNSEL**

**CERTIFICATION OF VIRUS CHECK**

**CERTIFICATION OF IDENTICAL BRIEFS**

# TABLE OF AUTHORITIES

## CASES                                                                    PAGE(S)

*Abels v. Dish Network Serv., LLC,* 507 F. App'x 179 (3d Cir. 2012) .....................29

*Acosta v. Hovensa LLC,* 529 F. App'x 297 (3d Cir. 2013) .....................................56

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)............................................28

*Armour v. County of Beaver,* 271 F.3d 417 (3d Cir. 2001) .....................................57

*Boyle v. Cnty. of Allegheny,* 139 F.3d 386 (3d Cir. 1988)......................................28

*Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326 (3d Cir. 1995) .......................29

*Coppett v. Tenn. Valley Auth.,* 987 F. Supp. 2d 1264 (N.D.Ala. 2013) .................37

*Dennis v. Osram Sylvania, Inc.,* 549 F.3d 851 (1st Cir. 2008)................................57

*Doe v. County of Ctr.,* 242 F.3d 437 (3d Cir. 2001)................................................41

*Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers,
    AFL-CIO,* 140 F. Supp. 3d 751 (N.D. Ill. 2015) ...........................................44

*Fogleman v. Greater Hazleton Health Alliance,* 122 F. App'x 581 (3d
    Cir. 2004)........................................................................................................42

*Gans v. Mundy,* 762 F.2d 338 (3d Cir. 1985) ........................................................28

*Gaul v. Lucent Techs.,* 134 F.3d 576 (3d Cir. 1998) ........................... 33, 34,  36, 45

*Harding v. CareerBuilder, LLC,* 168 F. App'x 535 (3d Cir. 2006) ........................51

*Hill v. City of Scranton,* 411 F.3d 118 (3d Cir. 2005) ............................................57

*Kiewit Eastern Co., Inc. v. L&R Constr. Co., Inc.,* 44 F.3d 1194 (3d
    Cir. 1995)..........................................................................................................4

*Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259 (3d Cir. 2007).... 56, 57, 58

*Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318 (3d Cir. 2005)...........................28

*Luh v. J.M. Huber Corp.,* 211 F. App'x 143 (4th Cir. 2006) .................................57

*Lute v. Dominion Nuclear Conn., Inc.,* No. 3:12-CV-01412, 2015 U.S.
    Dist. LEXIS 39854 (D. Conn. Mar. 30, 2015) .............................................39

*Macfarlan v. Ivy Hill SNF, LLC,* 675 F.3d 266 (3d Cir. 2012) ..............................33

## TABLE OF AUTHORITIES (CONTINUED)

**CASES**                                                       **PAGE(S)**

*Mathieson v. American Elec. Power,* No. 1:00-cv-870, 2002 U.S. Dist.
LEXIS 6560 (W.D.Mich. Jan. 14, 2002) ................................................ 37, 40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574
(1986) ........................................................................................................55

*McCoy v. Pa. Power & Light Co.,* 933 F. Supp. 438 (M.D.Pa. 1996) ....................38

*Montanez v. Thompson,* 603 F.3d 243 (3d Cir. 2010) ..............................................28

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000)......... 56, 57, 61

*Rocco v. Gordon Food Serv.,* 609 F. App'x 96 (3d Cir. 2015) ................................36

*Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602 (1989) ................................48

*Springer v. Henry,* 435 F.3d 268 (3d Cir. 2006) ......................................................57

*Stevens v. S. Nuclear Operating Co.,* No. CV-114-240, 2016 U.S. Dist.
LEXIS 116376 (S.D. Ga. Aug. 30, 2016) ............................................... 40

*Stratienko v. Cordis Corp.,* 429 F.3d 592 (6th Cir. 2005) ......................................57

*Sulima v. Tobyhanna Army Depot,* 602 F.3d 177 (3d Cir. 2010) ............................33

*Sysko v. PPL Corp.,* No. 3:CV-07-0470, 2009 U.S. Dist. LEXIS
111869 (M.D.Pa. Dec. 2, 2009)........................................................ 37, 38, 39

*Turner v. Hershey Chocolate USA,* 440 F.3d 604 (3d Cir. 2006) ...........................36

*Wetherbee v. Southern Nuclear Operating Co., Inc.,* No. 1:08-CV-
2138, 2010 U.S. Dist. LEXIS 147127 (N.D.Ga. Mar. 17, 2010),
*aff'd in relevant part on waiver grounds,* 423 F. App'x 933
(11th Cir. 2011) ........................................................................................40

*Woods v. Delta Air Lines Inc.,* 595 F. App'x 874 (11th Cir. 2014) .......................57

## CODES & STATUTES

10 C.F.R. §26.22(a)(4) .............................................................................................7

10 C.F.R. §26.23(c)..................................................................................................7

10 C.F.R. §26.33 ..................................................................................................7, 48

10 C.F.R. §26.77(b) ......................................................................................... 8, 35, 43

## TABLE OF AUTHORITIES (CONTINUED)

**CODES & STATUTES**           **PAGE(S)**

10 C.F.R. §26.187 ................................................................................ 10, 43

10 C.F.R. §26.189(a) ...............................................................................9, 35

10 C.F.R. §26.189(d) ................................................... 10, 35, 42, 44, 45

10 C.F.R. §73.55 ............................................................................................36

10 C.F.R. §73.56 ......................................................................................6, 36

10 C.F.R. §73.56(b)(1) ..................................................................................7

10 C.F.R. §73.56(b)(2) ..................................................................................7

10 C.F.R. §73.56(b)(2) (iii) .........................................................................7

10 C.F.R. §73.56(d)(1)(iii)(b) .....................................................................7

10 C.F.R. §73.56(d)(2) ...................................................................................8

10 C.F.R. §73.56(e) .......................................................................................11

29 C.F.R. §1630 ............................................................................................34

29 C.F.R. §1630.16(b)(5)-(6) ....................................................................34

29 C.F.R. §1630.16(b)(6) ...........................................................................41

29 C.F.R. §1630.9(e) ...................................................................................33

28 U.S.C. §1291 ..............................................................................................1

28 U.S.C. §1331 ..............................................................................................1

28 U.S.C. §1367(a) .........................................................................................1

42 U.S.C. §12111(8) ...................................................................... 33, 34, 37

42 U.S.C. §12114(c)(5)(B) .........................................................................41

42 U.S.C. §12201(h) ....................................................................................33

## RULES

Fed.R.Civ.P. 56(a)........................................................................................28

Fed.R.Civ.P. 56(c)........................................................................................58

Fed.R.Civ.P. 56(e)(2)...................................................................................61

## TABLE OF AUTHORITIES (CONTINUED)

**OTHER AUTHORITIES**                                    **PAGE(S)**

NRC Reg. Guide 5.66, at §7.2 (June 1, 1991) ........................................................11

## I.    COUNTER-STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal stems from a civil action filed by Plaintiff/Appellant Daryle R. McNelis against Pennsylvania Power & Light Company ("PPL")[1] alleging violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), the Pennsylvania Human Relations Act ("PHRA"), and the Family and Medical Leave Act ("FMLA"). Jurisdiction before the District Court was proper pursuant to 28 U.S.C. §1331 and §1367(a).

The Court of Appeals has jurisdiction over the instant appeal pursuant to 28 U.S.C. §1291, because the Memorandum and Order issued by U.S. District Judge Matthew W. Brann, adopting in its entirety the Report & Recommendation of U.S. Magistrate Judge Susan E. Schwab and granting PPL's Motion for Summary Judgment, was a final order.

---

[1] Appellee was named incorrectly at the District Court level. At the time the case was filed, the proper corporate Defendant was named PPL Susquehanna, LLC. PPL Susquehanna, LLC was renamed Susquehanna Nuclear, LLC in connection with a spinoff in 2015. Accordingly, the current proper corporate identity of Appellee in this matter is Susquehanna Nuclear, LLC. For ease of reference, however, Appellee will refer to itself simply as "PPL."

1

## II.    COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**A.    Whether PPL Is Entitled to Summary Judgment Because McNelis Was Not a Qualified Individual With a Disability?**

(Answered in the Affirmative by the District Court)

**B.    Whether PPL Is Also Entitled to Summary Judgment Because McNelis Failed to Create a Triable Issue of Pretext?**

(Answered in the Affirmative by the District Court)

**C.    Whether McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Jeff Helsel?**

(Answered in the Affirmative by the District Court)

**D.    Whether McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Dr. David Thompson?**

(Answered in the Affirmative by the District Court)

### III.    COUNTER-STATEMENT OF THE CASE

On October 22, 2013, McNelis filed a Complaint against PPL, his former employer, alleging discrimination on the basis of perceived disability in violation of the ADA and the RA.  (J.A.-132-135).  On March 24, 2014, McNelis filed a First Amended Complaint, which retained the claims in his original Complaint and added a claim for disability discrimination under the PHRA.  (J.A.-136-149).  On September, 17, 2014 McNelis filed a Second Amended Complaint, which retained all claims asserted previously and added claims for interference and retaliation in violation of the FMLA.  (J.A.-150-165).

On June 18, 2015, PPL filed a Motion for Summary Judgment as to all claims asserted by McNelis, which included a Statement of Uncontested Material Facts ("SUMF").  (J.A.-200-231).  McNelis filed a Brief in Opposition and a response to the numbered paragraphs of PPL's SUMF, which included a lengthy Statement of Additional Material Facts ("SAMF").  (J.A.-653-707).  Significantly, McNelis admitted virtually all facts contained in PPL's SUMF, and his SAMF consisted largely of non-additional information.  The parties are therefore largely in agreement as to the relevant factual background.

On March 23, 2016, U.S. Magistrate Judge Susan E. Schwab issued a Report & Recommendation ("R&R"), which concluded that PPL's Motion for Summary Judgment should be granted and that judgment should be entered in favor of PPL

on all claims asserted by McNelis.[2]  (J.A.-93-94).  The facts relied upon by Judge Schwab were all either admitted or asserted by McNelis.  (J.A.-9-10).  On May 16, 2016, McNelis filed Objections to the R&R.  (ECF No. 112).  On September 19, 2016, U.S. District Judge Matthew W. Brann issued a Memorandum and Order, which overruled McNelis' Objections and adopted the R&R in its entirety.  (J.A.-117).  Judgment was entered in favor of PPL on all claims asserted by McNelis.  (J.A.-118-120).

This appeal followed.  (J.A.-1-2).  Notably, McNelis does not appeal the summary judgment dismissal of his FMLA claims.  *See* Brief of Appellant Daryle R. McNelis ("McNelis Brief"), at 57 (seeking reversal of the District Court as to his ADA, RA, and PHRA claims only).  In addition, any claims that PPL allegedly regarded McNelis as an alcoholic or as having a psychiatric disability have been waived because McNelis failed to develop any arguments as to either theory before the District Court (or in the instant appeal).  *See Kiewit Eastern Co., Inc. v. L&R Constr. Co., Inc.*, 44 F.3d 1194, 1203-04 & n.30 (3d Cir. 1995) (affirming district court's holding that a party waived issue through inadequately developed argument).  Instead, McNelis has confined his arguments to the un-pled and unexhausted theory that PPL mistakenly perceived him as a drug user—

---

[2]  PPL advanced numerous additional, meritorious arguments that Judge Schwab declined to consider in light of her conclusion that PPL was entitled to summary judgment on other grounds.  (J.A.-55-56).

specifically, bath salts.     (J.A.-132-164) (revealing that McNelis' Complaint, Amended Complaint, and Second Amended Complaint make no reference to drug use or bath salts, nor do they allege that any adverse action was taken against McNelis because PPL regarded McNelis as a drug user); (J.A.-643-648 and 633-639) (revealing that McNelis did not mention drugs, or suggest that he was mistakenly perceived by PPL as a drug addict, in his questionnaires, which are the only documents he submitted to any administrative agency).

## IV.    **COUNTERSTATEMENT OF FACTS**

Like the factual recitation relied upon by the District Court, the following Counterstatement consists entirely of facts that were either admitted or asserted by McNelis. Accordingly, unless otherwise noted, these facts have been established conclusively as uncontested record evidence for this appeal. Citations to the Joint Appendix will include the paragraph at which the fact was asserted by PPL and admitted by McNelis or the paragraph at which the fact was asserted by McNelis. Additional record evidence will be referenced as appropriate throughout this Brief, as necessary to advance specific arguments.

### A.    **PPL's Legally-mandated Fitness-for-duty Standards**

PPL operates the Susquehanna Steam Electric Station ("SSES"), which is a nuclear power plant. (J.A.-200/694, ¶1). Regulations promulgated by the U.S. Nuclear Regulatory Commission ("NRC") require that all nuclear power plants adopt Fitness for Duty programs that prescribe, among other things, unescorted access authorization ("UAA") requirements for employees entering upon secured and vital areas of the nuclear facility. (J.A.-200-201/694, ¶2; *see also* 10 C.F.R. §73.56). All employees working in secured areas of SSES are required to maintain UAA. (J.A.-207/695, ¶28; *see also* J.A.-267, at 55:19-56:1).

NRC licensees authorized to operate a nuclear power reactor are obligated to "provide high assurance that individuals granted unescorted access authorization

are trustworthy and reliable and do not constitute an unreasonable risk to public health and safety" as well as "reasonable measures for the early detection of persons who are not fit to perform the duties that require them to be subject to the [Fitness for Duty] program." (J.A.-201/694, ¶¶3-4; *see also* 10 C.F.R. §73.56(b)(1) and 26 C.F.R. §26.23(c)). Specifically, NRC regulations require that a nuclear power plant's UAA program include a background investigation, psychological assessment, and behavioral observation of all individuals to be granted unescorted access. (J.A.-201/694, ¶5; *see also* 10 C.F.R. §73.56(b)(2)). The UAA program must also include "[b]ehavioral observation, conducted by supervisors and management personnel, designed to detect individual behavioral changes… ." (J.A.-201-202/694, ¶6; *see also* 10 C.F.R. §§26.22(a)(4) and 73.56(b)(2)(iii)).

Potentially disqualifying behaviors include those "that may indicate possible use, sale, or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security." (J.A.-202/694, ¶7; *see also* 10 C.F.R. §26.33). A refusal to provide, or the falsification of, any personal history information is also sufficient cause for denial or unfavorable termination of UAA status. (J.A.-204/695, ¶14; *see also* 10 C.F.R. §73.56(d)(1)(iii)(b)). Personal history information includes "any

7

information that may be necessary for the reviewing official to make a determination of the individual's trustworthiness and reliability." (J.A.-204/695, ¶15; *see also* 10 C.F.R. §73.56(d)(2)). Where an individual's fitness is "questionable," a licensee "shall take immediate action to prevent the individual" from continuing to perform his or her job duties. (J.A.-202/694, ¶8; *see also* 10 C.F.R. §26.77(b)).

In accordance with NRC regulations, PPL's Fitness for Duty/Behavior Observation Program ("FFD/BOP") is intended "to provide high assurance that personnel who have been granted unescorted access continue to be reliable, trustworthy, mentally and physically fit to perform their duties safely and competently." (J.A.-203/695, ¶11; and J.A.-1395, at §6.5.3). Specifically, PPL's FFD/BOP procedures contain the following directive:

> Behavioral observation must be performed by individuals who are trained to detect behaviors that may indicate possible use, sale or possession of illegal drugs; use or possession of alcohol on site or while on duty; or impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security.

(J.A.-203-204/695, ¶12; and J.A.-1395, at §6.37.1). Fatigue is further defined in PPL's FFD/BOP procedures as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest." (J.A.-204/695, ¶13; and J.A.-1381, at §6.37.1).

PPL's FFD/BOP procedures require that supervisors be vigilant in identifying any changes in employee behavior and initiate a Behavior Observation Program ("BOP") Referral upon detecting a change in behavior. (J.A.-204-205/695, ¶17; and J.A.-1381, at §6.37.1). In determining whether a BOP Referral is appropriate, PPL's FFD/BOP procedures provide management personnel with the following "Behavior Observation Questions" as a guideline:

Have you noticed any changes in the employee's thinking pattern?

• See things that aren't there (hallucinations)
• False beliefs (delusions)
• Bizarre or unusual ideas

(J.A.-205/695, ¶¶19-20; J.A.-1436, at §6.37.2(d)(1)l and J.A.-1452). Every PPL employee subject to the BOP is also required to self-report potential fitness-for-duty issues to their supervisor, and a failure to do so is grounds for disciplinary action. (J.A.-204/695, ¶16).

A determination of fitness-for-duty ("FFD") can only be made by "a licensed or certified professional who is appropriately qualified and has the necessary clinical expertise … to evaluate the specific fitness issues presented by the individual." (J.A.-206/695, ¶22; *see also* 10 C.F.R. §26.189(a)). Upon receipt of a BOP Referral, PPL is required to, among other things, place on Administrative Hold/Suspension the access key card of the individual that is the subject of the BOP Referral, interview the individual, and "use professional personnel

(psychologist, MRO, Substance abuse, etc.) to determine [the] course of action."
(J.A.-205-206/695, ¶21; and J.A.-1437, at §6.37.3(b)-(c)).  Neither the individual nor PPL "may seek a second determination of fitness if a determination of fitness … has already been performed by a qualified professional… ."  (J.A.-207/695, ¶27; *see also* 10 C.F.R. §26.189(d)).

Where a BOP clinician determines in the scope of a mandatory clinical interview that drug and/or alcohol concerns may be present, the individual is also required to be evaluated by a Substance Abuse Expert ("SAE").  (J.A.-206/695, ¶23; and J.A.-1463).  The SAE's function is to protect public health and safety and the common defense and security by professionally evaluating the individual, not to advocate for PPL or the individual.  (J.A.-206/695, ¶24; *see also* 10 C.F.R. §26.187).  The SAE must satisfy certain licensing/certification and training prerequisites, including training on the "[t]he role of the SAE in making **determinations** of fitness and … continuing treatment **recommendations**… ."  (J.A.-206/695, ¶25; and J.A.-1373, at §4.14.3(a)(5)) (emphasis in SUMF).  While a BOP clinician may function as both a psychologist and an SAE, separate documentation for each type of evaluation is required to be completed and provided to PPL's Site Access Services personnel.  (J.A.-207/695, ¶26; and J.A.-1375, at §4.14.3(e)(7)).

10

NRC regulations require licensees to implement a review procedure for denials/revocations of UAA and set forth minimum standards for such a procedure. (J.A.-202/694, ¶9; *see also* 10 C.F.R. §73.56(e)).  Specifically, "[e]ach permanent employee of a utility whose employment *is or will be terminated as a direct result of denial or revocation of unescorted access authorization* will: (1) be informed of the basis of a denial or revocation ... ; (2) have the opportunity to provide additional information; and (3) have the decision … reviewed by another designated manager ... who is ... independent of the individual who made the initial decision."  (J.A.-203/694, ¶10; *see also* NRC Reg. Guide 5.66, at §7.2 (June 1, 1991)) (emphasis in SUMF).

### B.    McNelis' Employment History

McNelis was hired by PPL in June 2009 as a Nuclear Security Officer ("NSO") I.  (J.A.-207/695, ¶29).  McNelis later became an NSO II, and remained in that position until the date of his separation.  (J.A.-207/695, ¶30).  NSOs are armed security officers responsible for, among other things, conducting surveillance, protection of vital areas of the plant, prevention of radiological sabotage, and use of deadly or non-deadly force as necessary to neutralize threats.  (J.A.-207/695, ¶31).  At all times while on duty at PPL, McNelis was armed with a semi-automatic pistol.  Additionally, while on patrol, which occurred multiple

11

times per shift, McNelis also was armed with a .223 caliber AR-15 assault rifle. (J.A.-208/695, ¶32).

In February 2010, PPL received an anonymous report that McNelis had been overheard bragging openly about his use of drugs.  (J.A.-208/695, ¶33; and J.A.-363-364).   The anonymous report was sent via e-mail to PPL by Joseph Lesperance, State Emergency Operations Center Watch Officer at the Pennsylvania Emergency Management Agency.  (J.A.-208/696, ¶34). Lesperance's e-mail reflects that the report had been received by way of an anonymous telephone call to the Columbia County 911 service.  (J.A.-208/696, ¶35).  Because the report was submitted anonymously, it was deemed not credible and PPL determined that no "for cause" drug testing of McNelis was warranted. (J.A.-208/696, ¶36).  PPL did not approach McNelis about the report and the report was not pursued further.  (J.A.-208/696, ¶37).

### C.    McNelis' Admitted Use of Bath Salts

"Bath salts" is a generic name for synthetic derivatives of cathinone.  The chemical compound, which is ingested by the user, affects the central nervous system in various ways.  (J.A.-209/696, ¶42; and J.A.-396).  McNelis admits to having ingested bath salts approximately three times in February-March 2010. (J.A.-208/696, ¶38).  McNelis also placed an order for bath salts over the internet in April 2010.  (J.A.-209/696, ¶39).  Specifically, McNelis paid approximately

$50.00 for bath salts to be delivered to his home.  (J.A.-209/696, ¶40).  McNelis ingested bath salts "on maybe one occasion" subsequent to March 2010.  (J.A.-209/696, ¶41).  McNelis never disclosed to his supervisor at PPL the fact that he had ingested bath salts.  (J.A.-209/696, ¶43).

### D.    The Keefer Report

In April, 2012 Kristopher Keefer was employed by PPL in the controller program.   (J.A.-209/696,  ¶44).   Keefer  and  McNelis  were  best  friends  and confidants, having known each other since 1986.  (J.A.-209/696, ¶45).  As of April 16, 2012, McNelis reported to Security Shift Supervisor Michael McCabe.  (J.A.-210/696, ¶46).  As of April 16, 2012, McCabe reported to Security Operations Supervisor, Brian Martonick.   (J.A.-210/696, ¶47).   As of April 16, 2012, Martonick reported to PPL's Manager of Nuclear Security, Jim Gorman.  (J.A.-210/696, ¶48).

On April 16, 2012, in a telephone conversation with his supervisor Michael McCabe, Keefer reported certain abnormal behaviors on the part of McNelis. (J.A.-210/696, ¶49).  McCabe's written summary of his conversation with Keefer contains the following narrative:

> @1920 hours I called Kristopher [Keefer] and he informed that there is a concern of another employee that reports directly to me related to Daryle McNelis that needs immediate attention. Kris stated that Daryle and his wife have been having marital problems lately and Daryle has been acting emotionally erratic the last couple of days and

has been completely diverse from his normal character. Kris informed me that Daryle has been not sleeping well and having illusions that his telephone is being wire tapped. … Kris was worried about Daryle's overall safety and the safety of Security and plant personnel at Susquehanna. Kris informed me that Daryle's wife is employed by the Central Columbia School district and a picture of Daryle was being passed around the Central Columbia elementary and middle school facilities to notify the authorities if Daryle made an attempt to enter those properties. …

(J.A.-210/696, ¶50; and J.A.-402).  Keefer was obligated to make this report, and the information conveyed by Keefer to McCabe regarding McNelis was factually accurate.  (J.A.-211/696, ¶¶51-52).  It is also accurate that, on April 16, 2012 the Central Columbia County Elementary and Middle Schools were placed on lockdown based on an anonymous report made to local law enforcement regarding McNelis.  (J.A.-211/696, ¶¶53-54; and J.A.-427).

Following his call with Keefer, McCabe placed McNelis' access key card on administrative hold and briefed his supervisor, Martonick.  (J.A.-211/696, ¶55).  Martonick then briefed Gorman.  (J.A.-211/697, ¶56).  On April 17, 2012, Martonick completed a BOP Referral for McNelis.  (J.A.-211/697, ¶57).  Gorman signed the BOP Referral as a concurring supervisor.  (J.A.-212/697, ¶58).  The BOP Referral stated:

Individual was identified by a peer through Security Supervision that Daryle is having marital issues and personal behaviors have changed recently.  Peer stated that Daryle has been acting emotionally erratic the last couple days and has not been sleeping well.  Peer stated that Daryle is having illusions that his telephone is being wire tapped.  Peer is concerned about Daryle's overall safety and the Safety and

> Security of those at Susquehanna.   On 4/16/12 Daryle's actions
> contributed to Central Columbia school being locked down related to
> dialog that occurred between Daryle and his spouse.

(J.A.-212/697, ¶59; and J.A.-457).   The BOP Referral contained no reference to

suspected alcohol or drug use by McNelis, nor does it reference any suspected

psychiatric impairment.   (J.A.-212/697, ¶60).

Once a BOP Referral is made, PPL's Site Access Department assumes all

further responsibility for evaluating the individual.   (J.A.-212/697, ¶61).

### E.     Request for Time Off and Inpatient Treatment at Geisinger

McNelis called Gorman on April 17, 2012 to request time off to attend to

"personal or family issues."   (J.A.-212/697, ¶62).   Gorman granted McNelis'

request for time off.   (J.A.-212/697, ¶63).   Gorman did not ask McNelis for any

additional information regarding the reasons underlying McNelis' request for time

off.   (J.A.-213/697, ¶64).   Gorman did ask McNelis about the report that McNelis

had been responsible for lockdown of the Central Columbia schools.   (J.A.-

213/697, ¶65).   McNelis was unaware, at the time of the call, that the Central

Columbia schools had been placed on lockdown.   (J.A.-213/697, ¶67).   McNelis

responded to Gorman by saying "I have no idea what you're talking about" and "I

don't know what to tell you."   (J.A.-213/697, ¶66).

McNelis had a second call with Gorman several days later, during which

McNelis confirmed there had been a lockdown of the Central Columbia schools

but that he had not been contacted by law enforcement. (J.A.-213/697, ¶68).

Gorman did not investigate or attempt to confirm McNelis' role in causing a

lockdown of the Central Columbia schools because McNelis had already been

referred to the BOP. (J.A.-213/697, ¶69).

On April 18, 2012, McNelis presented at Geisinger Medical Center and

signed a voluntary consent for inpatient treatment on Geisinger's psychiatric unit.

(J.A.-214/697, ¶70). The Initial Evaluation and Treatment Plan, which was

completed by the physician authorizing the admission and signed by McNelis,

listed the following under "Initial Findings":

> 1-2 weeks of paranoid thoughts (concerned over electronic
> surveillance, mistrustful of wife, concerned about unknown individual
> spying on him), sleeplessness, questionable auditory hallucinations.

(J.A.-214/697, ¶71; and J.A.-461). Geisinger's Health and Progress Notes contain

the following additional information regarding McNelis' presenting condition:

> PRESENTING PROBLEM: This patient was admitted through the
> emergency department where he appeared with his wife. He reports
> for about a 1-2 week period, he has been experiencing paranoid
> thoughts, mostly regarding electronic surveillance. He is convinced
> that someone is bugging his phone, his car, his computer, and other
> household objects. As an example, he stated that he was worried that
> his children's matchbox cars were actually antennae. His wife reports
> he has been paranoid that someone is following him, and he stated
> that he would kill whoever is doing so if he was able. His wife
> recently moved herself and the children out of the house because she
> was concerned over his erratic behavior and paranoid thoughts. …

(J.A.-214/697, ¶72; and J.A.-463).

16

In April 2012, Kris Lear was employed by PPL as a Security Shift Supervisor. (J.A.-215/697, ¶75). McNelis called Lear on April 19, 2012 and stated that he (McNelis) had been admitted to the hospital and would probably be there for a few days. (J.A.-215/697, ¶76). McNelis did not mention any medical or psychiatric condition on this call, nor did Lear ask any questions about the reason(s) for McNelis' hospitalization. (J.A.-215/697, ¶77).

McNelis was discharged by Geisinger on Friday, April 20, 2012. (J.A.-215/698, ¶78). At the time of his discharge from Geisinger, McNelis' symptoms had resolved. (J.A.-215/698, ¶79). Geisinger's Discharge Instructions contained the following statements:

> **Special Instructions:** If you start using or drinking again, your life will eventually become unmanageable and full of chaos. Stay clean and sober for now.
> …
> **Caseworker Instructions:** … Discontinue or reduce the use of alcohol, if you find you cannot stop drinking, consider attending AA meeting in your area, call the local hotline number … for meeting times and locations, or consult the list that was given to you at the time of discharge.
>
> **Additional Follow Up Appointments:**
> Caron Foundation
> Appointment for an evaluation and treatment recommendations for your drinking

(J.A.-215-216/698, ¶80; and J.A.-507-508) (bold type in original). McNelis never told Gorman that he had been admitted to the psychiatric unit at Geisinger. (J.A.-

216/698, ¶83).   McNelis has never suffered from, or been treated for, paranoia since April 2012.  (J.A.-216/698, ¶82).

### F.    Dr. Thompson's Reports and FFD Determination

McNelis was cleared to return to work on Monday, April 23, 2012.  (J.A.-217/698, ¶86).  McNelis was directed to report to the Access Processing Facility ("APF") upon his return to work for a meeting with Martonick and John Lines.  (J.A.-216/698, ¶84).  John Lines was PPL's Supervisor of Site Access and FFD Programs.  (J.A.-217/698, ¶85).

On April 23, 2012, McNelis reported to the APF and met with Martonick and Lines.  The BOP process was explained to McNelis and he was directed to report to the APF the following day.  (J.A.-217/698, ¶87).  On April 24, 2012, McNelis reported to the APF and prepared a type-written statement.  (J.A.-217/698, ¶88; and J.A.-519-20).  Also on April 24, 2012, McNelis completed an MMPI-2 test administered by psychologist David G. Thompson, Ph.D.  (J.A.-217/698, ¶89).  Dr. Thompson is a third party contracted professional who performs FFD evaluations nationwide, for approximately twenty (20) different nuclear power plants. (J.A.-217/698, ¶¶90-91).  Dr. Thompson is not employed by PPL.  (J.A.-217/698, ¶90).

Dr. Thompson completed a Confidential Psychological Screening Summary, dated April 24, 2012, which stated that, based upon "clinical analysis of the

MMPI-2 test results and/or information [supplied by PPL]," his professional opinion was that McNelis required a "Mandatory Interview." (J.A.-217-218/698, ¶92). The Confidential Psychological Screening Summary further stated: "A recommendation is **NOT** possible at this time. A Clinical Interview is necessary before an Unescorted Access Authorization decision is possible." (J.A.-218/698, ¶93; and J.A.-547) (emphasis in original).

McNelis had an interview with Dr. Thompson the following day, on April 25, 2012. (J.A.-218/698, ¶94). Following that interview, Dr. Thompson prepared a Confidential Psychological Screening Summary, dated April 30, 2012, which stated that a decision was "**ON-HOLD PENDING DETERMINATION OF FITNESS**." (J.A.-218/698, ¶95; and J.A.-549) (emphasis in original). Attached to the Confidential Psychological Screening Summary dated April 30, 2012 was a Confidential Psychological Interview Memo, which was dated June 8, 2011 (clearly in error). (J.A.-218/698, ¶96; and J.A.-551-552). The Confidential Psychological Interview Memo included the following continuing treatment recommendation: "[r]eferral [of] Mr. McNelis for alcohol assessment and possible inpatient treatment… ." (J.A.-220/699, ¶106).

The Confidential Psychological Interview Memo indicated that McNelis had provided Dr. Thompson with a copy of Geisinger's Discharge Summary, which noted that McNelis had been "referred to the Caron Foundation for evaluation and

treatment for alcohol." (J.A.-219/699, ¶101). It is accurate that McNelis had been referred by Geisinger to the Caron Foundation "for an evaluation and treatment recommendations for [his] drinking." (J.A.-219/699, ¶¶102-103). The Caron Foundation is "a non-profit group of three residential treatment centers for alcoholics and drug addicts." (J.A.-216/698, ¶81). McNelis never told Dr. Thompson that he (McNelis) believed the Caron Foundation referral to have been made or included in error. (J.A.-219/699, ¶104).

The Confidential Psychological Interview Memo also noted that McNelis admitted consuming "up to 12 beers per week" and also that "his use of alcohol has, 'at times,' been an issue of contention with his wife." (J.A.-218-219/698, ¶97). Both of the quoted statements in the preceding sentence were accurate. (J.A.-219/698, ¶98). The Confidential Psychological Interview Memo further noted that McNelis had two prior arrests for alcohol-related offenses (minor in possession and driving under the influence). (J.A.-219/698, ¶99). It is accurate that McNelis had two prior arrests, one for minor in possession and one for driving under the influence. (J.A.-219/698, ¶100).

Dr. Thompson also prepared an SAE Determination of Fitness on May 1, 2012, which contained, among other information, the same personal history notations and continuing treatment recommendations contained in the Confidential Psychological Interview Memo. (J.A.-220/699, ¶108; and J.A.-556-557). The

SAE Determination of Fitness determined that, "based upon analysis of all available data," McNelis was "**NOT** fit for duty." (J.A.-220/699, ¶109) (emphasis in original).  The narrative section of Dr. Thompson's SAE Determination of Fitness stated: "Mr. McNelis is considered not fit for duty pending receipt and review of a report from the facility where he receives an alcohol assessment and possibly treatment." (J.A.-220/699, ¶110).

McNelis disagreed with Dr. Thompson's SAE Determination of Fitness because he didn't "consider [himself] to be an alcoholic." (J.A.-221/699, ¶111).  McNelis does not believe he needed an alcohol assessment and/or treatment. (J.A.-221/699, ¶113).  Dr. Thompson, however, never stated to McNelis that he believed McNelis to be an alcoholic. (J.A.-221/699, ¶112).  McNelis has no evidence to indicate that Dr. Thompson's FFD determination was not made in good faith and/or in the exercise of his best clinical judgment.[3] (J.A.-221, ¶114; *see also* J.A.-323, at 152:19-24).

Dr. Thompson's Confidential Psychological Interview Memo contained the following statement: "**ILLEGAL DRUG USAGE**: None." (J.A.-221/700, ¶115; and J.A.-551) (emphasis in original).  Dr. Thompson's SAE Determination of

---

[3] Although McNelis failed to offer record evidence to cast doubt on Dr. Thompson's motives or clinical judgment, he denied this statement of fact by arguing that his deposition admission should be non-binding.  (J.A.-699-700, ¶114). Specifically, McNelis argues that Dr. Thompson is inherently non-credible because he is an interested witness.  *See infra* section VIII.D.

Fitness contained no reference to use of drugs other than prescription medication. (J.A.-221/700, ¶116). In fact, no document prepared by Dr. Thompson and provided to PPL regarding McNelis contained any reference to use of drugs other than prescription medications. (J.A.-221/700, ¶117). No document prepared by Dr. Thompson regarding McNelis contained any reference to a psychiatric diagnosis or mental health treatment. (J.A.-222/700, ¶118).

### G.     Revocation of UAA and Termination of Employment

Upon receipt of Dr. Thompson's SAE Determination of Fitness, Lines revoked McNelis' UAA. (J.A.-222/700, ¶119). Lines did not make the decision to terminate McNelis' employment. (J.A.-222/700, ¶120). Lines informed Gorman that Dr. Thompson had deemed McNelis not fit for duty and that McNelis' UAA had been revoked. (J.A.-222/700, ¶121). Gorman decided to terminate McNelis' employment because: (1) McNelis' UAA had been revoked based on Dr. Thompson's unfavorable FFD determination; and (2) because he (Gorman) concluded that McNelis had been "evasive and really nonresponsive" during the course of their telephone conversation on April 17, 2012.[4] (J.A.-222/700, ¶122; *see also* J.A.-274, at 81:14-82:1 and 82:17-83:9). Gorman then presented his termination decision for review by a Susquehanna Elevated Action Review Panel ("SEARP"). (J.A.-222/700, ¶123).

---

[4] McNelis admits this was Gorman's testimony but disputes the veracity.

Martonick drafted a SEARP Panel Preparation Checklist in anticipation of the SEARP. (J.A.-223/700, ¶124; and J.A.-515-517). The SEARP consisted of Jeff Helsel, Plant Manager and Vice President of Nuclear Operations, Carol Moody, Director of Human Resources, and Brad Drysdale, General Manager of Nuclear Maintenance. (J.A.-223/701, ¶125). Gorman, Martonick, and Kevin Cimorelli, General Manager, Nuclear Programs were also present. (J.A.-223/701, ¶126). The SEARP did not review the SEARP Panel Preparation Checklist or any other document aside from the proposed termination form. (J.A.-223/701, ¶127; J.A.-561). Helsel testified that the SEARP permitted Gorman's termination decision to stand because McNelis lost his UAA and because he "had the opportunity to report his fitness for duty issues … [but he] was not forthright with that information, and there was a potential that there could be a safety risk for [PPL] in protecting the health and safety of the public."[5] (J.A.-223, ¶130; *see also* J.A-246, at 46:14-24).

On May 11, 2012 McNelis attended a meeting with Lines and Site Access Specialist Pat Dieffenbacher at which McNelis was provided with a copy of Dr. Thompson's SAE Determination of Fitness and informed that his UAA had been revoked. (J.A.-224/701, ¶¶131-132). Immediately following the meeting with

---

[5] McNelis denied this statement of fact by arguing that, as interested witness, Helsel's testimony is inherently non-credible, such that his uncontradicted testimony regarding the SEARP should be disregarded. (J.A.-701, ¶130). *See infra* section VIII.C.

23

Lines and Dieffenbacher, McNelis attended a meeting with Martonick and a representative of Human Resources at which McNelis was informed that he was being terminated.  (J.A.-224/701, ¶¶133-134).

### H.    Request for Review

On May 22, 2012, McNelis submitted a Request for Review of Denial/Revocation of his UAA.  (J.A.-224/701, ¶135; and J.A.-563).  The review process is limited to a determination of whether proper procedure had been followed.  (J.A.-683, ¶228).  An employee's right to request review of the decision to revoke UAA does not constitute an appeal of a termination decision.  (J.A.-225/702, ¶137).  McNelis mistakenly believed that his request for review of the decision to revoke his UAA was also a request for review of the termination decision.  (J.A.-225/702, ¶136).

McNelis provided a number of documents in support of his request for review.  First, McNelis provided his own type-written statement dated May 15, 2012.  (J.A.-225/702, ¶138; and J.A.-565-566).  Second, McNelis provided a Telephone Contact Summary note dated May 16, 2012, authored by Thomas R. Wickham, a Physician's Assistant employed by Geisinger, indicating that McNelis' wife "was the source of the Caron Foundation referral."  (J.A.-225/702, ¶139; and J.A.-568).  Third, McNelis provided a copy of a police report dated April 16, 2012 regarding the school lockdown.  (J.A.-226/702, ¶¶143-145; and

J.A.-429-433).  And fourth, McNelis provided a letter from Francis McAndrew, a licensed professional counselor employed by Bloomsburg Psychological Center LLC, stating his (McAndrew's) "opinion that [McNelis] does not meet the criteria for chemical dependency at this time."  (J.A.-225/702, ¶140; and J.A.-570).  Lines would not have interpreted McAndrew's letter as addressing Dr. Thompson's recommendation that McNelis receive an alcohol assessment and possibly treatment.  (J.A.-226/702, ¶142).  Likewise, Dr. Thompson would not have considered McAndrew's letter to be an alcohol assessment report because certain elements had been omitted.  (J.A.-226/702, ¶141).

David T. Walsh, the independent manager assigned to conduct the review, was employed by PPL as a Shift Supervisor responsible for overseeing the operations of both nuclear reactors but had no direct supervisory responsibility for security.  (J.A.-226-227/702, ¶¶146-148).  The Access Authorization Review form completed by Walsh contains a footnote stating "it appears [McNelis] completed the SAE evaluation as recommended."  (J.A.-229/702, ¶149; and J.A.-607).  On June 12, 2012, Walsh nevertheless decided to affirm the decision to revoke McNelis' UAA because "at the time of revocation the process was followed." (J.A.-226-227/702, ¶¶146, 150).  McNelis received a letter dated June 12, 2012 by certified mail indicating that an independent manager had considered his request

for review and affirmed the decision to revoke his UAA.  (J.A.-227/702, ¶151; and

J.A.-625-626).

## V.    COUNTER-STATEMENT    OF    RELATED    CASES    AND PROCEEDINGS

PPL is unaware of any cases or proceedings related to this appeal.

## VI.    COUNTER-STATEMENT OF THE STANDARD OF REVIEW

This Court exercises a plenary standard of review over a District Court's Order granting summary judgment. *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A fact dispute is "material" if it could affect the outcome of the case under governing law and "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48.

In determining whether an issue of material fact exists, a court must consider all evidence and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1988).  A properly supported Motion for Summary Judgment, however, cannot be defeated by mere "colorable, conclusory or speculative" evidence. *Anderson*, 477 U.S. at 249.  Because the beliefs, suspicions, and speculations of a party are not evidence, they cannot create a material fact dispute. *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (stating that a plaintiff "cannot expect to rely merely upon bare

assertions, conclusory allegations or suspicions" in resisting summary judgment) (citations omitted).

Furthermore, a court's task is not to second guess employers' employment decisions but, rather, to determine whether an illegal discriminatory purpose motivated the decisions in question. *See Abels v. Dish Network Serv., LLC*, 507 F. App'x 179, 185 (3d Cir. 2012) ("We do not sit as a super personnel department that reexamines an entity's business decisions; no matter how mistaken the firm's managers, the [court will] not interfere") (citing *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 332 (3d Cir. 1995)).

## VII.  SUMMARY OF ARGUMENT

McNelis, an armed Nuclear Security Officer II, was referred to PPL's legally-mandated BOP based on objective—and admittedly accurate—reports of behavioral anomalies made by McNelis' best friend and co-worker, Kris Keefer.[6] Specifically, Keefer reported that McNelis was suffering from paranoid delusions, insomnia, and marital discord, and had been the reason for a publicized lockdown of local elementary and middle schools.[7]  McNelis knew that he had been suffering from symptoms of paranoia and insomnia for a period of at least 1-2 weeks.[8]  Yet, despite multiple opportunities, McNelis failed to self-report his known state of impairment to PPL.[9]

McNelis concedes that his referral to the BOP was lawful and appropriate.[10] Consistent with well-established procedures, McNelis was referred to Dr. Thompson, a third-party contracted psychologist specializing in FFD determinations at nuclear power plants, who determined that McNelis was "**NOT** fit for duty."[11]  PPL's Supervisor of Site Access and FFD Programs, John Lines,

---

[6] J.A.-210-211/696, ¶¶49, 52.

[7] J.A.-210/696, ¶50; and J.A.-402.

[8] J.A.-214/697, ¶¶70-72; *see also* J.A.-725, ¶¶7-9 and J.A.-461, 463.

[9]  J.A.-204/695,  ¶16;  J.A.-212/697,  ¶62;  J.A.-213/697,  ¶¶64,  77;  and  J.A.-215/698, ¶83; *see also* J.A.-91-92; and J.A.-720-721, at 110:18-115:8.

[10] *See* J.A.-58 (noting that McNelis is "not claiming that the referral to the BOP was discriminatory").

[11] J.A.-217/698, ¶¶90-91; J.A.-220/699, ¶109; and J.A.-556-557 (emphasis in original).

thereupon revoked McNelis' UAA.[12]  Significantly, once a determination of fitness has been made by a qualified clinician, PPL is prohibited by law from seeking a second opinion.[13]  Furthermore, PPL "shall" preclude any individual from continuing to perform his job duties where such individual's fitness-for-duty is "questionable."[14]  McNelis does not argue that Lines' decision to revoke McNelis' UAA was improper or discriminatory.[15]

Pursuant to PPL policy as well as federal law, UAA is both a job requirement and an essential function of the NSO II position.[16]  All PPL employees working in secured areas of the plant are required to maintain UAA.[17]  The District Court properly granted PPL's Motion for Summary Judgment as to McNelis' claims under the ADA, the RA, and the PHRA because McNelis failed to establish an essential element of his *prima facie* case.  More specifically, McNelis' loss of UAA, which is both a job requirement and an essential function of the NSO II position, meant that he was not "otherwise qualified" to hold that position at the time of the adverse employment action in question.

---

[12] J.A.-222/700, ¶119.

[13] J.A.-207/695, ¶27.

[14] J.A.-202/694, ¶8.

[15] *See* McNelis Brief, at 30 ("McNelis is not challenging his temporary loss of access.").

[16] J.A.-200-201/694, ¶2.

[17] J.A.-207/695, ¶28.

31

In addition, McNelis cannot show that PPL's proffered reason for the termination of his employment was pretextual. While McNelis argues that he was innocent of wrong-doing, it is the perception of PPL's Manager of Nuclear Security James Gorman that matters, and Gorman had legitimate reason to believe that McNelis knowingly failed to self-report significant fitness-for-duty issues about which he (McNelis) had been well-aware. McNelis failed to adduce any evidence to show that Gorman's proffered reasons for the termination decision were insincere, or even incorrect.

## VIII. <u>ARGUMENT</u>

### A.    **PPL Was Entitled to Summary Judgment Because McNelis Was** <u>**Not a Qualified Individual With a Disability**</u>

To state a *prima facie* case of disability discrimination, McNelis must show: (1) that he is disabled within the meaning of the ADA[18]; (2) that he is otherwise qualified for the job, with or without reasonable accommodation[19]; and (3) that he was subjected to an adverse employment decision under circumstances giving rise to an inference of unlawful discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

A plaintiff is "otherwise qualified" when, "with or without reasonable accommodation, he can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. 12111(8). The plaintiff has the burden to show that he is otherwise qualified. *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998). Critically, the determination that an individual is otherwise qualified is made "at the time of the employment decision" in question. *Id.* (internal quotations and citation omitted). The analysis has two steps. First, a

---

[18] The ADA, the RA, and the PHRA are interpreted consistently, with the same standard for determination of liability. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012). Accordingly, for the sake of brevity, this Brief will reference only the ADA.

[19] Employers are not obligated to accommodate individuals, like McNelis, who claim to be merely "regarded as" having a disability. 42 U.S.C. §12201(h); 29 C.F.R. §1630.9(e).

court must consider whether the individual possesses all necessary prerequisites to hold a position "such as … the appropriate educational background, employment experience, skills, licenses and other job related requirements." *Id*. at 580 (quoting 29 C.F.R. §1630, App. at 353-54). Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id*.; *see also* 42 U.S.C. §12111(8). Significantly, an employer may "require that employees employed in sensitive positions comply with the regulations (if any) of … the Nuclear Regulatory Commission." 29 C.F.R. §1630.16(b)(5)-(6).

The District Court did not err by holding that McNelis' loss of UAA rendered him unqualified, as a matter of law, to perform his job. McNelis argues that: (1) revocation of UAA was non-permanent; (2) he submitted evidence from which a reasonable fact-finder could find that he was qualified; and (3) anything other than a decision in his favor would sound the death knell for the ADA in the nuclear power industry. His arguments are baseless, and his concerns are overblown. These points will be addressed in the order in which they are raised in McNelis' Brief.

### 1. McNelis Was Not Qualified

McNelis' UAA was revoked following a BOP referral, which was premised on textbook fitness-for-duty concerns, and upon the "not fit for duty"

34

determination of an independent BOP clinician that PPL was compelled to accept.[20] Because he lacked legally-mandated UAA to access the very nuclear power plant he was employed to protect, it was impossible for McNelis to perform the essential functions of his NSO II position at the time of his termination.  (J.A.-207/695, ¶28) (uncontested statement of fact that all individuals working in secured areas of SSES are required to maintain UAA).

McNelis' repeated use of the word "temporary" in reference to his loss of qualification is imprecise and misleading because it implies that his loss of qualification was finite or for a limited period of time.  To the contrary, McNelis' loss of qualification was indefinite, in that his UAA could potentially have been restored at some undetermined future date, upon re-evaluation by Dr. Thompson (assuming, of course, that Dr. Thompson determined McNelis was "fit for duty").  (10 C.F.R. §26.189(a) and (d); *see also* J.A.-670, ¶¶128, 131; and J.A.-206/695, ¶22).  PPL had no assurance that McNelis would <u>ever</u> regain fit for duty status,

---

[20]  J.A.-205-206/695, ¶¶19-23; J.A.-207/695, ¶27; and J.A.-210/696, ¶¶49-50. Significantly, PPL is not free to overrule Dr. Thompson or ignore his unfavorable FFD determination.  *See* 10 C.F.R. §26.189(a) and (d); §26.77(b).  Only a BOP clinician can make a FFD <u>determination</u>, and, once made, PPL is bound by that determination.  (J.A.-207/695, ¶27).  By contrast, however, PPL is not bound to follow Dr. Thompson's continuing treatment <u>recommendations</u>.  (J.A.-1373, at §4.14.3(a)(5)) (distinguishing "determinations of fitness" from "continuing treatment recommendations"); (J.A.-682, ¶¶216-217) (noting that PPL does not always follow Dr. Thompson's continuing treatment recommendations).  In any event, as noted *supra*, McNelis does not argue that Lines' decision to revoke McNelis' UAA was improper or discriminatory.  (McNelis Brief, at 30) ("McNelis is not challenging his temporary loss of access.").

however, which is a condition prerequisite to UAA. So while McNelis' loss of qualification was indeed indefinite, it was not merely "temporary."

But regardless of duration, the "otherwise qualified" determination is made at the time of the challenged adverse employment action and it is undisputed that McNelis was not authorized to enter the plant or perform his job duties as of the date of discharge. *Gaul*, 134 F.3d at 580; *see also Rocco v. Gordon Food Serv.*, 609 F. App'x 96, 98 & n.7 (3d Cir. 2015) ("The relevant time for determining whether the plaintiff is a 'qualified individual with a disability' is the time of the adverse employment decision.") (collecting cases); *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006) (stating that the determination of whether a person was a "qualified individual with a disability" for purposes of an ADA claim is not made from the time the lawsuit is filed or any other later time period, but from the point at which the alleged discriminatory decision was made). Thus, whether McNelis potentially could have regained fit for duty status and/or UAA at some future point is simply not relevant.

McNelis fails the first step of the "otherwise qualified" analysis because, at the time of his termination, he was indisputably not authorized to work in any secured area of SSES. And McNelis fails the second step of the analysis because UAA is both a job-related requirement <u>and</u> an essential function of the NSO II position. *See* 10 C.F.R. §§73.55 and 73.56 (obligating nuclear power plants to

36

establish UAA for all employees entering upon secured and vital areas of the nuclear facility and to "limit unescorted access to vital areas … to individuals who require access in order to perform their duties"); *accord Coppett v. Tenn. Valley Auth.*, 987 F. Supp. 2d 1264, 1275 (N.D.Ala. 2013) (noting that UAA was an essential function of all tech positions in a nuclear power plant); *Mathieson v. American Elec. Power*, No. 1:00-cv-870, 2002 U.S. Dist. LEXIS 6560 (W.D.Mich. Jan. 14, 2002) (holding that "an employee's inability to satisfy a legally dictated fitness-for-duty program is by its very nature an essential function under section 12111(8) of the ADA") (internal quotations and citation omitted).

The preclusive effect of an unfavorable FFD determination and corresponding revocation of UAA on a plaintiff's ADA claims has been examined by several District Courts in this Circuit, in cases involving analogous facts and this very plant. In *Sysko v. PPL Corp.,* No. 3:CV-07-0470, 2009 U.S. Dist. LEXIS 111869 (M.D.Pa. Dec. 2, 2009), now-Circuit Judge Thomas I. Vanaskie held as follows:

> Plaintiff's status was revoked for six months based upon recommendations of qualified health care professionals. Revocation of his unescorted access status rendered Plaintiff "unqualified" for his position as an Instrument and Control Technician. As a matter of law, Plaintiff cannot sustain his burden of showing that he was a qualified individual under the ADA or PHRA. Thus, even if Plaintiff could establish that Defendant regarded him as disabled due to perceived mental health issues, he cannot show that he was qualified to perform the essential functions

of the I&C Tech position because Defendants properly revoked his security clearance based upon the recommendation of a psychologist following an appropriate evaluation. Accordingly, Defendants' Motion for Summary Judgment will be granted.

*Id.* at *33-34 (citations omitted). McNelis attempts to distinguish *Sysko* because the plaintiff remained employed by PPL in a position that did not require UAA and challenged only his loss of UAA, whereas McNelis challenges his discharge. But McNelis fails to appreciate that the outcome in *Sysko* was not premised on PPL's decision to continue the plaintiff's employment.[21] Instead, as here, once the plaintiff in *Sysko* lost his UAA as the direct result of Dr. Thompson's unfavorable FFD determination, he was not "otherwise qualified' to assert a disability discrimination claim under the ADA. *Id.*

Similarly, in *McCoy v. Pa. Power & Light Co.*, 933 F. Supp. 438 (M.D.Pa. 1996), a nuclear plant operator alleged that PPL violated the ADA by revoking his UAA after he self-reported a drinking problem, marital issues, and a DUI arrest. Like McNelis, the plaintiff was referred to the BOP and his UAA was revoked based on an unfavorable FFD determination made by a psychologist. *Id.* at 442. McNelis' attempt to distinguish *McCoy* as concerned solely with whether the employer failed to grant the plaintiff a reasonable accommodation distorts the

---

[21] Clearly the fact that PPL, or any employer, might elect to retain an employee despite loss of qualification pending re-evaluation does not *ipso facto* render such an individual "qualified" under the ADA. It is also significant that McNelis did not seek, nor was he entitled to, a reasonable accommodation in the form of a transfer to a position that did not require UAA. (J.A.-71).

holding of the case.  To the contrary, on account of plaintiff's loss of UAA, he was deemed not qualified to perform the essential functions of his job and his complaint was dismissed on that basis.  *Id.* at 444 ("[I]t is apparent as a matter of law that plaintiff is not a qualified individual with a disability within the meaning of the ADA, since his disability precludes him from retaining the security clearance necessary to perform his former job.").

PPL was unable to locate any case in the Federal Circuits addressing an ADA claimant's status as a "qualified individual" following an unfavorable FFD determination and corresponding revocation of UAA.  Ample District Court authority exists in other jurisdictions as well, however.  One such case is *Lute v. Dominion Nuclear Conn., Inc.*, No. 3:12-CV-01412, 2015 U.S. Dist. LEXIS 39854 (D. Conn. Mar. 30, 2015).  McNelis attempts to distinguish *Lute* on the basis that the plaintiff's loss of UAA in that case was not "temporary."  But, as explained above, McNelis' loss of UAA was not "temporary" either.  Just like McNelis, the plaintiff in *Lute* could have pursued reinstatement, and the fact that he decided not to do so had no bearing on whether he was "otherwise qualified" within the meaning of the ADA.  *Id.* at *35 ("The Court concludes that Lute's failure to maintain UAA means that he cannot show that he was 'otherwise qualified to perform the essential functions of his job,' and thus cannot establish a prima facie case of discrimination under the ADA.").

Likewise, in *Wetherbee v. Southern Nuclear Operating Co., Inc.*, the court held that a plaintiff was not qualified under the ADA because, absent UAA, he could not access the plant's safety-sensitive systems to perform the essential functions of the job sought. No. 1:08-CV-2138, 2010 U.S. Dist. LEXIS 147127 (N.D.Ga. Mar. 17, 2010), aff'd in relevant part on waiver grounds, 423 F. App'x 933 (11th Cir. 2011). The fact that the plaintiff in *Wetherbee* also failed to meet the ADA's definition of "disability" is irrelevant, because the "qualified individual" analysis mirrors the analysis here. *Id*. at \*19-30 ("Plaintiff cannot show that he was 'otherwise qualified' for the Engineer job at Plant Hatch, and his ADA claim thus fails as a matter of law."); *accord Stevens v. S. Nuclear Operating Co.*, No. CV-114-240, 2016 U.S. Dist. LEXIS 116376, at \*10-13 (S.D. Ga. Aug. 30, 2016) (holding plaintiff was not qualified to work as a nuclear security officer during the times she was removed from work); *Mathieson*, 2002 U.S. Dist. LEXIS 6560, at \*11 (noting that "other courts have held that the inability to meet the requirements of federal regulations concerning access to regulated nuclear power plants requires a finding that an ADA plaintiff is not a qualified individual") (internal quotations omitted).

For the reasons set forth above, McNelis' ADA, RA, and PHRA claims fail as a matter of law.

40

### 2.    ADA Protections in the Nuclear Power Industry

McNelis next argues that compliance with the NRC's legally-mandated FFD/BOP regulations and UAA requirements would undermine the ADA's protection of those who are "regarded as" disabled.  This argument is without merit.  ADA-covered entities are expressly permitted to "require that employees employed in sensitive positions comply with the regulations … of the Nuclear Regulatory Commission that apply to employment in sensitive positions subject to such regulations."  29 C.F.R. §1630.16(b)(6); *see also* 42 U.S.C. §12114(c)(5)(B) (stating that a covered entity may require that "employees comply with the standards established in … regulations of the Nuclear Regulatory Commission").[22] Any purported conflict between the NRC's legally-mandated FFD requirements and the ADA is therefore illusory.

McNelis' attempt to conflate his need for "time off for treatment" (McNelis Brief, at 33) with the indefinite loss of a legally-mandated qualification also fails for multiple reasons.  First, they are different things.  Absent disqualifying fitness-for-duty concerns, UAA will be entirely unaffected by an individual's need for leave or disability status generally.  Second, McNelis' prognostication that nuclear

---

[22] In a similar vein, the ADA also recognizes "that the goal of ending disability discrimination must be balanced against the health and safety risks that disabilities sometimes pose to others."  *Doe v. County of Ctr.*, 242 F.3d 437, 447 (3d Cir. 2001) (citations omitted).  This has been termed the "direct threat exception," and presumptively would apply to individuals deemed not fit to perform job duties in the secured and vital areas of a nuclear power plant.

power plants will be able to avoid the "regarded as" provisions of the ADA by hiding behind the NRC's regulations ignores the fact that only a licensed or certified professional, as opposed to the employer, is authorized to make FFD determinations.   10 C.F.R. §26.189(d).   The NRC's regulations and PPL's FFD/BOP procedures therefore require due process in the form of an impartial assessment conducted by a third-party professional who is appropriately qualified and has the necessary clinical expertise to evaluate the specific fitness issues presented by the individual.   (J.A.-205-206/695, ¶21; J.A.-1370, at §4.14.3(c)). Third, by analogizing to cases involving leave as a reasonable accommodation, McNelis overlooks the fact that individuals who are merely "regarded as" disabled are not entitled to accommodation, as well as the fact that indefinite or open-ended leave is generally deemed unreasonable.  *See, e.g., Fogleman v. Greater Hazleton Health Alliance*, 122 F. App'x 581, 585 (3d Cir. 2004).

In sum, there is no reason to believe that individuals who are erroneously regarded as disabled by their employers will be precluded, categorically, from working in nuclear power plants.  Instead, the ADA will continue to protect these individuals so long as they are able to maintain legally-mandated fit-for-duty status, which is subject to the clinical determination of a licensed or certified third-party professional.

### 3.     McNelis' Qualification "Evidence" Is Irrelevant

Finally, McNelis argues that a jury could find that he was "otherwise qualified" based on Geisinger's discharge instructions[23] and/or the letter issued by counselor McAndrew. (J.A.-507-509; 570). McNelis' arguments fundamentally misconstrue the BOP process. Furthermore, his suggested approach would impermissibly circumvent the NRC's mandated FFD process by substituting a hospital's discharge summary (and/or a counselor's letter) for a BOP clinician's fitness-for-duty determination.

First, McNelis was referred to the BOP based on credible reports of extraordinary behavioral anomalies, which were not limited to purported insomnia.[24] There is no record evidence whatsoever that McNelis was referred to

---

[23] Geisinger's discharge instructions were provided to Dr. Thompson, not PPL. (J.A.-219/699, ¶101). It is therefore unclear whether McNelis is referring to the Telephone Contact Summary note prepared by Geisinger Physician's Assistant Thomas R. Wickham. (J.A.-568).

[24] These anomalies included, but certainly were not limited to, the lockdown of the Central Columbia County Elementary and Middle Schools. While McNelis contends that "he had nothing to do with it" (McNelis Brief at 34), it is not disputed that McNelis was, in fact, the reason for the lockdown. (J.A.-211/696, ¶¶53-54). Keefer learned that McNelis' picture was passed around the school, and that the authorities intended to bar McNelis from entering school property. (J.A.-210/696, ¶50). Keefer learned of this information from none other than McNelis' wife. (J.A.-657, ¶27). The lockdown was then confirmed by PPL by way of an independent media report. (J.A.-779; *see also* J.A.-457 (referencing Press Enterprise article)). McNelis pleads his ultimate innocence, but potentially disqualifying behaviors warranting a BOP referral do not require a conclusive finding of guilt. 10 C.F.R. §26.77(b).

the BOP based on "rumors of drug use."  (*Compare* McNelis Brief at 34 *with* J.A.-212/697, ¶60 and J.A.-658, ¶¶33 and 38) (reflecting that rumored drug use was not mentioned in the BOP referral and that neither Keefer nor McCabe mentioned anything about suspected use of bath salts by McNelis).  PPL could not know whether the aberrant behavior that precipitated Keefer's report and the BOP Referral even related to the reason(s) why McNelis sought inpatient treatment at Geisinger.  That is why NRC regulations require an evaluation and entrust a qualified BOP clinician with the FFD determination.

Second, once a "not fit for duty" determination has been made by a qualified BOP clinician, absent special circumstances—none of which apply here—only that individual can later determine that the individual is "fit for duty."  10 C.F.R. §26.189(d) ("Unless the professional who made the initial determination of fitness is no longer employed by or under contract to the licensee or other entity, only that professional is authorized to modify the evaluation and recommendations."); *see also Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 140 F. Supp. 3d 751, 763 (N.D. Ill. 2015) (noting that §26.189 stipulates that "a party may not seek a determination of fitness from someone other than the authorized SAE").

For these reasons, PPL cannot substitute hospital discharge instructions  (or a Telephone Contact Summary note prepared by a Physician's Assistant) for the

determination of a qualified BOP clinician, particularly where there is no evidence that Geisinger was making, or was qualified to make, a FFD determination in accordance with the NRC regulations.[25]    McNelis' argument that McAndrew's letter could serve as dispositive evidence of his fitness-for-duty suffers from the same flaw.    Furthermore, McNelis has already admitted that both Lines and Dr. Thompson concluded that McAndrew's assessment was deficient.    (J.A.-226/702, ¶¶141-142).    This is not to say that McAndrew was incapable of performing an assessment that would have been acceptable to PPL and/or Dr. Thompson, only that the letter presented by McNelis at the time of his request for review of the decision to revoke UAA was not sufficient.    But even if McAndrew's letter were sufficient, it would simply satisfy a condition prerequisite to re-evaluation by Dr. Thompson.    10 C.F.R. §26.189(d).

Further, the determination that an individual is "otherwise qualified" is made "at the time of the employment decision" in question.    *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998).    McAndrew's assessment post-dated McNelis' termination and was offered in connection with McNelis request for review of the

---

[25]    McNelis also argues that BOP clinicians like Dr. Thompson "work exclusively for nuclear power plants" and are "company psychologists." (McNelis Brief, at 36 n.11).    First, there is no record support for McNelis' contention that BOP clinicians work exclusively for nuclear power plants.    Second, Dr. Thompson is not a "company psychologist."    It is uncontested that Dr. Thompson is an independent, contracted professional who is neither a PPL employee, nor is he under PPL's control. (J.A.-205-206/695, ¶¶21, 24; and J.A.-217/698, ¶¶90-91).

decision to revoke UAA.   (J.A.-224/701, ¶¶134-135).   McAndrew's letter's therefore cannot show that McNelis was "otherwise qualified" at the time of the challenged adverse employment action.

For the reasons set forth above, the District Court's Order should be affirmed and judgment entered in favor of PPL.

### B.    PPL Was Also Entitled to Summary Judgment Because McNelis Failed to Create a Triable Issue of Pretext

Because McNelis cannot show that he was "otherwise qualified" at the time of the challenged adverse employment action, this Court need not reach the pretext analysis.   Nevertheless, the District Court did not err when it determined that McNelis failed to create a triable issue of pretext.

### 1.    McNelis Failed to Self-report His Known State of Impairment to Gorman

Gorman testified that he decided to terminate McNelis' employment because McNelis lost UAA and also because McNelis had been evasive and nonresponsive in failing to self-report his unfitness for duty—in other words, the termination decision was the product of loss of qualification as well as the perceived lack of trustworthiness.   (J.A.-222/700, ¶122).   As recognized by the District Court, McNelis was well-aware of his symptoms, which included insomnia and paranoid thoughts, for several weeks prior to seeking treatment at Geisinger.  (J.A.-214/697, ¶71; *see also* J.A.-105-106).  Yet, it is undisputed that McNelis failed to self-report

these issues until after he had been referred to the BOP and discharged from the hospital, in clear violation of PPL policy.  (J.A.-204/695, ¶16; *see also* J.A.-106). Contrary to the representations in his Brief, McNelis did <u>not</u> disclose his sleep (and/or paranoia) issues to Gorman or tell Lear the reason for his inpatient treatment at Geisinger, but instead merely requested time off to deal with "personal or family issues."  (*Compare* McNelis Brief at 40 *with* J.A.-212/697, ¶62; J.A.-213/697, ¶¶64, 77; and J.A.-215/698, ¶83; *see also* J.A.-91-92).

All PPL employees subject to the BOP are responsible to self-report potential fitness-for-duty issues to their supervisors, and a failure to do so is grounds for disciplinary action.[26]  (J.A.-204/695, ¶16).  Fitness-for-duty issues that must be reported include "impairment from fatigue or any cause that, if left unattended, may constitute a risk to public health and safety or the common defense and security."  (J.A.-20/ 694, ¶7).  Fatigue is defined as "[t]he degradation in an individual's cognitive and motor functioning resulting from inadequate rest." (J.A.-204/695, ¶13).

At a minimum, as of April 17, 2012 McNelis knew that he was suffering from extreme sleep deprivation and that he was experiencing degradation in his cognitive and motor functioning.  In fact, the very next day following his April 17

---

[26] This is a critical point.  Like McNelis, two other PPL employees, R.S. and S.W., were also the subject of mandatory referrals to the BOP for performance-related and/or behavioral issues.  Both individuals <u>self-reported</u> fitness-for-duty concerns, and both were retained.  *See infra* section VIII.B.2.

47

conversation with Gorman, McNelis voluntarily admitted himself to the psychiatric ward at Geisinger, whereupon "sleeplessness" as well as "1-2 weeks of paranoid thoughts" and "questionable auditory hallucinations" all were noted on an initial evaluation form signed by McNelis.  (J.A.-214/697, ¶¶70-72).  Even if he was unsure as to the cause, it is evident that McNelis was well-aware of his symptoms.  (*Id.*, *see also* J.A.-725, ¶¶7-9).

Furthermore, regardless of whether his symptoms were the result of fatigue or some other cause, it is beyond reasonable dispute that his erratic behavior and paranoid delusions constituted a potential "risk to public health and safety or the common defense and security."  10 C.F.R. §26.33.  NSOs are armed with semi-automatic weapons and, among other things, are responsible for use of potentially deadly force to neutralize threats.  (J.A.-207-208/695, ¶¶31-32).  It is self-evident that a failure to distinguish between legitimate and illegitimate threats as a result of paranoia could have tragic consequences.  *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 628 (1989) (observing that "persons who have routine access to dangerous nuclear power facilities … can cause great human loss before any signs of impairment become noticeable to supervisors or others") (citations omitted).

In retrospect, McNelis admits that he should have notified PPL and not been permitted to work.  (J.A.-410, at 95:25-96:3).  McNelis' wife agrees that McNelis

was suffering from episodes of paranoid delusion, and that his judgment was impaired. (J.A.-410, at 23:18-20; J.A.-412, at 32:5-7; and J.A.-414, at 38:8-13). Yet, when presented with the opportunity to self-report his known state of impairment to Gorman, McNelis did not. (J.A.-212-213/697, ¶¶62-68; and J.A.-216/698, ¶83; *see also* J.A.-720, at 110:18-113:1). McNelis also failed to self-report his condition in his conversation with Lear. (J.A.-215/697, ¶¶76-77; *see also* J.A.-720-721, at 113:17-115:8; and J.A.-725, ¶13).

In sum, McNelis acknowledged that his symptoms began 1-2 weeks prior to his hospital admission date. Yet, it is undisputed that McNelis never told Gorman—or anyone else at PPL—about his symptoms or any fitness-for-duty concerns until several days *after* he had been released from the inpatient psychiatric ward, and only then because he had been referred to the BOP. (J.A.-519-20). Gorman was aware of the reports of McNelis' behavior because he was briefed by Martonick on April 16. (J.A.-211/697, ¶56). Gorman even asked McNelis to tell him "what's going on" during their April 17, 2012 telephone conversation. (J.A.-659/700, ¶42). Later, Gorman learned from Lines that Dr. Thompson had deemed McNelis not fit for duty. (J.A.-222/700, ¶121). Gorman's conclusion that McNelis had not been forthcoming in their April 17, 2012

telephone conversation was therefore not only logical, but accurate.[27]    (J.A.-222/700, ¶122).

McNelis argues that if Gorman truly believed he had been evasive in their telephone conversation, the termination decision should have been made at the time of the call on April 17 (or shortly thereafter).   Had Gorman done so, however, as opposed to waiting for Dr. Thompson to confirm the existence of disqualifying fitness-for-duty issues that should have been self-reported, McNelis would argue pretext because Gorman acted prematurely.   Instead of jumping to conclusions, Gorman let the BOP process run its course and followed PPL policy by relying upon the clinical judgment of a trained professional.   Helsel was of the same opinion, as he testified that he "would expect that [BOP] process to be completed." (J.A-248, at 55:5-56:14).

Gorman is not required to make contemporaneous notes of his reasoning, and McNelis' argument that one piece of documentation regarding his termination references only the loss of UAA overlooks the fact that the SEARP Panel Preparation Checklist set forth the additional reason.   (J.A.-515-517) (stating that,

---

[27] McNelis' argument that Lines did not find McNelis to be evasive is simply not relevant because Lines played no role in the termination decision.   (J.A.-222/700, ¶120; *see also* J.A.-387, at 83:8-25).   For the same reason, any conversation between Lines and Dr. Thompson regarding a purported "new" policy that Lines thought might have impacted Gorman's decision to terminate McNelis' employment is not relevant. In any event, Lines denied that Gorman had conveyed any change in policy, and it is unclear what Lines might have meant by that remark because he was never asked about it.   (J.A.-392, at 101:7-16).

during the call with Gorman, McNelis "was not forthright in providing information and did not want to address the issues identified and reported on 4/16/12…."). Further, Helsel testified that McNelis' failure to self-report his fitness-for-duty issues was not only discussed at the SEARP but was considered "the bottom line." (J.A-246, at 46:14-24).

While McNelis argues that he was not evasive on April 17, it is Gorman's perception that matters, and Gorman had legitimate reasons to believe that McNelis knowingly failed to self-report significant fitness-for-duty issues about which he (McNelis) was well-aware. "A successful pretext claim requires evidence that the employer actually based its decision on reasons other than those given." *Harding v. CareerBuilder, LLC*, 168 F. App'x 535, 538 (3d Cir. 2006). For all of the foregoing reasons, notwithstanding McNelis' professed innocence, he cannot show that Gorman's proffered reasons for the termination decision were insincere, or even illegitimate.

### 2.    R.S. and S.W. Are Not Proper Comparators

The only alleged comparators identified by McNelis, R.S. and S.W., are easily distinguished and underscore PPL's entitlement to summary judgment. Like McNelis, both individuals were the subject of mandatory referrals to the BOP for performance and/or behavioral anomalies. Both individuals exhibited significant emotional stressors and/or mental health issues. (J.A.-1465-1468) (R.S. exhibited

depression/anxiety, and marital stress issues); (J.A.-1476-1480) (S.W. exhibited adjustment disorder, post-traumatic stress disorder, stress, depression, and family issues). To the extent McNelis contends that he was discharged because PPL regarded him as having a psychiatric impairment,[28] both R.S. and S.W. are in the same protected class and the fact that both individuals were retained undercuts his position.

Critically, however, both R.S. and S.W. self-reported their personal circumstances and FFD concerns. (J.A.-1464) (contrary to McNelis, when asked whether anything non-obvious contributed to certain performance issues, R.S. recited personal circumstances and voluntarily confessed his fitness-for-duty concerns); (J.A.-1474) (reflecting that S.W. self-reported various issues and concerns). The fact that PPL employed both pending completion of their required regimen of mental health treatment and permitted both to re-apply for UAA following successful completion of the same lends credence to Gorman's stated reasons for the differential treatment of McNelis—*i.e.*, the distinguishing factor was Gorman's legitimate concerns regarding McNelis' trustworthiness. (*Accord* J.A.-246, at 45:20-46:24).

McNelis' contention that R.S. disclosed his FFD concerns only after he had been referred to the BOP is false. (McNelis Brief, at 44 n.13). To the contrary, the

---

[28] As noted *supra*, any claims that PPL regarded McNelis as an alcoholic or as having a psychiatric disability have been waived.

BOP referral for R.S. reflects that he volunteered his FFD concerns to his supervisors in a meeting convened to address his declining work performance. (J.A.-1464). The BOP referral, which was completed at R.S.'s request, references the earlier meeting. *Id.* Likewise, the BOP referral completed for S.W. reflected that she was referred to the BOP <u>because</u> she self-reported her FFD concerns, not the other way around. (J.A.-1474). S.W. was assured that "she was doing the right thing by bringing her feelings to light." *Id.* By contrast, McNelis never told Gorman on April 17, 2012—or anyone else at PPL—about his symptoms until several days *after* he had been released from Geisinger's inpatient psychiatric ward, and only then because he had been referred to the BOP.

### 3.    Dr. Thompson's Reports are Consistent and Not Pretextual

McNelis' next attempt to manufacture a fact dispute centers on his theory that Dr. Thompson "changed" his report the day after two PPL employees discussed McNelis' rumored use of bath salts. Dr. Thompson prepared two separate reports, however, because he wore two hats during the BOP process. (J.A.-207/695, ¶26; *see also* J.A.-1375, at §4.14.3(e)(7)). Dr. Thompson's Confidential Psychological Interview Memo, which was completed on April 30, 2012, concluded that McNelis' UAA should remain "**<u>ON-HOLD</u> PENDING DETERMINATION OF FITNESS**." (J.A.-549) (emphasis in original). Dr. Thompson's SAE Determination of Fitness, which was completed on May 1, 2012,

determined that McNelis was "**<u>NOT</u>** fit for duty." (J.A.-556-557) (emphasis in original). Dr. Thompson therefore did not "change" his determination and, as recognized by the District Court, his conclusions are not inconsistent. (J.A.-63-64; J.A.-111).

PPL employee Mick Steward discussed McNelis' rumored use of bath salts with Lear on April 30, 2012. (J.A.-668, ¶119). McNelis acknowledges in his own SAMF that Lear never communicated those rumors to <u>anyone</u>, much less Dr. Thompson. (J.A.-661, ¶119; J.A.-669, ¶123; and J.A.-678, ¶189). Lear did not report this conversation to management because McNelis' site access was already on hold and was being managed through the APF. (J.A.-494-495, at 28:21-29:15; and J.A.-496, at 33:6-19).

Also, there were prior allegations of drug use on the part of McNelis—on February 4, 2010 as well as April 18, 2012. (J.A.-906-907; J.A.-777; and J.A.-661, ¶57). Despite his contention that a jury had not yet found "that [Dr.] Thompson was initially informed of the drug use by Lines" (McNelis Brief at 46), McNelis asserted in his own SAMF that Lines told Dr. Thompson about the prior allegations that McNelis was using bath salts. (J.A.-667, ¶106). The District Court was correct that it is patently illogical to suggest that a new allegation, which was communicated only to Lear, somehow triggered an abrupt reversal in Dr. Thompson's clinical determination. In any event, McNelis' theory is undercut by

Dr. Thompson unrebutted testimony that "PPL did not in any way attempt to influence or interfere with" his clinical evaluations or determinations of fitness-for-duty. (J.A.-1325-1327, ¶7).

While McNelis protests that "disputed facts" were not resolved in his favor, the facts relied upon by the District Court were all either admitted or asserted by McNelis. His real argument is that the District Court refused to view an otherwise logical progression of events as inherently suspicious and therefore indicative of pretext. (McNelis Brief, at 45-46). But if an employer's actions are always inherently suspicious, regardless of whether they are rational or irrational, then it is simply not possible to win summary judgment.

Contrary to McNelis' suggestion, resolving inferences in favor of the non-moving party does not require that a court discard common sense and engage in metaphysical supposition or conspiracy theorism. Instead, the relevant question is whether the record might "lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). McNelis' irrational arguments do not suffice. For these reasons, the District Court's Order should be affirmed and judgment entered in favor of PPL.

### C.    McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Jeff Helsel

According to the uncontradicted deposition testimony of Jeff Helsel, the school lockdown was not a stated basis for the termination decision and was not a topic of discussion at the SEARP.  (J.A.-262, at 33:3-35:1).  In addition, Helsel testified that there was no discussion at the SEARP regarding suspected use of bath salts by McNelis.   (J.A.-266, at 49:21-50:4).   Finally, Helsel corroborated Gorman's proffered rationale for the termination decision, by explaining that the SEARP permitted the termination decision to stand because:

> …this employee, Mr. McNelis, had the opportunity to report his fitness for duty issues, and that ultimately our psychologist took away his access.  He was not forthright with that information, and there was a potential that there could be a safety risk for us in protecting the health and safety of the public.  That's the bottom line.

(J.A-246, at 46:14-24).  Given the above, it is not surprising that McNelis seeks to impeach Helsel's testimony.

Like many before him, however, McNelis misreads the scope of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  This Court has recognized that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness."  *Acosta v. Hovensa LLC*, 529 F. App'x 297, 301 (3d Cir. 2013) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480

F.3d 259, 272 (3d Cir. 2007)).[29]   In doing so, this Circuit joined with the other

Courts of Appeal.  *See, e.g., Woods v. Delta Air Lines Inc.*, 595 F. App'x 874, 879-

880 (11th Cir. 2014) ("We do not read [*Reeves*] to preclude summary judgment

where the employer relies on the uncontradicted sworn statements of its

decisionmaker employees."); *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 856

(1st Cir. 2008) ("At summary judgment we need not exclude all interested

testimony, specifically testimony that is uncontradicted by the nonmovant."); *Luh*

*v. J.M. Huber Corp.*, 211 F. App'x 143, 146 (4th Cir. 2006) (refusing to disbelieve

testimony of employer's witnesses unless the testimony displays "some indicia that

it is not credible—whether by betraying a lack of candor, or by being unsettled by

cross-examination, or by being contradicted by proof or circumstance") (citation

and internal quotations omitted); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 598

(6th Cir. 2005).

    As noted by the Sixth Circuit in *Stratienko*, a rule barring an interested

witness's testimony would "lead[] to absurd consequences because defendants will

often be able to respond only through the testimony of their employees." 429 F.3d

at 598 (quotation marks omitted).  If *Reeves* adopted such a requirement, as

---

[29] Other opinions of this Court cited by McNelis did not construe *Reeves*.  Two merely cited *Reeves* for the standard.  *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) and *Armour v. County of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001).  And the third mentioned *Reeves* in a footnote, only after first explaining that the case involved contradictory evidence.  *Hill v. City of Scranton*, 411 F.3d 118, 132 n.22 (3d Cir. 2005).  These cases do not invalidate *Lauren W.*

McNelis suggests, it would be entirely pointless for an employer to file a summary judgment motion in an employment discrimination case because the plaintiff could always defeat the motion simply by arguing that a jury is not required to believe anything the employer says. McNelis' suggested approach would also eviscerate the plaintiff's burden under Fed.R.Civ.P. 56(c) to adduce evidence showing a genuine dispute for the trier of fact. Thus, McNelis cannot oppose summary judgment by suggesting the mere possibility that a juror might disbelieve a particular witness. Instead, he must show that the testimony is "inherently implausible." *Lauren W.*, 480 F.3d at 272.

McNelis concedes that he cannot impeach or directly contradict Helsel's testimony. (McNelis Brief, at 49). Instead, he argues that Helsel should be discredited simply because McNelis has purportedly offered general "evidence of pretext[,] which call [sic] into question PPL's actions and intent in this case." *Id.* at 50. This argument puts the cart before the horse, because it presumes that McNelis has offered plausible evidence of pretext, which he has not. Moreover, McNelis' pretext arguments do not relate in any way to Helsel, or tend to show that Helsel's testimony is inherently implausible.

The one "very specific area of pretext" cited by McNelis in an attempt to discredit Helsel concerns Martonick's decision to include in the SEARP Panel Preparation Checklist a reference to the 2010 anonymous report of unspecified

drug use by McNelis.   This, according to McNelis, shows that "Martonick, Gorman, and Lines really *were* worried about the bath salts rumors."  (McNelis Brief, at 50) (emphasis in original).  McNelis thereupon presumes that his rumored use of bath salts must have been discussed at the SEARP, which means that Helsel must be lying when he said that it was not.

First, the SEARP Panel Preparation Checklist does not reference bath salts at all.  (J.A.-515-517).   Second, McNelis' contention that Martonick decided to reference the 2010 anonymous report of <u>unspecified</u> drug use received through the Pennsylvania Emergency Management Agency[30] "in light of the more recent unsupported allegations of McNelis' recent, illegal use of bath salts" is false and unsupported by the record.  (*Compare* McNelis Brief at 50 *with* J.A.-452, at 67:4-19)  Instead, Martonick was clear that he included the reference—under a heading that directs the author to "specify the worker's history"—because he considered it to be "an important piece of [McNelis'] history" not because of any allegations of "recent, illegal use of bath salts."  (*Id.*; *see also* J.A.-516-517).   There is also no evidence that Martonick included the reference "[a]t Gorman's behest."  (McNelis Brief, at 14).   Third, the anonymous EMA report is not part of the "problem

---

[30] McNelis suggests that the 2010 anonymous report received through the Pennsylvania Emergency Management Agency had been "discredited" and "rejected by PPL."  (McNelis Brief, at 14, 23).   While the report was in fact deemed "not credible" and no further investigation taken because it was submitted anonymously, it is nevertheless misleading to suggest that the report was "discredited" or "rejected." (J.A.-208/696, ¶36).

identified" on the SEARP Panel Preparation Checklist, nor was it the basis for the termination recommendation. (J.A.-515-517). And fourth, the SEARP did not even review the SEARP Panel Preparation Checklist. (J.A.-223/701, ¶127). In fact, McNelis has no evidence that Helsel was <u>ever</u> made aware of McNelis' rumored use of bath salts, and Helsel denied knowledge of the same. (J.A.-244, at 38:19-39:2; and J.A.-247, at 49:21-50:4). The SEARP Panel Preparation Checklist therefore does not undermine Helsel's testimony that the SEARP did not discuss McNelis' rumored use of bath salts. (J.A.-243, at 33:3-35:1).

McNelis failed to adduce evidence that his rumored use of bath salts played any role in, or was even raised in the context of, the termination decision and his repeated bald assertions that it was cannot defeat summary judgment. McNelis does not even argue, much less offer evidence, that the discharge decision was motivated by misperception of McNelis as an alcoholic or as having a psychiatric disability (and, as noted *supra*, these theories have been waived). For the reasons set forth above, the District Court's Order should be affirmed and judgment entered in favor of PPL.

**D.    McNelis Failed to Create a Fact Dispute Regarding the Uncontradicted Testimony of Dr. Thompson**

McNelis admitted at his deposition that he had no evidence to indicate that Dr. Thompson did not act in good faith and/or in the exercise of his best medical judgment. (J.A.-221/699-700, ¶114). The District Court did not consider

McNelis' testimony on that issue alone to be dispositive, however. (J.A.-43-44, at n.10; and J.A.-62-65; 112 at n.60). The District Court also held that McNelis failed to discredit Dr. Thompson because he failed to offer any evidence to challenge Dr. Thompson's motives and/or clinical judgment. *Id.*

McNelis' continued misapplication of *Reeves* is even more pronounced with regard to Dr. Thompson because he is not a "defense witness." (McNelis Brief, at 56 n.18). Despite his mis-characterization of Dr. Thompson as "one of PPL's psychologists" (McNelis Brief at 10) or a "company psychologist" (McNelis Brief, at 36 n.11), it is uncontested that Dr. Thompson is an independent, contracted professional who is not a PPL employee, nor is he under PPL's control. (J.A.-205-206/695, ¶¶21, 24, and J.A.-217/698, ¶¶90-91). Furthermore, Dr. Thompson provided a sworn statement that "PPL did not in any way attempt to influence or interfere with" his clinical evaluations or determinations of fitness-for-duty. (J.A.-1325-1327, ¶7). Dr. Thompson's testimony is not inherently implausible and McNelis failed to adduce anything other than unfounded allegations to impeach Dr. Thompson's credibility. *See* Fed.R.Civ.P. 56(e)(2).

## IX.    **CONCLUSION**

For all of the foregoing reasons, Appellee respectfully requests that this Court affirm the District Court's September 19, 2016 Order in all respects.


Respectfully submitted,

**POST & SCHELL, P.C.**

BY:    */s/ Darren M. Creasy*
       A. James Johnston, Esquire
       Darren M. Creasy, Esquire

       Counsel for Appellee

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to L.A.R. 28.3(d) and 46.1(e), I, A. James Johnston, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.


Dated:  <u>February 22, 2017</u>        <u>/s/ A. James Johnston</u>
                                    A. JAMES JOHNSTON, ESQUIRE



Pursuant to L.A.R. 28.3(d) and 46.1(e), I, Darren M. Creasy, certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.


Dated:  <u>February 22, 2017</u>        <u>/s/ Darren M. Creasy</u>
                                    DARREN M. CREASY, ESQUIRE

## **CERTIFICATION OF COMPLIANCE**
## **WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Brief contains 12,997 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).  In preparing this certification, I relied on the word-processing system used to prepare the foregoing Brief.  The foregoing Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  <u>February 22, 2017</u>        <u>/s/ Darren M. Creasy        </u>
                                             DARREN M. CREASY, ESQUIRE

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that I served two (2) true and correct copies of the foregoing

Brief, by mail, upon the following on the date indicated.

**Ralph Lamar, Esquire**
**The Law Office of Ralph Lamar**
**8515 Braun Loop**
**Arvada, CO 80005**

**Marc E. Weinstein, Esquire**
**Weinstein Law Firm, LLC**
**One Northbrook Corporate Center**
**1210 Northbrook Drive**
**Suite 280**
**Trevose, PA 19053**

**Attorneys for Appellant Daryle R. McNelis**

I further certify that on <u>February 22, 2017</u> the foregoing Brief was

electronically filed with the Court.

Seven (7) hard copies of the Brief were sent to the office of the Clerk of Court,

by first-class mail, on <u>February 22, 2017</u>.

/s/ Darren M. Creasy
DARREN M. CREASY, ESQUIRE

## **CERTIFICATION OF VIRUS CHECK**

I hereby certify that the foregoing Brief of Appellee was scanned for viruses by Sophos antivirus scan software, version 10.3, on <u>February 22, 2017</u>, and no viruses were detected.

Dated: <u>February 22, 2017</u>          /s/ Darren M. Creasy
                                   DARREN M. CREASY, ESQUIRE

## <u>CERTIFICATION OF IDENTICAL BRIEFS</u>

Pursuant to Third Circuit Local Rule 31.1(c), it is hereby certified that the text of this electronically filed Brief and the text of the "hard" copies of the Brief filed with the Court and served on the Appellant are identical.


Dated: <u>February 22, 2017</u>          <u>/s/ Darren M. Creasy</u>
                                                          DARREN M. CREASY, ESQUIRE